NON-CONFIDENTIAL

Nos. 25-1628 & 25-1629

# United States Court of Appeals for the Federal Circuit

PANTECH CORPORATION, PANTECH WIRELESS, LLC,

Plaintiffs-Cross-Appellants

v.

ONEPLUS TECHNOLOGY (SHENZHEN) CO., LTD.,

Defendant-Appellant

―――――――――――――――

On Appeal from the United States District Court for the Eastern District of Texas, No. 5:22-cv-00069, Hon. Robert Schroeder III

―――――――――――――――

## OPENING BRIEF OF DEFENDANT-APPELLANT ONEPLUS TECHNOLOGY (SHENZHEN) CO., LTD.

―――――――――――――――

Brian Bieluch
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
(424) 332-4798
bbieluch@cov.com

Ruixue Ran
COVINGTON & BURLING LLP
2301 Tower C Yintai Centre
2 Jianguomenwai Avenue
Beijing, China 100022
+86 (10) 5910 0511
rran@cov.com

Richard L. Rainey
  *Principal Counsel*
Kevin B. Collins
Peter A. Swanson
Matthew Kudzin
Justin W. Burnam
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000
rrainey@cov.com
kcollins@cov.com
pswanson@cov.com
mkudzin@cov.com
jburnam@cov.com

July 24, 2025

*Counsel for Defendant-Appellant*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 25-1628 & 25-1629

**Short Case Caption** Pantech Corporation v. OnePlus Technology (Shenzhen) C

**Filing Party/Entity** OnePlus Technology (Shenzhen) Co., Ltd.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/24/2025

Signature: /s/ Richard L. Rainey

Name: Richard L. Rainey

i

**FORM 9. Certificate of Interest**

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☐ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| OnePlus Technology (Shenzhen) Co., Ltd. | Guangdong OPPO Mobile Telecommunications Corp., Ltd. | N/A |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

ii

| **4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4). | | |
|---|---|---|
| ☐ None/Not Applicable | ☑ Additional pages attached | |
| Leydig, Voit & Mayer, Ltd. | David M. Airan | Paul J. Filbin |
| | Pei Chen | Christopher James Gass |
| | Leonard Z. Hua | Nicole E. Kopinski |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below)    ☐ No    ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

| **6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6). | | |
|---|---|---|
| ☑ None/Not Applicable | ☐ Additional pages attached | |
| N/A | | |
| | | |

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

**<u>CERTIFICATE OF INTEREST</u>**

**Case Number** 25-1628 & 25-1629

**Short Case Caption** Pantech Corporation v. OnePlus Technology (Shenzhen) Co

**Filing Party/Entity** OnePlus Technology (Shenzhen) Co., Ltd.

---

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

| | | |
|---|---|---|
| Leydig, Voit & Mayer, Ltd. | Wesley O. Mueller | James Sanner |
| | Michael J. Schubert | John K. Winn |
| | Robert T. Wittmann | |
| Mann, Tindel & Thompson | Gregory Blake Thompson | |
| | Andy Tindel | |
| The Mann Firm | James Mark Mann | |

CONFIDENTIAL MATERIAL OMITTED

# TABLE OF CONTENTS

Table of Authorities.................................................................vii

Table of Abbreviations .............................................................xi

Statement of Related Cases ....................................................xii

Jurisdictional Statement............................................................1

Statement of the Issues..............................................................2

Introduction...............................................................................3

Statement of the Case ...............................................................5

I.    Plaintiffs do not own four of the five asserted patents...................8

II.   Plaintiffs try to stretch the '654 patent to cover standard
user interface features. ......................................................11

III.  Plaintiffs' damages analysis is flawed .........................................17

    A.  Dr. Putnam's portfolio-level rates are discriminatory. ..............18

    B.  Dr. Putnam's rate for the '654 patent is arbitrary. ...................20

Summary of the Argument .....................................................24

Standards of Review.................................................................26

Argument..................................................................................27

I.    Plaintiffs lack constitutional standing to assert the
challenged patents. ...........................................................27

    A.  The anti-assignment provisions of the ▮name▮ and ▮name▮
licenses are effective.................................................28

    B.  Pantech Corp. failed to comply with the requirements of
the ▮name▮ and ▮name▮ licenses, rendering the attempted
assignments void *ab initio*. .........................................31

<span style="color:red">CONFIDENTIAL MATERIAL OMITTED</span>

C. The patent purchase agreements between Pantech Inc. and Pantech Corp. do not satisfy the anti-assignment provisions of the ███name███ or ███name███ licenses...............................34

II. Plaintiffs failed to prove that OnePlus infringes the '654 patent........................................................................................40

III. The damages award for the '654 patent is legally flawed. ............48

A. Plaintiffs failed to properly apportion damages for the '654 patent to reflect the value of the patented feature. ...................49

B. OnePlus was entitled to JMOL because Plaintiffs failed to prove a legally sufficient royalty rate for the '654 patent..........53

C. Dr. Putnam's damages theory on the '654 patent should not have been presented to the jury. .....................................56

IV. The damages award for the asserted SEPs is discriminatory and should be vacated. ...................................................................60

A. Dr. Putnam derived his discriminatory royalty rate from litigation settlement agreements, without accounting for the only license that was not the result of a settlement. ...........62

B. There is no evidence supporting the exclusion of the ███name███ and ███name███ licenses from the calculation of the portfolio rate. .......................................................................................64

1. Dr. Putnam was required to consider the ███name███ and ███name███ licenses. .............................................................65

2. Dr. Putnam's reasons for excluding the ███name███ and ███name███ licenses are irrelevant to the non-discriminatory prong.............................................................69

C. The jury's damages award discriminates against OnePlus. .......71

Conclusion ...................................................................................73

# TABLE OF AUTHORITIES

Page(s)

Cases

*Abraxis Bioscience, Inc. v. Navinta LLC,*
   625 F.3d 1359 (Fed. Cir. 2010) ........................................................ 26

*ACCO Brands, Inc. v. ABA Locks Mfrs. Co., Ltd.,*
   501 F.3d 1307 (Fed. Cir. 2007) ........................................................ 26

*Apple Inc. v. Motorola, Inc.,*
   757 F.3d 1286 (Fed. Cir. 2014) ........................................................ 58

*Apple Inc. v. Wi-LAN Inc.,*
   25 F.4th 960 (Fed. Cir. 2022)........................................................... 58

*Au New Haven, LLC v. YKK Corp.,*
   210 F. Supp. 3d 549 (S.D.N.Y. 2016).............................................. 39

*Cambridge Toxicology Grp. v. Exnicios,*
   495 F.3d 169 (5th Cir. 2007)............................................................ 26

*Commonwealth Sci. & Indus. Rsch. Organisation v. Cisco
Sys., Inc.,* 809 F.3d 1295 (Fed. Cir. 2015) ..................................... 56

*Daubert v. Merrell Dow Pharms., Inc.,*
   509 U.S. 579 (1993)......................................................................... 59

*Dowagiac Mfg. Co. v. Minnesota Moline Plow Co.,*
   235 U.S. 641 (1915)......................................................................... 49

*EcoFactor, Inc. v. Google LLC,*
   137 F.4th 1333 (Fed. Cir. 2025)........................................... 26, 59, 63

*Enovsys LLC v. Nextel Commc'ns Inc.,*
   614 F.3d 1333 (Fed. Cir. 2010) ....................................................... 28

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Products.
Group, LLC,* 879 F.3d 1332 (Fed. Cir. 2018)............................. 57, 58

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
879 F.3d 1299 (Fed. Cir. 2018) ............................................... 50, 55, 73

*Garretson v. Clark*,
111 U.S. 120 (1884) ...................................................................... 25

*Hanson v. Alpine Valley Ski Area, Inc.*,
718 F.2d 1075 (Fed. Cir. 1983) ........................................................ 63

*Intell. Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.*,
248 F.3d 1333 (Fed. Cir. 2001) ........................................................ 26

*Intell. Tech LLC v. Zebra Techs. Corp.*,
101 F.4th 807 (Fed. Cir. 2024) ........................................................ 27

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
694 F.3d 51 (Fed. Cir. 2012) .................................................... *passim*

*Lucent Techs., Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009) ........................................................ 55

*Omega Pats., LLC v. CalAmp Corp.*,
13 F.4th 1361 (Fed. Cir. 2021) ................................................. *passim*

*Optis Cellular Tech., LLC v. Apple Inc.*,
139 F.4th 1363 (Fed. Cir. 2025) .......................................... 60, 64, 73

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
904 F.3d 965 (Fed. Cir. 2018) ......................................................... 54

*Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru*,
109 F.3d 850 (2d Cir. 1997) ........................................................... 39

*Promega Corp. v. Life Techs. Corp.*,
875 F.3d 651 (Fed. Cir. 2017) .................................................... 56, 73

*Renfrew Ctr. v. Blue Cross & Blue Shield of Central N.Y., Inc.*,
1997 WL 204309 (N.D.N.Y. Apr. 10, 1997) ........................................ 30

*Schwendimann v. Arkwright Advanced Coating*,
959 F.3d 1065 (Fed. Cir. 2010) ....................................................... 28

*Se. Chester Cty. Refuse Authority v. BFI Waste Servs. of Pa.,
LLC,*
  2017 WL 2799160 (Del. Super. Ct. June 27, 2017) ........................... 29

*Spinex Labs. Inc. v. Empire Blue Cross & Blue Shield,*
  622 N.Y.S.2d 154 (N.Y. App. Div. 1995) ............................................. 30

*TCL Commc'n Tech. Holdings, Ltd. v.
Telefonaktiebolaget LM Ericsson,*
  2018 WL 4488286 (C.D. Cal. Sept. 14, 2018) ........................... *passim*

*TecSec, Inc. v. Adobe Inc.,*
  978 F.3d 1278 (Fed. Cir. 2020) ................................................... 56, 73

*Univ. of S. Fla. Rsch. Found., Inc. v. Fujifilm Med. Sys.
U.S.A., Inc.,*
  19 F.4th 1315 (Fed. Cir. 2021) ........................................................... 27

*Virnetx, Inc. v. Cisco Sys., Inc.,*
  767 F.3d 1308 (Fed. Cir. 2014) ................................................... 25, 54

*Vogler v. Blackmore,*
  352 F.3d 150 (5th Cir. 2003) ............................................................. 60

*W. Palm Beach Firefights' Pension Fund v. Moelis & Co.,*
  311 A.3d 809 (Del. Ch. 2024) ........................................................... 33

*In re Woodbridge Grp. of Cos., LLC,*
  590 B.R. 99 (Bankr. D. Del. 2018) .............................................. 29, 33

*In re Woodbridge Grp. of Cos., LLC,*
  606 B.R. 201 (D. Del. Sept. 11, 2019) .................................... 28, 29, 32

## Other Authorities

Fed. R. Evid. 408(a) .......................................................................... 64

Fed. R. Evid. 702 ...................................................................... 56, 59

## CONFIDENTIAL MATERIAL OMITTED

The names of licensees of the asserted patents are redacted on pages 2, 5, 9, 10, 18, 19, 24–36, 38, 39, 61–67, and 69–72.

The material redacted on pages 9 and 10 are quotations from the assignability provisions of certain licenses. The material redacted on page 19 describes the financial terms of the Sony settlement. The same material is also redacted on page 63. The material redacted in the footnote on page 19 describe the royalty rates paid by certain licensees. The material redacted on page 24, 29, and 30 are quotations from the assignability provisions of certain licenses. The material redacted on page 35 are quotations from the confidentiality provisions of certain licenses. The material redacted on page 36 are quotations from the assignability and confidentiality provisions of certain licenses. The material redacted on page 38 are quotations from certain licenses. The material redacted on page 65 reflects the amounts paid by certain licensees. The material redacted of page 66 identifies certain licensees by their market share. The material redacted on page 71 and 72 reflects the amount paid by certain licensees.

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| '052 patent | U.S. Patent No. 8,893,052 |
| '247 patent | U.S. Patent No. 10,869,247 |
| '654 patent | U.S. Patent No. 9,063,654 |
| '839 patent | U.S. Patent No. 9,548,839 |
| '954 patent | U.S. Patent No. 11,012,954 |
| challenged patents | the '052, '654, '839, and '954 patents, collectively |
| FRAND | fair, reasonable, and non-discriminatory |
| GoldPeak | GoldPeak Innovations Inc. |
| NEP | non-essential patents |
| OnePlus | Defendant-Appellant OnePlus Technology (Shenzhen) Co., Ltd. |
| Pantech Corp. | Plaintiff-Cross-Appellant Pantech Corporation |
| Pantech Wireless | Plaintiff-Cross-Appellant Pantech Wireless LLC |
| PPA | patent purchase agreement |
| SEP | allegedly standard-essential patents |

## STATEMENT OF RELATED CASES

No appeal has previously been taken in this action in any court of appeals. On July 2, 2025, Plaintiff-Cross-Appellant Pantech Corp. filed a Complaint in the United States International Trade Commission ("ITC") asserting the '839 patent, one of the patents at issue in this appeal. *In the Matter of Certain Mobile Cellular Communications Devices*, Inv. No. 337-TA-____, ITC Docket No. 3835. The ITC has not decided whether to institute an investigation.

On July 3, 2025, Pantech Corp. filed a new patent infringement action in the Eastern District of Texas asserting four patents, including the '839 patent. *Pantech Corp. v. OnePlus Technology (Shenzhen) Co. Ltd.*, Case No. 5:25-c-89-RWS-JBB (E.D. Tex.).

The U.S. Patent and Trademark Office has instituted *ex parte* reexaminations of two of the patents asserted in this case. On March 31, 2025, the examiner issued a final office action in reexamination 90/019,559 rejecting all asserted claims of the '654 patent. On July 14, 2025, the examiner issued a final office action in reexamination 90/019,726 rejecting all asserted claims of the '954 patent.

# JURISDICTIONAL STATEMENT

This appeal arises from a patent infringement action filed in the United States District Court for the Eastern District of Texas. The jurisdiction of the district court was predicated on 35 U.S.C. §§ 1331 and 1338(a). The district court entered final judgment on January 23, 2025. Appx211. Defendant-Appellant OnePlus Technology (Shenzhen) Co., Ltd. ("OnePlus") timely appealed on February 21, 2025. Appx53627. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

CONFIDENTIAL MATERIAL OMITTED

# STATEMENT OF THE ISSUES

I.   Whether Plaintiffs lacked constitutional standing to assert the '654, '052, '839, and '954 patents because the attempted patent assignments to Plaintiff Pantech Corp. were "null and void";

II.  Whether OnePlus is entitled to judgment of noninfringement of the '654 patent, where Plaintiffs presented an infringement theory that is contrary to the district court's claim construction;

III. Whether Plaintiffs violated the requirement of apportionment by summarily assigning the '654 non-essential patent the same royalty rate as the '247 patent, which Plaintiffs claim is the most valuable asserted SEP;

IV.  Whether Plaintiffs failed to present evidence of royalty rates for the '839, '247, and '954 patents that are "fair, reasonable, and non-discriminatory" ("FRAND"), where Plaintiffs' proposed rates do not account for the significantly lower amounts paid by two OnePlus competitors, ▮name▮ and ▮name▮.

## INTRODUCTION

In a first trial, the jury found that OnePlus's smartphones infringe five patents, including three allegedly standard-essential patents ("SEPs"), and awarded over $10 million in damages—nearly seven times what Plaintiffs' damages expert claimed Plaintiffs were entitled to. The district court granted a new trial on damages because the record did not support the jury's award, and it granted judgment as a matter of law of noninfringement as to one patent. In a second trial, the jury awarded a total of $1 million in damages. Because Plaintiffs are not entitled to any relief in this case, the judgment cannot stand.

*First*, the district court lacked jurisdiction over Plaintiffs' claims as to four of the five asserted patents because Plaintiffs do not own the patents. Plaintiff Pantech Corp. allegedly purchased the '654, '052, '839, and '954 patents in May 2020. But in 2018 and 2019, the owners of the patents entered into license agreements that restricted their ability to assign the patents. The licenses require any future assignee to execute a written agreement to be bound by all of the terms and conditions of the licenses. Plaintiffs did not execute the required agreements. Under the

clear and unambiguous terms of the licenses, the attempted assignments are "null and void." Appx42696; Appx42793.

*Second*, Plaintiffs failed to prove infringement of the '654 patent. That patent is directed to a graphical user interface and requires that a certain popup be removed if it is "not selected within a reference period of time." Appx387, 11:24-26. Plaintiffs identified the phone's inactivity timer as the alleged "reference period." Under the district court's claim construction, Plaintiffs had to prove that the timer represented "the time the second object is displayed." Appx121. They did not do so.

*Third*, the damages proffered by Plaintiffs were based on legally flawed theories. With respect to the '654 non-essential patent ("NEP"), Plaintiffs' damages expert arbitrarily assigned that patent the same royalty rate that he had testified was appropriate for the SEP that he considered most valuable—the '247 patent—even though no expert at trial compared the merits of these two completely different patents. As a result, Plaintiffs failed to prove a royalty rate reflecting only the "value added by [the patented] features" of the '654 patent. *Omega Pats., LLC v. CalAmp Corp.*, 13 F.4th 1361, 1376 (Fed. Cir. 2021).

CONFIDENTIAL MATERIAL OMITTED

With respect to the asserted SEPs, Pantech failed to prove damages that meet the "non-discriminatory" requirement of FRAND. At trial, their damages expert specifically declined to account for prior licenses to █name█ and █name█ in his proposed royalty rates. The upshot is that the jury's damages award requires OnePlus to pay much higher royalties than the two dominant players in the U.S. smartphone market. Plaintiffs' FRAND obligation bars such discrimination absent proof that █name█ and █name█ are not "similarly situated" to OnePlus—a showing that Plaintiffs and their damages expert failed to make.

## STATEMENT OF THE CASE

In this litigation, Plaintiffs have accused OnePlus's smartphones of infringing five patents.[1] Three of the patents—the '839, '954, and '247 patents—relate to the low-level communications between cell phones and cell towers. Plaintiffs claim that these are standard-essential patents that are necessarily practiced by any mobile device operating on a modern cellular network. According to Plaintiffs, the '839 patent is essential to the 4G standard, the '247 patent is essential to the

---

[1] The amended complaint asserted eight patents. Appx406, ¶ 14. Three were dropped before trial and are not relevant to this appeal.

5G standard, and the '954 patent is essential to both the 4G/LTE and 5G standards. Appx51709.

The other two patents, the '654 patent and the '052 patent, are not standard essential and are not directed to aspects of cellular communications. Instead, these patents relate to user interfaces for mobile devices. The '052 patent relates to the use of "gestures," such as "swiping left," to operate a mobile device. Appx350, 1:16-20. The '654 patent addresses problems in accurately selecting buttons on small touchscreen displays. Appx382, 1:43-51.

A jury trial was held in March 2024. The jury found that OnePlus infringed all five patents and that the asserted claims of the '654 and '052 patents were not invalid. Appx141-146. The jury awarded $7.41 million in damages for infringement of the three SEPs and $2.85 million in damages for the two NEPs. Appx144.

The parties filed various post-trial motions. As relevant to the present appeal, the district court:

(i) denied OnePlus's motion to dismiss as to the '654, '052, '839, and '954 patents for lack of standing, while acknowledging that this was a "close issue," Appx151-157;

6

(ii) granted OnePlus's motion for judgment as a matter of law of noninfringement of the '052 patent, but otherwise denied OnePlus's motions on noninfringement and invalidity, Appx157-171; and

(iii) vacated the damages award and ordered a new trial on damages, Appx174-178.

With respect to damages, the court held that there was "no question" that the verdict was excessive and that it was "clearly not supported by the evidence." Appx175. The total award, exceeding $10 million, was "more than seven times the amount supported by the expert testimony of [Plaintiffs' expert] Dr. Putnam." Appx176. The district court further found that the verdict was the result of passion and prejudice. Appx175-176. Plaintiffs' "excessive questions" about foreign litigation were prejudicial because they suggested the jury should "punish OnePlus for its holdout behavior." Appx176. Plaintiffs "inappropriately leveraged this prejudicial evidence during [their] closing arguments to seek punitive damages." *Id.*

In October 2024, the district court held the new trial on damages. The jury awarded a total of $1 million, divided as $739,708.43 for the SEPs and $260,291.57 for the '654 patent. Appx193.

## I.    Plaintiffs do not own four of the five asserted patents.

Plaintiffs did not invent any of the technology in the asserted patents. The '839 patent, for example, is part of a patent family derived from an application originally filed by LG Electronics. Appx406, ¶ 15, n.1. After a series of multiple assignments, the '839 and '954 patents were eventually transferred to GoldPeak Innovations Inc. ("GoldPeak"). *Id.*; Appx407, ¶ 18, n.4. The '247 patent derived from a parent application originally filed by InterDigital Technology Corporation and was transferred to RnB Wireless before being assigned to Pantech Wireless. Appx407, ¶ 20, n.6.

The '654 and '052 patents also passed through multiple hands and were eventually assigned to Pantech Inc. Appx408, ¶ 21, n.7; Appx407, ¶ 19, n.5. Despite the similarity in names, Pantech Inc. has no relationship to the plaintiffs in this case, Pantech Corp. and Pantech Wireless, LLC. At trial, Mr. Yang-Won Jung, a senior vice president of Pantech Corp. testified that his company is "totally unrelated" to Pantech Inc. Appx44596, 306:3-8.

CONFIDENTIAL MATERIAL OMITTED

Pantech Corp. does not own the '654, '052, '839, or '954 patents (collectively, the "challenged patents").[2] It claims to have purchased the challenged patents in May 2020. As alleged in the amended complaint, Pantech Corp. acquired the '654 and '052 patents from Pantech Inc. on May 6, 2020. Appx407-408, ¶¶ 19, 21. Pantech Corp. allegedly acquired the '839 and '954 patents from GoldPeak on May 7, 2020. Appx406-407, ¶¶ 15, 18. Prior to the alleged assignments, however, Pantech Inc. and GoldPeak entered into licensing agreements that limited their ability to assign the patents.

On January 1, 2018, Pantech Inc. and GoldPeak licensed the challenged patents to ██name██. Appx42685-42690, ¶¶ 1.2, 1.3, 2.1, 3.1-3.7. The '052 and '654 patents are expressly identified as licensed "Pantech Patents." Appx42714. The '964 patent is a continuation of U.S. Patent No. 9,054,835, which is a licensed "GoldPeak Patent." Appx42756. The '839 patent is a continuation of the licensed "GoldPeak Patent" U.S. Patent No. 7,894,330. Appx42764. Under the terms of the ██name██ license,

██████████████████████████████████
██████████████ license term ████████████
██████████████████████████████████

---

[2] OnePlus does not dispute that Pantech Wireless owns the '247 patent.

CONFIDENTIAL MATERIAL OMITTED

██████████████████████████████████

license term

██████████████████████████████████

Appx42696, ¶ 7.1. The license further provides that ████████

██████████████████████████████████

license term

████ *Id.*

    On July 5, 2019, Pantech Inc. and GoldPeak licensed the challenged patents to **name**. Appx42784. Like the **name** license, the **name** license expressly restricts the power of the patent owners to assign the challenged patents. As stated in the **name** license,



license term

Appx42793.[3] Under the **name** license, ████████████████

██████████████████████████████████

license term     *Id.*

    Pantech Corp. did not execute the agreements required by either the **name** or **name** license. No agreements were produced in discovery. Representatives of Pantech Corp. and Pantech Inc. testified at

---

[3] The license contains an identical restriction on GoldPeak. Appx42793.

trial that they were unaware of any agreements ever being executed. Appx44625, 37:1-4; Appx44654-44655, 54:17-55:4.

## II.   Plaintiffs try to stretch the '654 patent to cover standard user interface features.

The '654 patent relates to touchscreen mobile devices, such as cell phones. As touchscreens become smaller, the space between buttons shrinks, which can make it difficult to select one specific button. Appx382, 1:26-30 ("If a gap between the target object and surrounding objects is narrow, inaccurate selection of the target object or selection of multiple objects may occur."). The '654 patent attempts to address this problem by giving the user a second chance to select which of the multiple buttons they intended to press.

Figure 4 illustrates the idea. As shown below, the user's finger, represented by the ellipse, covers multiple keys of the on-screen keyboard.



Appx378 (annotated). The phone determines that the user has touched multiple buttons—which the '654 patent calls "first objects"—in this example, the "g", "h", and "b" buttons. The phone therefore displays a selection of larger, more widely spaced buttons—which the '654 patent calls "second objects." The user can select one of the larger buttons to indicate which letter they intended to press. If none of the options is correct, then, after a delay, the phone removes the larger buttons, permitting the user to start over. Appx384, 5:49-55 ("[I]f a second object is not selected within a reference time period after the second object is displayed, the control unit 105 may remove the display of the second object and may return to an idle state for a selection or touch of a firm object.").

Plaintiffs argued that claims 1, 6, and 10 are infringed by the combination of two unrelated features of Google's Android operating system.[4] The first is a "shortcut menu." On an Android device, the home screen displays icons for different applications, any of which may be launched by tapping on the application's icon. But if a user presses and holds down on the icon (also called a "long-press," Appx44787, 464:12-14), Android displays a "shortcut menu" for that application. The following images, taken from a video prepared by Plaintiffs' expert, illustrate this feature.

  

Appx39451.

---

[4] "It is an uncontested fact that the features accused of infringing the '654 patent and '052 patent are implemented by standard Android that are not changed by OnePlus." Appx44784, 461:1-4.

The shortcut menu is unrelated to the problem of small touch screens. There is no confusion as to which icon has been pressed. The phone correctly identified the selected application, as indicated above by the fact that all other icons have been blurred out. Rather than provide the user an option of selecting different icons, Android displays a menu of options associated with the one selected application. The menu is the Android equivalent of right-clicking on a desktop icon in Microsoft Windows.

The second feature is the "inactivity timer." Appx44789, 466:5-14. Android, like virtually all operating systems, locks the device after a period of inactivity. The inactivity timer is unrelated to the size of the screen or the problem of pressing multiple buttons. Plaintiffs' source code expert[5] testified that it is a security feature, "so that if you leave your phone around, somebody else can't just pick it up and start using it." Appx44797, 474:9-17. It also preserves the battery life of the device by

---

[5] Two different experts testified for Plaintiffs with respect to the '654 patent. Dr. Martin Walker reviewed the Android source code but did not offer any opinions on infringement. Appx44786, 463:2-6. Mr. Charles Mauro offered infringement opinions based, in part, on Dr. Walker's source code review.

turning off the display. *Id.* The following images, taken from the video prepared by Plaintiffs' expert, show the operation of the inactivity timer:

  

Appx39451.

As explained by Plaintiffs' experts, when the inactivity timer expires, Android "delivers essentially a blank screen" (above left). After a further delay, the phone displays what plaintiffs' source code expert calls an "idle screen" (above center). Appx44791, 468:3-8. In order to continue using the phone, the user must reenter their password (above right). Appx44827, 504:4-6.

During claim construction, the parties disputed the meaning of the following limitation, which is required by all asserted claims:

> wherein the control unit removes the display of the second object if the second object is not selected within a reference period of time.

Appx387, 11:24-26. As the district court explained in its *Markman*
opinion, "[t]he parties dispute whether this limitation 'encompasses
turning the display off entirely.'" Appx1410. The court agreed with
OnePlus that it does not: "OnePlus[] appears to have the better claim
construction []position that merely having the screen go off or idle after
an arbitrary amount of time would not, by itself, fall within this claim
scope." Appx1411. As the court explained, "nothing in the specification
describes the invention as relating to whether the display is turned off."
*Id.* "Instead, the invention is always described in an environment where
the display is always on." *Id.*

The court therefore adopted a slightly modified version of OnePlus's
proposed construction:

> wherein the control unit removes the display of the second
> object if the second object is not selected within *a reference
> period of time for displaying the second object.*

Appx1411.[6] While OnePlus had suggested that the construction should
clarify that the control unit "selectively removes" the second object, the
district court found the word "selectively" to be unnecessary because
"[t]he inclusion of 'for displaying the second object' sufficiently addresses

---

[6] All emphasis is added unless otherwise noted.

the issue by tying the limitation to not just any time, but the time the second object is displayed." *Id.*

OnePlus moved for summary judgment of noninfringement on the ground that Android's inactivity timer is not "a reference period of time for displaying the second object," which the district court denied. Appx119-122. At the conclusion of Plaintiffs' case in the first trial, OnePlus moved for judgment as a matter of law. The district court carried the motion until after the jury returned its verdict. Appx45304, 834:9-20. When the jury found the '654 patent infringed, OnePlus renewed its motion, which the district court denied. Appx161-163.

## III.   Plaintiffs' damages analysis is flawed

Plaintiffs' damages expert, Dr. Jonathan Putnam, "determine[d] the total damages" by "find[ing] a royalty rate" for each of the asserted patents and "multiply[ing] it" by OnePlus's total accused sales. Appx51045, 337:4-8. His resulting damages figures were $836,591 for the asserted SEPs and $294,383 for the '654 patent, totaling $1,130,974. Appx51046, 338:19-24. This calculation involved identifying (A) portfolio-level royalty rates based on purportedly comparable licenses and (B) individual royalty rates for the asserted patents.

CONFIDENTIAL MATERIAL OMITTED

### A.    Dr. Putnam's portfolio-level rates are discriminatory.

Dr. Putnam first sought to derive portfolio-level rates from purportedly comparable licenses to Plaintiffs' portfolio of over 1800 patents. Appx51047-51046, 339:19-340:3; Appx50872, 205:8-9. In doing so, he expressly declined to account for prior licenses to **name** and **name**, two companies that together make up over 70% of the U.S. smartphone market. Appx51076, 12:17-23; Appx51118, 41:17-23; Appx50928, 39:13-19; Appx51166-Appx51167, 63:11-64:20; Appx42685; Appx42784. These were full-portfolio licenses for approximately **amount** each, entered within two years of one another, reflecting nearly identical effective royalty rates. Appx50920, 31:6-21; Appx50926-50927, 37:6-38:15; Appx51119, 42:5-11; Appx51121, 44:15-21; Appx51168-51170, 65:24-67:10.

Instead, Dr. Putnam relied on settlement agreements licensing Plaintiffs' portfolio to four companies: GNJ, BLU, Coolpad, and Sony. Appx51106-51107, 29:15-30:7; *see* Appx11192; Appx11207; Appx11222; Appx11236. He did so even though all four companies are small players in the smartphone market, Appx51164, 394:11-14; Appx50883:17-21, GNJ and Coolpad exited the market before paying any royalties under

CONFIDENTIAL MATERIAL OMITTED

their agreements, Appx51108, 31:3-17; Appx50885, 7:9-14; Appx51174, 396:15-21; Appx50910-50911, 28:15-29:17; Appx51177-51178, 70:4-71:14, and the Sony agreement states that the lump sum paid "██████

██████████ license term ██████████

██████████████████████████████████

██████████████████" Appx50906-50907, 24:20-25:11; Appx11243. Based on these litigation settlements, Dr. Putnam arrived at royalty rates of 0.50% for Plaintiffs' SEP portfolio and 0.15% for their NEP portfolio. Appx51075, 11:14-24.

Despite testifying that the "non-discriminatory" prong of FRAND "means that you treat similarly situated people similarly," Appx51091, 27:2-3, Dr. Putnam at no point attempted to establish that the licenses on which he relied involved companies similarly situated to OnePlus, or that ██name██ and ██name██ are not similarly situated to OnePlus. The result was a portfolio-level royalty rate far higher than the effective royalty rates reflected in the ██name██ and ██name██ licenses.[7]

---

[7] OnePlus's damages expert calculated effective royalty rates of "██rate██ percent" for the ██name██ license and "██rate██ percent" for the ██name██ license. Appx51168-51170, 65:24-67:10. Dr. Putnam declined to rebut these rates with his own calculations. Appx51119-51121, 42:12-44:24.

**B.    Dr. Putnam's rate for the '654 patent is arbitrary.**

Dr. Putnam next attempted to apportion down "shares of the portfolio" attributable to the asserted patents. Appx51048, 340:11-15; Appx51050, 342:6-10; Appx51092, 28:3-14. For the asserted SEPs, he performed a "forward citation analysis" in which he ranked the SEP families of Plaintiffs' portfolio based on how many times they were cited by the U.S. Patent and Trademark Office and assigned each family a percentage of his SEP portfolio rate. Appx51093-51094, 358:6-359:1; Appx51098-51099, 363:6-364:5. Dr. Putnam's method yielded a rate of 0.075% for the '247 patent, for example. Appx51098-51099, 363:21-364:1.

For the '654 patent, Dr. Putnam did not attempt to calculate its share of his NEP portfolio rate, despite acknowledging that there are "many" NEPs in Plaintiffs' portfolio. Appx51136, 59:6-20. He simply "presented the rate [for this patent] as being the same as the rate for the '247 patent," the SEP to which he had assigned the *highest* royalty rate. Appx51103, 368:1-5; Appx51098, 363:12-17; *see also* Appx45047-45048, 5:21-6:8. This attributed to the '654 patent *one-half* of Dr. Putnam's 0.15% rate for Plaintiffs' entire NEP portfolio. Appx51136-51137, 59:21-60:3; Appx51185, 78:2-18. Dr. Putnam elaborated that he assigned the

'654 patent this rate "on the basis that Mr. Mauro testified that it was commercially essential." Appx51135, 58:18-25. Yet no expert at trial compared the merits of the '654 patent with those of the '247 patent.

Dr. Putnam recognized that he was not qualified to form an understanding of the technical merits of the '654 patent on his own, so he gained his understanding of that patent from Mr. Mauro. Appx51138, 61:1-8; *see also* Appx51117, 40:22-23 ("I'm not competent to evaluate the claims and the technology of individual patents."). But Mr. Mauro did not equate the '654 patent to the '247 patent, or even compare them. Appx51034-51035, 326:14-327:10; Appx51003, 295:12-17. Nor did he provide Dr. Putnam with any opinions about the value of the '247 patent or opine on how its value compares to that of the '654 patent. Appx51035-51036, 327:11-328:1. Indeed, Mr. Mauro admitted that he is not qualified to offer opinions about the '247 patent and had "not looked at that patent." Appx51034, 326:10-16; *see also* Appx50944-50945, 236:4-237:6.

Mr. Mauro testified further that there is *no way* to quantitatively assess the value of the '654 patent. Appx51034, 326:4-7. He specifically declined to "proffer actual financial impact," instead providing "a list of benefits … from the reading of the patent." Appx51032-51033, 324:21-

325:5. Mr. Mauro spoke only to the question of whether the "patent ha[s] value," not how much, Appx51032, 324:23, and offered no opinion on whether there is "any specific value" associated with the infringed feature—i.e., "waiting 15 seconds for a pop-up to be cleared," Appx51029, 321:3-6. Despite stating that this is "an essential" feature, he added that its essentiality depends on "the priorities that the user places on their specific interaction with the phone." Appx51029-51030, 321:7-322:3.

Mr. Mauro also provided no evidence that this popup-clearing feature drives sales of OnePlus phones. Appx51031, 323:2-9. Rather, he testified that "the modern smartphone today is driven by apps" and "[t]he sale of modern smartphones are driven overwhelmingly by the overall usability of the device itself" and "the user's ability to interact with it in a way that is consistent across many different types of applications." *Id.*, 323:10-22. He confirmed that "no individual app ever drives a sale of a smartphone," nor do "features." *Id.*, 323:22-25.

Plaintiffs' SEP technical expert, Dr. Todor Cooklev, also did not compare the '654 patent with the '247 patent. He did not recall having ever even read the '654 patent, and he confirmed that his "analysis does not extend to" that patent and that he "did not analyze" it, let alone

compare it with the '247 patent, Appx50956-50957, 248:21-249:19 ("[W]hy would I have even done that? That's not – that has not been part of my assignment."). Nor did Dr. Cooklev quantify the value of the '247 patent. Appx50941, 233:18-20. And Drs. Cooklev and Putnam did not speak with one another regarding their opinions. Appx50958, 250:5-21; Appx51133, 56:9-14.

* * * * *

Before trial, OnePlus moved to strike Dr. Putnam's damages opinion for the '654 patent, but the district court denied OnePlus's motion, concluding that he had "at least put forth a baseline theory that the '247 [p]atent may be economically comparable" to the '654 patent and that "the degree of comparability between the '247 [p]atent and the ['654 patent] is appropriately left for the jury to decide." Appx86. At the damages retrial, the jury awarded Plaintiffs exactly $1 million in total damages—$260,291.57 for infringement of the '654 NEP and $739,708.43 for infringement of the three asserted SEPs. Appx193. OnePlus moved for judgment as a matter of law that Plaintiffs failed to present legally sufficient evidence to support the damages awards. The district court denied the motions and entered final judgment. Appx195; Appx211-213.

23

CONFIDENTIAL MATERIAL OMITTED

## SUMMARY OF THE ARGUMENT

I. The ███████ and ███████ licenses mean what they say. Any party seeking to acquire the licensed patents must execute written agreements agreeing to be bound by all of the terms and conditions of the licenses. The licenses are equally clear as to the consequences of failing to execute the required agreements: ████████████████████████████████ ████████████████████████████████████████ Appx42696, ¶ 7.1. Pantech Corp. did not execute either of the agreements required by the ███████ and ███████ licenses. Therefore, the attempted assignments of the challenged patents are "null and void." The district court's conclusion that the licenses require only "looser compliance," Appx156, was erroneous.

Absent the attempted assignments, Plaintiffs have *no* exclusionary rights in the challenged patents. Plaintiffs have not suffered any injury-in-fact from OnePlus's alleged infringement and therefore lack even "the irreducible constitutional minimum of standing." *Lujan*, 504 U.S. at 560. As a result, there is no case or controversy as to those patents.

II. Plaintiffs failed to prove infringement of the '654 patent. Android's inactivity timer is not "a reference period of time for displaying

CONFIDENTIAL MATERIAL OMITTED

the second object," as required by the district court's claim construction. The undisputed evidence presented at trial proves that the inactivity time measures how long the user has been inactive—not "the time the second object is *displayed*," which the district court held was necessary to prove infringement. Appx121.

III. This Court mandates that "a patentee must take care to seek only those damages attributable to the infringing features" of an accused product. *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014). Plaintiffs' damages theory for the '654 patent does not do so. Instead, it arbitrarily assigns that patent the proposed royalty rate for the '247 patent, based on the sort of "conjectural" and "speculative" evidence that the law forbids. *Id.* (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)).

IV. Plaintiffs' damages theory for the SEPs failed to present a royalty rate that satisfies the non-discriminatory requirement of FRAND. Ignoring the royalties paid by ▮name▮ and ▮ name ▮, Dr. Putnam relied on cherry-picked settlement agreements to small players, without presenting any evidence as to which of the prior licensees are, and are

CONFIDENTIAL MATERIAL OMITTED

not, similarly situated to OnePlus. The result is a set of royalty rates that discriminate against OnePlus as compared to **name** and **name**.

## STANDARDS OF REVIEW

Constitutional standing is a question of law that is reviewed *de novo*. *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1363 (Fed. Cir. 2010). The interpretation of a patent assignment agreement is a question of contract law that is reviewed *de novo*. *Intell. Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.*, 248 F.3d 1333, 1339 (Fed. Cir. 2001) ("The legal effect of an agreement transferring patent rights is an issue of law that we review *de novo*.").

Infringement is a question of fact that the Court reviews for substantial evidence. *ACCO Brands, Inc. v. ABA Locks Mfrs. Co., Ltd.*, 501 F.3d 1307, 1311 (Fed. Cir. 2007).

The Fifth Circuit reviews the denial of a motion for judgment as a matter of law *de novo*. *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 66 (Fed. Cir. 2012) (citing *Cambridge Toxicology Grp. v. Exnicios*, 495 F.3d 169, 173, 179 (5th Cir. 2007)). It reviews a trial court's decision to admit expert testimony for abuse of discretion. *EcoFactor, Inc.*

*v. Google LLC*, 137 F.4th 1333, 1338 (Fed. Cir. 2025) (citing *In re MBS Mgmt. Servs.*, Inc., 690 F.3d 352, 354 (5th Cir. 2012)).

## ARGUMENT

### I.     Plaintiffs lack constitutional standing to assert the challenged patents.

"Article III standing is a jurisdictional requirement, which is incurable if absent at the initiation of suit." *Intell. Tech LLC v. Zebra Techs. Corp.*, 101 F.4th 807, 814 (Fed. Cir. 2024). "To establish constitutional standing under the case-or-controversy requirement of Article III, a plaintiff must demonstrate that it has suffered an 'injury in fact.'" *Univ. of S. Fla. Rsch. Found., Inc. v. Fujifilm Med. Sys. U.S.A., Inc.*, 19 F.4th 1315, 1323 (Fed. Cir. 2021). In patent cases, "the touchstone of constitutional standing" is whether the plaintiff has an exclusionary right in the asserted patents. *Id.* at 1324 ("[C]onstitutional standing is satisfied when a party holds at least one exclusionary right.").

Here, Plaintiffs do not own the challenged patents. Under the **name** and **name** licenses, the attempted assignments of the challenged patents to Plaintiffs are "null and void" due to the failure to comply with all contractual conditions for assignment. Plaintiffs have *no* rights in the

CONFIDENTIAL MATERIAL OMITTED

patents, much less any exclusionary rights. Therefore, they fail to satisfy the "injury in fact" requirement for constitutional standing.

### A.    The anti-assignment provisions of the ███ and ███ licenses are effective.

The district court correctly held that "[u]nder both Delaware and New York law, assignability clauses may render an assignment void *ab initio*." Appx154. A patent assignment agreement is a contract, the interpretation of which is governed by state law. *See, e.g.*, *Schwendimann v. Arkwright Advanced Coating*, 959 F.3d 1065, 1072 (Fed. Cir. 2010) ("The assignment of a patent's legal title is interpreted in accordance with contract statutes and common law in the state where the assignment took place."); *Enovsys LLC v. Nextel Commc'ns Inc.*, 614 F.3d 1333, 1342 (Fed. Cir. 2010) ("Who has legal title to a patent is a question of state law.").

The ███ license is governed by Delaware law. Appx42699, ¶ 10.10. Delaware permits parties to limit assignability. *See, e.g., In re Woodbridge Grp. of Cos., LLC*, 606 B.R. 201, 205-07 (D. Del. Sept. 11, 2019) (Stark, J.) ("*Woodbridge II*"). A contract containing "express language that any subsequent assignment will be void or invalid" unless the terms of the contract are satisfied is valid. *In re Woodbridge Grp. of*

CONFIDENTIAL MATERIAL OMITTED

*Cos., LLC*, 590 B.R. 99, 103-04 (Bankr. D. Del. 2018) ("*Woodbridge I*") (quoting *Se. Chester Cty. Refuse Authority v. BFI Waste Servs. of Pa., LLC*, 2017 WL 2799160, at *5 (Del. Super. Ct. June 27, 2017)). The Loan Agreement at issue in *Woodbridge II* contained an anti-assignment clause requiring "prior written consent of [the Fund]" and stating that any "attempted assignment without such consent shall be null and void." *Woodbridge II*, 606 B.R. at 203-04. The Court held that this "clear and unambiguous" language was a valid limitation on the power of the parties to assign their rights. *Id.* at 207.

The language of the **name** license is equally clear and unambiguous. The patent owners cannot assign the licensed patents unless the " ███████████ license term ███████████ ███████████████████████████████████████████ Appx42696, ¶ 7.1. Using nearly the exact same language as in *Woodbridge II*, the **name** license further states that ██████████ license term ██████████ ████████████████████████████████████████ *Id.* The **name** license is therefore a valid restriction on Pantech Inc.'s power to assign the challenged patents to Pantech Corp.

CONFIDENTIAL MATERIAL OMITTED

The ████ name ████ license is governed by New York law. Appx42795. Like Delaware, New York recognizes the rights of parties to limit assignments. *See, e.g.*, *Renfrew Ctr. v. Blue Cross & Blue Shield of Central N.Y., Inc.*, 1997 WL 204309, at *1-2 (N.D.N.Y. Apr. 10, 1997) (finding anti-assignment clause in contract binding). Under New York law, "[i]t is well established that, so long as the language of the contract provision prohibiting assignments is clear and definite, assignments made in contravention of its terms are void." *Spinex Labs. Inc. v. Empire Blue Cross & Blue Shield*, 622 N.Y.S.2d 154, 155 (NY. App. Div. 1995); *see also Nat'l Football League Players' Concussion Inj. Litig.*, 923 F.3d 96, 110-11 (3d Cir. 2019).

The ████ name ████ license contains such "clear and definite" language. The patent owners "█████████████████████████████████

███████████████ license term ██████████████████

████████████████████████████████████████████

██████████████████████████ Appx42793. "███████████

███████████████ license term ██████████████████

████ *Id.*

CONFIDENTIAL MATERIAL OMITTED

**B.　Pantech Corp. failed to comply with the requirements of the ▮name▮ and ▮name▮ licenses, rendering the attempted assignments void *ab initio*.**

Plaintiff Pantech Corp. has not complied with either the ▮name▮ or ▮name▮ license. Both licenses require an assignee to execute a written agreement agreeing to be bound by the terms of the license. Pantech Corp. has not produced any agreements in which it agreed to be bound by the terms of either license.

Neither Pantech Corp. nor Pantech Inc. has any knowledge of any such agreements ever being executed. At trial, Mr. Yang-Wong Jung, a senior vice president of Pantech Corp., testified that Pantech Corp. had never seen the ▮name▮ or ▮name▮ license. Appx44600, 310:15-22. To the best of his recollection, Pantech Corp. did not notify ▮name▮ or ▮name▮ that it had attempted to acquire the challenged patents, much less execute the required agreements. Appx44625, 37:1-4.

Similarly, Mr. Byeong Jin Kim, the Chief Executive Officer and former Chief Financial Officer of Pantech Inc., testified that he did not request that Pantech Corp. execute the required agreements. Appx44654, 54:10-16. He was not aware of anyone else at Pantech Inc. ever requesting Pantech Corp. to execute any agreements. *Id.* Nor could

CONFIDENTIAL MATERIAL OMITTED

he remember ever seeing any such agreements. Appx44654-44655, 54:17-55:4.

Pantech Inc. and Pantech Corp.'s failure to comply with the requirements of ███ name ███ and ███ name ███ licenses renders the attempted assignment of the challenged patents to Pantech Corp. "null and void." Appx42696, ¶ 7.1; Appx42793. Pantech Corp. thus does not own the challenged patents.

In a footnote, the district court incorrectly suggested that Plaintiffs' failure to comply with the assignability provisions would only render the assignments "voidable," and that it would be incumbent on ███ name ███ or ███ name ███ to bring an action to enforce the license agreements. Appx156, n.4. Under both Delaware and New York law, however, Plaintiffs' failure to execute the required written agreements renders the assignments void *ab initio*. There is, therefore, no need for any action by ███ name ███ or ███ name ███ to void the assignments.

Delaware law distinguishes between contract provisions that restrict a party's "power to assign" and those that restrict a party's "right to assign." *Woodbridge II*, 606 B.R. at 205-06. "When a provision restricts a party's power to assign, it renders any assignment void." *Id.* (quoting

*Woodbridge I*, 590 B.R. 103-04). By contrast, "[w]hen a contract limits a party's right to assign instead of the power to do so, the assignment is valid and enforceable but generates a breach of contract action that the non-assigning party may bring against the party assigning its interest." *Id.* In *Woodbridge II*, the court held that clear and unambiguous contract language that an attempted assignment "shall be null and void," is a restriction on the *power* to assign, not merely a restriction on the right to assign. *Id.* at 207.

The ██name██ license, which uses nearly identical language, is likewise a restriction on the patent owners' *power* to assign the challenged patents. Since Pantech Inc. and GoldPeak did not have the *power* to assign the patents unless Pantech Corp. executed the required agreement, the attempted assignment was an *ultra vires* act and is therefore void *ab initio. See, e.g.*, *W. Palm Beach Firefights' Pension Fund v. Moelis & Co.*, 311 A.3d 809, 856 (Del. Ch. 2024) ("When a corporation purports to take an action that it lacks the capacity or power to accomplish, that action is *ultra vires* and void.").

The result is the same for the ██name██ license. As discussed in the previous section, the ██name██ license contains the clear and definite

language required to void the attempted assignments. The Third Circuit has expressly held that the use of such "clear, definite, and appropriate language" renders an attempted assignment "void *ab initio*." *Nat'l Football League Players' Concussion Inj. Litig.*, 923 F.3d at 110. As a result, Pantech Corp. does not own—and has *never* owned—the challenged patents. Counts I, IV, V, and VII of the amended complaint must, therefore, be dismissed for lack of jurisdiction.

**C.    The patent purchase agreements between Pantech Inc. and Pantech Corp. do not satisfy the anti-assignment provisions of the ▮name▮ or ▮name▮ licenses.**

The district court erred in holding that the patent purchase agreements ("PPAs") between Pantech Inc. and Pantech Corp.—the attempted assignments themselves—"implicitly" satisfy the ▮name▮ and ▮name▮ licenses. Appx156. According to the district court, the licenses "have strict confidentiality provisions that limit" what could be disclosed to Pantech Corp. *Id.* Based on these confidentiality provisions, the court adopted "a looser compliance requirement" whereby it sufficed that Pantech Corp. knew that "▮name▮ and ▮name▮ had lifetime licenses" and that it therefore "could not interfere with ▮name▮ and ▮name▮ rights

CONFIDENTIAL MATERIAL OMITTED

to use these patents." *Id.* The district court's conclusion is flawed for several reasons.

*First*, the district court mischaracterized the confidentiality requirements of the **name** and **name** licenses, claiming that the only "information that *could* be disclosed" to Pantech Corp. was that **name** and **name** had licensed the patents. Appx156 (emphasis in original). But the **name** and **name** licenses both say that the terms of the licenses *can* be disclosed **license term** " Appx42696, ¶ 8.1; Appx42793. There is no evidence that Pantech Inc. ever sought **name** or **name** consent to disclose the terms to Pantech Corp. Nor is there evidence that **name** or **name** unreasonably withheld their consent, or that they would have done so if asked.

By its own admission, Pantech Corp. knew of the existence of the **name** and **name** licenses. Yet it failed to take even the most basic steps to inform itself of the terms of those licenses before agreeing to purchase the patents. Plaintiffs' failure to exercise due diligence is not a basis to ignore the clear and unambiguous requirements of the **name** and **name** licenses.

CONFIDENTIAL MATERIAL OMITTED

*Second*, the district court's "looser compliance" standard is contrary to the plain language of the licenses. While the confidentiality clause of the ███ name license refers to ███████ license term ███████ Appz42696, ¶ 8.1, the assignability clause provides that any assignment must be "███████ license term ███████ and the assignee must ███████ license term ███████ ," *id.*, ¶ 7.1 (emphases added). The district court ignores these important differences in language and fails to give effect to the parties' explicit decision to require any assignee to agree to be bound by *all* of the terms and conditions.

*Third*, Pantech Corp. has not agreed to be bound by all of the terms and conditions of the ███ name ███ or ███ name ███ licenses, or even by the "███████ license term ███████ Neither Plaintiffs nor the district court have identified any provision of the PPAs in which Pantech Corp. agreed to be bound by any of the terms of the ███ name ███ or ███ name ███ license. Pantech Corp. attempted to rely on the warranties in the PPAs disclosing the existence of the ███ name ███ and ███ name ███ licenses. But as the district court acknowledged, these are warranties by the assignor, Pantech Inc., not an agreement by the assignee, Pantech Corp., to be

bound by the licenses. Appx153. Nonetheless, the district court held that it is sufficient that Pantech Corp. "accept[ed] the assignors' warrants." Appx156.

That is incorrect as a matter of law. Acknowledging, or even "accepting" that a license exists, is not the same as agreeing to be bound by the terms of the license. In *Datatreasury Corp. v. Wells Fargo & Co.*, this Court held that an assignee in *not* bound by a mandatory arbitration clause in a patent license entered into by the previous owner of the patent. 522 F.3d 1368, 1372-73 (Fed. Cir. 2008). The Court explained that, although patent licenses generally "run with the patent," this principle applies only to "the right to use the patented product." *Id.* While the assignee may not be able to sue the licensee for patent infringement, the "procedural terms of a licensing agreement unrelated to the actual use of the patent," including an arbitration clause, are not "binding on a subsequent owner of the patent." *Id.* The Court held that "requiring a non-signatory party to arbitrate solely on the basis of an arbitration clause in a license agreement between signatory parties would be inconsistent with basic principles of contract law and the Federal Arbitration Act." *Id.*

CONFIDENTIAL MATERIAL OMITTED

The ██name██ license includes a mandatory ██term██ clause. According to the license, ████████████████████████████

████████████████████████████

██████████ license term ██████████

████████████████████████████

████████████████████████████

Appx42795. While the ██name██ license does not require ██license term██ it includes a similarly "procedural" ██term██ clause whereby ████████

████████████████████████████

██████████ license term ██████████

████████████████████████████

██████████ Appx42699-42700, ¶ 10.10. The ██name██ license further states that "████████████ license term ████████████ *Id.*

The district court failed to identify any provision of the PPAs in which Pantech Corp. agreed to be bound by the ██term██ clause of the ██name██ license, the ██term██ clause of the ██name██ license, or any of the other "procedural terms" of the licenses. There is also no evidence that Pantech Corp. was even aware of these terms. The district court's

CONFIDENTIAL MATERIAL OMITTED

conclusion that Pantech Corp. "implicitly" agreed to these terms is therefore contrary to this Court's precedents.

*Fourth*, the district court's reliance on *Au New Haven, LLC v. YKK Corp.*, 210 F. Supp. 3d 549 (S.D.N.Y. 2016), is misplaced. *Au New Haven* supports the anti-assignment clauses as written, recognizing that "*express* limitations on assignability are enforceable." *Id.* at 555 (quoting *Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru*, 109 F.3d 850, 856 (2d Cir. 1997)) (emphasis in original). The issue in *Au New Haven* was that the contract was not explicit that the anti-assignment provision applied to the asserted patent. *Au New Haven*, 210 F. Supp. 3d at 555 ("[T]he anti-assignment provision does not expressly bar transfers of the '214 [p]atent itself, or render transfers of the '214 [p]atent void."). As the court explained, "[t]he parties could have chosen to draft the provision to expressly reference the '214 [p]atent, but did not do so." *Id.* Here, the parties were both express and explicit. *Au New Haven* therefore does not support the district court's "looser compliance" standard, given the clear and unambiguous language of the ▇▇name▇▇ license.

*Finally*, the district court speculated that, even if the attempted assignment was void, Pantech Corp. *might* nevertheless possess some

exclusionary right in the patents. Appx157. Although the court stated that it was "not convinced that Pantech [Corp.] would be divested of *all* its exclusionary rights," *id.* (emphasis in original), it did not identify any rights that Pantech Corp. would possess. Nor did the court identify the source of these hypothetical rights. Pantech Corp. has consistently maintained, in the Complaint and throughout the litigation, that it was the lawful owner of the challenged patents by virtue of the assignments from GoldPeak and Pantech Inc. It has never claimed to possess more limited exclusionary rights. Because the attempted assignments are "null and void," Pantech Corp. has no rights in any of the patents. The district court's speculation that some other rights might exist is not a valid constitutional basis for asserting jurisdiction.

## II. Plaintiffs failed to prove that OnePlus infringes the '654 patent.

Assuming that Pantech Corp. owns the '654 patent, OnePlus is entitled to judgment of noninfringement. Plaintiffs' infringement theory is fundamentally at odds with both the patent and the district court's claim construction. The '654 patent is directed to the problem of "fat-fingering"—accidentally pressing more than one button at the same time, because the buttons are too small or too close together. Plaintiffs' expert

explained how, as screens got smaller, typographical errors became more common: "The more buttons we put on the screen and the tighter we pushed them together, the higher the error rate." Appx44815, 492:12-13. He testified that the '654 patent relates to the concept of "smart touch," which "makes it possible to enter content more quickly and with less error rates." Appx44808, 485:9-12.

Plaintiffs have not identified any "smart touch" feature in any of the accused products. They have failed to identify anything that even remotely resembles the claimed apparatus. Instead, Plaintiffs have attempted to stretch the claims of the '654 patent to read on a combination of standard features of any Android device—indeed, standard features of any computer: a generic popup menu and an inactivity timer. The accused features, alone or in combination, simply do not practice the claims of the '654 patent.

Each asserted claim requires a "control unit" that "removes the display of the second object if the second object is not selected within a reference period of time." Appx387, 11:24-26. The district court correctly construed this limitation to mean that the "reference period of time" must be "a reference period of time for displaying the second object." Appx1411.

41

The court explained that "the inclusion of 'for displaying the second object' ties the limitation 'to not just any time, but the time the second object is *displayed.*'" Appx121 (quoting Appx1411) (emphasis in original).

According to Plaintiffs, this limitation is satisfied by the Android inactivity timer. But as the district court explained, its claim construction "holds that 'merely having the screen go off or idle after an arbitrary amount of time would not, by itself, fall within this claim scope.'" Appx161 (quoting Appx1411). Yet that is exactly what the inactivity timer does—it turns the screen off. Plaintiffs' own experts refer to the inactivity timer as the "auto screen off" timer. Appx44826, 503:15-21; *see also* Appx44879, 556:13-18. At other times, Plaintiffs' experts refer to an "idle screen." Either way, Plaintiffs contend that the "reference period of time" limitation is satisfied because, when the inactivity timer expires, the screen goes blank, thereby removing the application shortcut menu (i.e., the alleged "second object") from the display. Appx44827, 504:9-16. But they assume—without any evidence—that the inactivity timer is "the time the second object is *displayed.*'" Appx121.

That assumption is erroneous. As the district court explained in its order denying OnePlus's motion for summary judgment, it is not enough

to determine when the timer *expires*. It is also necessary to establish when the timer *begins*: "if [Plaintiffs] could not offer any evidence that the inactivity timer begins with the display of the second object, there would be obvious problems with [their] infringement theory." Appx121. Proof of what triggers the inactivity timer to commence is necessary in order to show that timer (i.e., the alleged reference period of time) is "*for displaying the second object*," as the district court construed this claim. In denying OnePlus summary judgment, the district court gave Plaintiffs the opportunity to present evidence as to when the inactivity time begins. They failed to do so.

At trial, Plaintiffs presented testimony from two experts, Dr. Martin Walker and Mr. Charles Mauro, neither of whom offered evidence as to when the inactivity timer begins. Dr. Walker, who reviewed the Android source code, Appx44785-44786, 462:21-463:6, provided detailed testimony as to what happens when the inactivity timer *expires*. He set the inactivity timer to 15 seconds and testified that when "this 15-second period expires without users interacting with the screen, a software function called the PowerManagerService sends a notification to the … notifier, which is another software function, to

switch the focus of the Android device to the keyguard application which cause the idle screen to be shown." Appx44789, 466:8-22. He also identified specific source code files, including "PowerManagerService.Java" and "Notifier.java," that are executed when the inactivity timer expires. Appx44789-44790, 466:23-467:6. In stark contrast, Dr. Walker offered *no* testimony as to when the inactivity timer begins. He did not identify any functions that are called when the inactivity timer begins, nor did he cite any source code files that are responsible for beginning the inactivity timer.

Mr. Mauro similarly failed to present any evidence that "the inactivity timer begins with the display of the second object." Appx121. Like Dr. Walker, Mr. Mauro "select[ed] the auto screen off function and set[] it at 15 seconds." Appx44826, 503:19-21. Based on "Dr. Walker's extensive analysis of the underlying source code," Mr. Mauro testified that "[w]e know that the exact time in which the 15 seconds expires, the second object is removed from the screen." Appx44827, 504:9-19. But, like Dr. Walker, Mr. Mauro did not present evidence to show when the timer begins.

44

More importantly, on cross-examination, Mr. Mauro conceded that the 15-second inactivity timer is *not* "for displaying the second object," as required under the court's claim construction. Appx121. He admitted that "a user could prevent expiration of the sleep timer by hitting something other than the [second item]." Appx44880, 557:16-18. Further elaborating, he explained that "[a]s long as you have an active interaction with the—between the finger and the—and the screen, the touch timer is pushed back in time." *Id.*, 557:19-24. Thus, by his own testimony, the alleged "second item" may be displayed far longer than the set value of the inactivity timer. If the user has "active interaction[s]" with the phone, the timer will continue to be "pushed back," and the shortcut menu will be displayed indefinitely.

Dr. Walker's cross-examination testimony further dispels any argument that the inactivity timer is "for displaying the second object." Appx121. He admitted that the inactivity timer runs even when no second object is being displayed. Appx44800, 477:5-17. Thus, the testimony of Plaintiffs' experts establish that the inactivity timer does exactly what its name suggests: it measures the time that the user has been inactive. The inactivity timer does not measure the time that the

second object is displayed. It is, therefore, not the "reference period of time *for displaying the second object*" required by the claim construction. Appx1411.

Plaintiffs attempted to square their infringement theory with the court's claim construction by arguing that turning off the display does not "by itself" satisfy the limitation. The district court credited Plaintiffs' argument that "Mr. Mauro provided circumstantial evidence that non-accused pop-ups in the accused products remained on the screen after the expiry of the inactivity timer." Appx161-162. The court held that the jury could have concluded that "something more is happening than the screen going off or idle." Appx162.

The district court erred in at least three respects. *First*, there is no evidence that "non-accused pop-ups in the accused products remained on the screen." As Mr. Mauro's own demonstration showed, when the inactivity time expires, the screen goes completely blank.



Appx39451. Rather, the testimony from Mr. Mauro that the district court cited concerns what happens much later, after the user unlocks their phone by reentering their password. Appx162 (citing Appx44826-44829).

*Second*, the testimony cited by the district court as to what happens when "the screen comes back" after the user unlocks their phone, is not relevant to the question of infringement. The mere fact that another window—which the district court acknowledged is non-accused—may reappear after the phone is unlocked is not evidence of when the inactivity timer begins or whether the timer is "a reference period of time for displaying the second object." Appx1411.

47

*Third*, although the district court speculated that perhaps "something more is happening," Appx162, neither the court nor Plaintiffs ever explained what that "something more" is, or how it would convert an inactivity timer into "a reference period of time for displaying the second object."

Plaintiffs have failed to identify "a reference period of time for displaying the second object" in any of the accused products. Not only have Plaintiffs failed to carry their burden of proof, the testimony of their own experts establishes that the accused inactivity timer does *not* satisfy the district court's claim construction. The jury verdict is therefore not supported by substantial evidence.

## III.   The damages award for the '654 patent is legally flawed.

Through Dr. Putnam, Plaintiffs presented a damages theory for the '654 patent that did not properly apportion for the value of the patented feature accused of infringement. Instead, Dr. Putnam assigned this patent the same royalty rate as the SEP that he deemed most valuable—the '247 patent—based on a statement from Mr. Mauro that the '654 patent is "commercially essential." Accordingly, the district court should

have granted OnePlus's motion for judgment as a matter of law and its motion to strike Dr. Putnam's opinion.

## A. Plaintiffs failed to properly apportion damages for the '654 patent to reflect the value of the patented feature.

Calculating a legally sound royalty rate "requires a determination of the value added by [the patented] features" of the accused product. *Omega*, 13 F.4th at 1376. Put differently, "it is the 'value of what was taken' that measures a 'reasonable royalty.'" *Ericsson*, 773 F.3d at 1226 (quoting *Dowagiac Mfg. Co. v. Minnesota Moline Plow Co.*, 235 U.S. 641, 648 (1915)). But Plaintiffs did nothing to reflect "only the value of the infringing features" in the damages it sought for the '654 patent. *Id.*

Dr. Putnam made no attempt to isolate the value of the '654 patent relative to Plaintiffs' "many" other NEPs. Appx51136, 59:12-23 (Q. "You did not apportion the value of the '654 patent relative to the other NEP patents that Pantech owns, correct?" A. "Of course not."). His royalty rate for that patent is therefore completely unmoored from the license agreements he deemed comparable, and from the portfolio rate that he had derived from them. The result is striking: by assigning the '247 patent's 0.075% royalty rate to the '654 patent, the rate for this one

patent represents *half* of Dr. Putnam's 0.15% rate for Plaintiffs' *entire* NEP portfolio of at least 200 patent families.[8] Appx51136-51137, 59:24-60:3; Appx85; Appx51185, 78:2-18.

Plaintiffs presented no evidence that the '654 patent has the same value as the '247 patent. No expert at trial was qualified to compare the merits of the two patents. And no expert did so. Mr. Mauro analyzed only the '654 patent, not the '247 patent. Appx51034-51035, 326:14-328:1; Appx51003, 295:12-17. Dr. Cooklev analyzed only the '247 patent, not the '654 patent. Appx50956-50957, 248:6-249:19. And Dr. Putnam was not qualified to analyze either patent, let alone compare them. Appx51138, 61:2-8; *see also* Appx51117, 40:22-23.

Without a basis to equate the '654 patent's value to that of the '247 patent, Dr. Putnam could not establish the "essential requirement" of apportionment—i.e., "the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product." *Ericsson*, 773 F.3d at 1226. In *Finjan, Inc. v. Blue Coat*

---

[8] Before the Court granted JMOL of noninfringement as to the '052 patent, Dr. Putnam assigned the '247 patent's rate to *both* the '654 patent and the '052 patent—such that the two asserted NEPs together amounted to 100% of the 0.15% NEP portfolio rate. Appx84-85.

*Systems, Inc.*, for instance, this Court rejected an attempt to apportion by analogy to patents that were the subject of a prior verdict, explaining that there was "no evidence showing that the patents that were at issue [were] economically or technologically comparable" to the asserted patent. 879 F.3d 1299, 1312 (Fed. Cir. 2018). Likewise here, Dr. Putnam has no basis to assign the '654 patent the same value as the '247 patent.

Dr. Putnam offered no reason for why he analogized the '654 patent to the '247 patent, as opposed to a different SEP. As Dr. Putnam acknowledges, not all SEPs are created equal. For example, he opined that the rate for the '839 patent should be 0.01%—seven times less valuable than his rate for the '247 patent. Appx51098-51099, 363:12-364:1; *see* Appx45047 at 5:21-24. He also opined that the SEPs asserted in this case have above-average values compared to Plaintiffs' other SEPs, with the asserted SEP families accounting for 21% of the total value of the 30-plus SEPs in Plaintiffs' portfolio. Appx51098, 363:12-17; Appx51049, 341:15-19.

Dr. Putnam's only purported basis for assigning the '247 patent's rate to the '654 patent was Mr. Mauro's testimony that the '654 patent is "commercially essential." Appx51135, 58:18-25; *see* Appx51029-51030,

51

321:7-322:3. But that statement has no relation to the '247 patent, particularly given Plaintiffs' admission that not all standard-essential patents are equal. Nor does Mr. Mauro's declaration of "commercial" essentiality provide a basis to calculate the value of the patented feature. He did not offer an opinion on the value of that feature. Appx51029, 321:3-6. Instead, he insisted on only qualitatively listing "benefits … from the reading of the patent" rather than "proffer[ing] actual financial impact." Appx51032-51033, 324:21-325:5. And he explained that a feature's essentiality depends on "the priorities [of] the user." Appx51029-51030, 321:7-322:3.

Dr. Putnam's failure to apportion contravenes this Court's precedents. In *Omega*, for example, the patentee's damages expert testified that—"whether it's one patent or all the patents," the applicable royalty rate is "five bucks" because "no patent was any more valuable than the others." 13 F.4th at 1379, 1381 (internal quotation marks omitted). That expert's theory—under which the accused infringer must pay the "same rate no matter how many claims or how many of the patents it infringes"—did not properly apportion to the value of the patented feature, or even the asserted patent. *Id.* at 1380-82 (internal

quotation marks omitted). Like the patent-agnostic rate in *Omega*, Dr. Putnam's choice to apply the '247 patent's royalty rate to the '654 patent is not tailored to the value of the patented feature.

Similarly, the damages expert in *LaserDynamics* purported to apportion by concluding that the patented technology "is responsible for one-third of the value of a laptop computer," resulting in a royalty rate of 2% per computer. 694 F.3d at 61. That rate, however, "appear[ed] to have been plucked out of thin air based on vague qualitative notions of the relative importance of the [accused] technology." *Id.* at 69. So is Dr. Putnam's rate for the '654 patent, which is based on testimony from Mr. Mauro that reflects a "complete lack of economic analysis to quantitatively support the [purported] apportionment." *Id.*

## B. OnePlus was entitled to JMOL because Plaintiffs failed to prove a legally sufficient royalty rate for the '654 patent.

Careful apportionment is paramount in cases like this one, "[w]here small elements of multi-component products are accused of infringement" and a damages theory sets out to "calculat[] a royalty on the entire product." *Id.* at 67. Such theories "carr[y] a considerable risk that the patentee will be improperly compensated for non-infringing

components of that product." *Id.* As set forth above, Dr. Putnam did not properly apportion to the value of the '654 patent, instead assigning it the value attributable to an entirely different patent.

Mr. Mauro's opinion that the '654 patent is commercially "essential" does not excuse Dr. Putnam's lack of apportionment. "It is not enough to merely show that the patented feature is viewed as valuable, important, *or even essential* to the use of the overall product." *VirnetX,* 767 F.3d at 1326-27 (cleaned up). Rather, "[t]he law requires patentees to apportion the royalty down to a reasonable estimate of the value of its claimed technology, or else establish that its patented technology drove demand for the entire product." *Id.* at 1329. And because Plaintiffs asserted that the accused products have "other valuable features" (such as those claimed in the asserted SEPs), Plaintiffs needed to prove that such other features "*do not* cause consumers to purchase the product" in order to avoid apportionment. *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.,* 904 F.3d 965, 979 (Fed. Cir. 2018) (holding that the damages expert, Dr. Putnam, needed to apportion where there was no "proof that [other] features … did not affect consumer demand").

Plaintiffs met none of these requirements. Mr. Mauro *admitted* that the infringing feature does not drive demand for OnePlus phones, confirming that individual "features" do not drive sales of smartphones. Appx51031, 323:2-25.[9] He instead testified that "the modern smartphone today is driven by apps" and "the overall usability of the device itself." Appx51031, 323:10-23. Because there is no evidence that the patented feature drives consumer demand, apportionment was required. *See, e.g.*, *LaserDynamics*, 694 F.3d at 69.

"The burden of proving damages falls on the patentee." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). Because Plaintiffs "failed to present a damages case that can support the jury's verdict" as to the '654 patent, this Court should reverse the denial of JMOL as to damages for the '654 patent, vacate the damages award as to that patent, and remand for a determination of whether Plaintiffs have "waived the right to damages based on alternate theories." *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1312 (Fed. Cir. 2018) (citing *Promega*

---

[9] Neither Dr. Putnam nor any other expert provided evidence to the contrary. *See* Appx51137-51138, 60:4-61:1 (Dr. Putnam explaining the he did not conduct a consumer survey on whether the patented feature drives demand).

*Corp. v. Life Techs. Corp.*, 875 F.3d 651, 666 (Fed. Cir. 2017) ("[A] patent owner may waive its right to a damages award when it deliberately abandons valid theories of recovery in a singular pursuit of an ultimately invalid damages theory."); *see also TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1291 (Fed. Cir. 2020) (Section 284 "does not require an award of damages if none are proven that adequately tie a dollar amount to the infringing acts.").

### C.    Dr. Putnam's damages theory on the '654 patent should not have been presented to the jury.

Expert testimony must be "based on sufficient facts or data," be "the product of reliable principles and methods," and "reflect[] a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702 (2023). In the patent-damages context, "qualitative testimony that an invention is valuable—without being anchored to a quantitative market valuation—[is] insufficiently reliable." *Commonwealth Sci. & Indus. Rsch. Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1302 (Fed. Cir. 2015). Here, Dr. Putnam's royalty rate for the '654 patent was "untethered from the patented technology at issue and the … licenses thereto and, as such, was arbitrary and speculative." *LaserDynamics*, 694 F.3d at 81. It therefore should not have been presented to the jury.

This Court confronted a similar failure in *Exmark Manufacturing Company Inc. v. Briggs & Stratton Power Products Group, LLC*, 879 F.3d 1332 (Fed. Cir. 2018). There, the patentee's damages expert "concluded with little explanation that [the parties] would have agreed to a 5% reasonable royalty rate on the sales of the accused [products] as the value for the [patented feature]," without "explain[ing] how she calculated" that rate. *Id.* at 1349. Instead, she discussed "her understanding of the benefits" of the product—"[r]elying on the testimony of experts and fact witnesses [to] identif[y] a number of advantages arising from the use of the claimed [feature]." *Id.* Her opinion was inadmissible because she "did not explain how these advantages … led to her proposed 5% royalty rate." *Id.* at 1350.

Similarly here, Dr. Putnam relied on Mr. Mauro's generic, qualitative opinions about the "benefits" of the '654 patent. Appx51032-51033, 324:21-325:5. But it is "not enough" to merely "explain the advantages of the [features] claimed in the [asserted] patent." *Exmark*, 879 F.3d at 1350. That says "nothing more than that the patented technology was important and commercially successful." *Id.* Dr. Putnam

instead needed to "carefully tie proof of damages to the claimed invention's footprint in the market place." *Id.* He did not.

The damages opinion in *Exmark* was also flawed because it failed to account for "other components" covered by other patents. *Id.* Likewise here, Dr. Putnam offered no basis for how he disentangled the value of the '654 patent from that of other patented features. Instead, "the jury [was] simply left to speculate or adopt [Dr. Putnam's] unsupported conclusory opinion." *Id.*; *see also LaserDynamics*, 694 F.3d at 67 ("[A] reasonable royalty analysis requires a court to hypothesize, not to speculate …." (cleaned up)).

Dr. Putnam cannot "hide behind" [Mr. Mauro's opinion] to avoid the task of apportionment." *See Omega*, 13 F.4th at 1379. As discussed above, Mr. Mauro's opinion that the '654 patent is "commercially essential" is itself *ipse dixit* and not based on any quantitative analysis. *See Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 972-74 (Fed. Cir. 2022) (requiring exclusion of damages opinion premised on conclusory testimony that asserted patents were "key patents"). That testimony is "no more reliable" coming from Mr. Mauro than Dr. Putnam. *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1325 (Fed. Cir. 2014), *overruled on other grounds by Williamson v.*

*Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015)). And Dr. Putnam

relied on nothing other than Mr. Mauro's testimony. Appx51138, 61:9-12;

*EcoFactor*, 137 F.4th at 1345 ("Rule 702 requires the expert's relied-upon

facts or data—not the record as a whole—to constitute a sufficient basis

for the expert's testimony.").

The district court denied OnePlus's motion to strike Dr. Putnam's

theory with little explanation, stating that he had "at least put forth a

baseline theory that the '247 [p]atent may be economically comparable"

to the '654 patent, and leaving "the degree of comparability … for the jury

to decide." Appx86; *see EcoFactor*, 137 F.4th at 1338 ("An absence of

reviewable reasoning may be sufficient grounds for this court to conclude

the district court abused its discretion.").[10] In so doing, the district court

abdicated its "gatekeeping" duty. *EcoFactor*, 137 F.4th at 1339 (quoting

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)).

This Court reviews improper admission of expert testimony "under

the harmless error doctrine, affirming the judgment[] unless the ruling

---

[10] The district court recited the pre-2023-amendment version of Rule 702, Appx56, although the amendment had recently gone into effect. Leaving the jury to assess Dr. Putnam's methodology is the type of error the amendment sought to discourage. *See EcoFactor*, 137 F.4th at 1339.

affected substantial rights of the complaining party." *Id.* at 1338 (quoting *Vogler v. Blackmore*, 352 F.3d 150, 154 (5th Cir. 2003)). Dr. Putnam's damages theory was the only evidence Plaintiffs set forth regarding the royalty rate for the '654 patent, and the jury's $260,291.57 award closely approximates his $294,383 damages figure. Appx193; Appx51046. There is thus no way to "be sure 'that the error did not influence the jury or had but a very slight effect on its verdict.'" *Id.* at 1346 (quoting *Carlson v. Bioremedi Therapeutic Sys.*, Inc., 822 F.3d 194, 202 (5th Cir. 2016)). Accordingly, this Court should reverse the denial of OnePlus's motion to strike and vacate the jury's damages award as to the '654 patent.

## IV. The damages award for the asserted SEPs is discriminatory and should be vacated.

Where SEPs are found infringed, "any royalty award ha[s] to be FRAND." *Optis Cellular Tech., LLC v. Apple Inc.*, 139 F.4th 1363, 1376 n.8 (Fed. Cir. 2025). As the district court instructed the jury, "[a] reasonable royalty with respect to the '247, '954, and '839 standard[]-essential [p]atents cannot exceed the amount permitted under [Plaintiffs'] FRAND obligations." Appx51709.

Plaintiffs did not comply with their FRAND obligations in calculating damages, and this failure tainted the jury's damages award.

60

FRAND has two components: a royalty must be "fair and reasonable," and it must also be "non-discriminatory." *TCL Comm'n Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*, 2018 WL 4488286, at *26-29 (C.D. Cal. Sept. 14, 2018), *rev'd in part on other grounds, vacated in part*, *TCL Comm'n Tech. Holdings Ltd. v. Telefonaktiebolaget LM Ericsson*, 943 F.3d 1360 (Fed. Cir. 2019); *see* Appx51158-51159, 388:22-389:9. At a minimum, to be "non-discriminatory," licensees that are "similarly situated" must be able to license the patents at similar rates. *Id.* at *29 (observing that "like, or close to, like rates must be offered to firms [that] are similarly situated").

Dr. Putnam acknowledged that "non-discriminatory means that you treat similarly situated people similarly." Appx51091, 27:2-3. But he did not establish which of Plaintiffs' licensees are similarly situated to OnePlus. Instead, Dr. Putnam selected four licenses (all settlement agreements) that supposedly reflect a SEP portfolio-level rate of 0.50%, while excluding two licenses (the ▮name▮ and ▮name▮ licenses) that reflect rates orders of magnitude smaller. Appx51106-51107, 29:15-30:7; Appx51069, 5:16-18; Appx51076, 12:17-23. The result is a rate that discriminates against OnePlus relative to ▮name▮ and ▮name▮. Because

CONFIDENTIAL MATERIAL OMITTED

Plaintiffs failed to show that OnePlus is not similarly situated to **name**

and **name** there is not sufficient evidence to support Plaintiffs'

discriminatory rate and the resulting discriminatory damages award.

### A. Dr. Putnam derived his discriminatory royalty rate from litigation settlement agreements, without accounting for the only license that was not the result of a settlement.

Of the six agreements considered by the experts in this case, the

**name** license is the only one that was not negotiated as part of a

settlement agreement. Appx51169, 66:17-23. But Dr. Putnam excluded

the **name** license from his damages calculation, instead relying on the

GNJ, Coolpad, BLU, and Sony settlement agreements.

Although the GNJ and Coolpad settlement agreements include a

portfolio rate of 0.65%, Appx51069, 5:16-20, which Dr. Putnam asserts

translates to a rate of 0.50% for the SEP portfolio, Appx51093, 358:6-10,

neither company has paid any royalties under those agreements,

Appx50885, 7:9-14; Appx50910-50911, 28:15-29:17. GNJ made a lump-

sum payment of $1,000 for all past sales and exited the smartphone

market. Appx51108, 31:3-9. Coolpad similarly stopped selling

smartphones before paying any royalties. *Id.*, 31:10-13. The recited

CONFIDENTIAL MATERIAL OMITTED

royalty rate was therefore not a significant term to either company, since they knew that they would never be liable for any ongoing royalties.

The Sony settlement agreement is no better. Sony agreed to a lump-sum payment, and the agreement expressly stated that this payment ████████████████████████████████████████████████ license term ████████████████████████████████████████████ Appx50906-50907, 24:20-25:11; Appx11243; *see EcoFactor*, 137 F.4th at 1342 (holding that similar language "directly contradicts any claim that the lump sum is based upon any particular royalty rate"). And while BLU did not exit the market, it is a small player without the market share of █name█ or █name█ and it received a discount on past sales that Dr. Putnam did not account for in his royalty rate. Appx51164, 394:15-25; Appx51173-51174, 395:1-396:4; Appx51107, 30:8-11.

As the Court has explained, "license fees negotiated in the face of a threat of high litigation costs may be strongly influenced by a desire to avoid full litigation" and "should not be considered evidence of an established royalty." *LaserDynamics*, 694 F.3d at 77 (quoting *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078-79 (Fed. Cir. 1983)). For

CONFIDENTIAL MATERIAL OMITTED

this reason, Federal Rule of Evidence 408 prohibits the use of settlement agreements to prove the "amount of a disputed claim." Fed. R. Evid. 408(a). While settlement agreements may be used in "certain limited circumstances, such as where the settlement agreement is the most reliable license in the record," there is no basis to conclude that the four settlement agreements relied upon by Dr. Putnam are more reliable than the ▮name▮ license, much less that they are "the most reliable." *Optis*, 139 F.4th at 1384 (cleaned up). Nor is there any evidence that the licensees in these settlement agreements are similarly situated to OnePlus. Dr. Putnam simply cherry-picked settlements with higher rates without establishing the non-discriminatory prong of FRAND.

> **B.    There is no evidence supporting the exclusion of the ▮name▮ and ▮name▮ licenses from the calculation of the portfolio rate.**

Juries have the "obligation (not just option) to take [a patentee's FRAND] commitments into account when determining a royalty award." *Id.* at 1376 n.8 (quoting *Ericsson*, 773 F.3d at 1231). Even assuming that there was some basis for Dr. Putnam to consider the GNJ, Coolpad, BLU, and Sony settlement agreements in setting the portfolio rate, there was no basis for his failure to account for the ▮name▮ and ▮name▮ licenses.

CONFIDENTIAL MATERIAL OMITTED

1.  **Dr. Putnam was required to consider the ███ and ███ licenses.**

The ███ license was a worldwide portfolio license, for ███ that covered all ███ products and *did not* result from settlement of litigation. Appx50920, 31:6-13; App50926, 37:6-18; Appx51118-51119, 41:24-42:11. As established by the unrebutted testimony of OnePlus's damages expert, the license represents a royalty rate of only ███. Appx51119-51121, 42:12-44:24; Appx51168-51170, 65:14-67:10.

Similarly, the ███ license, entered into eighteen months later, was a worldwide portfolio license for about ███ Appx50927, 38:3-15; Appx51121, 44:15-21. Unlike the ███ license, the ███ license did result from settlement of litigation. Appx50921-Appx50922, 32:24-33:2. But if Dr. Putnam is permitted to rely on settlement agreements to GNJ, Coolpad, BLU, and Sony, there is no basis to exclude the ███ settlement agreement. At a minimum, the ███ license confirms the reasonableness of the royalty of the ███ license—reflecting a nearly identical effective royalty rate, ███%. Appx51168-51170, 65:24-67:10.

Dr. Putnam did not attempt to counterbalance his chosen settlement agreements with the ███ and ███ licenses. The result is a royalty rate that discriminates against OnePlus relative to its biggest

competitors. Together, those two companies make up over ## of the U.S. smartphone market, with name alone having about ## to ## market share. Appx51118, 41:17-23; Appx50927-Appx50928, 38:16-39:19, Appx51166-Appx51167, 63:11-64:20.

The Central District of California undertook a detailed analysis of the non-discrimination prong of FRAND in *TCL*, resolving a dispute over which prior licensees were "similarly situated" to TCL for purposes of setting a FRAND royalty rate. 943 F.3d at 1369. The parties "agreed that four firms were similarly situated to TCL," but they "disputed whether four others (Apple, Samsung, Coolpad, [and] Karbonn) were also similarly situated to TCL." *Id.* at 1367. Relevant here, Ericsson attempted to exclude Apple and Samsung, while including smaller players like Coolpad. *TCL*, 2018 WL 4488286, at *31.

The *TCL* court observed that TCL was a "global firm" and concluded that companies "similarly situated" to TCL were "all firms reasonably well-established in the world market," which "implies a necessarily wide spectrum." *Id.* at *29-32. "[E]xcluding from the analysis the largest firms in the market," the court reasoned, "would have the effect of insulating them, and further contributing to their dominant positions, by imposing

a barrier in the form of higher rates for those not at the top end of the market." *Id.* at \*30. The court concluded that Apple and Samsung were similarly situated to TCL and that smaller firms Coolpad and Karbonn were "local kings" not similarly situated to TCL. *Id.* at \*30-33.

Similar to Ericsson in the *TCL* case, Plaintiffs seek to exclude **name** and **name** from the FRAND analysis. But Dr. Putnam did not attempt to establish that **name** and **name** are *not* similarly situated to OnePlus—let alone perform a fulsome analysis like the *TCL* court. At most, he summarily opined in the abstract that "similarly situated" means that "[i]f people are different sizes, they may get different terms," and "large firms get volume discounts." Appx51091, 27:4-8. But he did not apply these criteria to **name** and **name** and, in any case, this volume-based view of "similarly situated" is legally flawed. As the *TCL* court concluded, "[s]ales volume alone *does not* justify giving lower rates to otherwise similar firms." 2018 WL 4488286, at \*33.

The *TCL* court explained that sales volume is useful "only as a filter to separate out niche and small firms from the reasonably well-established global firms." *Id.* Had Dr. Putnam considered sales volume in this way, most or all of the licensees on which he relied for his damages

CONFIDENTIAL MATERIAL OMITTED

calculation would *not* be similarly situated to OnePlus. GNJ and Coolpad undisputedly have *zero* sales volume, and BLU and Sony are "very minor players" in the smartphone market. Appx51108, 31:3-17; Appx50885, 7:9-14; Appx51164, 394:12-13; Appx51174, 396:15-21. Indeed, the *TCL* court specifically "filter[ed] out" Coolpad. 2018 WL 4488286, at *33.

Conversely, the *TCL* court's reasons for not excluding Apple and Samsung apply here. The court held that "while Ericsson would clearly prefer that Apple and Samsung be considered *sui generis*" companies, the "prohibition on discrimination would mean very little if the largest, most profitable firms could always be a category unto themselves simply because they were the largest and most profitable firms." *Id.* Like TCL, OnePlus is a "global firm." *Id.* at *32. As Plaintiffs observed at trial, OnePlus "advertises as one of the top 50 global brands and boasts a 500 percent growth in North America just in Q3 2021 alone." Appx50850, 183:2-7. FRAND therefore required Dr. Putnam to account for "all firms reasonably well-established in the world market," including ▮name▮ and ▮name▮, in his damages calculation. *TCL*, 2018 WL 4488286, at *30.

## 2. Dr. Putnam's reasons for excluding the **name** and **name** licenses are irrelevant to the non-discriminatory prong.

Dr. Putnam's reasons for excluding the **name** and **name** licenses from his royalty calculation do not relate to whether **name** and **name** are "similarly situated" to OnePlus, or any other consideration relevant to the non-discrimination prong. Instead, they address whether the **name** and **name** licenses reflected "fair market value" of the asserted SEPs and whether they are "technically comparable." Appx51078-51085, 14:3-21:10.

For example, Dr. Putnam testified that the **name** and **name** licenses were entered by the Pantech Inc. predecessor entity when it was in financial trouble. Appx51076, 12:6-13; Appx51078-51079, 14:13-15:15; Appx51121-51123, 44:25-46:6; Appx51056-51057, 348:18-349:4. But this is irrelevant to whether excluding the **name** and **name** licenses is discriminatory against OnePlus. And as Dr. Putnam admitted, SEPs remain encumbered with FRAND obligations even if they change hands, the FRAND obligation is an irrevocable undertaking, and it is improper to ignore licensing activity that happened before a company acquired a

CONFIDENTIAL MATERIAL OMITTED

SEP in determining the applicable royalty. Appx51103, 368:6-21; *see also* Appx50899-50901, 17:3-19:3; Appx51160, 390:10-21.

Dr. Putnam also asserted that the ███████ and ███████ licenses were not "arm's-length" because of other agreements in existence at the time. Appx51079-51080, 15:16-16:15; Appx51085-51086, 21:23-22:21. And he speculated that negotiation of the ███████ and ███████ licenses may have been influenced by a license between Pantech Inc. and ███████. Appx51080-51081, 16:16-17:24. Again, this has nothing to do with the discriminatory effect on OnePlus. And the existence of other agreements did not prevent the *TCL* court from analyzing whether licensees were "similarly situated." 2018 WL 4488286, at *29 (engaging in "unpacking" analysis "to account for cross-licenses, lump sum payments, pass-through rights, and other issues").

Dr. Putnam additionally observed that the ███████ and ███████ licenses were lump-sum licenses, covered more than just LTE and 5G standards, and did not include the '247 patent. Appx51084-51085, 20:1-21:15. But such differences in royalty form and technical coverage do not justify completely declining to account for the ███████ and ███████ licenses, which undisputedly cover two of the three asserted SEPs. *See*

*TCL*, 2018 WL 4488286, at *31 n.30 ("[W]hether a firm is similarly situated … is a separate question from whether the firm's effective rate can be calculated ….").

Allowing Plaintiffs to satisfy the non-discriminatory requirement based on Dr. Putnam's rationales, which do not at all address whether OnePlus is similarly situated to ▮▮▮name or ▮▮▮name▮▮▮ would at best amount to "defin[ing] similarly situated very narrowly by picking and choosing criteria with no relation to [their] SEPs or the FRAND commitment." *Id.* at *30. Plaintiffs should not be allowed to meet their burden in this way, "effectively allow[ing] [them] to read the non-discrimination prong out of the FRAND commitment." *Id.*

## C.    The jury's damages award discriminates against OnePlus.

The 0.65% portfolio rate proposed by Dr. Putnam—which he translates to a 0.50% rate for Plaintiffs' SEPs—is approximately ▮##▮ *times* higher than the rates ▮name▮ and ▮▮name▮▮ paid for licenses to Plaintiffs' portfolio. Appx51168, 65:1-7. That is inherently discriminatory.

Because Dr. Putnam calculated individual royalty rates for the asserted SEPs by determining their "shares" of this inflated rate, his

failure to account for the **name** and **name** licenses necessarily infected his patent-specific royalty rates, making his damages figure approximately **##** times higher than it would have been had he instead used the portfolio rate reflected in the **name** license.[11] Thus, Dr. Putnam's exclusion of the **name** and **name** licenses resulted in an inflated royalty rate that does precisely what he said Plaintiffs must not do under FRAND: "jack up [the] price" for OnePlus. Appx51089, 25:5.

Although Dr. Putnam purported to consider Plaintiffs' obligation to "price [their patents] on FRAND terms," his royalty-rate calculation did not reflect that. *Id.*, 25:3-4. As a result, the jury's damages award of $739,708.43 for the asserted SEPs closely approximates Dr. Putnam's SEP damages figure of $836,591. Appx193; Appx51046, 338:19-24. Because Plaintiffs failed to present sufficient evidence of a royalty rate that complies with the requirement that "any royalty award [must] be

---

[11] That disparity cannot be chalked up to addition of the '247 patent to Plaintiffs' portfolio after the **name** and **name** licenses. According to Dr. Putnam, the '247 patent family amounts to only 15% of Plaintiffs' SEP portfolio. Appx51098, 363:12-17. Thus, any value added after the **name** and **name** licenses by the '247 patent cannot justify calculating damages for OnePlus using a portfolio rate **##** times what **name** and **name** paid. *See* Appx51168, 65:1-7.

FRAND," *Optis*, 139 F.4th at 1376 n.8, this Court should reverse the denial of JMOL as to damages for the asserted SEPs, vacate the damages award as to those patents, and remand for a determination of whether Plaintiffs have "waived the right to damages based on alternate theories." *Finjan*, 879 F.3d at 1312 (citing *Promega*, 875 F.3d at 666; *see also TecSec*, 978 F.3d at 1291.

## CONCLUSION

Plaintiffs lacked standing to assert the challenged patents, and the district court lacked jurisdiction to hear Plaintiffs' claims. The judgment should be vacated with respect to those patents, and Counts I, IV, V, and VII of the amended complaint should be dismissed.

The judgment of infringement of the '654 patent is not supported by substantial evidence. If Pantech Corp. has standing to assert the '654 patent, the Court should reverse the judgment of infringement.

Independent of the standing issue, OnePlus respectfully requests that the Court reverse the district court's denial of OnePlus's motions for JMOL as to damages and OnePlus's motion to strike Dr. Putnam's damages opinion as to the '654 patent, vacate the damages awards, and

remand for a determination of whether Plaintiffs have waived the right to compensation for infringement under alternative theories.

Dated: July 24, 2025                          /s/ *Richard L. Rainey*

Richard L. Rainey
Kevin B. Collins
Peter A. Swanson
Matthew A. Kudzin
Justin W. Burnam
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000
rrainey@cov.com
kcollins@cov.com
pswanson@cov.com
mkudzin@cov.com
jburnam@cov.com

Brian Bieluch
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
(424) 332-4800
bbieluch@cov.com

Ruixue Ran
COVINGTON & BURLING LLP
2301 Tower C Yintai Centre
2 Jianguomenwai Avenue
Beijing, China 100022
+86 (10) 5910 0591
rran@cov.com

*Counsel for Defendant-Appellant*

# CERTIFICATE OF COMPLIANCE

I certify that the foregoing brief of Defendant-Appellant OnePlus Technology (Shenzhen) Co., Ltd. complies with the type-volume limitation of Fed. Cir. R. 32(b)(1) and contains 13755 words, excluding the portions of the brief exempted by Fed. Cir. R. 32(b)(2).

I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been composed in a proportionally spaced typeface using Microsoft Word in 14 point Century Schoolbook font.

*/s/ Richard L. Rainey*
Richard L. Rainey
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001
Telephone: (202) 662-6000
Fax: (202)
RRainey@cov.com

## CERTIFICATE OF CONFIDENTIAL MATERIAL

I certify that Defendant-Appellant OnePlus Technology (Shenzhen) Co., Ltd. has sought to mark 307 unique words (including numbers) in this brief as confidential. Pursuant to Fed. Cir. R. 25.1(d)(3), Defendant-Appellant has filed a motion to waive the confidentiality requirements of Fed. Cir. R. 25.1(d)(1)(A).

/s/ *Richard L. Rainey*
Richard L. Rainey
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001
Telephone: (202) 662-6000
Fax: (202)
RRainey@cov.com

# Addendum

# TABLE OF CONTENTS

Order Granting-in-part and Denying-in-part Plaintiffs'
    Motions to Strike OnePlus's Expert Opinions, granting-in-
    part and denying-in-part Plaintiffs' Motion for Summary
    Judgment regarding availability of certain prior art, and
    granting-in-part and denying-in-part OnePlus's Motions
    to Strike and Exclude Pantech's Expert Testimony,
    (02/12/2024) ........................................................................Appx000053

Order denying OnePlus's Motions for Summary Judgment,
    (02/27/2024) ........................................................................Appx000111

Jury Verdict (04/01/2024) ......................................................Appx000139

Order denying OnePlus's Motion to Dismiss for Lack of
    Standing and granting-in-part and denying-in-part
    OnePlus's Motions for Judgment as a Matter of Law
    (08/17/2024) ........................................................................Appx000148

Jury Verdict (10/17/2024) ......................................................Appx000192

Order denying OnePlus's Motions for Judgment as a Matter
    of Law and granting-in-part Plaintiffs' Motions for Entry
    of Judgment and Pre- and Post-Judgment Interest
    (01/23/2025) ........................................................................Appx000195

Final Judgment (01/23/2025) .................................................Appx000211

U.S. Patent No. 9,548,839 ......................................................Appx000364

U.S. Patent No. 11,012,954 ....................................................Appx000306

U.S. Patent No. 10,869,247 ....................................................Appx000358

U.S. Patent No. 9,063,654 ......................................................Appx000373

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION**

PANTECH CORPORATION and PANTECH §
WIRELESS, LLC, §
§
    Plaintiffs, §
§
v. §    CASE NO. 5:22-CV-00069-RWS
§
ONEPLUS TECHNOLOGY (SHENZHEN) §
CO., LTD., §
§
    Defendant. §
§

## <u>ORDER</u>

On February 6, 2024, the parties had the opportunity to argue their dispositive motions (Docket Nos. 79, 84, 86, 87) as well as several motions to strike (Docket Nos. 78, 80, 81, 82, 85, 100). Docket No. 169. This order addresses (1) Pantech's Motion to Strike OnePlus's Expert Opinions Concerning Untimely Disclosed Defenses of Alleged Non-Infringing Alternatives and Prosecution History Estoppel (Docket Nos. 78, 104, 115, 138); (2a) Pantech's Motion to Strike Defendant's Opinions Exceeding the Scope of Pantech's Supplemental Expert Report (Docket Nos. 100, 125, 145, 156) and (2b) the portions of Pantech's omnibus motion for summary judgment that rise and fall with this motion to strike (Docket Nos. 79 at 30–31, 111 at 33–34, 132 at 24–25, and 157 at 15–16); (3) the portions of Pantech's omnibus motion for summary judgment that concern whether certain references are prior art (Docket Nos. 79 at 20–29, 111 at 26–33, 132 at 13–24, and 157 at 11–15); (4) Pantech's Motion to Strike OnePlus's Opinions Concerning Indefiniteness and Based on an Incorrect Claim Construction (Docket Nos. 81, 103, 116, and 133); (5) OnePlus's Motion to Strike Expert Testimony of Dr. Jonathan D. Putnam (Docket Nos. 85, 106, 122, and 142); and (6) OnePlus's Motion to Strike and Exclude Expert Testimony of Charles

Mauro (Docket Nos. 82, 83, 105, 121, and 141). The parties' remaining motions will be addressed in forthcoming orders.

## BACKGROUND

Plaintiffs Pantech Corporation and Pantech Wireless, LLC (together "Pantech") allege direct and indirect infringement by Defendant OnePlus Technology (Shenzhen) Co., Ltd. ("OnePlus") of claims from eight United States patents. Four of the patents relate to wireless communications, including U.S. Patent Nos. 9,548,839 (" '839 Patent"), 10,869,247 (" '247 Patent"), 11,012,954 (" '954 Patent"), and 11,172,493 (" '493 Patent"). The parties agree that three of these patents—the '839 Patent, the '247 Patent, and the '954 Patent (collectively, the "SEP Patents")—are standard essential patents that cover 4G LTE and 5G telecommunication standards. The remaining four patents—U.S. Patents 8,587,710 (" '710 Patent"), 8,893,052 (" '052 Patent"), 9,063,654 (" '654 Patent"), and 10,162,490 (" '490 Patent")—concern mobile device displays, inputs, and their operations.

The accused products include telecommunications equipment that OnePlus provides and makes available for sale. This includes smartphones and mobile devices with LTE and 5G capabilities, such as the OnePlus X, OnePlus 3T, OnePlus 3, OnePlus 5T, OnePlus 5, OnePlus 6, OnePlus 6T, OnePlus 7 Pro, OnePlus 7T, OnePlus 7T Pro, OnePlus 8, OnePlus 8T, OnePlus 8 Pro, OnePlus 9 5G, OnePlus 9 Pro 5G, OnePlus Nord N10 5G, OnePlus Nord N100, OnePlus Nord N200 5G, OnePlus Nord N20 5G, and OnePlus 10 Pro 5G devices.

## LEGAL STANDARD

### I. Motions for Summary Judgment

Summary judgment exists, in part, "to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). A court may grant summary judgment when the moving party shows that "there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also*, *Celotex*, 477 U.S. at 327. A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The trial court must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment. *Casey Enterprises, Inc. v. American Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981) (citations omitted). The substantive law identifies which facts are material. *Anderson*, 477 U.S. at 248.

The party moving for summary judgment "always bears the initial responsibility of . . . demonstrat[ing] the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. If the movant bears the burden of proof on a claim or defense on which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure all of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original). The moving party, however, is not required to support its motion with materials negating its opponent's claim where the party in opposition carries the burden of proof at trial. *Celotex*, 477 U.S. at 322–23. Instead, the movant may discharge its burden by showing there is an absence of evidence to support the nonmovant's case. *Id.* at 325; *see also*, *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). Where a nonmoving party that carries the burden of proof at trial fails to make a showing sufficient to establish an essential element of its case in response to a motion for summary judgment, "there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323 (internal quotations and citations omitted).

## II.     Motions to Strike Untimely Disclosed Information

"If a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Courts apply a four-factor test to determine whether to find a violation substantially justified or harmless: (1) "the justification for why the disclosure should be considered timely"; (2) "the prejudice to the party opposing the introduction of the evidence"; (3) "the importance of the evidence"; and (4) "the possibility of curing such prejudice by granting a continuance." *Primrose Operating Co. v. National Am. Ins. Co.*, 382 F.3d 546, 564 (5th Cir. 2004).

## III.     Expert Testimony

Under Federal Rule of Evidence 702, a qualified expert may testify if (1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702.

An expert may base their opinion on facts or data that the expert has been made aware of or personally observed. Fed. R. Evid. 703. "Faced with a proffer of expert scientific testimony under Rule 702, the trial judge must determine . . . whether the reasoning or methodology underlying the testimony is scientifically valid and [] whether that reasoning or methodology [can properly] be applied to the facts in issue." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993). Many considerations bear on this inquiry. And a court, in its "gatekeeping" role, must focus "solely on principles and methodology." *Id.* at 594–95.

Case 5:22-cv-00355-JKP-HJB Document 189-1 Filed 09/04/25 Page 47 of 326 Page ID #: 8950

## DISCUSSION

Several of the parties' motions address the same topic. This order addresses multiple motions concurrently, where appropriate.

### IV. Pantech's Motion to Strike OnePlus's Expert Opinions Concerning Untimely Disclosed Defenses of Alleged Non-Infringing Alternatives and Prosecution History Estoppel (Docket No. 78)[1]

Pantech argues that certain evidence and arguments concerning noninfringing alternatives and prosecution history estoppel should be struck because OnePlus failed to timely disclose the evidence and arguments in support of these affirmative defenses. Pantech believes the evidence it seeks to strike is untimely because OnePlus bears the burden on these affirmative defenses but failed to disclose them until OnePlus filed its rebuttal expert reports. OnePlus responds it timely disclosed its noninfringing alternatives and prosecution history estoppel positions but that even if it did not, its failure to disclose is justified and harmless.

Pantech propounded Interrogatory No. 7, which sought OnePlus's non-infringing alternatives, and Interrogatory No. 6, which sought the bases and facts for all of OnePlus's defenses, which includes prosecution history estoppel. Pantech contends that by the close of fact discovery, OnePlus failed to disclose any noninfringing alternatives and its only identification of prosecution history estoppel arguments was a citation to the full prosecution history, which comprises over 3,000 pages. Further, OnePlus's corporate witness on noninfringing alternatives, who was deposed after close of fact discovery by agreement, testified twice that OnePlus "does not contend any non-infringement alternatives." *See* Docket No. 78-10 at 121:5–11, 126:21–127:11. Further, OnePlus's experts did not disclose the noninfringing alternatives or prosecution history estoppel arguments in their opening expert reports, but instead first disclosed these

---

[1] The parties' respective arguments are disclosed in Docket Nos. 78, 104, 115, and 138.

Appx000057

opinions in their rebuttal expert reports. Four days after the rebuttal expert reports were served, and two months after the close of fact discovery, OnePlus served a supplemental response to Interrogatory No. 7 that incorporated OnePlus's expert reports by reference. *Id.*

Applying the *Primrose* factors, Pantech first acknowledges that while these are important defenses for OnePlus, this importance does not override the prejudice Pantech would face. Pantech also notes that this prejudice arises solely from OnePlus's failure to carry its own burden by timely disclosing its bases for these defenses through interrogatory responses, deposition testimony, or opening reports. Pantech argues that granting a continuance would be highly prejudicial because it would essentially allow OnePlus a third bite of the apple very close to trial.

Pantech states that OnePlus's excuses for its failure to timely disclose these defenses are meritless. Pantech criticizes OnePlus's excuse that its corporate representative was unaware of noninfringing alternatives because (1) OnePlus still had the obligation to do timely due diligence and (2) OnePlus's corporate representative did not testify he did not have knowledge, he testified twice that OnePlus "does not contend any non-infringement alternatives." *See* Docket No. 78-10 at 121:5–11, 126:21–127:11. Pantech also notes that these excuses do not address OnePlus's failure to address noninfringing alternatives in its opening expert reports. Pantech further argues the opening reports contain no discussion or arguments concerning prosecution history estoppel, noting OnePlus only points to the bare recitation of claim limitations in its expert's opening report. Pantech argues that it was unable to identify prosecution history estoppel arguments when OnePlus cited the entire prosecution history in response to its interrogatory because Pantech would have had to discuss the potential application of prosecution history estoppel to every single claim whether it was in dispute or not. Pantech argues it lost the opportunity to depose inventors and

prosecution counsel about these amendments and its expert lost the opportunity to identify these arguments in his rebuttal report.

OnePlus responds that it timely disclosed its noninfringing alternatives and prosecution history estoppel arguments, and that even if it did not its disclosures are justified and harmless. Regarding its noninfringing alternatives, OnePlus argues Pantech mischaracterizes its corporate witness's testimony. OnePlus argues its corporate witness was unaware of noninfringing alternatives because they are a customer. OnePlus also contends that it made clear to Pantech that noninfringing alternatives were an issue for expert discovery. OnePlus further contends that noninfringing alternatives are proper rebuttal evidence because damages are Pantech's burden. OnePlus also states that Pantech's motion to strike noninfringing alternatives is overbroad because many of the damages opinions identified by Pantech have nothing to do with noninfringing alternatives.

OnePlus argues that its citation of the entire prosecution history in its interrogatory response was sufficient because Pantech could identify potential prosecution history estoppel arguments just as well as OnePlus could.[2] Specifically, OnePlus notes Pantech's own briefing agrees that certain amendments were made to overcome prior art. OnePlus also argues that any prejudice was cured because Pantech was able to depose OnePlus's corporate witnesses and experts, and the parties were permitted to supplement their expert reports by agreement. In addition, OnePlus argues its supplemental interrogatory response disclosed that its patent history estoppel theories applied to specific limitations (*e.g.*, "target application control gesture," "without displaying a control interface," and "reference time period"). Finally, OnePlus cites extensive case

---

[2] Defendant also argues that paragraphs 186, 187, and 216 of Dr. Kia's rebuttal report were discussed on pages 23–30 and 39–42 of his opening report.

law to argue that Pantech was not prejudiced because it did not have the opportunity to depose inventors and prosecution counsel because such testimony is irrelevant to whether prosecution history estoppel applies.

## A.    Defendant's Non-Infringing Alternative Arguments are Stricken

Pantech persuasively argues that its motion to strike OnePlus's reliance on noninfringing alternatives should be granted in part. OnePlus's disclosure of these noninfringing alternatives was untimely because OnePlus failed to disclose these noninfringing alternatives in its interrogatory responses and initial reports. Pantech correctly states that OnePlus should have disclosed the noninfringing alternatives in its opening reports because OnePlus bears the burden of identifying non-infringing alternatives. *See, e.g.*, *ZiiLabs Inc., Ltd. v. Samsung Elecs. Co. Ltd.*, No. 2:14-cv-203-JRG-RSP, 2015 WL 6690403 at *2 (E.D. Tex. Nov. 1, 2015) ("Disclosing this non-infringing alternative in the Lastra Report deprived ZiiLabs of a chance to offer competing expert testimony."); *see also Godo Kaisha IP Bridge 1 v. Broadcom Ltd.*, No. 2:16-CV-134-JRG-RSP, 2017 WL 2869344, at *3 (E.D. Tex. Apr. 20, 2017).

Both parties agree that noninfringing alternatives is an important defense for OnePlus. But OnePlus's excuse for withholding the disclosure of the noninfringing alternatives until its rebuttal reports is not credible. Even if OnePlus's corporate representative was unaware of noninfringing alternatives,[3] this does not explain why OnePlus failed to identify these noninfringing alternatives in interrogatory responses or, at the very least, in its opening expert report. It was OnePlus's burden to investigate and disclose possible noninfringing alternatives—to allow OnePlus to disclose

---

[3] Defendant's argument that its noninfringing alternatives were timely disclosed because the parties agreed to submit supplemental reports is likewise unconvincing. The parties agreed this supplementation was limited to "information unavailable prior to Sept. 22nd." Docket Nos. 69, 72. Defendant provides no explanation as to why it was unable to investigate and disclose the availability of noninfringing alternatives by September 22, 2023.

noninfringing alternatives for the first time in a rebuttal report would cause substantial prejudice and render contention interrogatories useless. *See Godo Kaisha IP Bridge*, 2017 WL 2869344, at *3.[4] Allowing OnePlus to present this untimely theory of noninfringing alternatives would be substantially prejudicial to Pantech because of the numerous factual issues it would have to investigate. Pantech lost the opportunity to investigate whether these alternatives were actually available. Furthermore, asking Pantech to perform an infringement analysis less than two months before trial would be incredibly prejudicial. Furthermore, OnePlus has failed to convincingly argue that a continuance would be fair or warranted. For these reasons, Pantech's motion to strike OnePlus's untimely noninfringing alternatives defense is **GRANTED-IN-PART** and **DENIED-IN-PART**. Accordingly, it is

**ORDERED** that ¶¶ 175–183, 230–232, and 273–278 of the Rebuttal Report of Dr. Apostolos K. Kakaes (Docket No. 78-11) are stricken and Dr. Kakaes is precluded from offering any testimony about noninfringing alternatives. It is further

**ORDERED** that the highlighted portion of ¶ 169 of the Dr. Kia's rebuttal report (Docket No. 78-13) is not stricken to the extent Dr. Kia is opining that certain accused products do not contain the allegedly infringing functionality, but Dr. Kia cannot characterize this update as a noninfringing alternative. It is further

**ORDERED** that ¶¶ 75, 171, 179, 180, 200–203, 219, 226–230, 235–236, 253–254 of the Rebuttal Report of Dr. Mario A. Lopez (Docket No. 78-12) are stricken in their entirety and Dr.

---

[4] OnePlus's argument that Pantech's motion to strike Dr. Lopez's damages opinion as overbroad is unpersuasive. As Pantech argued at the February 6, 2023 hearing, the identified paragraphs in Dr. Lopez's report should be stricken in their entirety because Dr. Lopez's reliance on noninfringing alternatives is embedded into his methodology. Furthermore, OnePlus's position that there would be no prejudice to Pantech if OnePlus was allowed to update certain paragraphs of Dr. Lopez's report to adjust this analysis by removing Dr. Lopez's reliance on noninfringing alternatives ignores the realities of Dr. Lopez's analysis.

Lopez may not opine about any alleged noninfringing alternative, the value of such alleged noninfringing alternative, or the value of the asserted patents compared to any such alleged noninfringing alternative.

### B. Defendant's Prosecution History Estoppel Arguments are Stricken-in-Part

With respect to Pantech's motion to strike paragraphs 186, 187, and 216 of Dr. Kia's rebuttal report (Docket No. 78-13), Pantech is again correct that OnePlus bears the initial burden of identifying narrowing amendments. *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1366 (Fed. Cir. 2003) (noting the first question is whether an accused infringer establishes that an amendment filed at the Patent and Trademark Office was narrowing). The Court agrees that OnePlus could have specified in its interrogatory responses and opening report where in the prosecution history it was referring to make its prosecution history estoppel argument. For example, it is unclear what amendments or arguments Dr. Kia is referencing in paragraphs 186 and 216 of his rebuttal report because he does not cite specific paragraphs of his opening report or describe the narrowing amendments he believes resulted in the complete disavowal of certain functionalities. Similarly, in paragraph 187 of his report, Dr. Kia also opines that "[s]imilar arguments regarding display of control interface were given in other prior art citations." Docket No. 78-13, ¶ 187. When read in context of OnePlus's arguments, the opening report, and the claim construction history, this opinion provides little context as to what amendments or arguments Dr. Kia may be referencing.

Dr. Kia does, however, specifically reference Matthews in his rebuttal report when discussing the disavowal of a partial control interface. Docket No. 78-3, ¶ 187. The effect of amendment the applicant made to overcome Matthews was discussed extensively during claim construction:

This prosecution history is not clear enough to exclude the selection of all user interface buttons from the scope of "gesture." For one, the applicants' prosecution-history arguments were directed to not just the "gesture" terms *but to the entire limitation, including the phrases "without displaying a control interface of the first application" and "the contact signal being generated on a display screen in which a control interface of the target application is not displayed."* '052 Patent at 13:36–60. (emphasis added); *see also, id.* 14:59–15:19. T*hus, the surrounding claim language provides context as to whether control interface buttons are displayed for the different gesture types.* Moreover, the prosecution history was clear that "such selection of the user interface buttons in Matthews cannot be characterized as 'application selection gesture' or 'target application control gesture' recited in Claim 1." *Id.* at 11 (emphasis added). Because the applicants' arguments concern the entire limitation rather than just "target application control gesture" and the specific selection buttons of Matthews, it is not sufficient to hold the applicants disavowed the selection of all user interface buttons under any possible configuration whatsoever.

Docket No. 51 at 46. Accordingly, both parties were aware that the applicant's discussion of Matthews was not sufficient to disavow the selection of all user buttons under any possible configuration but that it was clear enough that "such selection of the user interface buttons in Matthews cannot be characterized as 'application selection gesture' or 'target application control gesture' recited in Claim 1." *Id.* Given the language of the claim itself, and the Court's construction, both parties should have been prepared to address the basic issue of whether a partial control interface was a foreseeable equivalent or whether Pantech disavowed the same. *See, e.g.*, *Graver Tank & Mfg. Co. v. Linde Air Prod. Co.*, 339 U.S. 605, 609 (1950) ("What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case. . . . An important factor is whether persons reasonably skilled in the art would have known of the interchangeability of an [equivalent] not contained in the patent with one that was."). "Prosecution history estoppel applies as part of an infringement analysis to prevent a patentee from using the doctrine of equivalents to recapture subject matter surrendered from the literal scope of a claim during prosecution." *Trading Techs. Int'l, Inc. v. Open E Cry, LLC*, 728 F.3d 1309, 1322 (Fed. Cir. 2013). Both parties recognize prosecution history estoppel is an

important legal issue. OnePlus offers no plausible reason it could not have disclosed its new estoppel theory about the disavowal of a "partial control interface" in Dr. Kia's opening report, especially given the Court had considered this amendment on a different disavowal theory. OnePlus obviously understood the importance and relevance of this amendment but chose not to argue that a partial control interface was disavowed in this amendment. OnePlus correctly argues that there is minimal prejudice to Pantech because inventor and prosecution counsel testimony is not relevant to prosecution history estoppel. *See Festo Corp.*, 344 F.3d at 1370 ("[W]hether the patentee has established a merely tangential reason for a narrowing amendment is for the court to determine from the prosecution history record without the introduction of additional evidence, except, when necessary, testimony from those skilled in the art as to the interpretation of that record."). But OnePlus ignores that its failure to disclose this new theory still deprived Pantech of the opportunity to submit an expert report rebutting this new theory of prosecution history estoppel. OnePlus also ignores that its own motion for summary judgment of noninfringement of the '052 Patent (Docket No. 86) asks the Court to resolve OnePlus's argument of prosecution history estoppel before Pantech had an opportunity to submit an expert report in support of its position.

OnePlus's failure to properly disclose this estoppel argument has put Pantech, and the Court, in the difficult position of resolving a newly introduced legal issue on the eve of trial. On its face, based on the plain language of the claim and argument made during the amendment, OnePlus's estoppel argument is strong. But allowing OnePlus to foreclose Pantech's reliance on a partial control interface as an equivalent based on a late-disclosed prosecution history estoppel argument—that Pantech has not had the opportunity to respond to—would be substantially prejudicial. Accordingly, whether the applicant's amendment to overcome Matthews resulted in estoppel is an issue that will be carried through trial and resolved through judgment as a matter of

law ("JMOL"). *See Loral Fairchild Corp. v. Sony Corp.*, 181 F.3d 1313, 1318 (Fed. Cir. 1999) (discussing the underlying court's rejection of the jury's advisory verdict on prosecution history estoppel on JMOL).

For these reasons, Pantech's motion to strike OnePlus's prosecution history estoppel argument is **GRANTED-IN-PART** and **DENIED-IN-PART**. Accordingly, it is

**ORDERED** that the identified portions of paragraphs 186 and 216 of Dr. Kia's rebuttal report (Docket No. 78-13) are stricken in their entirety. The portion of paragraph 187 of Dr. Kia's report that states "[s]imilar arguments regarding display of control interface were given in other prior art citations" is also stricken. It is further

**ORDERED** the prosecution history estoppel argument identified in paragraph 187 of Dr. Kia's rebuttal report will be resolved through JMOL. It is further

**ORDERED** that Pantech **MAY** serve a supplemental expert report responding to paragraph 187 of Dr. Kia's report by March 1, 2024.

## V. Pantech's Motion to Strike OnePlus's Opinions Exceeding the Scope of Pantech's Supplemental Expert Report (Docket No. 100) and the Portion of Pantech's Omnibus Motion for Summary Judgment Addressing Invalidity (Docket No. 79)[5]

On October 16, 2023, the Court granted the parties' joint motion to serve supplemental expert reports as "to information unavailable prior to September 22." Docket No. 72. Pantech argues that OnePlus violated the Court's limited leave to supplement by introducing new invalidity theories in violation of Rule 26 and the Court's order. Specifically, Pantech contends OnePlus's supplemental report was only supposed to address Charles Mauro's and Martin Walker's

---

[5] The parties' respective arguments about Pantech's motion to strike Defendant's opinions exceeding the scope of Pantech's supplemental expert report are disclosed in Docket Nos. 100, 125, 145, 156. The portions of Pantech's omnibus motion for summary judgment that rise and fall with this motion to strike are briefed at Docket Nos. 79 at 30–31, 111 at 33–34, 132 at 24–25, and 157 at 15–16. At the hearing, the parties agreed to rest on their briefing regarding these issues.

supplemental reports, which were focused on infringement, not invalidity. OnePlus responds that these supplemental reports opened the door to a new invalidity theory and that its erratum properly corrected a copy and paste error.

### A. Pantech's Motion to Strike Section 8 of Dr. Kia's Supplemental Rebuttal Report is GRANTED

First, Pantech seeks to strike Section 8 of Dr. Kia's supplemental report, titled "Evidence of Invalidity of the '654 Patent," which contends that OnePlus's own source code is prior art for the '654 Patent. Docket No. 100-2, ¶¶ 57–63. This is a new invalidity position not previously disclosed in OnePlus's contentions or opening report. Pantech also notes that this supplementation is in violation of the parties' agreement to file supplemental reports because the agreement was limited to information unavailable prior to September 22, 2023. *See* Docket Nos. 69, 72.

Pantech admits it addressed this source code for the first time in its supplemental infringement report. But Pantech explains it only learned that OnePlus's "previously-unavailable code" was substantively the same as "stock" Android code shortly before supplementation. Pantech maintains that OnePlus could have disclosed this invalidity opinion at any time because the theory is based on the source code of OnePlus's own products. Pantech summarizes that this functionality has been accused throughout litigation and accordingly this invalidity theory does not *contradict or rebut infringement e*vidence.

OnePlus responds that Pantech's supplemental report identified code that was used in earlier versions of the Android OS that predate the patents in suit, so Dr. Kia addressed this "new information" concerning the source code because it is relevant to his invalidity theory. OnePlus contends Pantech "opened the door" by relying on this new source code in its supplemental report. OnePlus contends Section 8 is responsive because Dr. Walker's report has an entire section about the consistency of source code across Android models (*see* Docket No. 100-3 ¶¶ 50–51 (discussing

consistency of source code in Android 12, 11, 10, 9, 8, and 7) and Dr. Kia responds to Dr. Walker's analysis by showing that this same source code was a printed publication before the issuance of the '654 Patent.

Section 8 of Dr. Kia's report should be stricken. While it would be proper for Dr. Kia to respond to Dr. Walker's opinions about the consistency of this source code in terms of infringement, Section 8 of Dr. Kia's analysis does not discuss whether there is infringement based on the consistency of the source code between Android 12, 11, 10, 9, 8, and 7—the versions discussed by Dr. Walker. *Compare* Docket No. 100-3, ¶¶ 50–51 *with* Docket No. 100-2, ¶¶ 57–63. Instead, Dr. Kia goes beyond Dr. Walker's report to compare the alleged infringing software versions against the software used in Android Version 2, which he contends was released before the priority date. Docket No. 100-2 at ¶¶ 57–63. Both parties recognize that this is an important issue. But OnePlus's excuse that it could not identify this source code as prior art until Pantech relied on later versions for the purpose of infringement is simply not credible. It was OnePlus's burden to investigate and disclose possible prior art and by its own admission this source code was publicly available. OnePlus should have known to investigate earlier versions of its own source code as possible prior art, especially because later versions of this source code were used in OnePlus's own products. OnePlus's failure to disclose this invalidity theory can only be attributed to OnePlus's lack of due diligence, not Pantech's behavior. Further, the prejudice against Pantech is substantial—OnePlus's untimely invalidity theory has denied Pantech the opportunity to sufficiently investigate the public availability of this version of the source code or have its expert compare that version to the asserted claims. For these reasons, Pantech's motion to strike Section 8 of Dr. Kia's rebuttal report is **GRANTED**. Accordingly, it is

**ORDERED** that Dr. Kia's opinions at Section 8 (concerning invalidity) of his November 28, 2023 rebuttal expert report is hereby stricken; and Dr. Kia is not permitted to offer any testimony at trial concerning these stricken opinions.

**B.    Pantech's Motion to Strike Dr. Kia's Erratum is DENIED and the Portion of Pantech's Omnibus Motion for Summary Judgment that Relies on Striking Dr. Kia's Erratum is DENIED**

Second, Pantech argues Section 9 of Dr. Kia's November 28, 2023 rebuttal expert report should be stricken. Section 9 of Dr. Kia's rebuttal report is styled as an erratum and purportedly corrects a copy and paste error. Pantech contends this is not a proper erratum because it does not fix a typographical error, but instead offers new grounds of invalidity disclosed nowhere else in the opening report. Specifically, the erratum discloses newly identified structures in Kinoshita and analyzes the novel aspects of claim element 10.h, particularly the requirements of "without the application selection gesture" and "if the first application is the only background application being executed." Pantech believes Section 9 exceeds the scope of the parties' agreed supplementation because Dr. Kia's correction of his report is unrelated to Pantech's supplemental expert reports and is based on information available to Dr. Kia prior to September 22, 2023. Pantech contends that OnePlus's defense of invalidity based on the alleged prior art reference Kinoshita fails as a matter of law. Specifically, Dr. Kia failed to offer a valid anticipation opinion for Claims 10 and 18 of the '052 patent because he did not address each and every claim limitation. Dr. Kia's original report addresses random claim language rather than claim 10(h) of the '052 Patent. Similarly, Pantech notes that Dr. Kia's assessment of claim 18(c) must also fail because his analysis of this limitation just incorporates his opinions related to claims 10(c) and (h) by reference.

OnePlus responds that Pantech is improperly seeking "to seize on a copy and paste error" in Dr. Kia's opening report. OnePlus admits Dr. Kia's report inadvertently addressed the wrong limitation in his opening report but argues the limitation he addressed is similar to claim 10(h) and

nevertheless disclosed structures relevant to anticipation. OnePlus argues Pantech's motion to strike should fail because Dr. Kia disclosed the relevant teachings concerning limitations 10(h) and 18(c) in paragraphs 97–104, 137–139, 144–152, 176–180 of his opening report. OnePlus contends it timely served an erratum that properly fixed this error on November 28, 2023. OnePlus further notes the erratum relies on the same citations Dr. Kia disclosed in reference to the wrong claim element (18(h)) as well as other similar citations.

Pantech fails to persuade the Court it was unfairly surprised by OnePlus's anticipation theory or that OnePlus's use of an erratum to correct a copy and paste error is unduly prejudicial. Both parties appreciate OnePlus's invalidity theory is important, and the prejudice of striking Dr. Kia's corrected opinions would be substantial. While the Court agrees with Pantech that Section 9 of Dr. Kia's report is outside the scope of the parties' agreed supplementation, Pantech's briefing failed to identify substantial prejudice that would arise from this supplementation. For these reasons, the portion of Pantech's motion to strike Section 9 of Dr. Kia's November 23, 2023 report is **DENIED** and the portion of Pantech's Omnibus Motion for Summary Judgment that addresses invalidity is **DENIED**. Accordingly, it is

**ORDERED** that Pantech **MAY** serve a supplemental expert report responding to Section 9 of Dr. Kia's report by March 1, 2024.

## VI. Pantech's Motion for Summary Judgment on the Availability of Certain Prior Art (Docket No. 79)[6]

Both parties agree that the priority date of the '839 Patent is February 19, 2008. The parties disagree over the priority date of the '954 patent—Pantech believes the correct priority date is February 10, 2010 and OnePlus opines the correct priority date is January 2, 2010.

Pantech contends that OnePlus's defenses of invalidity based on alleged prior art references R1-081161, R1-081063, and R2-100423 fail as a matter of law because OnePlus cannot show that these references were publicly accessible prior to the priority dates of the '839 and '954 Patents, and because R1-081161 did not even exist before the priority date of the '839 Patent. Pantech's expert opines these documents would have been created in 2008 and 2010 (based on first two digits after hyphen). He further opines these documents were not publicly accessible because there is evidence, consistent with his experience, that these documents were not uploaded to the public database at the time they were created. He also states these documents were not publicly available because they were stored in a database that was unindexed and not text searchable.

In response to Pantech's motion for summary judgment, OnePlus submitted a declaration (the "Rodermund declaration") to support its position on the public accessibility of the references. Pantech argues that OnePlus does not materially dispute Pantech's list of undisputed facts. Instead, OnePlus offers new, disputed material facts that depend "solely" on the untimely and improper declaration of Friedhelm Rodermund. Rodermund's declaration was produced for the first time in response to Pantech's motion for summary judgment. Pantech believes Rodermund's declaration should be disregarded because it introduces new facts and sets forth new opinions that were never

---

[6] The portions of Pantech's omnibus motion for summary judgment that concern whether these 3GPP documents are prior art are briefed at Docket Nos. 79 at 20–29, 111 at 26–33, 132 at 13–24, and 157 at 11–15.

disclosed during discovery. Further, Rodermund was not disclosed in response to Rule 26 or in OnePlus's interrogatory responses, and Rodermund was not listed as a potential witness for trial. Finally, Pantech questions OnePlus's reliance on case law that found similar 3GPP documents were prior art because whether a particular document is a printed publication must be approached on a case-by-case basis.

OnePlus responds that there is ample evidence that these documents were publicly available pursuant to 3GPP's regularly conducted business activities and were sufficiently indexed and searchable on the 3GPP website. OnePlus notes it originally opined these documents were publicly available based on the date disclosed on the face of the documents. OnePlus contends that there is case law that shows similar materials were publicly available and that reliance on the date of publication of the document can be sufficient. OnePlus argues that Rodermund's declaration is necessary and proper because Pantech challenged the publication date of this prior art for the first time in its motion for summary judgment. OnePlus cites several cases where the Patent and Trademark Board considered declarations for a similar purpose.

OnePlus also argues that there is little prejudice because Rodermund is not an expert. Instead, OnePlus posits Rodermund is like a librarian submitting a declaration for the limited purpose of authenticating and establishing the date of a prior art reference. OnePlus notes Rodermund's declaration is consistent with the date of publication disclosed in Dr. Kakaes's report and there is ample evidence that these documents were disseminated via email. OnePlus further criticizes Pantech's reliance on metadata and comments to establish a later publication date because OnePlus believes Pantech is attempting to use its expert to rely on inadmissible hearsay.

Pantech persuasively argues that it would be highly prejudicial to admit Rodermund's declaration or to allow Rodermund to testify at trial. Unlike the cases OnePlus relies on,

Rodermund's declaration is not a short declaration by a current or former custodian or librarian who has actual knowledge of when these documents were published. *See Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, 240 F. Supp. 3d 605, n.10 (E.D. Tex. Mar. 03, 2017) (allowing defendant to "submit[] a modest amount of supplemental evidence" regarding public availability of a reference);[7] *see also, e.g., Telefonaktiebolaget LM Ericsson v. TCL Corp.*, 941 F.3d 1341, 1345 (Fed. Cir. 2019) (admitting untimely declaration of a librarian who had "personal knowledge" of the availability of a journal issue and of the record keeping procedures at the time). Rodermund's declaration is not a short declaration based on personal knowledge—it is 44 pages long and relies on opinions based on his experience, not his personal knowledge about the availability of these specific documents. *See* Docket No. 112. Rodermund's declaration also includes almost 600 pages of appendices and exhibits, including Rodermund's curriculum vitae, the official meeting report of the RAN WG1 meeting #52 held on February 11–15, 2008, and other documents. *See id.* Further, OnePlus had notice of Pantech's position as early as October 27, 2023, when Dr. Cooklev opined these documents did not qualify as printed publications. *See* Docket No. 79-3.

Even with the knowledge that this was an important issue for which OnePlus bears the burden, OnePlus never moved for leave to supplement its report nor did it provide Pantech with notice it intended to rely on a new witness's declaration. Instead, OnePlus waited over two months

---

[7] Notably, the "new evidence" attached to the sur-reply consisted "of one new item—a five-page affidavit" describing the author's practice of making copies of his monographs available to a public institution was allowed because the issue of public availability arose late in the case. *Id.* The Court specifically noted, however, that "the new material d[id] not affect the Court's ruling that summary judgment of anticipation should be denied [because t]he evidence adds little more than support for the inference that the Cheung book has been in the ACTCM library since shortly after its publication in November 1994, although it does not establish that the book was catalogued at that time." *Id.*

to serve Rodermund's declaration concurrently with its reply to Pantech's motion for summary judgment. OnePlus offers no explanation for this delay and instead argues this issue came up late. But this argument is unconvincing given OnePlus's admission at the hearing that Rodermund's declaration should have been disclosed earlier. Pantech would be highly prejudiced by the admission of Rodermund's declaration and Pantech has lost valuable time to depose Rodermund and rebut his opinions. OnePlus fails to justify its delayed disclosure of Rodermund's opinions. Accordingly, Rodermund's declaration is inadmissible and he may not testify at trial.

OnePlus's briefing, however, does identify evidence as to R1-081063 and R2-100423 that raises genuine disputes of material fact. OnePlus appears to have initially relied on the date alone because of case law where similar standards documents were found to be publicly available. *See, e.g.*, *Cradlepoint, Inc. v. 3G Licensing S.A.*, No. IPR2020-01103, 2021 WL 203194 (P.T.A.B. Jan. 19, 2021) (relying on upload date corresponding to file and declaration in support that such a time stamp accurately reflects the date the document was uploaded and became publicly accessible). OnePlus's motion shows that it has evidence for R1-081063 and R2-100423, such as emails and agendas, that contradicts the opinions of Pantech's expert, and accordingly raises genuine issues of material fact. Accordingly, the Court finds that it is appropriate to allow OnePlus to explore the availability of R1-081063 and R2-100423 with Pantech's expert through cross examination.[8]

The summary judgment record, however, does not create a genuine dispute of material fact as to R1-081161. Unlike R1-081063 and R2-100423, OnePlus does not provide evidence of email dissemination or agendas that could create a genuine issue of material fact as to R1-081161. Instead, OnePlus relies primarily on the date on this document and challenges Pantech's reliance

---

[8] The evidence cited in OnePlus's briefing on this report was not cited in Dr. Kakaes's report, and this order does not authorize Dr. Kakaes to testify outside of the scope of his report. OnePlus may, however, use the evidence attached to its motion to challenge Dr. Cooklev's opinion.

on metadata as impermissible hearsay.[9] OnePlus fails to carry its burden to show that R1-081161 was publicly available. *See In re Lister*, 583 F.3d 1307, 1317 (Fed. Cir. 2009) ("[A]bsent any evidence pertaining to the general practices of the Copyright Office, Westlaw, and Dialog, or the typical time that elapses between copyright registration, inclusion in the Copyright Office's automated catalog, and subsequent incorporation into one of the commercial databases, any presumption [as to when certain events occurred] would be pure speculation."). OnePlus's reliance on cases where the Patent and Trial Board found a similar 3GPP document was publicly available is unpersuasive because in those cases the alleged infringer presented evidence well beyond the date on the face of the document. *See Apple*, 2020 WL 2549627, at *4 (finding R2-010182 was publicly available because there was evidence that it was discussed during a well-attended, open meeting, uploaded on a file server by a certain date, and disseminated via email to over a thousand subscribers). Similarly, the cases OnePlus relies on to argue a date on a document is sufficient are inapplicable because those documents have dates with some other indicia of reliability. *See, e.g.*, *DeLorme Publ'g Co., Inc. v. BriarTek IP, Inc.*, 60 F. Supp. 3d 652, 662 (E.D. Va. 2014) (relying on copyright date and testimony of the employee who created the manual); *VidStream LLC*, 981 F.3d at 1062–63 (relying on copyright page of book issued by a publishing company that also had an ISBN number, a certificate from the copyright office, and testimony from an expert on library cataloging and classification). As Pantech argued at the hearing, OnePlus has failed to carry its burden as to R1-081161 by not identifying genuine issues of material fact.

---

[9] While the Court need not reach the issue of whether the upload data and metadata is hearsay, even the cases cited by OnePlus rely on similar evidence. *See Apple, Inc. v. Uniloc 2017 LLC*, No. IPR2019-00222, 2020 WL 2549627, at *4 (P.T.A.B. May 19, 2020) (relying, in-part, on the date a file was uploaded onto a file server).

For these reasons, Pantech's motion for summary judgment on the availability of R1-081161, R1-081063, and R2-100423 as prior art is **GRANTED** as to R1-081161 and **DENIED** as to R1-081063 and R2-100423. Accordingly, it is

**ORDERED** that Pantech's motion for summary judgment against OnePlus's defense that R1-081161 anticipates and/or renders obvious claims 9–12 of the '839 Patent is **GRANTED**. Accordingly, OnePlus may not argue that R1-081161 or R1-081063 *in view of R1-081161* renders obvious claims 9-12 of the '839 Patent. It is further

**ORDERED** that Pantech's motion for summary judgment against OnePlus's defense that R1-081063 renders obvious claims 9-12 of the '839 Patent is **DENIED.** It is further

**ORDERED** that Pantech's motion for summary judgment against OnePlus's defense that R2-100423 anticipates and/or renders obvious claims 6 and 9 of the '954 Patent is **DENIED.** It is further

**ORDERED** that Rodermund's declaration is inadmissible and Rodermund may not testify at trial.

## VII. Pantech's Motion to Strike OnePlus's Opinions Concerning Indefiniteness and Based on an Incorrect Claim Construction (Docket No. 81)[10]

Pantech argues that OnePlus has raised two belated claim construction opinions for the '954 Patent that are improper and should be stricken. OnePlus responds that Dr. Kakaes's opinions are proper because they are consistent with the plain and ordinary meaning of the claim terms.

### A. Pantech's Motion to Strike Dr. Kakaes's Claim Construction Opinions is Granted-in-Part

First, Pantech seeks to strike paragraphs 217 and 219 of Dr. Kakaes's noninfringement report. (Docket No. 81-2, ¶¶ 217, 219). Pantech contends that Dr. Kakaes's opinion sets forth a

_____

[10] The parties' respective arguments are disclosed in Docket Nos. 81, 103, 116, and 133.

particular construction for "delegate CC" that was not argued at claim construction and improperly narrows the term. Specifically, Pantech disputes that the plain and ordinary meaning of "delegating a CC" requires that a Component Carrier ("CC") is selected from a group based on some characteristics of the set of component carriers in that group. Pantech argues that even though Dr. Kakaes characterized this as the plain and ordinary meaning, this cannot be the case because Dr. Kakaes admitted "set as a delegate CC" is not a technical term of art. *See* Docket No. 81-3 at 91:10–14. Pantech argues that Dr. Kakaes relies on prosecution history to argue that the examiner's rejection narrowed the scope of the term such that simply using a CC to be the 'representative' for the TAG is not sufficient. Docket No. 81-2, ¶ 217. Pantech argues this is improper because Dr. Kakaes should have viewed the terms in context of the patent specification and not considered the prosecution history to define the term because such a determination is within the purview of the Court. *See, e.g.*, *Ziilabs Inc., Ltd. v. Samsung Elecs. Co*., No. 2:14-CV-203-JRG-RSP, 2015 WL 8274055, at *2 (E.D. Tex. Dec. 8, 2015) ("[An expert's testimony] must view the terms in the context of their use in the patent but cannot rely on statements in the prosecution history to limit the ordinary meaning of the term. That is for the Court."). Finally, Pantech notes that OnePlus had originally proposed "delegate CC" for construction in its P.R. 4-1(a) disclosures but subsequently dropped it and did not raise this dispute earlier despite the Court's commentary that it wished to avoid *O2 Micro* disputes.

OnePlus responds that Pantech mischaracterizes Dr. Kakaes's opinion as a narrowing of the plain and ordinary meaning "being set as a delegate CC," when he is simply applying the correct meaning based on the specification. Specifically, Dr. Kakaes relies on the specification to understand that "the one or more delegate CCs are selected by the UE based on a state of the UL timing group and characteristics of a plurality of CCs forming the UL timing group, so as to

establish the UL synchronization." '954 Patent at 2:34–37. OnePlus critiques Pantech's argument because Pantech does not explain how Dr. Kakaes's understanding of this term is inconsistent with the plain and ordinary meaning, which is supported by the specification. In contrast, OnePlus notes that Dr. Cooklev believes that the plain and ordinary meaning allows "any of the activated" CCs to be a delegate CC, but Pantech identifies nothing in the specification that supports this understanding of the term. OnePlus argues that Dr. Cooklev's construction must be improper because it reads out the term "being set as a delegate CC" from the claim and accordingly cannot be the plain and ordinary meaning. OnePlus argues that Pantech is asking the Court to ignore the ordinary meaning of the term as disclosed in the specification and rely only on the attorney argument Pantech offers in support of its position.

Pantech persuasively argues Dr. Kakaes's opinions in paragraph 217 of his report should be struck because he relies on the prosecution history rather than the specification. But Pantech's criticism of Dr. Kakaes's understanding of this term based on the specification falls flat. Pantech acknowledges that Dr. Kakaes should have considered the plain and ordinary meaning in context of the patent specification. But Pantech's briefing fails to reference the specification to explain why Dr. Kakaes's reliance on the specification is improper or point to anything in the specification itself that shows Dr. Kakaes is improperly narrowing this term. At the hearing, Pantech admitted that there is nothing in the specification that supports Dr. Cooklev's interpretation of the plain and ordinary meaning. Pantech's argument that this is irrelevant because Dr. Kakaes's opinion imports an unnecessary limitation into the claim is unconvincing given that Pantech cannot point to anything in the record that would allow a broader meaning without reading out this limitation. *See id*.

Generally, a "delegate CC" is a CC used for RAP transmission on behalf of a group of CCs. *See* '954 Patent at 11:22–23 ("When the UL timing group is generated, the UE 480 may select a delegate CC for each group (step S434)"). Based on the specification, a delegate CC may be a "predetermined CC in the set UL timing group" or it may be chosen based on any number of technical characteristics, such as the CC with the lowest or highest center frequency value, a center frequency value closest to a mean value, or the broadest frequency band. *Id*. at 11:23–35, 19:43–45. "[T]he same criterion may be used for all groups or a different criterion may be used for each timing group"—a delegate CC may be selected based on a network state of each group, characteristics of CCs forming each group, and the like." *Id*.at 12:59–64. Dr. Kakaes's opinion in paragraph 219 of his report is consistent with the specification and Pantech has not shown otherwise.

For these reasons, Pantech's motion to strike Dr. Kakaes's opinions based on an improper claim construction is **GRANTED-IN-PART** and **DENIED-IN-PART.** Accordingly, it is

**ORDERED** that Dr. Kakaes's noninfringement opinion at ¶ 217 of his rebuttal report (Docket No. 81-2, ¶ 217) is hereby stricken.

## B. Pantech's Motion to Strike Dr. Kakaes's Indefiniteness Opinions is Moot

Second, Pantech argues that Dr. Kakaes's opinions in paragraphs 65–72 of his invalidity report should be stricken. Docket No. 81-6, ¶¶ 65–72. In these paragraphs, Dr. Kakaes opines that there is an uncertainty as to the correct interpretation of independent Claim 9 because of grammatical and comma errors. At the hearing, the parties represented they had to come an agreement that Dr. Kakaes could testify as to what grammatical tweaks he made to understand the claims but he cannot say that the claims are uncertain "or any of the reasons behind it." Accordingly, Pantech's motion to strike paragraphs 65–72 of Dr. Kakaes's invalidity report is **DENIED-AS-MOOT** per party agreement.

## VIII. OnePlus's Motion to Strike Expert Testimony of Dr. Jonathan D. Putnam (Docket No. 85)[11]

OnePlus moves to strike several opinions of Pantech's damages expert, Dr. Putnam, including (1) his "Scenario 1" opinions that claim damages for the entire six-year damages period, (2) his opinions concerning an IDC report, (3) his opinions that the royalty rate of each non-essential patent ("NEP") may be calculated based on the royalty rate of a standard essential patent, and (4) his opinions that a 1.72 multiplier is appropriate to account for validity and infringement. Pantech opposes the striking of each of these opinions. For the reasons below, OnePlus's motion to strike the expert testimony of Dr. Putnam is **GRANTED-IN-PART** and **DENIED-IN-PART**.

### A. Dr. Putnam May Not Offer Opinions About "Scenario 1"

First, OnePlus seeks to strike Dr. Putnam's opinions on "Scenario 1," which calculates damages for the entire six-year damages period allowed under 35 U.S.C. § 286. OnePlus's Interrogatory No. 7 sought:

> Describe Your efforts to ensure that any product, component, part and/or service identified in response to Interrogatory No. 6 was marked according to 35 U.S.C. § 287, including a full description of each such effort or activity and all persons with knowledge of any of the foregoing; describe any other evidence that Pantech intends to rely upon to show that Pantech or licensees to the Patents-In-Suit have complied with the marking provisions of 35 U.S.C. § 287; and identify all documents evidencing the same.

Docket No. 85-3 at 8.[12] After making general objections, including an objection that OnePlus bears the initial burden of production on this issue, Pantech stated that it is "not relying on compliance

---

[11] The parties' respective arguments are disclosed in Docket Nos. 85, 106, 122, and 142.

[12] Interrogatory No. 6 seeks "Other than products marketed, manufactured, sold, or imported by Defendants in the above-captioned case, identify all current and former products (by product name and model number), including all licensed products, that You allege embody(ied) any invention claimed in the Patents-in-Suit and the claim(s) which such products embody(ied), provide a detailed description of how each such product embodies(d) each identified claim, and provide an identification of the persons most knowledgeable about such allegations and all documents

with the marking of its products or its licensees' products to satisfy 35 U.S.C. § 287 for purposes of notice in this litigation." *Id.* at 9. Pantech's interrogatory response goes on to affirmatively state that "Pantech intends to *instead* rely on the notice provision of 35 U.S.C. § 287." *Id.* (emphasis added). Then Pantech's response described correspondence between the parties and cited the relevant documents it was relying on to show notice to OnePlus under the notice provision of 35 U.S.C. § 287. *Id.* at 10.

"The patentee bears the burden of pleading and proving he complied with § 287(a)'s marking requirement." *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1366 (Fed. Cir. 2017) (noting that whether products have been marked is particularly within the patentee's knowledge). After the patentee pleads compliance with the marking requirement, the alleged infringer must satisfy the low bar of meeting an initial burden of production to articulate which products it believes are unmarked "patented articles" subject to § 287. *Id.* at 1368. OnePlus does not dispute, or challenge, that Pantech has sufficiently pleaded compliance under § 287 through an alternative form of notice such that Pantech may seek damages under the "Scenario 2" theory.[13] But based on Pantech's Amended Complaint, and its own representations in its interrogatory responses, OnePlus reasonably believed Pantech only intended to plead compliance with § 287 by relying on letters or the filing of the Complaint to show notice. Nowhere in the Amended Complaint or in its discovery responses, did Pantech disclose that it intended to rely on the alternate theory of compliance with § 287 through marking. Docket No. 85-3 at 8–10; *see also,*

---

evidencing the same." 85-3 at 3. Although Pantech supplemented Interrogatory No. 6 twice, it did not supplement Interrogatory No. 7. *Id.* at 3–8.

[13] Scenario 2 refers to damages beginning on the date OnePlus was notified by Pantech about potential infringement of the Asserted Patents.

*e.g.*, Docket No. 6, ¶¶ 43, 53–54, 58, 67–68, 72, 84–85, 89, 100–101, 105, 118–119, 132–133, 137, 150–151, 154, 166–167, 171.[14]

It was reasonable for OnePlus to take Pantech at its word and determine it did not need to expend resources to investigate whether Pantech or Pantech's licensees marked its products when Pantech did not intend to rely on showing compliance with § 287 through marking. Even though Pantech identified products that embodied the asserted patents in response to Interrogatory No. 6, Pantech's response to Interrogatory No. 7 unequivocally waived any reliance on a notice theory that relied on marking. Accordingly, it was reasonable for OnePlus to focus its resources on when the damages period began based on the notice requirement of 35 U.S.C. § 287.[15]

Pantech also alternatively argues that the damages limitations of § 287 do not apply to the '052 and '654 Patents because Pantech's response to Interrogatory No. 6 never identified any of its own products or its licensees' products that practiced either patent. OnePlus persuasively responds that because Pantech only ever pleaded compliance with § 287 through notice, OnePlus reasonably understood that Pantech did not plead that it complied with § 287 for the '052 or '654 Patents because there was no need to mark any products with those patent numbers. Because Pantech failed to meet this low pleading standard, the burden of production never shifted to OnePlus. *See Express Mobile, Inc. v. Liquid Web, LLC,* No. 1:18-CV-01177-RGA, 2019 WL 1596999, at *2 (D. Del. Apr. 15, 2019) ("A claim for past damages requires pleading compliance

---

[14] At the hearing, both parties confirmed that dates disclosed in the Amended Complaint are "Scenario 2" dates which rely on compliance with § 287 through an alternative form of notice, not "Scenario 1" dates which would comply with § 287 through marking.

[15] Pantech points out that OnePlus's damages expert analyzed possible damages under the entire statutory period of 35 U.S.C. § 286. But the prejudice here does not arise from whether OnePlus knew it needed to calculate damages for a longer time period—the prejudice here is that OnePlus believed there was no need to investigate whether Pantech complied with § 287 through marking because Pantech conceded it was not pleading compliance based on such a theory.

with the marking statute—even when compliance is achieved, factually, by doing nothing at all."); *see also Seoul Semiconductor Co. v. Finelite, Inc.,* No. 22-CV-02869-TLT, 2023 WL 7106480, at *3 (N.D. Cal. Jan. 27, 2023); *Power Density Sols. LLC v. IBM Corp.*, No. 19-CV-03710-RS, 2020 WL 4876895, at *3 (N.D. Cal. Mar. 20, 2020) (noting that plaintiff's burden to plead compliance with § 287 "has a long pedigree").[16] OnePlus, again, has the better argument. Pantech's affirmative statement that it was not relying on marking—along with the allegations in the Amended Complaint—properly limits its damages even as to the '052 and '654 Patents.[17] Pantech's representation in its interrogatory responses led OnePlus to believe it did not need to investigate whether Pantech's or its licensees' products actually practiced the '052 or '654 Patent because Pantech's affirmatively stated it did not intend to show compliance with § 287 through marking, even if such compliance was achieved because there were no products to mark. Accordingly, the same reasoning as above also applies to these two patents, and Pantech may not present "Scenario 1" theories for either of these patents because Pantech represented it was not relying on the theory that there was compliance with § 287 through marking.

For these reasons, this portion of OnePlus's motion is **GRANTED**. Accordingly, it is

**ORDERED** that Dr. Putnam will not provide testimony regarding any computation of damages for activity occurring before OnePlus was notified of the alleged infringement, and Dr.

---

[16] At the hearing, Pantech identified *Freeny v. Fossil Grp., Inc.*, No. 2:18-cv-49, 2019 WL 8688587 (E.D. Tex. July 24, 2019) and *Salazar v. AT&T Mobility LLC, et al.*, No. 2:20-cv-4, ECF No. 222 (E.D. Tex. May 28, 2021) for the first time as instructive cases on this issue. Both parties submitted supplemental briefing addressing these specific cases. Docket Nos. 176, 177. OnePlus correctly argues that the facts here are distinguishable. In neither of these cases did the plaintiff affirmatively plead compliance with § 287 through notice, not marking.

[17] Pantech's argument that Interrogatory No. 7 is limited to the products described in response to Interrogatory No. 6 is not credible given that Interrogatory No. 7 seeks "any other evidence that Pantech intends to rely upon to show that Pantech or licensees to the Patents-In-Suit have complied with the marking provisions of 35 U.S.C. § 287; and identify all documents evidencing the same."

Putnam's computations of damages related to the time period under "Scenario 1" is stricken. It is further

**ORDERED** that, within **seven (7) days** of this Order's entry, the parties **SHALL** jointly move to file a redacted version of Docket Nos. 176 and 177. The parties' joint motion **SHALL** provide proposed redactions, describe the confidential information in those proposed redactions, and provide good cause for each redaction. Or, if no redactions are necessary, the parties **SHALL** jointly file an unsealed and unredacted version of Docket Nos. 176 and 177 with a cover page stating no redactions are needed.

### B.      Dr. Putnam May Offer Testimony Based on the IDC Report

OnePlus also seeks to strike Dr. Putnam's opinions that rely on handset sales data arising from an International Data Corporation ("IDC") report. OnePlus argues his opinions should not be admitted because the IDC report is inadmissible hearsay, Dr. Putnam cannot establish the report is reliable, and OnePlus provided its own, accurate sales data.

Pantech responds that Dr. Putnam may opine on the sales data arising from the IDC report because this is a reliable publication from a well-known source that experts like Dr. Putnam typically rely on. Pantech further contends that Dr. Putnam's reliance on the report is needed because OnePlus's corporate representatives were not able to clearly articulate how OnePlus was paid for the alleged infringing devices. Pantech further notes that OnePlus's own employees admitted there were errors in OnePlus's sales data that were never corrected, and therefore it is reasonable for Dr. Putnam to present alternative figures based on reliable public information that is regularly used by those in the industry. Pantech stresses that Dr. Putnam will not opine that the IDC estimates should be credited over OnePlus's actual sales data because this is an issue for the jury to decide.

Pantech persuasively argues there are potential issues with OnePlus's sales data and that the IDC report is the type of report an expert could typically rely on to inform and confirm his opinions. OnePlus's arguments about the reliability of the IDC sales report and Dr. Putnam's apportionment of the sales disclosed by this report go to credibility issues for the jury to consider, not admissibility. Any potential issues with how IDC collects sales data can be explored on cross-examination.[18] OnePlus's argument that the IDC sales report is inadmissible hearsay goes to how this report may be used rather than the reliability of Dr. Putnam's opinions. The IDC sales data may be used to inform and confirm whether OnePlus's own sales data contains errors. While the IDC report or the schedules in Dr. Putnam's report may not be received as evidence to go back with the jury for deliberations, Dr. Putnam may present his opinions about this report and demonstratives about how it would affect the damage analysis.

For these reasons, OnePlus's motion to strike Dr. Putnam's reliance on the IDC sales data is **DENIED**.

### C.    Dr. Putnam May Opine the Asserted NEPs have a Royalty Rate of ▮▮▮▮

OnePlus also seeks to strike Dr. Putnam's opinion that the royalty rate of ▮▮▮▮ for the two asserted non-essential patents ("NEP")—the '654 Patent and the '052 Patent—may be based on the royalty rate of the '247 standard essential patent ("SEP") because he understands that the '247 Patent has the same "technical impact" as each asserted NEP.[19] OnePlus argues this method

---

[18] At the hearing, the parties disputed how IDC collects data and what products the IDC sales data included. Dr. Putnam's report acknowledges that "Pantech's accusations are limited to the OnePlus handset models explicitly identified in its complaint. However, OnePlus regularly discontinues old models and introduces new ones. The IDC sales data reflect all OnePlus models, not just those named in the Complaint." Docket No. 85-2, at 9 n. 52. Exhibit 3.4 of Dr. Putnam's report appears to apportion the IDC sales data by product. Docket No. 85-2 at 31–32 (Schedules A and B).

[19] Dr. Putnam testified that he relied on expert testimony to understand the technical impact of each asserted NEP. Docket No. 85-7 at 180:15–181:4. But Mauro, an expert who provided

is improper because all Pantech does is "alleg[e] a loose or vague comparability between different technologies or licenses," which is insufficient. *Laser Dynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012). OnePlus further challenges the reliability of this methodology because Dr. Putnam found that the "established royalty" for Pantech's patent portfolio is ███, which includes a ███ rate for *all* SEPs and ███ for *all* NEPs. According to OnePlus, Dr. Putnam's opinion that the two asserted NEPs each have a royalty rate of ███ cannot be reliable because it fails to apportion the "established" NEP royalty and instead renders the remaining 200 NEP families in Pantech's portfolio worthless.

Pantech believes that all of OnePlus's critiques of Dr. Putnam's methodology go to weight, not admissibility. Pantech responds that Dr. Putnam's methodology was not unreasonable just because Dr. Putnam did not perform an apportionment analysis. *See Commonwealth Sci. & Indus. Rsch. Org. v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015). Pantech contends Dr. Putnam used an acceptable methodology by determining a royalty through the consideration of the '247 Patent. Pantech argues it does not matter that Dr. Putnam does not rely on opinions "that the asserted NEPs cover the same technology as the '247 patent" because Dr. Putnam instead relied on the "technical impact," which is "[b]ased on the usage and commercial and technical advantages of Pantech's NEPs described by Pantech's technical experts." Specifically, Pantech points to paragraphs 56–59 and 223–228 for the basis of Dr. Putnam's opinion, where he opines that while these NEPs may not be "technical[ly] essential," he understands that these patents are "commercially" essential. Docket No. 106-7, ¶¶ 51–59, 223–228. Pantech further states that

---

testimony about one of the NEP patents at issue, testified he never spoke with Dr. Putnam or offered opinions about the '247 Patent. Docket No. 85-8 at 14:21–24, 57:17–18, 58:18–59:18. Pantech's response offered a declaration from Mauro that clarified statements made during his deposition. Docket No. 106-2.

OnePlus's arguments about the failure to apportion go to weight, not admissibility, especially because the royalties for Pantech's NEPs are not capped at ▮▮▮▮▮ Similarly, Pantech contends it is the jury's role to weigh the contradicting record evidence regarding whether Dr. Putnam spoke to certain technical experts about the technical impact of each asserted NEP.

Pantech is correct that determining a reasonable royalty from comparable licenses is an appropriate method for estimating a royalty rate. And the Court agrees that it would be up to a jury to determine whether Dr. Putnam actually spoke to the technical experts to determine comparability. "Assessing the comparability of licenses requires a consideration of whether the license at issue involves comparable technology, is economically comparable, and arises under comparable circumstances as the hypothetical negotiation." *Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1372–73 (Fed. Cir. 2020) (citing *Laser Dynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51 (Fed. Cir. 2012)). While Pantech's briefing concedes that the '247 Patent may not be technically comparable to the two asserted NEPs, Dr. Putnam has at least put forth a baseline theory that the '247 Patent may be economically comparable. Docket No. 106-7, ¶¶ 51–59, 223–228. Accordingly, the degree of comparability between the '247 Patent and the asserted NEPs is appropriately left for the jury to decide. *See Bio-Rad*, 967 F.3d at 1373 (finding no error in admitting testimony about a license for which the district court ultimately determined was not technically comparable); *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012) (finding the district court did not err in allowing an expert to opine on a license that did not "involve the patents-in-suit and did not cover any of the technologies in the case" because comparability went to weight, not admissibility). OnePlus's evidence and argument about lack of comparability and possible overvaluation are for the jury to consider and can be addressed through cross examination.

For these reasons, OnePlus's motion to strike Dr. Putnam's opinion that the reasonable royalty for the '052 and '654 Patents is ███ is **DENIED**.

### D. Dr. Putnam May Not Offer Testimony Concerning the 1.72 Multiplier

Finally, OnePlus moves to strike Dr. Putnam's 1.72 multiplier, which he applies to the royalty rate. OnePlus argues that this multiplier is not connected to the asserted patents. Instead, Dr. Putnam relies on a Michigan Law Review article from 2000 that allegedly establishes a success rate for patent litigants. *See* Docket No. 85-2 at 26 (Exhibit 3.3. at note b). OnePlus also relies on several cases to argue that this multiplier should be excluded because it is not actually tied to the facts of the case. *See Avocent Redmond Corp. v. Rose Elecs*., No. C06-1711RSL, 2013 WL 8844098, at *5 (W.D. Wash. Mar. 11, 2013) (excluding testimony that the royalty rate should be multiplied by three based on a "general litigation-success-rate theory" rather than having "some relationship to the patent at issue."); *Carucel Invs., L.P. v. Novatel Wireless, Inc*., No. 16-cv-118-H-KSC, 2017 WL 1215838 at *20–21 (S.D. Cal. Apr. 3, 2017) (granting motion *in limine* concerning expert testimony that a royalty rate should be adjusted upward based on litigation statistics found in a "PWC Litigation Report"); *MAZ Encryption Techs. LLC v. Blackberry Corp*., No. 13-304-LPS, 2016 WL 4490706, at *2 (D. Del. Aug. 25, 2016) (excluding an expert's opinion on upward adjustment that "patent holders tend to prevail approximately 40% of the time" because it was "not sufficiently tied to the particular facts of this case").

Pantech responds that OnePlus ignores the extensive case law that adjusting royalty rates from comparable licenses to account for validity and infringement is appropriate. Pantech argues a jury should determine whether such an adjustment is necessary because royalty rates in licenses may be discounted for litigation risks and costs.

But the cases cited by Pantech are distinguishable. For example, in *Mondis Tech., Ltd. v. LG Elecs., Inc.*, the Court explicitly noted that an opinion that the royalty rate should be tripled

must be "supported by sufficient facts or data." No. 2:07-cv-565, 2011 WL 2417367, at *5 (E.D. Tex. June 14, 2011). The Court in *Mondis* also relied on evidence within pre-litigation licensing documents that established the "litigation rate," the sophistication of the parties involved in the license agreements, as well as Federal Circuit case law that provides examples at trial where the royalty determined at trial is three times higher. In *Saint Lawrence Commc'ns v. ZTE Corp.,* the invalidity and settlement discounts were tied to the facts in the case because the expert considered proposals made by the licensee to the alleged infringer to quantify the discounts. No. 2:15-cv-349, 2017 WL 679623, at *2 (E.D. Tex. Feb. 21, 2017). Similarly, in *Image Processing Techs., LLC v. Samsung Electronics Co., Ltd.,* the price premium analysis compared a product that contained the relevant invention to a product that did not. No. 2:20-cv-50, 2020 WL 2499736, at *4–6 (E.D. Tex. May 14, 2020). Even the Federal Circuit discusses that the adjustment of a settlement needs to consider "various aspects. . . of the *particular* litigation settlements offered for admission into evidence" because of "the inherent connection between patent licenses and at least the potential for litigation." *Prism Techs. LLC v. Sprint Spectrum L.P.,* 849 F.3d 1360, 1369 (Fed. Cir. 2017) (emphasis added). In fact, one of the cases cited by Pantech vacated a damages award that "significantly adjust[ed] upward the reasonable royalty without any factual findings that accounted for the technological and economic differences between those licenses and the [asserted] patent." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 872–73 (Fed. Cir. 2010).

"[A]s a matter of policy, Plaintiff should at least be able to make the argument that at the hypothetical negotiation the royalty rate would be increased due to the lack of uncertainty," but whether the 1.72 multiplier is appropriate "is another issue." *Mondis*, 2011 WL 2417367, at *5. Dr. Putnam may testify that the royalty rate can be adjusted upward to account for the discounts that may inherently be present during pre-litigation settlement, but he may not rely on the 1.72

multiplier because it is completely disconnected from the facts here. *See Avocent*, 2013 WL 8844098, at *5 ("The fact that patent holders are successful in only 33% of cases nationwide tells us nothing about the actual or perceived strength of [the patentee's] claims as it was negotiating the settlement with [the licensee]."); *Carucel*, 2017 WL 1215838, at *21 ("The PWC report provides general statistics that are untethered to the facts in this case and, therefore, should be excluded.");

For these reasons, OnePlus's motion to strike Dr. Putnam's testimony about the 1.72 multiplier is **GRANTED**. Dr. Putnam will not provide testimony concerning a computation of damages using his 1.72 multiplier and Dr. Putnam's calculations relating to the multiplier are stricken.

## IX. OnePlus's Motion to Strike and Exclude Expert Testimony of Charles Mauro (Docket No. 82)[20]

OnePlus contends that Mauro is not qualified to offer opinions on patent infringement, claim construction, and invalidity regarding the '654 patent because he is not a person of ordinary skill in the art ("POSITA"). OnePlus points to the Court's claim construction order to argue that Mauro is not a POSITA and alleges that Mauro has no computer engineering experience. OnePlus argues that Pantech's failure to object to the claim construction waived any challenge to the definition of a POSITA. OnePlus also criticizes Mauro's understanding of the plain and ordinary meaning of the terms "region," "pop-up form," and "information," arguing that those terms were not presented for consideration during claim construction and Pantech cannot proffer narrower constructions for them now. OnePlus also seeks to strike Mauro's arguments about secondary considerations and non-obviousness because OnePlus is not relying on a theory of obviousness for

---

[20] The parties' respective arguments are disclosed in Docket Nos. 82, 83, 105, 121, and 141. At the hearing, the parties agreed to rest on their briefing for this issue.

the '654 Patent—it is only relying on the theory of anticipation. OnePlus argues that the portions of Mauro's opinion that address the state of the art are irrelevant because the prior art anticipates every element of the invention.

Pantech argues that Mauro qualifies under the Court's definition of a POSITA because of his extensive experience in Graphical User Interface ("GUI") design. Pantech argues in the alternative that the Court only offered that definition of a POSITA for the purpose of claim construction. Pantech argues the jury should be allowed to consider whether Mauro's experience in GUI design is sufficiently related to qualify him as a POSITA. Pantech notes that Mauro did extensive programming in graduate school and has an "extensive background in software development related to user interface design and human factors engineering." Pantech further argues that even if the Court finds Mauro is not qualified to testify about the hardware or software of the invention, he can testify as to other aspects of the invention where there is no question he has significant experience (*i.e.*, how the user interface works).

Pantech also disputes each of OnePlus's challenges to specific portions of Mauro's testimony. Pantech believes Mauro's limited testimony about the state of the art is relevant and important because it is closely tied to how the claimed user interface works differently from the prior art that OnePlus contends anticipates the '654 Patent. Furthermore, Pantech contends Mauro's discussions about the nine problems in the art are relevant to the technological background, the perspective of a POSITA and damages. Pantech also believes the nine problems in the art lend support to is doctrine of equivalents theory. Plaintiff also alleges that Mauro's opinions about the terms "touch region," "pop-up form," and "information associated with" are proper and consistent with the plain and ordinary meaning as understood by a POSITA. Finally,

OnePlus seeks to preclude Mauro from testifying on issues of direct infringement, inducement, and secondary considerations.

### A.    OnePlus Fails to Persuasively Argue Mauro's Years of Experience in GUI Design Cannot Qualify Him as a POSITA

During claim construction, neither party offered a definition of a POSITA. Accordingly, the claim construction order found that, for the '654 Patent, "a skilled artisan would have had a bachelor's degree in electrical engineering, computer engineering, computer science, or a related field, and three-years experience *in the design and programming of user applications and interfaces for mobile terminals*." Docket No. 51 at 7 (emphasis added). Mauro has 45 years of experience in design and human factors research and offers his services as an expert in GUI design and testing. Docket No. 82-2 at 8. But Mauro possesses a Bachelor of Science Degree in Industrial Design and a Master's Degree in Ergonomics and Human Factors Engineering. *Id.* at 8. While Mauro does not have a degree in computer engineering, a jury could reasonably find his years of substantial experience in the GUI design field make up for his lack of "classical training" with respect to the design of user applications and interfaces for mobile terminals. *Allure Energy, Inc. v. Nest Labs, Inc.*, No. 9-13-CV-102, 2015 WL 9450793, at *2–3 (E.D. Tex. Apr. 20, 2015) (denying a motion to exclude after finding that an expert who did not have an engineering degree but who had almost 20 years of experience had "substantial hands-on experience in the precise field of the invention"). OnePlus "is free to cross-examine [Mauro] about his qualifications and how he developed his skills"—especially with respect to his software and hardware skills. *See id.*

But, based on the record before the Court, OnePlus has failed to persuade the Court that Mauro is unqualified to testify.[21]

### B.    Other Challenges to Mauro's Opinions

OnePlus has other concerns about Mauro's testimony, aside from whether he is qualified. The Court addresses each concern in turn.

#### 1.    Mauro's Testimony About Problems in the Art and Secondary Considerations

First, OnePlus challenges the relevance of Mauro's testimony about problems in the art and secondary considerations of non-obviousness. *See, e.g.*, Docket Nos. 82-2, ¶¶ 50–77; 82-3, ¶¶ 59–86, 89–96, 99–108, 210–212 Pantech persuasively argues the background testimony is permissible and relevant. It will be helpful to the jury for Mauro to provide background knowledge to frame his opinions and introduce and describe the problems the '654 Patent was trying to address. This testimony is relevant to several issues, including basic technological background and damages. OnePlus, however, correctly argues that "obviousness requires analysis of secondary considerations of non-obviousness, while secondary considerations are not an element of a claim of anticipation." *Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1364 (Fed. Cir. 2008). Accordingly, OnePlus's motion to strike is **DENIED-IN-PART** as to Mauro's background testimony to frame the knowledge of his opinions and generally discuss problems in the art and **GRANTED-IN-PART** as to Mauro's testimony about secondary considerations of non-obviousness. Accordingly, it is

---

[21]OnePlus may reurge dismissal of Mauro's opinions, in whole or in part, based on the testimony that comes in at trial. *See DynaEnergetics Eur. GmbH v. Hunting Titan, Inc.,* 629 F. Supp. 3d 548, 560 (S.D. Tex. 2022).

**ORDERED** that Mauro's opinions in ¶¶ 210–212 of his rebuttal report (Docket No. 82-3) are stricken. Mauro shall not provide testimony about secondary considerations of non-obviousness.

### 2.    Mauro's Alleged Claim Construction Arguments

Second, OnePlus argues that Mauro applies an improper, narrowing opinion as to the plain and ordinary meaning of "touch region" (*see* Docket Nos. 82-2, ¶¶ 115–117; 82-3, ¶¶ 99–108, 111, 113–123, 160–163, 164, 171–172), "pop-up form" (*see* Docket Nos. 82-2, ¶¶ 145–150; 82-3, ¶¶ 135–137, 179–180), and "information" (*see* Docket Nos. 82-2, ¶¶ 156–160; 82-3, ¶¶144–146, 187–188). OnePlus argues Pantech waived narrowing constructions for these terms by not presenting these terms at claim construction. OnePlus acknowledges that Mauro may review the asserted patents "to determine the technical context of the claimed invention and then use his technical understanding to form his opinions on whether the accused products infringe." *Varta Microbattery GmbH v. Audio P'ship LLC*, 2023 WL 5192986, at *3 (E.D. Tex. Aug. 11, 2023); *see also, e.g.*, *Ziilabs*, 2015 WL 8274055, at *2 ("An expert's testimony on the plain meaning of terms should be based on his training and experience. [An expert's testimony] must view the terms in the context of their use in the patent but cannot rely on statements in the prosecution history to limit the ordinary meaning of the term. That is for the Court.").

The opinions OnePlus seeks to strike from Mauro's opening report do not offer claim construction arguments to the jury. Docket No. 82-2, ¶¶ 115–117, 145–150, 156–160. There is nothing in this report that shows he narrowed or relied on anything but his experience to understand the meaning of the "touch region" and "pop-up form" terms. Similarly, most of Mauro's opinions in his rebuttal report consistently consider these same terms based on their plain and ordinary meaning. Mauro's opinions reasonably explain the plain and ordinary meaning of these terms when viewed in the context of their use in the patent, based solely on his experience. For example,

Mauro's explanation of the different meanings of "touch" and "touch region" in the '654 Patent and Sugiyama is appropriate and simply supports his understanding that these patents address different issues. Docket No. 82-3, ¶¶ 99–108, 111, 113–123, 160–164, 171–172. Similarly, Mauro's discussion of why screen switching is not the same as a "pop-up form" relies on his experience and does not rely on improper evidence to narrow the meaning of this term. *Id.*, ¶¶ 135–137, 179–180.

Mauro's discussion of "information" in his rebuttal report, however, is problematic. Docket No. 82-3, ¶¶ 144–146, 187–188. He relies on extrinsic evidence based on the research of M.K. Buckland to offer three different types of information and narrows the type of "information" claimed in the term. *Id*. OnePlus correctly argues that Mauro's "information" argument is an inappropriate narrowing of the plain and ordinary meaning that should have been addressed in claim construction. And Pantech fails to persuade the Court that this improper narrowing did not affect Mauro's opinions about Goren. *See* Docket No. 82-3, ¶¶ 187–188. Accordingly, this portion of OnePlus's motion to strike is **DENIED-IN-PART** as to the "touch region" and "pop-up form" terms and **GRANTED-IN-PART** as to the "information" term. It is therefore

**ORDERED** that Mauro may not opine on the narrowed meaning of "information" disclosed in paragraphs 144–146, 187–188 of his rebuttal report (Docket No. 82-3).

### 3. Mauro's Opinion that OnePlus Directly and/or Induced Third Parties to Infringe the '654 Patent

Finally, OnePlus challenges Mauro's testimony that OnePlus directly and/or induced third parties to directly infringe the asserted claims of the '654 Patent. Docket No. 82-2, ¶¶ 176–177. OnePlus argues Mauro's failed to provide an independent analysis of whether OnePlus sells and/or imports accused products in the United States, whether OnePlus induces infringement, and whether OnePlus did so with knowledge. Pantech responds that Mauro is not offering an opinion

on whether OnePlus sells and/or imports accused products in the United States, whether OnePlus induces infringement, or whether OnePlus did so with knowledge. He simply opines that if Pantech satisfies these other elements of these claims, then his comparison of the claim language to the accused products means that infringement occurred.

Here, Mauro's report does not offer opinions as to whether the other elements of infringement are met, so he, of course, cannot offer such opinions. But it is acceptable for Mauro to offer the opinion that the accused products infringe based on an assumption or hypothetical that the other elements are satisfied. Accordingly, this portion of OnePlus's motion to strike Mauro's testimony is **DENIED**.

## CONCLUSION

For the reasons discussed above, the Court rules as follows:

- Pantech's Motion to Strike OnePlus's Expert Opinions Concerning Untimely Disclosed Defenses of Alleged Non-Infringing Alternatives and Prosecution History Estoppel (Docket No. 78) is **GRANTED-IN-PART** and **DENIED-IN-PART**;

- Pantech's Motion to Strike OnePlus's Opinions Exceeding the Scope of Pantech's Supplemental Expert Report (Docket No. 100) is **GRANTED-IN-PART** (Section 8) and **DENIED-IN-PART** (Section 9);

- The portion of Pantech's Omnibus Motion for Summary Judgment Addressing Invalidity (Docket No. 79) is **DENIED** and the portion addressing the availability of certain prior art is **GRANTED-IN-PART** and **DENIED-IN-PART**. The remaining issues in Docket No. 79 that address patent exhaustion will be addressed in a separate order;

- Pantech's Motion to Strike OnePlus's Opinions Concerning Indefiniteness and Based on an Incorrect Claim Construction (Docket No. 81) is **GRANTED-IN-PART** and **DENIED-IN-PART**;[22]

- OnePlus's Motion to Strike Expert Testimony of Dr. Jonathan D. Putnam (Docket No. 85) is **GRANTED-IN-PART** and **DENIED-IN-PART**; and

- OnePlus's Motion to Strike and Exclude Expert Testimony of Charles Mauro (Docket No. 82) is **GRANTED-IN-PART** and **DENIED-IN-PART**. It is further

**ORDERED** that, within **seven (7) days** of this Order's entry, the parties **SHALL** jointly move to file a redacted version of this Order. The parties' joint motion **SHALL** provide proposed redactions, describe the confidential information in those proposed redactions, and provide good cause for each redaction. Or, if no redactions are necessary, the parties **SHALL** jointly file an unsealed and unredacted version of the Order with a cover page stating no redactions are needed.

**So ORDERED and SIGNED this 12th day of February, 2024.**

*Robert W. Schroeder III*
ROBERT W. SCHROEDER III
UNITED STATES DISTRICT JUDGE

---

[22] The portion of this motion that address indefiniteness is **DENIED-AS-MOOT** per party agreement.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TEXARKANA DIVISION

| | | |
|---|---|---|
| PANTECH CORPORATION and PANTECH WIRELESS, LLC, | § § § | |
| Plaintiffs, | § § | |
| v. | § § § | CASE NO. 5:22-CV-00069-RWS |
| ONEPLUS TECHNOLOGY (SHENZHEN) CO., LTD., | § § § | |
| Defendant. | § § § | |



## ORDER

Before the Court are Defendant's Motion for Judgment of Invalidity and Noninfringement of U.S. Patent No. 9,063,654 (Docket No. 84) and Defendant's Motion for Judgment of Ineligibility and Noninfringement of U.S. Patent No. 8,893,052 (Docket No. 86). These motions have been fully briefed. Docket Nos. 118–119, 136–137, 153–154. The parties argued these motions on February 6, 2024. Docket No. 169.

## BACKGROUND

Plaintiffs Pantech Corporation and Pantech Wireless, LLC (together "Pantech") allege[1] direct and indirect infringement by Defendant OnePlus Technology (Shenzhen) Co., Ltd. ("OnePlus") of U.S. Patent Nos. 8,893,052 (" '052 Patent") and 9,063,654 (" '654 Patent"), which concern mobile device displays, inputs, and their operations. The accused products include telecommunications equipment that OnePlus provides and makes available for sale, including smartphones and mobile devices.

---

[1] The other patents OnePlus is accused of infringing are not relevant to this order.

**LEGAL STANDARD**

**I.     Motions for Summary Judgment**

Summary judgment exists, in part, "to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). A court may grant summary judgment when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also*, *Celotex*, 477 U.S. at 327. A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The trial court must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment. *Casey Enterprises, Inc. v. American Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981) (citations omitted). The substantive law identifies which facts are material. *Anderson*, 477 U.S. at 248.

The party moving for summary judgment "always bears the initial responsibility of . . . demonstrat[ing] the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. If the movant bears the burden of proof on a claim or defense on which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure all of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original). The moving party, however, is not required to support its motion with materials negating its opponent's claim where the party in opposition carries the burden of proof at trial. *Celotex*, 477 U.S. at 322–23. Instead, the movant may discharge its burden by showing there is an absence of evidence to support the nonmovant's case. *Id.* at 325; *see also*, *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). Where a nonmoving party that has the burden of proof at trial fails to make a showing sufficient to establish an essential element of its case in response to a motion for summary judgment, "there can be no genuine issue

as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323 (internal quotations and citations omitted).

## II. Infringement

"Infringement is a two-step inquiry, in which a court must first construe disputed claim terms, and then compare the properly construed claims to the accused device." *Nazomi Commc'ns, Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1367–68 (Fed. Cir. 2005) (citing *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed.Cir.1998) (*en banc*)). "To establish infringement, every limitation set forth in a patent claim must be found in an accused product or process exactly or by a substantial equivalent." *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991). "It is well established that the burden of proving infringement by a preponderance of the evidence rests upon the patentee. *Medtronic, Inc. v. Mirowski Fam. Ventures, LLC*, 571 U.S. 191, 198–99 (2014) (finding this burden does not shift in a declaratory judgment); *see also Laitram*, 939 F.2d at 1535. "A finding of infringement, whether literal or by equivalents, is a question of fact." *Nazomi Commc'ns*, 403 F.3d at 1367 (citation omitted). But "when legal 'experts' offer their conflicting views of how the patent should be construed, or where the legal expert's view of how the patent should be construed conflicts with the patent document itself, such conflict does not create a question of fact nor can the expert opinion bind the court or relieve the court of its obligation to construe the claims according to the tenor of the patent." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 983 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996).

## III. Patent Eligible Subject Matter

Patents are presumed valid and the burden of establishing invalidity is with the party asserting such invalidity. 35 U.S.C. § 282; *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 100

(2011). A defendant must overcome the presumption that each claim of an asserted patent is valid by clear and convincing evidence. *Id.* at 97–98, 114.

"Patent eligibility is governed by 35 U.S.C. § 101, which provides that '[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.' " *Sanderling Mgmt. Ltd. v. Snap Inc.*, 65 F.4th 698, 702 (Fed. Cir. 2023). " 'Laws of nature, natural phenomena, and abstract ideas' are, however, 'an important implicit exception' to Section 101." *Id.* (citing *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014)). Courts have been warned to be wary of patents that threaten to "pre-empt use of [an] approach in all fields" thereby "effectively grant[ing] a monopoly over an abstract idea." *Bilski v. Kappos*, 561 U.S. 593, 612 (2010). But because all inventions, on some level, use or rely on laws of nature, natural phenomena, or abstract ideas "too broad an interpretation of this exclusionary principle could eviscerate patent law." *Nat. Alts. Int'l, Inc. v. Creative Compounds, LLC*, 918 F.3d 1338, 1342 (Fed. Cir. 2019). Accordingly, courts must also be sure not to "describ[e] the claims . . . at a high level of abstraction and untethered from the language of the claims" for that would "all but ensure[] that the exceptions to § 101 swallow the rule." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016).

In *Alice*, the Supreme Court provided a two-step analysis to determine whether a patent claims patent-ineligible subject matter. *Alice*, 573 U.S. at 217. The first step "determine[s] whether the claims at issue are directed to one of those patent-ineligible concepts." *Id*. If the claims are directed to a patent-ineligible concept, the second step searches for an "inventive concept" by "consider[ing] the elements of each claim both individually and as an ordered combination to

determine whether the additional elements transform the nature of the claim into a patent-eligible application." *Id.*

*Alice* step one implements "an important common-sense distinction between ends sought and particular means of achieving them, between desired results (functions) and particular ways of achieving (performing) them." *Elec. Power Grp. v. Alstom S.A.*, 830 F.3d 1350, 1356 (Fed. Cir. 2016). Claims are abstract when they use "result-based functional language" but fail to recite how the goals are achieved. *Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143, 1153 (Fed. Cir. 2019); *see also Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1328 (Fed. Cir. 2020) (noting a non-abstract claim must "ha[ve] the specificity required to transform a claim from one claiming only a result to one claiming a way of achieving it."). "Indeed, the essentially result-focused, functional character of claim language has been a frequent feature of claims held ineligible under § 101[.]" *Elec. Power Grp.*, 830 F.3d at 1356.

With respect to computer-implemented claims, "the first step in the *Alice* inquiry . . . asks whether the focus of the claims is on the specific asserted improvement in computer capabilities. . . or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." *Enfish,* 822 F.3d at 1335–36. When "the plain focus of the claims is on an improvement to computer functionality itself, not on economic or other tasks for which a computer is used in its ordinary capacity" the claims are not directed to an abstract idea but instead are "directed to a specific improvement to the way computers operate." *Id.* at 1336.

If claims are not directed to an abstract idea under step one of the *Alice* analysis, the Court need not proceed to step two of that analysis. *Id.* at 1339. But in cases where there are "close calls about how to characterize what the claims are directed to," the Court may analyze whether "there are arguably concrete improvements in the recited computer technology." *Id.*

In step two of *Alice,* courts consider "the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application." *CardioNet, LLC v. InfoBionic, Inc*, 955 F.3d 1358, 1368 (Fed. Cir. 2020) (citations and quotations omitted). "This second step is 'a search for an "inventive concept"—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself.' " *Id.* (citations omitted). An inventive concept must " 'involve more than performance of well-understood, routine, and conventional activities previously known to the industry.' " *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1367 (Fed. Cir. 2018). Whether a concept is inventive is evaluated not from the perspective of the present day or with the benefit of hindsight but from the "time of the patent." *Id.* at 1369.

"The appropriate question is not whether the entire claim as a whole was 'well-understood, routine and conventional' to a skilled artisan (*i.e.*, whether it lacks novelty)[.]" *Chamberlain Grp. v. Techtronic Indus. Co.*, 935 F.3d 1341, 1348-49 (Fed. Cir. 2019) (quotation omitted). Instead, the first question is "whether each of 'the elements in the claimed product (apart from the natural laws themselves) involve well-understood, routine, conventional activity previously engaged in by researchers in the field[.]' " *Id.* at 1349 (quotation omitted). The second question is "whether all of the steps 'as an ordered combination add nothing to the laws of nature that is not already present when the steps are considered separately[.]' " *Id.*

"Patent eligibility under 35 U.S.C. § 101 is ultimately an issue of law," although "[t]he patent eligibility inquiry may contain underlying issues of fact." *Berkheimer*, 881 F.3d at 1365. Specifically, underlying issues of fact may arise during the second step of *Alice* when considering "whether a claim element or combination of elements is well-understood, routine and conventional

to a skilled artisan in the relevant field." *Id.* at 1368. But "not every § 101 determination contains genuine disputes over the underlying facts material to the § 101 inquiry." *Id.*

Finally, "[e]ach claim of a patent [] shall be presumed valid independently of the validity of other claims." 35 U.S.C. § 282(a). Accordingly, while a movant may use representative claims in a patent eligibility analysis, the movant bears the burden of making a prima facie case that a claim is representative. *See PPS Data, LLC v. Jack Henry & Assocs.*, 404 F. Supp. 3d 1021, 1030–31 (E.D. Tex. 2019) ("[W]hen a defendant seeks to invalidate multiple claims based only on allegations relating to a subset of those claims, the defendant must justify treating that subset as representative of the other claims."). "In all cases, the representativeness inquiry must be 'directly tethered to the claim language.' *"Id.* at 1031. "[A] claim is not representative merely because it generally deals with the same subject matter as the other asserted claims," and "[i]n general, claims in one patent will not represent claims in another patent because patents must contain distinct inventions." *Id.*

## DISCUSSION

## IV. OnePlus's Motion for Summary Judgment of Invalidity and Noninfringement of the '654 Patent[2]

OnePlus's motion argues (1) claims 1, 6, 8, and 10 ("the asserted claims") of the '654 Patent are invalid as not being directed to patentable subject matter; and (2) the asserted claims of the '654 Patent are not infringed because the accused products lack a control unit that "removes the display of the second object if the second object is not selected within a reference period of time." Pantech responds that OnePlus's motion should be denied because (1a) the asserted claims of the '654 Patent provide a distinct, inventive user interface tool that takes into account the inherent

---

[2] The parties briefed this motion at Docket Nos. 84, 119, 136, and 153.

imprecision of user input into a touch screen and offers a particular solution that improves conventional devices; (1b) OnePlus ignores that there is at least a dispute of fact whether the '654 Patent's claim elements in combination are well-understood, routine, and conventional; and (2) OnePlus ignores Pantech's infringement theory and imports nonexistent claim limitations.

The '654 Patent relates "to a smart touch technology to support a display of an overlapped object." '654 Patent at 1:15–17. Generally, the '654 Patent addresses the problem of inaccurate selection via touch input when one of many target objects overlap or are closely located on a user interface. *See id.* at 1:19–30. Pantech asserts independent claim 1, which describes:

> 1. A terminal apparatus, comprising:
> an interface to detect a touch input, to detect a touch region corresponding to the touch input, and to identify an object that is overlapped by the touch input in the touch region as a first object;
> a processing unit to generate a second object based on the first object, and to display the second object in an untouched region; and
> a control unit to execute an operation corresponding to the second object if the second object is selected,
> wherein the control unit removes the display of the second object if the second object is not selected within a reference period of time.

*Id.* at 11:14–26. OnePlus's motion also addresses dependent claims 6, 8, and 10:

> 6. The terminal apparatus of claim 1, wherein the second object is displayed in a pop-up form.

> 8. The terminal apparatus of claim 1, wherein the second object comprises information associated with the first object.

> 10. The terminal apparatus of claim 1, wherein the control unit controls the interface to restrict a selection of the first object while the second object is selected.

*Id.* at 11:41–42, 11:46–47, 11:53–55.

The Court construed several terms related to the '654 Patent in its claim construction order. *See* Docket No. 51 at 49–54. Of particular importance to OnePlus's motion is the Court's construction of "wherein the control unit removes the display of the second object if the second

object is not selected within a reference period of time." *Id.*[3] When construing this term, the Court

noted that "the invention is always described in an environment where the display is always on."

Docket No. 51 at 53. The Court also found that "merely having the screen go off or idle after an

arbitrary amount of time would not, *by itself*, fall within this claim scope." *Id.* Accordingly, the

Court found that:

> The inclusion of "for displaying the second object" sufficiently addresses the issue
> by tying the limitation to not just any time, but the time the second object is
> displayed. Accordingly, the Court construes these terms as "wherein the control unit
> removes the display of the second object if the second object is not selected within
> *a reference period of time for displaying the second object*."

*Id.* (emphasis added).

### A.   OnePlus's Motion for Summary Judgment of Non-Infringement of the '654 Patent is DENIED

Pantech contends the "wherein the control unit removes the display of the second object if

the second object is not selected within a reference period of time" limitation in claim 1 is satisfied

because the user can configure their device to enter a lock screen or "inactive state." Docket No.

84-8, ¶ 23. Pantech alleges that if the alleged second object is not selected after the device's display

of that object, the screen will time out as a result of the expiration of the "auto screen off" display

inactivity sleep timer. *See id.*; *see also* Docket No. 174-3. Pantech alleges that the second object

is removed at the moment of screen time out, pointing to the fact that the second object is no longer

displayed upon waking the device:

---

[3] The Court also construed "removing the display of the second object if the second object is not selected within a reference period of time," which is used in claim 12 of the '654 Patent. *Id.*



*See* Docket Nos. 84-8, ¶ 23 (excerpted and annotated in red); 174-3 . Pantech notes that there are some scenarios where the second object is not removed. *See id.* at 10.

OnePlus argues that Pantech's theory of infringement cannot succeed because Pantech relies on the time set by the "auto screen off" feature as the "reference period of time for displaying the second object." OnePlus argues the undisputed evidence shows the "auto screen off" feature times out based on inactivity, not the display of the second object. For example, Pantech's expert Martin Walker opines that "[a]s part of certain battery-saving features, the Android OS can initiate a lock screen and keyguard function *after a period of inactivity*." Docket No. 84-8, ¶ 23. OnePlus believes the evidence shows that the auto sleep off feature is an energy saving mechanism because the "auto screen off" feature is tied to power savings, not the display of the second object. OnePlus also points to alleged weaknesses in the analysis of Charles Mauro, Pantech's expert. OnePlus argues that Mauro's testing does not sufficiently show the second object is removed based on a reference period *time for displaying the second object*, especially because Mauro did not inspect the software. OnePlus argues that Pantech's testing does not show the expiration of the "auto screen off" feature *causes* the removal of the second object. OnePlus believes Mauro's testing shows, at most, only a *correlation* between the activation of the lock screen and the removal of the second object not *causation*. In other words, OnePlus believes Mauro's testing fails to show that the removal of the second object has anything to do with how long the second object is displayed.

Pantech responds that OnePlus mischaracterizes Mauro's opinions. Pantech maintains that the time limit set by the "auto screen off" feature of the accused devices satisfies the reference period of time because in each of Mauro's examples the second object is removed *when* the "auto screen off" timer expires, not *after* it expires. Pantech contends the expiration of the "auto screen off" timer is not just any time—it's a time that corresponds to the time at which the second object is removed if it is not selected. Pantech argues the second object is not removed just because the screen goes to sleep because its experts have shown that when the screen turns back on the second object stays removed. Pantech believes it is inconsequential that the auto screen off time is a power saving mechanism. Pantech contends causation is not a requirement of the claim language, so long as the "the control unit removes the display of the second object if the second object is not selected within a reference period of time."

Per the Court's construction, Pantech must show that the "reference period of time" is "a reference period of time for displaying the second object." Docket No. 51 at 53. As discussed in the Court's claim construction order, the inclusion of "for displaying the second object" ties the limitation "to not just any time, but the time the second object is *displayed*." *Id.* (emphasis added). OnePlus is correct that the Court found that merely allowing the phone to enter sleep mode "after an arbitrary amount of time would not, by itself, fall within the claim scope." *Id.* If Pantech's analysis had ended at the "inactivity state," or if Pantech could not offer any evidence that the inactivity timer begins with the display of the second object, there would be obvious problems with Pantech's infringement theory. But Pantech's experts offer at least some circumstantial evidence that the auto screen off timer begins its countdown at the time the second object is displayed. Similarly, Pantech's experts offer the opinion that the second object is removed at the time of the expiration of the auto screen off timer based on the circumstantial evidence that the

second object is removed after the screen is unlocked. OnePlus criticizes the reliability of this circumstantial evidence. But a patentee may rely "on either direct or circumstantial evidence" to prove infringement. *Linear Tech. Corp. v. Int'l Trade Comm'n*, 566 F.3d 1049, 1060 (Fed. Cir. 2009). Accordingly, there are genuine issues of material fact as to the infringement of the '654 Patent that the jury must resolve.

For these reasons, OnePlus's Motion for Summary Judgment of Noninfringement of the '654 Patent is **DENIED**.

### B. OnePlus's Motion for Summary Judgment of Patent Ineligibility of the '654 Patent is DENIED

OnePlus alleges that the '654 Patent is directed to patent ineligible subject matter. The parties dispute whether the asserted claims are directed towards an abstract idea under *Alice* step one. The parties also dispute whether the asserted claims are well known, routine, and conventional under *Alice* step 2. The Court addresses each step of *Alice* in turn.

#### 1. Step 1: The Asserted Claims of the '654 Patent are Not Abstract

Under *Alice* step one, OnePlus argues the '654 Patent addresses the "specific problem of multi-object touch arising in the context of touchscreens." OnePlus contends the asserted claims are not directed to a specific solution to the multi-object touch problem as contemplated in the '654 Patent specification. Instead, OnePlus reads the asserted claims to cover the much broader concept of temporarily displaying a second object based on a touch input on a first object, so long as the second object is displayed in an untouched region. OnePlus alleges the asserted claims are simply drafted to cover the display of a second object in an untouched region using conventional touchscreen technology. OnePlus primarily argues the asserted claims are like those considered by the Federal Circuit in *GREE, Inc. v. Supercell Oy*, 855 F. App'x. 740 (Fed. Cir. 2021). In *GREE*, the Federal Circuit affirmed the Board's reasoning that the claims did not improve the touch

interface because the touch interface was only the mechanism used to execute the focus of the invention, which was "the movement-based rules" that comprised the remaining steps in the claims. *Id.* at 742 (noting the "patent's wholly generic claiming and description of the touch interface, and the claiming of wholly generic touch-screen functionality"). Specifically, the Federal Circuit distinguished the *GREE* patent claims from those in the cases Pantech relies on— *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356 (Fed. Cir. 2018), and *Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999 (Fed. Cir. 2018). Specifically, the Federal Circuit noted that in *Core Wireless* and *Data Engine*, the claims at issue provided specific steps and details that solved known technological problems in contrast to conventional user interface methods. *Id.* at 742–43. OnePlus argues the claims here are like those asserted in *GREE*, which "recite only generic functionality of a touch-screen—recognizing a touch and a movement operation—and thus recite merely the abstract idea of associating and moving an object on a screen" not the improvement of its interface. *GREE*, 855 F. App'x. at 743.

Pantech responds that the claimed invention is not abstract under *Alice* step one because it discloses a "touch region" as a tool to identify a user's intentions as to a first object, discloses a second object in a new area based on the user's input, and provides the option of executing an action if the second object is selected or removing the second object it if is not. Pantech also criticizes OnePlus's analysis because it fails to provide a representative claim analysis for claims 6, 8 and 10. Pantech believes OnePlus's characterization of claim 1 oversimplifies the invention and argues the Court should find the asserted claims are patent eligible because they provide a specific improvement to the way the graphical user interface ("GUI") operates. Pantech primarily relies on two cases to argue the asserted claims of the '654 Patent are not abstract: *Core Wireless*, 880 F.3d at 1356, and *Data Engine*, 906 F.3d at 999.

First, Pantech argues the asserted claims of the '654 Patent are like the claims in *Core Wireless* where the Federal Circuit found the asserted claims were patent eligible because they were "directed to an improved user interface for computing devices, not to the abstract idea of an index." 880 F.3d at 1362. The Federal Circuit noted that even though "the generic idea of summarizing information certainly existed prior to the invention, these claims are directed to a particular manner of summarizing and presenting information in electronic devices" *Id.* Specifically, the Federal Circuit pointed to the "particular manner by which the summary window must be accessed," the fact that the application summary window had a limited set of data that "restrains the type of data that can be displayed in the summary window," and the requirement that device applications "exist in a particular state." *Id.* at 1362–63. Pantech argues that the asserted claims here are like those in *Core Wireless* because they solve problems rooted in GUI design caused by the "small screen size, complex interaction demands of apps, global hand size variation, error detection and error correction management, environmental conditions, and the fundamental large press area of the human finger." Pantech argues the invention overcomes these problems by using "touch regions" and "interactive sequences (first elements, secondary elements, popups and timeout screen clearance procedures)" to guide the user's interaction. OnePlus responds that the claims in *Core Wireless* recite specific structure, unlike the claims at issue here which rely on features of a conventional user interface.

Pantech also relies on *Data Engine*, which found that representative claim 12 of U.S. Patent No. 5,590,259 ("the '259 Patent") is directed to patent-eligible subject matter, and that claim 1 of the U.S. Patent No. 6,282,551 ("the '551 Patent") and claims 1 and 26 of U.S. Patent No. 5,303,146 ("the '146 Patent") were ineligible. 906 F.3d at 1011. Reading the claims as a whole, in light of the specification, the Federal Circuit found claim 12 of the '259 Patent was "directed to more than

a generic or abstract idea as it claims a particular manner of navigating three-dimensional spreadsheets, implementing an improvement in electronic spreadsheet functionality." *Id.* The Court noted that the claims improved existing technology by using "specifically recited notebook tabs"—specific structures within the three-dimensional spreadsheet environment—that were "not merely labeled buttons or other generic icons." *Id.* The Federal Circuit distinguished claim 12 of the '259 Patent claims from others that had been found patent ineligible because those cases involved claims that were "entirely functional in nature," and there was nothing in the claims "directed to *how* to implement [the abstract idea]." *Id.* at 1010 (citing *Affinity Labs of Texas, LLC v. DirecTV, LLC*, 838 F.3d 1253, 1258 (Fed. Cir. 2016)). The Federal Circuit noted the claims that were found to be abstract "did not recite any specific structure or improvement of computer functionality sufficient to render the claims not abstract." *Id.* (citing *Intell. Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1328–29 (Fed. Cir. 2017)).

In contrast, the Federal Circuit found that claim 1 of the '551 Patent and claims 1 and 26 of the '146 Patent were ineligible. The Federal Circuit found that claim 1 of the '551 patent was more "general" and "not limited to a specific technical solution and improvement in the electronic spreadsheet functionality." *Id.* at 1012. Accordingly, the Federal Circuit found the '551 Patent was abstract because it "covers any means for identifying electronic spreadsheet pages." *Id.* Similarly, the Federal Circuit found claims 1 and 26 of the '146 Patent were "directed to the abstract idea of collecting spreadsheet data, recognizing changes to spreadsheet data, and storing information about the changes." *Id.* Viewing the claims in light of the specification, the Federal Circuit found that the claimed method did not improve spreadsheet functionality in a specific way that renders the claims not abstract. *Id.* at 1012–13 (noting the claims "recite determining changes to

spreadsheets by comparing the cells in two versions of the spreadsheet and storing that information").

Here, claim 1 is not abstract when read in view of the specification.[4] Claim 1 discloses how to improve the functionality of a GUI by using a "touch region" to identify a first object, provide a second object in a new, specific area (*i.e.*, the "untouched region"), and then either execute an action if that second object is selected or remove the second object if it is not selected within a specific period of time (*i.e.*, a "reference period of time"). OnePlus argues claim 1 is like that of *GREE*, because it "does not provide a specific manner of displaying a limited set of information, but rather recites generic steps of temporarily displaying a second object based on a touch input on a first object, so long as the second object is displayed in an untouched region—in other words, data manipulation on a touchscreen." Unlike *GREE*, however, claim 1 is not a "computer-implemented" method. And OnePlus's analysis ignores that the claim does not identify a first object based on touch input alone. As Pantech argues, claim 1 addresses the problem of imprecise touch input by describing the alleged improvement of using a touch input "to detect a touch region corresponding to the touch input, and to identify an object that is overlapped by the touch input in the touch region as a first object." Viewed in light of the specification, the invention then addresses the problems with spacing by displaying the second object in the "untouched region." Similarly, the invention addresses the limited size of the screen by removing the second object after a reference period of time if the second object is not selected. OnePlus is correct that the claims themselves provide little specificity as to the "touched" and "untouched" region and that significant portions of the claim rely on the normal function of general processors. But the fact

---

[4] The Court need not address Pantech's arguments about OnePlus's failure to make a *prima facie* case of representativeness given its finding that claim 1 is not abstract.

that the claims describe some conventional components and that a POSITA must turn to the specification to understand the context for certain terms does not render claim 1 of the '654 Patent abstract.

### 2. Step 2: There are Genuine Issues of Material Fact as to Inventiveness

If claims are not directed to an abstract idea under step one of the *Alice* analysis, the Court need not proceed to step two of that analysis. *Enfish*, 822 F.3d at 1339. But in cases where there are "close calls about how to characterize what the claims are directed to," the Court may analyze whether "there are arguably concrete improvements in the recited computer technology." *Id*. Here, even if these claims were abstract, they would survive summary judgment because there are genuine disputes of material fact under *Alice* step two. Both parties present expert testimony and evidence that support their respective position as to whether the claim elements are well-understood, routine, and conventional, considered separately or in their ordered combination. *See Berkheimer*, 881 F.3d at 1360.

For the above reasons, OnePlus's Motion for Summary Judgment of Invalidity of the '654 Patent is **DENIED**.

### V. OnePlus's Motion for Summary Judgment of Ineligibility and Noninfringement of the '052 Patent[5]

OnePlus's motion argues (1) claims 10 and 17–20 ("the asserted claims") of the '052 Patent are invalid as not being directed to patentable subject matter; and (2) the asserted claims of the '052 Patent are not infringed because (a) Pantech uses two different "target application control gestures" and "contact signals" when the claim requires the same gesture or signal whether one or multiple applications are running; and (b) Pantech identifies gestures that interact with a control

---

[5] The parties briefed this motion at Docket Nos. 86, 123, 137, and 154.

interface of the background application even though the asserted claims require that no control interface be displayed.

Pantech responds that OnePlus's motion should be denied because (1) the asserted claims are not abstract and OnePlus offers no clear and convincing evidence that the claim elements in combination are well-understood, routine, and conventional and (2) OnePlus's noninfringement analysis raises previously abandoned claim construction arguments and ignores the merits of Pantech's doctrine of equivalents arguments.

The '052 Patent teaches a system and method for using a gesture to perform a command event by a *background* application while another application is running in the *foreground*. *See* '052 Patent at 1:16–20, 1:45–51, 1:60–2:2. As explained in the claim construction order, "gesture" means "an image from a contact signal generated on a display screen." Docket No. 51 at 44 (citing '052 Patent at 4:1–8). Non-limiting examples of a gesture include an image coinciding with an outline, shape, or path followed by a pointer generating the contact signal on the display screen. *Id.* at 44–45. Pantech asserts OnePlus infringes claims 10 and 17–20:

> 10. A system to control a mobile terminal application using a gesture, comprising:
> an application executing unit to execute a first application, and to execute a second application while executing the first application as a background application, the first application being executed in a background without displaying a control interface of the first application;
> a gesture identifying unit to identify a target application control gesture corresponding to a contact signal, the contact signal being generated on a display screen in which a control interface of a target application is not displayed;
> a command event verifying unit to verify a command event corresponding to the target application control gesture; and
> a processor comprising an application controlling unit to forward the command event to the determined target application, and to control the target application to perform the command event in a background application state,
> wherein the application executing unit further determines the first application as the target application based on an application selection gesture if multiple background applications controllable by the target application control

gesture are being executed and determines the first application as the target application without the application selection gesture if the first application is the only background application being executed.

17. The system of claim 10, wherein the application executing unit executes the first application or the second application if a gesture associated with an application execution event of the first application or the second application, respectively, is identified.

18. A system to control a mobile terminal application using a gesture, comprising:
an application executing unit to execute a plurality of applications, to determine a target application from among the plurality of executed applications based on a contact signal generated in a display screen if multiple background applications are being executed, and to determine a first application as the target application without the contact signal if the first application is the only background application being executed, the target application being executed in a background without displaying a control interface of the target application;
a gesture identifying unit to identify a gesture corresponding to the contact signal, the contact signal being generated on the display screen in which the control interface of the target application is not displayed;
a command event verifying unit to verify a command event corresponding to the gesture, and to determine whether the command event corresponding to the gesture is a command event of the target application;
and a processor comprising an application controlling unit to forward the command event to the determined target application, and to control the target application to perform the command event in a background application state if the command event is a command event of the target application.

19. A mobile terminal, comprising the system of claim 10.

20. A mobile terminal, comprising the system of claim 18.

'052 Patent at 14:59–15:19, 16:7–41.

As during claim construction, the prosecution history is not clear enough to exclude the selection of *all* user interface buttons from the scope of "gesture." Docket No. 51 at 44–47. But the context of the claims themselves "provide[] context as to whether control interface buttons are displayed for the different gesture types." *Id.* at 46.

### A.    OnePlus's Motion for Summary Judgment of Non-Infringement of the '052 Patent is DENIED

#### 1.  OnePlus Waived its Antecedent Basis Relationship Argument

First, OnePlus argues about the "target application control gesture" requirement of independent claim 10 and the "contact signal" requirement of independent claim 18.[6] Pantech's expert, Dr. Stevenson, mapped "target application control gesture" to two different functionalities depending on the scenario that the accused products are in—the "target application control gesture" is the "tap and drag" in the scenario of a single background application ("Scenario 1"), and a "tap" in the scenario where there are multiple background applications controllable by the gesture ("Scenario 2"). OnePlus believes the plain and ordinary meaning of the claim requires the same "target application control gesture" whether one application is running in Scenario 1 or Scenario 2. OnePlus interprets the claim to require that the target application control gesture "(1) be identified based on the contact signal and on which a command event is verified, and (2) control multiple applications running in the background is a matter of claim construction." OnePlus reads the claim language to mean that "*the* target application control gesture" naturally refers back to "*a* target application control gesture" that the claim sets forth earlier as corresponding to a contact signal. OnePlus argues that this antecedent basis relationship requires the "target application control gestures" to be the same whether there is one or multiple background applications running. Accordingly, OnePlus believes Pantech's reliance on two different "target application contact signals" for claim 10 and two different contact signals for claim 18 means Pantech cannot show infringement of the asserted claims of the '052 Patent.

---

[6] Due to the similarity of the parties' arguments for each of these terms, the Court's analysis focuses on the "target application control gesture" of claim 10.

Pantech responds that OnePlus is applying a flawed claim construction argument regarding the antecedent basis relationship for the "target application control gesture" and "contact signal" terms of claims 10 and 18. Pantech argues that it is not offering different definitions of these terms. Instead, Pantech posits claims 10 and 18 do not require the same "target application control gesture" or "contact signal" in Scenario 1 and Scenario 2. Pantech believes that these are two mutually exclusive scenarios and there is no reason why the "target application control gesture" or the "contact signal" must be the same in both scenarios. Pantech states that if OnePlus believed that the use of "a" and "the" required the same "the target control gesture" it should have raised this issue at claim construction, instead of narrowing this construction belatedly to avoid infringement evidence.

While the construction of "target application control gesture" was raised during claim construction, the antecedent basis relationship dispute was not brought to the Court's attention. *See* Docket No. 51 at 43–47. Both parties believe the other waived its construction. Pantech believes OnePlus should have raised this dispute during claim construction because its contentions were known at the time of the *Markman* and have not changed. Pantech also argues it will be prejudiced by a late construction because it has not had the ability to provide expert testimony supporting its proposed construction. OnePlus believes that Pantech is the party that waived its construction because Pantech is seeking a broader construction than the plain and ordinary meaning.

While Pantech's understanding that the plain and ordinary meaning allows an independent Scenario 1 and 2 that may or may not use different target application control gestures is not the most straightforward interpretation of the plain and ordinary meaning, it is a reasonable reading of this claim. Even if OnePlus's interpretation of the claim language is more straightforward, OnePlus

understood that Pantech was using different "target application control gestures" and "contact signals" during claim construction. OnePlus provides no reason it did not timely raise this dispute during claim construction. OnePlus does not address Pantech's case law on waiver, the fact that Pantech's theory of infringement as to this issue has not changed, or the prejudice Pantech would face based on OnePlus's untimely challenge of Pantech's interpretation of these terms.[7] Given Pantech's disclosure of its infringement position, the Court finds that the onus was on OnePlus, not Pantech, to raise this dispute. *See Maxell, Ltd. v. Apple Inc.*, No. 5:19-CV-00036-RWS, 2020 U.S. Dist. LEXIS 248960, at *71 (E.D. Tex. Nov. 17, 2020) (noting defendant should have presented a dispute to the Court because plaintiff's infringement contentions disclosed the disputed limitation). If OnePlus disputed Pantech's interpretation of these terms, it should have raised this dispute issue during claim construction. *See id.*(finding defendant was not permitted to limit the plain language based on preferred embodiments). It did not. Accordingly, OnePlus has waived this argument and it is

**ORDERED** that OnePlus may not raise arguments that the accused products do not infringe because Scenario 1 and Scenario 2 require the same "target application control gesture" and/or "contact signal."

### 2. There are Genuine Issues of Material Fact About Whether a Control Interface is Displayed

The parties also dispute whether a "control interface" is visible when the contact signal is generated and whether the target application is being executed in the background without displaying a control interface of the target application. Portions of this dispute were addressed in

---

[7] Further, even if OnePlus's is correct that an antecedent basis relationship exists, there is nothing currently before the Court that suggests Pantech would not have been able to pursue its present infringement theory under the doctrine of equivalents.

Pantech's motion to strike OnePlus's prosecution history estoppel arguments, which was granted in part and denied-in-part. Docket No. 178 at 13.

OnePlus argues that Pantech cannot show infringement as a matter of law because the claims require that the "control interface of a target application is not displayed." Pantech's infringement positions, however, rely on interactions with a yellow "Phone Bubble," "task bars," and other buttons which OnePlus contends are control interfaces of the background application (an ongoing phone call):



*See, e.g.*, Docket Nos. 86-7, 86-8, 87-10 (provided to Court via USB). OnePlus infers that Pantech's expert, Robert Stevenson, appears to concede that a partial control interface of the target application is shown because he opines "the *full* control interface of the Phone application is not shown." *See, e.g.*, Docket No. 86-9, ¶¶ 93, 166 (emphasis added). This is consistent with his opinion under the doctrine of equivalents:

> To the extent that OnePlus argues that the Accused '052 Products do not execute the first application "in a background without displaying a control interface of the first application," each of these products include software and hardware that perform the equivalent function of executing the first application in the background without displaying a control interface because the accused functionality continues to run applications without displaying a full control interface. Indeed, the testing of the Accused '052 Products supports Pantech's doctrine of equivalents infringement theory

*Id.*, ¶ 81; *see also id.*, ¶¶ 96, 153, 167.

Pantech's response, and argument at the hearing, focuses on whether the yellow "Phone Bubble" is a control interface. Pantech argues that the yellow "Phone Bubble" itself is not a control interface because interactions with the yellow bubble "cannot cause the phone application itself to do anything—in other words, interactions with the icon itself cannot control any functions of the phone." For example, at the hearing, Pantech's counsel demonstrated that the yellow "Phone Bubble" may be moved around the screen without controlling the background application. Pantech argues OnePlus mischaracterizes Dr. Stevenson's opinion that the "full control interface" is not visible was referring to the fact that the "call screen" of the phone application was not visible.

There is a genuine dispute of material fact regarding whether the yellow "Phone Bubble" or "yellow 'D' icon" is a control interface. Dr. Stevenson specifically opines "the yellow 'D' icon is not a control interface of the [p]hone application but rather is an indication that there is an ongoing active call" because a "user cannot control the phone call from the yellow 'D' icon, but must first tap the icon which then displays available controls." Docket No. 123-2, ¶ 77; *see also id.*, ¶ 78 ("[T]he yellow 'D' icon is not a control interface of the [p]hone application but rather provides an indication for a user for a starting point for a gesture."). While OnePlus may have valid challenges to Dr. Stevenson's opinions, this is for the jury, not the Court to resolve.

Pantech primarily relies on its doctrine of equivalents position in response to OnePlus's arguments about the task bar and other buttons. This doctrine of equivalents theory is presented as an alternative to Dr. Stevenson's repeated opinion that the accused products practice the asserted claims without displaying a control interface. Docket No. 86-9, ¶¶ 79, 82, 90–92, 94, 101, 151, 154, 164, 165, 167. As discussed in the Court's earlier order (Docket No. 178), Pantech has been allowed to supplement its expert report because of OnePlus's failure to fully disclose its

prosecution history estoppel arguments related to Matthews in its opening report. The parties are aware this issue is being carried and will be resolved through judgment as a matter of law. *See* Docket No. 178.

For these reasons, OnePlus's Motion for Judgment of Noninfringement of U.S. Patent No. 8,893,052 (Docket No. 86) is **DENIED**.

### B. OnePlus's Motion for Summary Judgment of Patent Ineligibility of the '052 Patent is DENIED

The parties' respective arguments about the patent ineligibility of claims 10 and 17–20 of the '052 Patent generally rely on the same positions discussed above in reference to the '654 Patent. *See supra*, Section IV.B.

Relying primarily on claim 10, OnePlus argues claims 10 and 17–20 are directed towards an abstract concept under *Alice* step one because the claimed subject matter is directed to the abstract idea of associating movements on a display to control particular applications. OnePlus argues the patentee did not invent a mobile terminal, the execution of foreground and background applications on a mobile terminal, or even gesture-based control on a touchscreen. Rather, the purported invention associates certain gestures to correspond to command events of one or more background applications, that is, to associate movements on a display with the control of particular applications. OnePlus argues the claims here are just like those in *GREE* because the asserted '052 Patent claims are directed to generic functionality of a touchscreen—recognizing contact signals input on the touchscreen—and recite, at a high level of generality, the abstract idea of associating movements on a display with control of particular applications. OnePlus also argues there is no inventive step under *Alice* step two because, like *GREE*, "the capacity to distinguish between different types of operations" and the claimed hardware configuration are not inventive. OnePlus argues the asserted Patent claims nothing more than conventional computing hardware running on

a conventional mobile terminal performing conventional functions of executing applications, identifying gestures, and performing operations associated with gestures.

Pantech again begins by arguing that OnePlus fails to apply a proper representativeness analysis. Pantech asserts this failure is especially glaring regarding claim 17, which adds the concept of gestures being separately associated with first or second applications. Next, Pantech believes the claims are not directed to an abstract idea but instead "are directed to improving the control of a small handheld device (i.e. a "mobile terminal") in a particular way." Specifically, a user can use "gestures" to control certain background applications on a terminal using specific steps and controls. Pantech posits these claims cannot be abstract because they are the very definition of an invention that is focused on "the specific asserted improvement in computer capabilities" rather than "a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool."

Pantech also concludes that the asserted claims of the '052 Patent would survive under *Alice* step two even if they were abstract. Pantech argues that the evidence relied on by OnePlus actually shows there is an inventive step because conventional technology did not let a user operate background applications while continuously running a foreground application. Pantech also notes OnePlus's reliance on Kinoshita and Tannenbaum does not resolve the issue of inventiveness because both references fail to disclose (1) "a target application control gesture" that is distinguishable from an "application selection gesture;" and (2) "the application executing unit further determines the first application as the target application based on an application selection gesture if multiple background applications controllable by the target application control gesture are being executed."

When read in view of the specification, claim 10 is not abstract.[8] Unlike *GREE*, claim 10 is not a "computer-implemented" method. Claim 10 discloses how to improve the functionality of a GUI by providing a specific way a user can use specific "gestures" (*i.e.*, the "target application control gesture" and "application selection gesture") to control background applications when another application is running in the foreground. The specification shows that conventional mobile terminals could not execute a background application without bringing it to the foreground. Viewed in light of the specification, the invention of the '052 Patent is a specific asserted improvement in the functionality of a mobile terminal because the claims focus on the fact that a user will be able to execute a background application "without displaying a control interface of the target application." OnePlus's arguments that the claims are not specific enough to resolve the alleged abstraction, especially because the claims only use general processors are unpersuasive. While the invention may be executable via general processors, the claims provide enough specificity to render them non-abstract.

If claims are not directed to an abstract idea under *Alice* step one, the Court need not proceed to step two. *Enfish*, 822 F.3d at 1339. But again, even if these claims were abstract they would survive summary judgment because, as Pantech described, there are genuine disputes of material fact under *Alice* step two.

For the above reasons, OnePlus's Motion for Summary Judgment of Ineligibility of the '052 Patent is **DENIED**.

## VI.    CONCLUSION

For the reasons provided above, it is

**ORDERED** that OnePlus's Motion for Judgment of Invalidity and Noninfringement of

---

[8] The Court need not address Pantech's arguments about OnePlus's failure to make a *prima facie* case of representativeness given its finding that claim 10 is not abstract.

U.S. Patent No. 9,063,654 (Docket No. 84) is **DENIED**. It is further

    **ORDERED** that OnePlus's Motion for Judgment of Ineligibility and Noninfringement of U.S. Patent No. 8,893,052 (Docket No. 86) is **DENIED**. It is further

    **ORDERED** that, within **seven (7) days** of this Order's entry, the parties **SHALL** jointly move to file a redacted version of this Order. The parties' joint motion **SHALL** provide proposed redactions, describe the confidential information in those proposed redactions, and provide good cause for each redaction. Or, if no redactions are necessary, the parties **SHALL** jointly file an unsealed and unredacted version of the Order with a cover page stating no redactions are needed.

    **So ORDERED and SIGNED this 27th day of February, 2024.**

ROBERT W. SCHROEDER III
UNITED STATES DISTRICT JUDGE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TEXARKANA DIVISION

| | |
|---|---|
| PANTECH CORPORATION and PANTECH WIRELESS, LLC, | |
| *Plaintiffs,* | Civil Action No. 5:22-cv-00069-RWS |
| v. | |
| ONEPLUS TECHNOLOGY (SHENZHEN) CO., LTD., | |
| *Defendant.* | |

## <u>VERDICT FORM</u>

In answering these questions, you are to follow all of the instructions I have given in the Final Jury Instructions. Your answers to each question must be unanimous. In this verdict form, "Pantech" refers to Pantech Corporation and Pantech Wireless, LLC and "OnePlus" refers to OnePlus Technology (Shenzhen) Co., Ltd. As used below:

- "the '247 patent" refers to U.S. Patent No. 10,869,247;

- "the '954 patent" refers to U.S. Patent No. 11,012,954;

- "the '839 patent" refers to U.S. Patent No. 9,548,839;

- "the '654 patent" refers to U.S. Patent No. 9,063,654;

- "the '052 patent" refers to U.S. Patent No. 8,893,052;

- "the Asserted Claims" are:

  - Claim 1 of the '247 patent;

  - Claims 6 and 9 of the '954 patent;

   o Claims 9 and 11 of the '839 patent;

   o Claims 1, 6, and 10 of the '654 patent; and

   o Claims 10 and 17 of the '052 patent;

- "SEPs" refers to the standards-essential '247, '839, and '954 patents.

**QUESTION NO. 1:**

Did Pantech prove by a preponderance of the evidence that OnePlus infringes any of the Asserted Claims?

Answer "Yes" in favor of Pantech or "No" in favor of OnePlus.

**'247 Patent**:

        Claim 1: Yes __√__ (for Pantech)      No _____ (for OnePlus)

**'954 Patent**:

        Claim 6: Yes __√__ (for Pantech)      No _____ (for OnePlus)

        Claim 9: Yes __√__ (for Pantech)      No _____ (for OnePlus)

**'839 Patent**:

        Claim 9: Yes __√__ (for Pantech)      No _____ (for OnePlus)

        Claim 11: Yes __√__ (for Pantech)      No _____ (for OnePlus)

Appx000141

**'654 Patent**:

Claim 1: Yes __✓__ (for Pantech)     No _____ (for OnePlus)

Claim 6: Yes __✓__ (for Pantech)     No _____ (for OnePlus)

Claim 10: Yes __✓__ (for Pantech)     No _____ (for OnePlus)

**'052 Patent**:

Claim 10: Yes __✓__ (for Pantech)     No _____ (for OnePlus)

Claim 17: Yes __✓__ (for Pantech)     No _____ (for OnePlus)

Appx000142

**QUESTION NO. 2:**

Did OnePlus prove by clear and convincing evidence that the following listed Asserted Claims of the following Asserted Patents are invalid?

**'654 Patent:**

Claim 1: Yes _____ (for OnePlus)        No __✓__ (for Pantech)

Claim 6: Yes _____ (for OnePlus)        No __✓__ (for Pantech)

Claim 10: Yes _____ (for OnePlus)        No __✓__ (for Pantech)

**'052 Patent:**

Claim 10: Yes _____ (for OnePlus)        No __✓__ (for Pantech)

Claim 17: Yes _____ (for OnePlus)        No __✓__ (for Pantech)

Appx000143

**QUESTION NO. 3:**

*If you answered "No" as to every claim for Question 1, or answered "Yes" as to every claim for Question 2, do not answer Question 3.*

*For each asserted patent you determined to be infringed (Question 1) __and__ not invalid (Question 2), answer the corresponding subpart of Question 3 below.*

<u>Question 3A:</u>

What damages, if any, expressed as a total dollar amount, has Pantech proven by a preponderance of the evidence would fairly and reasonably compensate Pantech for its damages resulting from infringement of the SEPs ('247, '839, and/or '954)?

*Answer in United States Dollars and Cents, if any:*

$ 7.41 million USD

<u>Question 3B:</u>

What damages, if any, expressed as a total dollar amount, has Pantech proven by a preponderance of the evidence would fairly and reasonably compensate Pantech for its damages resulting from infringement of the '654 Patent and/or '052 Patent?

*Answer in United States Dollars and Cents, if any:*

$ 2.85 million USD

*If you answered "Yes" for any subpart of Question 1, then continue to Question 4. If you answered "No" as to every claim for Question 1, skip Questions 4 and 5.*

## QUESTION NO. 4:

Did Pantech prove by a preponderance of the evidence that OnePlus's infringement, if any, was willful?

*Check "Yes" in favor of Pantech or "No" in favor of OnePlus. For each patent below, only provide a response if you answered "Yes" for at least one claim of that patent in Question 1.*

**SEPs:**

**'247 Patent**:    Yes __✓__ (for Pantech)    No _____ (for OnePlus)

**'839 Patent**:    Yes __✓__ (for Pantech)    No _____ (for OnePlus)

**'954 Patent**:    Yes __✓__ (for Pantech)    No _____ (for OnePlus)

**NEPs:**

**'654 Patent**:    Yes __✓__ (for Pantech)    No _____ (for OnePlus)

**'052 Patent**:    Yes __✓__ (for Pantech)    No _____ (for OnePlus)

*If you answered "Yes" for the '839 and/or '954 Patent for Question 1, then continue to Question 5. If you answered "No" for both the '839 and '954 Patent for Question 1, skip Question 5.*

## QUESTION NO. 5:

Did OnePlus prove by a preponderance of the evidence that licensed base stations sold in the United States substantially embody the '839 and/or '954 Patents?

*Check "Yes" in favor of OnePlus or "No" in favor of Pantech as to each asserted patent claim*

### '839 Patent:

Yes _____ (for OnePlus)      No __✓__ (for Pantech)

### '954 Patent:

Yes _____ (for OnePlus)      No __✓__ (for Pantech)

## FINAL PAGE OF THE JURY VERDICT FORM

You have now reached the end of the verdict form and should review it to ensure it accurately reflects your **unanimous** determinations. The jury foreperson should then sign and date the verdict form in the spaces below and notify the Court Security Officer that you have reached a verdict. The jury foreperson should retain possession of the verdict form and bring it when the jury is brought back into the courtroom.

Signed this ___29___ day of ___March___, 2024.

_____

Jury Foreperson

Appx000147

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TEXARKANA DIVISION



| | | |
|---|---|---|
| PANTECH CORPORATION and PANTECH WIRELESS, LLC, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | CASE NO. 5:22-CV-00069-RWS |
| ONEPLUS TECHNOLOGY (SHENZHEN) CO., LTD., | § § § | |
| Defendant. | § § | |

## **ORDER**

Before are the Court are the parties' post-trial motions. Docket Nos. 299, 300, 302, 303, 308. The motions are fully briefed. Docket Nos. 309–12, 316, 319, 321–24, 334–37. The Court heard argument on these motions (Docket No. 350), and subsequent briefing was submitted (Docket Nos. 352, 353). For the reasons set forth below,

- Defendant OnePlus Technology (Shenzhen) Co., Ltd.'s Motion to Dismiss for Lack of Standing (Docket No. 299) is **DENIED**;

- Defendant OnePlus Technology (Shenzhen) Co., Ltd.'s Omnibus Motion for Judgment as a Matter of Law (Docket No. 300) is **GRANTED-IN-PART** and **DENIED-IN-PART**; and

- Plaintiffs Pantech Corporation's and Pantech Wireless, LLC's Motions for Entry of Judgment (Docket No. 302), Award of Attorneys' Fees and Enhancement (Docket No. 303), and Bill of Costs (Docket No. 308) are **DENIED-WITHOUT-PREJUDICE** as premature.

# BACKGROUND

On March 21, 2024, the Court empaneled a jury, and trial commenced on March 25, 2024. Docket Nos. 260, 262. Plaintiffs Pantech Corporation and Pantech Wireless, LLC (collectively "Pantech") asserted that Defendant OnePlus Technology (Shenzhen) Co., Ltd. ("OnePlus") willfully infringed Claim 1 of U.S. Patent No. 10,869,247 ("the '247 patent"), Claims 6 and 9 of U.S. Patent No. 11,012,954 ("the '954 patent), Claims 9 and 11 of U.S. Patent No. 9,548,839 ("the '839 patent"), Claims 1, 6, and 10 of U.S. Patent No. 9,063,654 ("the '654 patent), and Claims 10 and 17 of U.S. Patent No. 8,893,052 ("the '052 patent"). *See* Docket No. 258. OnePlus denied that it was liable for infringement, asserted that the '839 and '954 Patents are exhausted, and argued that the '654 and '052 patents are invalid. *See id.*; *see also* Docket No. 228 at 10.

The jury returned a unanimous verdict, finding all the asserted claims were willfully infringed, the asserted claims of the '654 and '052 patents were not invalid, and that the licensed base stations did not substantially embody the '839 or '954 patents. Docket No. 258. The jury awarded $7.41 million in damages for the infringement of the standard essential patents (the '247, '839, and '954 patents, collectively the "SEPs") and $2.85 million in damages for the non-essential patents (the '654 and '052 patents, collectively the "NEPs"). *Id.* at 6.

# LEGAL STANDARDS

## I. Constitutional Standing

"Article III standing is a jurisdictional requirement, which is incurable if absent at the initiation of suit." *Intell. Tech LLC v. Zebra Techs. Corp.*, 101 F.4th 807, 814 (Fed. Cir. 2024) (citations omitted). "At least one plaintiff must have [Article III] standing to seek each form of relief requested in the complaint." *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017). Article III standing "requires: (1) an injury in fact; (2) traceability; and (3) redressability." *Intell. Tech.*, 101 F.4th at 813 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

"An injury in fact is an 'actual or imminent' 'concrete and particularized' 'invasion of a legally protected interest.' " *Id*. (citing *Lujan*, 504 U.S. at 560).

There is a "jurisdictional and substantive distinction" between Article III standing and the statutory requirements of 35 U.S.C. § 281. *See id.* at 814. First, Article III standing is a jurisdictional requirement that is "incurable if absent at the initiation of the suit" while § 281 is a statutory requirement that is not jurisdictional and is curable by joinder. *Id*. Second, the § 281 inquiry and the Article III injury-in-fact inquiry are distinct. *Id.* (citing *Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*, 925 F.3d 1225, 1234–35 (Fed. Cir. 2019)*,* and then citing *Univ. of S. Fla. Rsch. Found., Inc. v. Fujifilm Med. Sys. U.S.A., Inc.*, 19 F.4th 1315, 1324 (Fed. Cir. 2021)). The Article III inquiry questions "whether a party has *an* exclusionary right." *Id.* (citing *Univ. of S. Fla. Rsch. Found.*, 19 F.4th at 1323). The § 281 inquiry questions whether a party has "*all* substantial rights in the asserted patents." *Lone Star*, 925 F.3d at 1234–35.

## II.     Rule 50 Judgment as a Matter of Law

A renewed motion for judgment as a matter of law under Rule 50(b) may only raise arguments previously made in a motion for judgment as a matter of law under Rule 50(a). *OneBeacon Ins. Co. v. T. Wade Welch & Assocs.*, 841 F.3d 669, 676 (5th Cir. 2016). A court's review of a jury's verdict is "especially deferential." *Id.* at 675 (citation omitted). The jury's verdict may not be overturned "unless the jury's factual findings are not supported by substantial evidence, or if the legal conclusions implied from the jury's verdict cannot in law be supported by those findings." *See E.E.O.C. v. Boh Bros. Const. Co.*, 731 F.3d 444, 452 (5th Cir. 2013) (citations omitted). "Substantial evidence is defined as evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions."

*Nelson v. Sunbeam Prods, Inc*., 579 F. Supp. 3d 857, 864 (E.D. Tex. 2022) (quoting *Threlkeld v. Total Petroleum, Inc.*, 211 F.3d 887, 891 (5th Cir. 2000)).

## III. New Trial

A new trial may be granted on all or some of the issues on which there has been a trial by jury for "any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a)(1)(A). Notwithstanding the broad sweep of Rule 59, in the Fifth Circuit[1] "district courts 'do not grant new trials unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done, and the burden of showing harmful error rests on the party seeking the new trial.' " *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004) (citing *Sibley v. Lemaire*, 184 F.3d 481, 487 (5th Cir.1999)); *see also Core Wireless Licensing S.a.r.l. v. LG Elecs., Inc.*, 344 F. Supp. 3d 890, 894 (E.D. Tex. 2018). For example, a new trial may be granted "if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Core Wireless*, 344 F. Supp. 3d at 894 (quoting *Smith v. Transworld Drilling Co*., 773 F.2d 610, 612–13 (5th Cir. 1985)).

### ANALYSIS

## I. OnePlus's Motion to Dismiss for Lack of Standing

At trial, OnePlus challenged Pantech's standing for the first time. Given that trial was the first time OnePlus raised the issue, OnePlus has waived the ability to contest whether Pantech has satisfied the § 281 inquiry (previously referred to as statutory standing). Accordingly, the only question currently before the Court is whether Pantech "demonstrated the irreducible constitutional

---

[1] In considering a motion for a new trial, the Federal Circuit applies the law of the regional circuit. *z4 Techs., Inc. v. Microsoft Corp*., 507 F.3d 1340, 1347 (Fed. Cir. 2007).

CONFIDENTIAL MATERIAL OMITTED

minimum of an injury in fact," which only requires Pantech "to show that it retained *an* exclusionary right" in the asserted patents. *See Intell. Tech.*, 101 F.4th at 813–14.

Here, OnePlus asserts that Pantech Corp. has no constitutional standing because the assignment of the asserted patents from Pantech Inc. ("PI") and GoldPeak Innovations, Inc. ("GoldPeak") (PI and GoldPeak collectively, "prior owners") to Pantech Corp. is void. Docket No. 299 at 5–6. OnePlus argues the assignment was void *ab initio* because the prior owners and Pantech Corp. did not comply with the "Assignability" clauses of the ████████████████, which encumbered the prior owners' power to assign the asserted patents:



CONFIDENTIAL MATERIAL OMITTED

Specifically, OnePlus argues the prior owners' assignment was automatically "null and void" because "Pantech Corp. did not execute an agreement to be bound by either license." Docket No. 299 at 5; *see also* Docket No. 321 at 7. OnePlus explains Pantech's reliance on the warranties of the patent purchase agreements ("PPAs") does not show Pantech Corp. agreed to be bound by the ███████████████, either explicitly or implicitly. Docket No. 321 at 6. OnePlus argues these are instead warrants by the *prior owners* that disclose that the patents subject to the PPA are encumbered by the ███████████████. *Id.* OnePlus cites Delaware and New York law to argue that these anti-assignment clauses are enforceable and that the prior owners' assignment was void from the beginning because the assignment clauses contain clear language that assignment in contravention with the terms of the clause "shall be null and void." *Id.* at 8–9; Docket No. 299 at 10–11. Accordingly, OnePlus asserts Pantech Corp. never had Article III standing because it was never assigned the asserted patents. Docket Nos. 299 at 11–12, 321 at 5.

Pantech responds that OnePlus would not have filed its motion if OnePlus had properly raised this issue. Docket No. 310 at 9. Pantech explains the PPAs expressly and implicitly satisfy the Assignability clauses of the ███████████████. *Id.* at 9–11. Pantech contends that OnePlus's arguments rely on a misreading of the Assignability clauses because the Assignability clauses allowed the prior owners "to freely assign their patents" subject to certain conditions. *Id.* at 8–9. Pantech dismisses OnePlus's reliance on witness testimony at trial, arguing that such testimony at most showed those witnesses could not remember executing an agreement to be bound by those licenses. *Id.* at 10–11. Pantech blames its witnesses' testimony on OnePlus's belated Article III standing argument. *Id.* Pantech further argues that only ███████████████ may enforce and adjudicate the contractual rights within their respective license agreements. *Id.* at 13–15. Pantech explains that PI sent ███████████████ notice of the assignment of the asserted

CONFIDENTIAL MATERIAL OMITTED

'052, '654, '839, and '954 patents[2] and that both ██████████ have been communicating

with Plaintiffs in connection with these licenses and ongoing litigation but neither ██████████

██████ has challenged the validity of the PPA or the assignment of the asserted patents. *Id.*

Finally, Pantech argues that the case law cited by OnePlus is inapplicable because those cases

involved a contracting party enforcing its own rights and focus on the assignability of *contracts*,

not the assignability of *patents*. *Id.* at 11–12.[3]

"[Q]uestions of patent ownership are determined by state law." *Larson v. Correct Craft,

Inc.*, 569 F.3d 1319, 1327 (Fed. Cir. 2009); *see also Schwendimann v. Arkwright Advanced

Coating, Inc.*, 959 F.3d 1065, 1072 (Fed. Cir. 2020) ("[T]he plaintiff must have the legal title to

the patent or patent application, which is determined by state law."). There is no dispute that the

██████████ is subject to Delaware law (*see* Docket Nos. 299 at 10, 299-1 at ¶ 10.10, 310 at 14)

and the ██████████ is subject to New York law (Docket No. 299 at 10, 299-2 at 13, 310 at

14). Delaware and New York contract law are similar as to this issue. Under both Delaware and

New York law, assignability clauses may render an assignment void *ab initio*—but such clauses

are construed and enforced narrowly. *See In re Woodbridge Grp. of Co., LLC*, No. BR 17-12560-

BLS, 606 B.R. 201, 205–6 (D. Del. 2019) (applying Delaware law); *see also Au New Haven, LLC

v. YKK Corp.*, 210 F. Supp. 3d 549, 553–54 (S.D.N.Y. 2016) (applying New York law). For

example, in *Au New Haven* the assignment of patents was not void *ab initio* because the

---

[2] At the hearing OnePlus conceded that the '247 patent is not subject to the Assignability clause "[u]nder the current state of the record." Docket No. 350 at 21:6–9.

[3] Pantech also argues that precedent shows the adjudication of the contractual rights of a third party is not a constitutional question. Docket No. 310 at 18–19. This argument is without merit. "The interpretation of an unambiguous contract is a legal issue" and courts frequently interpret third party contracts to confirm validity of title. *See, e.g.*, *Intell. Tech.*, 101 F.4th at 811–13; *see also, Nat'l Oilwell Varco, L.P. v. Omron Oilfield & Marine, Inc.*, No. A-12-CA-773-SS, 2015 WL 11251772, at *3 n.2 (W.D. Tex. Feb. 17, 2015), *aff'd in relevant part, vacated in part, remanded*, 676 F. App'x 967 (Fed. Cir. 2017).

CONFIDENTIAL MATERIAL OMITTED

assignability clause did not explicitly limit the transfer of the patent at issue or render such assignment void. 210 F. Supp. 3d at 554. In *National Football League Players' Concussion Injury Litigation* ("*NFL Players' Litigation*"), the appellate court found that even though an agreement was formed in violation of an assignability clause, the district court erred by voiding the entire agreement because "something less than a true assignment would not violate the anti-assignment agreement." 923 F.3d 96, 110–11 (3d Cir. 2019) (applying New York law).

While this is a close issue, ultimately the Court determines that there is constitutional standing. Pantech persuasively argues that there is sufficient compliance with the Assignability clause such that the assignment is not void *ab initio*. The PPAs exclude ███████ ███████ from the warranty provision and disclose that ███████████ had non-exclusive licenses for the lifetime of the patents. Docket No. 310-3 at 5, 36; *see also* Docket No. 310-4 at 4, 25. By accepting the PPAs with these warrants, Pantech signed a written agreement that acknowledged that ███████████████ licenses. *See* Docket Nos. 310-3, 310-4. Thus, at the very least, Pantech's signing of the PPAs created a written agreement acknowledging that ███████████ have the right to use these patents ██████████. *See Sanitec Indus. v. Micro-Waste Corp.*, No. CIV.A. H-04-3066, 2006 WL 3455000, at *40 (S.D. Tex. Nov. 28, 2006), *aff'd sub nom. Sanitec Indus., Inc. v. Micro-Waste Corp.*, 296 F. App'x 44 (Fed. Cir. 2008) ("A party 'acquiring by assignment or license an interest in [an] invention. . . takes title [from the assignor] subject to prior assignments or licenses of which the assignee must inform himself as best he can and at his own risk.").

OnePlus correctly points out that the license information disclosed in the PPAs is not coextensive with the terms of the ████████████. Given Delaware's and New York's narrow interpretation and enforcement of void *ab initio* provisions, however, OnePlus fails to

CONFIDENTIAL MATERIAL OMITTED

convincingly argue that this issue renders the patent assignment void *ab initio*.[4] Both ██████

██████████████ have strict confidentiality provisions that limit what can be disclosed—even

to bona fide purchasers. Docket Nos. 299-1 at ¶¶ 8.1–8.3, 299-2 at 11–12. For example, the ████

██████ allows disclosures to "████████████████████████████████████████

██████████████████████████████" Docket No. 299-1 at ████. The ██████████ is

even more explicit, stating a disclosure may be made "███████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████" Docket No. 299-2 at 11.

When read in the context of the confidentiality clauses, the Assignability clauses support a

looser compliance requirement than OnePlus's proposal. As discussed above, the PPAs' disclosure

that ████████████████████████ licenses is consistent with the information that *could* be

disclosed to a bona fide purchaser pursuant to the confidentiality clauses of the ████████████

██████████. Pantech executed a written agreement accepting the assignors' warrants with

the knowledge that it could not interfere with ████████████ rights to use these patents

██████████ Accordingly, as Pantech acknowledges, Pantech's decision to execute the PPA

resulted in a written agreement that bound it to the reasonably necessary terms of the ████████

██████████—at the very least implicitly.

---

[4] At most OnePlus has shown that this contract is *voidable* by ████████████. This does not
affect Pantech's constitutional standing because there has been no showing that any party has
exercised a right to divest Pantech of its exclusionary rights. *See Intell. Tech.*, 101 F.4th at 817.
Pantech's argument that ██████████████ have long been aware of these patent assignments,
however, bears less weight because, based on the evidence before the Court, it is unclear whether
████████████ has seen the language of the PPAs. *See Docket Nos. 310-3 at Art. 18, 310-4 at
Art. 15. Accordingly, this order has no bearing on ██████████████ right to enforce their
respective license agreements.

CONFIDENTIAL MATERIAL OMITTED

Moreover, even if the assignment was void *ab initio*, the central question here is whether Pantech obtained *an* exclusionary right, not *all* exclusionary rights. The Court is not convinced that Pantech would be divested of *all* its exclusionary rights even if the assignment of the asserted patents was void. Based on the parties' briefing, the language of the PPAs, and the scope of the assignability provisions, case law suggests that Pantech would still retain *an* exclusionary right in the affected patents even if the assignment of the asserted patents was void *ab initio*. *See NFL Players' Litigation*, 923 F.3d at 110 (finding something less than a true assignment would not violate the assignability clause).[5]

For these reasons, OnePlus's motion to dismiss for lack of standing (Docket No. 299) is **DENIED**.

## II. OnePlus's Motion for Judgment as a Matter of Law

OnePlus moves for judgment as a matter of law ("JMOL") on direct infringement, inducement, willfulness, invalidity of the '052 and '654 patents, exhaustion of the '839 and '954 patents, and damages.[6] Docket Nos. 300, 322. Pantech opposes, arguing the Court should uphold the jury's verdict on all these issues. Docket Nos. 312, 337. The Court addresses each issue in turn.

---

[5] The subject language "[a]ny such assignment, or attempt to assign, to any person or entity other than the NFL Parties *any rights or claims* relating to the subject matter of the Class Action Complaint will be void, invalid, and of no force and effect and the Claims Administrator shall not recognize any such action" is like the language of the ████████ and broader than the language of the ████████. *Compare id.* at 102 *with* Docket Nos. 299-1 at ¶ 7.1, 299-2 at 10–11. The language of the assignability clause in *NFL Players' Litigation*, however, is only directed towards the agreement itself, while the provisions in the ████████ are directed towards both the assignment of the agreement and ownership of the patents.

[6] OnePlus also maintains its position that the '052 and '654 patents cover unpatentable subject matter. *See* Docket No. 300 at 31. The Court already addressed this argument at the summary judgment phase and need not address this conclusory argument, which is made for the purposes of preserving OnePlus's rights on appeal. *See id.*

## A. OnePlus's JMOL on Direct Infringement

### 1. OnePlus's JMOL on Direct Infringement of the '052 Patent

OnePlus argues that Pantech failed to offer substantial proof for claims 10 and 17 of the '052 patent. Docket Nos. 300 at 11–18, 322 at 8–12. First, OnePlus contends that the "downward swipe" identified as the "application selection gesture" and the "diagonal swipe" identified as the "target application control gesture" do not meet the requirements of the '052 patent. Docket Nos. 300 at 11–14, 322 at 8–9. Second, OnePlus argues Pantech's concession that its expert, Dr. Robert Stevenson, did not identify an "event table" structure is fatal because Stevenson's conclusory testimony that the structure must be present because of how the phone works cannot satisfy a means-plus-function claim. Docket Nos. 300 at 15–17, 322 at 9–11. Finally, OnePlus argues that Pantech's position that the phone bubble icon is not a "control interface" conflicts with Pantech's invalidity position and ignores evidence that the phone bubble icon controls the application. Docket Nos. 300 at 17–18, 322 at 11–12.

Pantech responds that there is substantial evidence to satisfy all the elements of the asserted claim. Docket Nos. 312 at 11–19, 337 at 4–5. First, Pantech contends that OnePlus is incorrectly reading the claim language to (1) improperly limit it to a single target application control gesture and (2) require the application control gesture to *cause* the application executing unit to determine the first application as the target application when the claim only requires selection *based on* the gesture. Docket No. 312 at 11–14 (emphasis added). Second, Pantech represents that its expert met the burden of showing the structure of an event table by observing the function and using his knowledge and experience to infer the presence of an event table. Docket Nos. 312 at 14–15, 337 at 4. Finally, Pantech argues that there is no inconsistency between its interpretation of a "control interface" for its infringement and non-invalidity opinions because the call bubble "is not an

interface that provides control of any features of that application." Docket Nos. 312 at 17–19, 337 at 4–5.

OnePlus persuasively argues there are many issues with Pantech's infringement read. The most problematic is Pantech's reliance on Dr. Stevenson's *ipse dixit* testimony to show the presence of the required structure. The Court's claim construction requires a processor that is programmed to "identify, in an event table in which at least one gesture had been registered, a gesture corresponding to the analyzed outline, shape, or path within an allowable range." Docket No. 51 at 58. At trial, Dr. Stevenson testified:

> The second piece, identifying an event table in which at least one gesture has been registered, a gesture corresponding to this particular gesture, the way, you know, these devices -- kind of the limitations of the hardware, what the hardware is and what the software can do, this is necessarily there. The -- when you have multiple apps like this that can accept all sorts of gestures, when they start up, they have to tell the operating system. The operating system is the lower parts of the soft -- of the software that interacts with the user. So when you're -- when you're using a smartphone, kind of all the general screens when you're not running applications, when you're going to start things up, those are all – that's part of the operating system. That handles all the input and output, all the user input and all the screen displays is the operating system, the apps, the things you download, you know, the weather app or the -- you know, the -- or the music app.
>
> Those are the applications, right? And so the fact that we can download, you know, literally thousands of applications on there, all of which can accept all sorts of gestures, the only way the operating system knows where things go is when you start up these apps, you know, they keep a record of where these gestures are going, what applications they go. And so that's being held in an event table.

Docket No. 264 at 602:7–603:8. This is *ipse dixit*. Dr. Stevenson's opinion is not based on the specific inputs, outputs, or specific functionality of the accused devices—it is a high-level assumption that could be made for any electronic device that runs multiple applications. But a means-plus-function claim must be satisfied through both structure and function because different structures may perform the same functions. *See Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed. Cir. 1991); *see also*, *CytoLogix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168, 1178

(Fed. Cir. 2005) ("[I]t is insufficient for the patent holder to present testimony 'based only on a functional, not a structural, analysis.' ").

Furthermore, Dr. Stevenson admitted he did not look at the source code to determine whether the claimed event table was present. Docket No. 264 at 603:13–604:1. He opined that for the specific target application control gesture the event table stored the "beginning point and the ending point of the gesture." *Id.* at 620:17–25. And when asked whether he knew the structure of the table, Dr. Stevenson responded:

> *I don't know that -- the details of exactly what is stored for every -- every possible gesture that you can make.* You can -- you can go look at the software if you want. It's -- but that's -- I don't need to know that in order to determine infringement.

*Id.* at 622:21–623:2 (emphasis added). In other words, Dr. Stevenson conceded that his testimony about the target application control gesture was speculative because he would need to look at the software to determine "the details of exactly what is stored."

It was Pantech's burden to show the accused products possess the infringing structure, including an "event table" that registers the allegedly infringing "gesture[s] corresponding to the analyzed outline, shape, or path within an allowable range." *See* Docket No. 51 at 58. At most Dr. Stevenson provided *ipse dixit* testimony that relied on a phone's general functionality to impute the claimed structure. This is not enough. *See Traxcell Techs., LLC v. Sprint Commc'ns Co. LP*, 15 F.4th 1121, 1129 (Fed. Cir. 2021) (affirming finding of noninfringement because the expert "discussed the accused technology at only a generalized level and didn't at all discuss [the structure]—focusing on function and results but eliding the way those results are achieved").

For these reasons, OnePlus's judgment as a matter of law for non-infringement of the '052 patent is **GRANTED**.

## 2. OnePlus's JMOL on Direct Infringement of the '654 Patent

OnePlus argues judgment as a matter of law should be granted for noninfringement of claims 1, 6, and 19 of the '654 patent. Docket Nos. 300 at 18–22, 322 at 12–13. OnePlus contends that there is no evidence that the "inactivity timer" is a reference period of time for displaying a second object because both sides' experts agree that the inactivity timer initiates a process of generating a new display, not the removal of the second object. Docket Nos. 300 at 18–20, 322 at 12–13. OnePlus also re-raises its belated claim construction argument that was struck at trial—that the processing unit and control unit were satisfied by the same structure but the plain and ordinary meaning requires that these units use separate processors. Docket Nos. 300 at 20–22, 322 at 13.

Pantech responds that it provided substantial circumstantial evidence that the second object is removed at the expiration of the inactivity timer. Docket Nos. 312 at 19–21, 337 at 5. Pantech also notes that the Court's construction does not prohibit the device from using the "reference period of time" (*i.e.*, the inactivity timer) to execute other actions. Docket Nos. 312 at 19–21, 337 at 5. In response to OnePlus's second argument, Pantech maintains that OnePlus's control and processing unit argument is waived because it was raised for the first time at trial. Docket Nos. 312 at 21–22, 337 at 5. Moreover, Pantech argues that OnePlus's interpretation is not supported or created by the Court's claim construction order. Docket Nos. 312 at 21–22, 337 at 5.

First, Pantech persuasively argues it provided sufficient circumstantial evidence that the accused products meet the "reference period of time" requirement. Pantech's experts, Charles Mauro and Dr. Martin Walker, provided substantial circumstantial evidence, including videos, that the removal of the second object coincides with the expiry of the inactivity timer. *See, e.g.*, Docket No. 264 at 468:3–469:7, 503:8–506:16. The Court's claim construction, however, holds that "merely having the screen go off or idle after an arbitrary amount of time would not, *by itself*, fall within this claim scope." Docket No. 51 at 53. Here, Mr. Mauro provided circumstantial evidence

that non-accused pop-ups in the accused products remained on the screen after the expiry of the inactivity timer. *See, e.g.*, Docket No. 264 at 503:8–506:16. Pantech persuasively argues that a reasonable jury could rely on this testimony to understand that something more is happening than the screen going off or idle after an arbitrary amount of time by contrasting the alleged infringing function (*i.e.*, when the second object remains removed after the screen is reactivated) with the non-infringing action (*i.e.*, when the second object remains after the screen is reactivated). *See id.* OnePlus's other argument—that there can be no infringement because the activity timer removes "all displayed objects"—is unpersuasive. The Court has already rejected OnePlus's position that the "reference period of time" is "selectively" linked to removal of only the second object. *See* Docket No. 51 at 52–54.

Second, OnePlus fails to convincingly argue the Court's decision concerning the "processing unit" and "control unit" claim construction warrants reconsideration. As discussed at trial, Pantech reasonably argues OnePlus's position is a claim construction argument. *See HTC Corp. v. Cellular Commc'ns. Equip., LLC*, 701 F. App'x. 978, 982 (Fed. Cir. 2017). Accordingly, the argument that the control unit and the processing unit require separate processors should have been raised at the *Markman* hearing, and it was not. *See* Docket Nos. 40 at 31–32, 51 at 50–52. OnePlus misrepresents the Court's order because nothing in the Court's construction addresses this unraised issue. *See* Docket No. 51 at 50–52. Allowing OnePlus to raise this new claim construction argument so late in this litigation would be highly prejudicial to Pantech—especially because OnePlus fails to show that anything in the intrinsic record precludes Pantech's interpretation of the plain and ordinary meaning either literally or under the doctrine of equivalents. Accordingly, the Court maintains its trial ruling that OnePlus's belated claim construction argument is waived.

For these reasons, OnePlus's motion for judgment as a matter of law of no direct infringement of the asserted claims of the '654 patent is **DENIED**.

### 3. OnePlus's JMOL on Direct Infringement of the '954 Patent

OnePlus argues that Pantech cannot show direct infringement of the asserted claims of the '954 patent because of Dr. Todor Cooklev's testimony that the mobile device can *randomly* select *any* of the component carriers as the delegate component carrier ("delegate CC"). Docket Nos. 300 at 24–25, 322 at 14. OnePlus contends this interpretation reads out an aspect of the asserted claims because the delegate CC *must* be selected from the group of component carriers based on some technical characteristics. Docket Nos. 300 at 24–25, 322 at 14. Pantech responds that Dr. Apostolos Kakaes's requirement that selection must be "based on some characteristics" is inapposite with the claim language and a reasonable jury could have credited Dr. Cooklev's testimony that "random" selection satisfies this claim term. Docket Nos. 312 at 24, 337 at 6.

Upon review of the parties' arguments and the experts' testimony, the Court is not convinced that Dr. Cooklev's interpretation of the plain and ordinary meaning is precluded by the '954 patent.[7] OnePlus points to nothing in the specification that would preclude infringement if the selection of the delegate CC was random (*e.g.*, randomly selecting a number between 1 and 10 is still selecting a number). Nor does OnePlus convincingly argue that the claim language itself

---

[7] The Court allowed Dr. Kakaes to present his testimony because it was consistent with the specification. Docket No. 178 at 24–25. The parties' pretrial motions, however, focused on Dr. Kakaes's testimony, not Dr. Cooklev's. *Id.* At the dispositive motion hearing, Pantech's counsel could not explain how Dr. Cooklev's broader interpretation was supported by the specification. At trial, however, Dr. Cooklev emphasized that his interpretation is supported by the specification because it only provides examples wherein the delegate CC *may* be selected based on certain characteristics. Docket No. 262 at 384:16–385:18. OnePlus points to nothing in the specification that requires that a delegate CC "must" be selected based on specific technical characteristics. The jury considered both parties' positions and reasonably credited Dr. Cooklev's testimony.

precludes random selection or setting of the delegate CC because the specification provides examples wherein the delegate CC *may* be selected based on certain characteristics.

Accordingly, OnePlus's motion for judgment as a matter of law of no direct infringement of the asserted claims of the '954 patent is **DENIED**.

### 4. OnePlus's JMOL on Direct Infringement of the '247 Patent

OnePlus argues judgment as a matter of law is warranted for claim 1 of the '247 patent because the parties' experts agree that the 5G standard requires a New Data Indicator (NDI) bit to retransmit. Docket Nos. 300 at 23–24, 322 at 13–14. OnePlus contends that Dr. Kakaes opined that an NDI works using the exact same functionality as a negative acknowledgement ("NACK") and Dr. Cooklev testified that a "NACK is an indication that whatever has been sent was not decoded successfully." Docket Nos. 300 at 23–24, 322 at 13–14. Accordingly, OnePlus posits Claim 1 is not infringed because the NDI's decision not to retransmit is the same as a NACK. Docket Nos. 300 at 23–24, 322 at 13–14.

Pantech responds that the jury heard substantial testimony that 5G uses substantially different technology than 4G—specifically that 5G does *not* use NACKs. Docket Nos. 312 at 23–24, 337 at 5–6. Pantech specifically credits Dr. Cooklev's testimony about the differences between NDIs and NACKs to provide support that there was substantial evidence of infringement. Docket Nos. 312 at 23–24, 337 at 5–6.

OnePlus fails to show judgment as a matter of law is warranted. The jury heard substantial testimony that 5G technology does not use a NACK and a reasonable jury could have disagreed with Dr. Kakaes's opinion that an NDI is equivalent to a NACK. *See, e.g.*, Docket No. 262 at 353:10–355:19, 360:23–361:16; *see also* Docket No. 264 at 459:14–16.

Accordingly, OnePlus's motion for judgment as a matter of law of no direct infringement of claim 1 of the '247 patent is **DENIED**.

### 5. OnePlus's JMOL on Direct Infringement of the '839 Patent

OnePlus also argues that there is no direct infringement of claim 9 of the '839 patent because Pantech failed to show that the indexes are determined according to the claimed ratios. Docket Nos. 300 at 22–23, 322 at 14. OnePlus argues that the fact that Pantech did not evaluate the source code is fatal because, as Pantech's expert Dr. Cooklev conceded, the standards may be implemented in ways that would not use the claimed ratios. Docket Nos. 300 at 22–23, 322 at 14. Pantech responds that there is substantial evidence that the accused products use the claimed ratios. Docket Nos. 312 at 22–23, 337 at 6. Specifically, Dr. Cooklev considered the relevant ratios in the mandatory provisions of 3GPP TS 36.211 V8.9.0, which aligned with asserted patents. Docket No. 312 at 22. Dr. Cooklev showed that OnePlus's conformance tests rely on clause 6.9 of the 3GPP TS 36.211 standard, which requires the use of the claimed ratios. *Id.*

Here, OnePlus's own documents show that the accused products are tested and shown to be in conformance with clause 6.9 of the 3GPP TS 36.211 standard—which requires the claimed ratios. *See, e.g.*, PX-079; PX-063; PX-098. Consistent with Dr. Cooklev's testimony, this is sufficient circumstantial evidence to show the accused products implement the standard using the claimed ratios. *See, e.g.*, Docket No. 262 at 369:11–371:14, 376:12–23. OnePlus's motion for judgment as a matter of law of no direct infringement of the '839 patent is **DENIED**.

### B. OnePlus's JMOL on Inducement

OnePlus contends judgment as a matter of law is warranted because no reasonable jury could conclude that OnePlus induced infringement of the asserted patents.[8] Docket Nos. 300 at 25–26, 322 at 17–19. OnePlus criticizes Pantech's reliance on OnePlus's supply chain, arguing

---

[8] The Court need not address the parties' remaining arguments about the '052 patent because there is no direct infringement for the asserted claims of the '052 patent. *See supra* Section II.A.1.

CONFIDENTIAL MATERIAL OMITTED

that Pantech offered no evidence that OnePlus encouraged or instructed its subsidiaries or customers to use or manufacture the accused products in an infringing manner. Docket Nos. 300 at 25–26, 322 at 17–19. OnePlus argues that "touting" the accused products as 4G or 5G compliant does not show that OnePlus induced infringement of the SEPs. Docket No. 300 at 26. OnePlus emphasizes that there is even less evidence of inducement for the '654 patent because Pantech produced no evidence that OnePlus promoted or advertised the accused functionality of the '654 patent. Docket Nos. 300 at 25, 322 at 18. Moreover, OnePlus argues there can be no inducement because the accused functionality arose from combining stock Android software with off-the-shelf Qualcomm hardware, but neither Android nor Qualcomm have been sued for infringement. Docket No. 300 at 26. Finally, OnePlus argues there can be no induced infringement for the '654 and '954 patents because it had no knowledge of these patents pre-suit and there is a circuit split whether filing of the complaint satisfies the knowledge requirement. Docket No. 322 at 17.

Pantech responds that OnePlus actively encouraged ████████ sales of the accused products in the United States. Docket Nos. 312 at 25–28, 337 at 6–7. Pantech points to evidence that OnePlus established ████████ to facilitate the infringing sales, ████████ ████████████████████████████████████████████████████████████████, communicates with United States wireless carriers about the accused products, and has a ████████████████████████████ "PCTRB, Federal Communication Commission, and Underwriters Laboratory certifications for the accused products." Docket No. 312 at 25–26. Pantech also notes that OnePlus oversees all business related to ████████ sales and even contacts ████████ customers directly to discuss "routine and specific matters." *Id.* at 26. Pantech argues that the fact that the infringing functionality arises from "off-the-shelf" components is irrelevant because this case is not about the manufacturing process—it is about the

evidence that OnePlus established and facilitated a sales channel of infringing products. *Id.* at 27. Finally, Pantech states that—as a matter of law—it has shown sufficient notice for the '654 and '954 patents because a complaint can provide sufficient notice to a party to support an induced infringement finding at least as of the time the complaint was filed. Docket No. 337 at 6.

First, a reasonable jury could find that OnePlus had knowledge of the asserted patents and knowledge of OnePlus USA's infringing activities. Pantech offered substantial evidence that OnePlus had knowledge of the allegations of infringement for the '839 and '247 patents based on the pre-suit licensing negotiations and by at least the filing of the complaint for the '954 and '654 patents. Thus, the jury could reasonably find there was sufficient evidence that OnePlus had knowledge of the alleged infringement. *See RightQuestion, LLC v. Samsung Elecs. Co.*, No. 2:21-CV-00238-JRG, 2022 WL 507487, at *3 (E.D. Tex. Feb. 18, 2022) ("The Complaint—and the service thereof—therefore provides [the defendant] the requisite notice of the Asserted Patents to support a claim of induced infringement at least as of the time the Complaint was filed.").

Next is whether OnePlus's involvement in the supply chain is sufficient to show OnePlus actively directed and encouraged infringement by the direct infringers (*e.g.*, ███████████). *See DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006). Pantech persuasively argues it presented substantial evidence that a reasonable jury could rely upon to find induced infringement. Pantech presented evidence that OnePlus took affirmative steps to aid the sale of the infringing devices in the United States, including obtaining the required certifications, communicating with wireless carriers, and ████████████████████████. *See, e.g.*, Docket Nos. 264 at 457:22–458:5, 266 at 681:21–682:19; PX-226 at 1.

The facts here are similar to those in *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, where the Federal Circuit reversed a district court's grant of summary judgment of

no induced infringement because there was no dispute the indirect infringer knew of the asserted patent and a reasonable jury could reasonably rely on communications between the indirect and direct infringer related to product testing, shipment coordination, and product troubleshooting to find that the indirect infringer intended to encourage infringement. 420 F.3d 1369, 1380 (Fed. Cir. 2005). Likewise, here a reasonable jury could find that OnePlus's active participation in the sale and certification of the accused products is sufficient to encourage infringement. *See id.* at 1379–80; *see also Enplas Display Device Corp. v. Seoul Semiconductor Co.*, 909 F.3d 398, 407–08 (Fed. Cir. 2018) (upholding a jury verdict of induced infringement of an apparatus claim where defendant manufactured, co-developed, and sold products it knew practiced the asserted patents even though it was not involved in the sales of the accused products within the United States).

OnePlus's arguments about its lack of advertising and its practice of buying off-the-shelf components are unconvincing. While advertising may be relevant when the theory of inducement relies on a consumer, Pantech's indirect infringement theory did not rely on the direct infringement of consumers (*e.g.*, end users or wireless carriers). OnePlus admits that Pantech instead relied on OnePlus's inducement of entities within its supply chain—a relationship in which external advertising is less relevant. Similarly, the manufacturers' use of off-the-shelf components is less persuasive because the inducing acts considered by the jury were directed towards testing, certification, and supply coordination—not manufacture.

Thus, OnePlus's motion for judgment as a matter of law of no inducement is **DENIED**.

**C.     OnePlus's JMOL on Willful Infringement[9]**

When arguing willfulness, the parties primarily repeat their positions about inducement. *See* Docket Nos. 300 at 27–28, 312 at 29–30, 322 at 19–20, 337 at 7. Both parties also discuss

---

[9] The Court need not further address the '052 patent. *See supra* Section II.A.1.

whether Pantech's pre-suit negotiations for the '839 and '247 patents show willfulness. *See, e.g.*, Docket Nos. 300 at 27, 312 at 29–30. OnePlus focuses on its position that the pre-suit offers for the '839 and '247 patents were not fair, reasonable, and non-discriminatory ("FRAND")— contrastingly, Pantech highlights OnePlus's alleged "holdout" pre-suit negotiation tactics. *See, e.g.*, Docket Nos. 300 at 27, 312 at 29–30. The parties also dispute whether post-suit willfulness is a legally available argument for the '954 and '654 patents. Docket Nos. 322 at 19, 337 at 7.

Pantech shows that there is sufficient evidence on the record to support the jury's verdict of willfulness for the '654, '954, '839, and '247 patents. OnePlus had knowledge of the infringement allegations for the '839 and '247 standard essential patents pre-suit and the jury considered evidence that OnePlus dragged out the pre-suit negotiations in bad faith. Similarly, a reasonable jury could have found post-suit[10] willfulness for the '954 patent given OnePlus's continued use of the standard essential technology even after it learned it was being accused of infringement. Willfulness is an especially close call for the '654 patent but the jury heard no evidence that OnePlus did anything to avoid infringement of the '654 patent after it received notice of the complaint.

Accordingly, OnePlus's motion for judgment as a matter of law of no willful infringement for the '654, '954, '839, and '247 patents is **DENIED**.

---

[10] Infringement may be willful post-suit if a defendant "continues its allegedly infringing conduct even after receiving notice of a complaint." *See Touchstream Techs., Inc. v. Altice USA, Inc.*, No. 2:23-CV-00059-JRG, 2024 WL 1117930, at *3 (E.D. Tex. Mar. 14, 2024).

### D. OnePlus's JMOL on Invalidity

#### 1. OnePlus's JMOL on the Invalidity of the '052 Patent

OnePlus argues that Tannenbaum anticipates the '052 patent.[11] First, OnePlus contends that "Stevenson's testimony that Tannenbaum's 'icons' 'all look like control interfaces because you can enter controls in all of them' . . . cannot be reconciled with his opinion that the call bubble is not a control interface. . . ." Docket No. 322 at 20. Second, OnePlus maintains that the separate gestures are met by Tannenbaum's advanced user interface, which associates gesture inputs to target application and control. Docket Nos. 300 at 29, 322 at 21.

Pantech persuasively shows a jury could reasonably find OnePlus did not show anticipation by clear and convincing evidence. Dr. Stevenson explained that everything in Tannenbaum is a control interface because one can enter controls in all of them, whether the background application is in an icon or control interface form.[12] Docket No. 268 at 972:1–974:1, 975:5–23. A reasonable jury could have also relied on Dr. Stevenson's testimony that Tannenbaum cannot anticipate the '052 patent because it only teaches the input of one gesture, rather than different and distinct target application control gestures and application selection gestures as required by the Court's claim construction. *Id.* at 976:10–977:7.

For these reasons, OnePlus's motion for judgment as a matter of law of invalidity of the '052 patent is **DENIED**.

---

[11] OnePlus correctly points out that any argument that Tannenbaum does not disclose a mobile terminal is irrelevant because Pantech never argued that the preamble is limiting. Docket No. 300 at 28. Pantech's briefing does not contest this position.

[12] While OnePlus has shown that Dr. Stevenson's infringement and invalidity opinions about what comprises a "control interface" are incongruent, if the jury credited his explanation of what a "control interface" is with respect to Tannenbaum, it could have found that Tannenbaum does not anticipate the asserted claims because its icons allow a user to enter controls.

## 2. OnePlus's JMOL on the Invalidity of the '654 Patent

OnePlus argues judgment as a matter of law as to invalidity of the '654 Patent is warranted because its expert provided unrebutted testimony that Goren anticipates the '654 patent. Docket No. 300 at 30–31. In its reply, OnePlus explains that its expert provided testimony that the touch region is disclosed in Goren, because Goren teaches there is no substantive difference between the "touch region" and the "I" icon region. Docket No. 322 at 21–22. Finally, OnePlus believes that Pantech misrepresents Dr. Kia's testimony. *Id.* at 22.

Having considered the parties' arguments and the evidence, the jury could reasonably find Dr. Kia's testimony did not provide clear and convincing evidence that Goren anticipates the '654 patent. Pantech did not need to put up a rebuttal witness because a jury could have found that Dr. Kia conceded that the "touch region" "is not disclosed." Docket No. 268 at 948:11–17. Further, the jury could have also found that Dr. Kia's testimony that a touch region was "implied" did not meet the clear and convincing evidence standard required to show anticipation. *Id.*

Accordingly, OnePlus's motion for judgment as a matter of law of invalidity of the '654 patent is **DENIED**.

## E.  OnePlus's JMOL on Patent Exhaustion

OnePlus argues that because the jury found the '839 and '954 patents were infringed, they also had to find that the licensed based stations exhausted both patents. Docket Nos. 300 at 31–33, 322 at 14–17. Pantech responds that a reasonable jury could find OnePlus did not show substantial embodiment because the licensed base stations were never compared to the '839 or '954 patents or the SEP standards and there was no evidence about the licensed base stations' configurations or capabilities. Docket No. 312 at 41–44. Pantech also argues that patent exhaustion is legally inapplicable because its theory of infringement does not rely on any authorized acquirers of any licensed products. *Id.* at 44–45.

Having considered the parties' argument and the evidence, judgment as a matter of law is not warranted here. A reasonable jury could have found the evidence insufficient on this issue. Furthermore, the defense of patent exhaustion does not bar Pantech's infringement claims because the infringement theory that was ultimately presented at trial did not rely on "an assertion that an authorized acquirer was using the same invention by infringing the asserted claims." *Helferich Pat. Licensing, LLC v. New York Times Co.*, 778 F.3d 1293, 1302 (Fed. Cir. 2015).[13] Based on the evidence actually submitted at trial, allowing patent exhaustion to apply here would improperly extend it "far beyond the doctrine's traditional scope" by "bar[ring] the patentee from enforcing a patent claim against the making, selling, and using of new, patentee-unauthorized copies of an article covered by the claim." *Id.* at 1306.

For these reasons, OnePlus's motion for judgment as a matter of law of patent exhaustion is **DENIED**.

### F. OnePlus's JMOL on Damages

OnePlus argues it is entitled to judgment as a matter of law on damages. Docket Nos. 300 at 33–50, 322 at 22–34. OnePlus reiterates its summary judgment arguments—that Pantech's damages theory is legally flawed because it fails to apportion and disregards comparable licenses. Docket Nos. 300 at 33–46, 322 at 28–34. OnePlus also emphasizes its belief that the royalty rates for the SEPs are not FRAND. Docket Nos. 300 at 41–43, 322 at 29. OnePlus argues that if the Court finds Pantech's damages theory is legally unsound, it should receive judgment of no damages or the damages at the royalty rate calculated by OnePlus's expert. Docket No. 300 at 33–40. Because it believes the jury's damages verdict is inappropriate, OnePlus alternatively

---

[13] Although OnePlus relies on Pantech's original infringement contentions to argue Pantech's inducement theory relied on authorized acquirers, the jury did not see these contentions or hear evidence of that infringement theory. *See* Docket No. 337 at 9; *see also,* Docket Nos. 255, 256.

CONFIDENTIAL MATERIAL OMITTED

argues that—assuming Pantech's damages theory is legally sound—the Court should grant judgment as a matter of law that damages are no more than Dr. Putnam's figures. Docket No. 300 at 47–50.[14] OnePlus concludes that the Court cannot accept the jury's verdict because it was 7.4 times higher than the highest number presented at trial and higher than what ███████ paid for a worldwide license to Pantech's portfolio. Docket No. 300 at 33–34, 47–50; *see also* Docket No. 322 at 22–29.[15]

Pantech responds that Dr. Putnam's damages were appropriate, reliable, and only provided a floor for the jury's award. Docket No. 312 at 47–49. Pantech explains that Dr. Putnam's analysis was based on comparable licenses and that he not only considered the ███████ but also explained why they were not comparable. Docket Nos. 312 at 59–64, 337 at 14. Pantech reasons that Dr. Putnam adhered to the requirements of apportionment by explaining the licenses had built-in apportionment, and then performing further apportionment to reach a per-patent rate for the asserted SEPs and by considering comparable technology for the asserted NEPs. Docket Nos. 312 at 61–64, 337 at 15–17. Finally, Pantech argues that Dr. Putnam's royalty rates for the SEPs are not unfair or discriminatory. Docket No. 337 at 15. Pantech also reiterates the IDC data was a reliable source of data for OnePlus's sales given the errors in OnePlus's own sales data. Docket No. 312 at 64–65.

Judgment as a matter of law of no damages is appropriate for the '052 patent because there is no direct infringement. *See supra* Section II.A.1. Otherwise, OnePlus fails to persuasively argue judgment of no damages or damages at the rate opined by its expert is required as a matter of law. All the issues identified by OnePlus could have been addressed via cross-examination.

---

[14] This argument is addressed below, in Section III.

[15] OnePlus also makes specific arguments about the '052 patent that are now moot. *See supra* Section II.A.1.

Accordingly, OnePlus's motion for judgment as a matter of law of no damages is **GRANTED-IN-PART** for the '052 patent and **DENIED-IN-PART** for the remaining asserted patents.

## III.     OnePlus's Motion for a New Trial or Remittitur

Both parties spent a significant portion of their briefing addressing the jury's verdict of $10.62 million in damages, which was significantly higher than the highest damages figure calculated by any expert at trial—$1.39 million. *See generally* Docket Nos. 300, 312, 322, 337, 352, 353. OnePlus argues a new trial on damages is necessary because the size of the award is so exaggerated as to indicate bias and prejudice.[16] *See generally* Docket No. 352. OnePlus argues that if the Court decides to offer a remittitur, it should not exceed $1,393,948. *Id.* at 9–12.

Pantech's original position was that remittitur was unnecessary because a jury could have awarded up to $13,935,019 damages based on the evidence presented at trial. *See* Docket No. 312 at 50–58. At the post-trial hearing, however, Pantech acknowledged that the theories it relied on in its briefing to reach up to $13 million in damages "absolutely were not argued at trial." Docket No. 351 at 27:4–6; *see also id.* at 23:2–25:4 (OnePlus discussing the fact that these theories were not presented at trial); *see also* Docket No. 350 at 37:14–25 (same). Pantech subsequently argued that the Court should offer remittitur of $3,441,979 before ordering a new trial because the jury's award does not reflect passion or prejudice. *See generally* Docket No. 353. Pantech reasons the jury's verdict is simply a mathematical error because it "reflect[s], roughly, undiscounted pre-

---

[16] OnePlus very briefly argues that a new trial on all issues is warranted because all these issues are "interwoven." *See* Docket Nos. 300 at 51, 322 at 35. But OnePlus fails to meet its burden of showing a new trial on all issues is warranted. The Court already found the evidence of liability as to the '954, '654, '839, and '247 patents was sufficient and OnePlus fails to articulate how infringement, invalidity, and willfulness are interwoven with damages. *See, e.g.*, *Westbrook v. Gen. Tire & Rubber Co.*, 754 F.2d 1233, 1242 (5th Cir. 1985) (finding a new trial on damages may be held once liability is established because "[a] jury's assessment of damages may be influenced by impermissible factors even though it reaches an acceptable verdict on liability.").

litigation offers made by Pantech for its entire patent portfolio, although the SEP rate appears to have been adjusted upward." *Id.* at 7.

Typically, the Court defers to a jury's verdict, but when the Court "is left with the perception that the verdict is clearly excessive, deference must be abandoned." *Wantou v. Wal-Mart Stores Tex., L.L.C.*, 23 F.4th 422, 431 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 745 (2023), *reh'g denied*, 143 S. Ct. 1049 (2023) (citation omitted). In the Fifth Circuit, remittitur is ordinarily appropriate when "defects in the award are readily identifiable and measurable." *Id.* However, a new trial—not remittitur—is appropriate "when the jury's award resulted from passion and prejudice." *Frazier v. Honeywell Int'l, Inc*., 518 F. Supp. 2d 831, 836 (E.D. Tex. 2007) (citing *Whitehead v. Food Max of Miss., Inc.,* 163 F.3d 265, 275 (5th Cir. 1998)).

First, there is no question this verdict is excessive. While Pantech is correct that the jury could treat Dr. Putnam's royalty rate as the floor, the overall damages award was more than seven times the amount of Dr. Putnam's highest damages calculation. Even if the attorney argument during closing—that the damages should be increased by $2.5 million to account for a litigation discount—is considered, the ultimate $10.62 million verdict is three times the $3,441,979 in damages that Pantech's own counsel sought during closing. Accordingly, given the evidence presented at trial and Pantech's admission that its theories supporting a verdict higher than $3.4 million were never discussed before the jury, the verdict is excessive and clearly not supported by the evidence.

Second, there is evidence that the verdict may have resulted from passion or prejudice.[17] Here, the verdict is so excessive in comparison to the evidence presented at trial that impropriety

---

[17] At the hearing, the Court permitted subsequent briefing on whether remittitur or a new trial was appropriate because it was unclear whether the unquestionably excessive award arose from passion, prejudice, or a mathematical error. Docket No. 350 at 73:6–9.

may be inferred. The verdict was more than seven times the amount supported by the expert testimony of Dr. Putnam. *See Wells v. Dallas Indep. Sch. Dist.*, 793 F.2d 679, 684 (5th Cir. 1986) (finding a remittitur that reduced an award "by more than an order of seven" was inappropriate because the "jury award was so large that it reflected passion or prejudice"). Moreover, the verdict was more than three times what Plaintiff ultimately asked for during closing. *See id.*

OnePlus points to several incidents that it believes prejudiced the jury. *See* Docket No. 353 at 7–9. Most prejudicial are Pantech's excessive questions about litigation in the United Kingdom and Germany and Pantech's closing arguments that suggested to the jury that they should increase the damages to punish OnePlus for its holdout behavior. *See id.* at 9. The Court gave Pantech some leeway to talk about the United Kingdom and Germany litigation based on its representation that it wanted to impeach a witness who testified they did not know what a "holdout" was. Docket No. 266 at 723:16–725:12. The Court ultimately stopped this line of questioning because Pantech's questioning went well beyond impeachment and became prejudicial. *Id.* at 727:9–730:6. Pantech reintroduced this issue, prompting further objection that the Court sustained. Docket No. 269 at 44:3–7.

Pantech also inappropriately leveraged this prejudicial evidence during its closing arguments to seek punitive damages. Pantech argued that the jury should increase the final award by more than the "median cost of litigation" because "this is no average case," OnePlus was an "unwilling licensee," and the higher litigation rate should be applied because "[t]hat's how you stop it." *See e.g.*, Docket No. 270 at 1105:1–13. This argument is improper because the Court— not the jury—is responsible for adjusting the award to account for any alleged willfulness. *See Godo Kaisha IP Bridge 1 v. TCL Commc'n Tech. Holdings Ltd.*, No. CV 15-634-JFB, 2019 WL

1877189, at *7 (D. Del. Apr. 26, 2019), *aff'd*, 967 F.3d 1380 (Fed. Cir. 2020) (noting that an "unwilling licensee" argument is part of a willfulness claim).

Moreover, Pantech's initial explanation that the jury could have applied multiple, unargued theories to reach the ultimate verdict would itself show that the jury's increased damages finding was based on prejudice or passion. *See generally* Docket No. 312 at 47–49, 51–58. The leaps of logic a jury would have had to perform to identify and apply all the unargued theories to significantly increase the royalty rate would suggest that the jury was attempting to punish OnePlus rather than provide an appropriate measure of damages. Pantech's subsequent argument that the jury's verdict is simply a mathematical error because it reflects, roughly, the undiscounted pre-litigation offers made for Pantech's entire patent portfolio would also suggest the verdict was a result of passion or prejudice. Even Pantech admits this explanation does not fully explain the SEP damages. *See* Docket No. 353 at 7. Moreover, the jury heard repeated testimony that Pantech's entire patent portfolio includes hundreds of patents—only five of which were at issue in this case. To ignore this evidence and apply the royalty rate for Pantech's *entire* patent portfolio to these five patents supports an inference of impropriety. This is especially true for the SEPs because the jury was instructed that the SEPs were subject to a FRAND rate.

Pantech fails to persuade the Court that remittitur is the appropriate remedy here. When it comes to the maximum amount a reasonable jury could have awarded, the parties are more than $2 million apart. *Compare* Docket No. 352 *with* Docket No. 353. While the maximum recovery is likely somewhere below Pantech's estimate, there is no simple mechanical solution to determine what the maximum verdict should be. For example, both parties assume the IDC data should be used when analyzing the verdict and the maximum award, rather than OnePlus's records of lower sales. *See* Docket Nos. 352, 353. But Pantech presented the IDC data based on its position that

OnePlus's own sales data was unreliable and inaccurate, and there was evidence on both sides as to the reliability of OnePlus's own data. An unprejudiced jury should have the opportunity to determine whether OnePlus's sales data or the IDC sales data is more reliable.

As another example, OnePlus's argument that the royalty rate is capped based on Dr. Putnam's maximum royalty rate ignores that the jury could have increased the royalty rate upon consideration of the *Georgia-Pacific* factors. *See generally* Docket No. 352. On the other hand, Pantech relies on Dr. Lopez's testimony to increase Dr. Putnam's damages by $2.5 million. *See* Docket No. 352. But this attorney argument—presented for the very first time at closing—does not appear to be reliable or appropriate.[18] Pantech argued Dr. Lopez's testimony supported dividing the $2.5 million cost for "above-average" litigation between the five asserted patents by "simply add[ing] an additional $500,000 for each patent." *See* Docket No. 270 at 1105:1–24, 1106:23–1107:3. The Court has already discussed why this argument improperly asks the jury to penalize OnePlus. But it is unclear whether this argument is even supported by Dr. Lopez's testimony given that he was testifying about a general survey that does not appear to be connected to the five asserted patents. *See* Docket No. 269 at 15:6–16:14. Accordingly, remittitur is inappropriate because the Court cannot determine whether the jury intended to remove a litigation discount or whether the jury increased the award simply to punish OnePlus.

For these reasons, OnePlus's motion for a new trial on damages is **GRANTED.**

## IV.    Pantech's Motions are Premature

The new trial on damages and a new jury verdict will affect attorneys' fees, interest, and costs. Moreover, the parties' present briefing does not account for the Court's judgment as a matter

---

[18] OnePlus initially believed this $2.5 million came from the 1.72 multiplier that was stricken. *See* Docket Nos. 300 at 35–36, 178 at 35–37. OnePlus's confusion appears to arise from the fact that Dr. Lopez's presented opinion testimony that relied on a survey that had data comparable to a stricken article. *Compare* Docket No. 178 at 35–37 *with* Docket No. 269 at 15:8–23.

of law for the '052 Patent. Accordingly, Pantech's Motions for Entry of Judgment (Docket No. 302), Award of Attorneys' Fees and Enhancement (Docket No. 303), and Bill of Costs (Docket No. 308) are **DENIED-WITHOUT-PREJUDICE** because they are premature. *See Shum v. Intel Corp.*, 629 F.3d 1360, 1370 (Fed. Cir. 2010) (affirming that it was not error for a district court to wait until after a second trial to determine the prevailing party and award costs).

## CONCLUSION

For these reasons, it is

**ORDERED** that OnePlus's Motion to Dismiss for Lack of Standing (Docket No. 299) is **DENIED**. It is further

**ORDERED** that OnePlus's Motion for Judgment as a Matter of Law (Docket No. 300) that OnePlus does not infringe—willfully, directly, or by inducement—the asserted claims of the '052 patent is **GRANTED**. It is further

**ORDERED** that OnePlus's Motion for Judgment as a Matter of Law (Docket No. 300) that OnePlus does not infringe—willfully, directly, or by inducement—the asserted claims of the 654, 839, 247, and 954 patents is **DENIED**. It is further

**ORDERED** that OnePlus's Motion for Judgment as a Matter of Law (Docket No. 300) that the asserted claims of the '052 and '654 patents are invalid is **DENIED**. It is further

**ORDERED** that OnePlus's Motion for Judgment as a Matter of Law (Docket No. 300) that the licensed base stations substantially embody the '839 and '954 patents and that the '839 and '954 patents are exhausted is **DENIED**. It is further

**ORDERED** that OnePlus's Motion for Judgment as a Matter of Law of no damages (Docket No. 300) is **GRANTED-IN-PART** as to the '052 patent and **DENIED-IN-PART** as to the remaining asserted patents. It is further

**ORDERED** that OnePlus's Motion for a New Trial (Docket NO. 300) is **GRANTED-IN-PART** as to damages for the '654 patent and SEPs only. It is further

**ORDERED** that Pantech's Motion for Entry of Judgment (Docket No. 302) is **DENIED-WITHOUT-PREJUDICE** as premature. It is further

**ORDERED** that Pantech's Motion for Award of Attorneys' Fees and Enhancement (Docket No. 303) is **DENIED-WITHOUT-PREJUDICE** as premature. It is further

**ORDERED** that Pantech's Motion for Bill of Costs (Docket No. 308) is **DENIED-WITHOUT-PREJUDICE** as premature. It is further

**ORDERED** that, within **seven (7) days** of this Order's entry, the parties **SHALL** jointly move to file a redacted version of this Order. The parties' joint motion **SHALL** provide proposed redactions, describe the confidential information in those proposed redactions, and provide good cause for each redaction. Or, if no redactions are necessary, the parties **SHALL** jointly file an unsealed and unredacted version of the Order with a cover page stating no redactions are needed. It is further

**ORDERED** that within **seven (7) days** of this order the parties **SHALL** prepare and submit a joint motion attaching a joint proposed docket control order[19] for the damages retrial that incorporates the following schedule of deadlines:

| Jury Trial | *October 15, 2024 immediately following jury selection in Texarkana, Texas |
|---|---|
| Jury Selection | *October 15, 2024 in Texarkana, Texas |
| Pre-Trial Conference | *October 2, 2024 at 10:00 a.m. in Texarkana, Texas |
| File Joint Jury Panel Questionnaire<br><br>If the parties request to submit a jury panel questionnaire, the proposed questionnaire shall be | August 21, 2024 |

---

[19] While the parties should reference the sample docket control order for patent cases that can be found on the Court's website, the parties need only propose deadlines related to pretrial and trial.

| jointly filed as an agreed, single document that is no more than three pages. The parties shall also email a Microsoft Word version of the questionnaire to the law clerk assigned to this case. | |
|---|---|

(*) indicates a deadline that cannot be changed without showing good cause. Good cause is not shown merely by indicating that the parties agree that the deadline should be changed.

**So ORDERED and SIGNED this 14th day of August, 2024.**

Robert W Schroeder III
ROBERT W. SCHROEDER III
UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

| | |
|---|---|
| PANTECH CORPORATION and PANTECH WIRELESS, LLC, | |
| *Plaintiffs,* | Civil Action No. 5:22-cv-00069-RWS |
| v. | |
| ONEPLUS TECHNOLOGY (SHENZHEN) CO., LTD., | |
| *Defendant.* | |

## VERDICT FORM

In answering these questions, you are to follow all of the instructions I have given in the Final Jury Instructions.  Your answers to each question must be unanimous.  In this verdict form, "Pantech" refers to Pantech Corporation and Pantech Wireless, LLC and "OnePlus" refers to OnePlus Technology (Shenzhen) Co., Ltd. As used below:

- "the '247 patent" refers to U.S. Patent No. 10,869,247;

- "the '954 patent" refers to U.S. Patent No. 11,012,954;

- "the '839 patent" refers to U.S. Patent No. 9,548,839;

- "the '654 patent" refers to U.S. Patent No. 9,063,654;

- "SEPs" refers to the standards-essential '247, '839, and '954 patents.

**QUESTION NO. 1:**

What damages, if any, expressed as a total dollar amount, has Pantech proven by a preponderance of the evidence would fairly and reasonably compensate Pantech for its damages resulting from OnePlus's infringement of the SEPs ('247, '839, and/or '954)?

*Answer in United States Dollars and Cents, if any:*

$ __739,708.43_____

**QUESTION NO. 2:**

What damages, if any, expressed as a total dollar amount, has Pantech proven by a preponderance of the evidence would fairly and reasonably compensate Pantech for its damages resulting from OnePlus's infringement of the '654 Patent?

*Answer in United States Dollars and Cents, if any:*

$ __260,291.57_____

**FINAL PAGE OF THE JURY VERDICT FORM**

You have now reached the end of the verdict form and should review it to ensure it accurately reflects your **unanimous** determinations. The jury foreperson should then sign and date the verdict form in the spaces below and notify the Court Security Officer that you have reached a verdict. The jury foreperson should retain possession of the verdict form and bring it when the jury is brought back into the courtroom.

Signed this _____ day of _Oct 17,_____, 2024.



_____
Jury Foreperson

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TEXARKANA DIVISION



| PANTECH CORPORATION and PANTECH WIRELESS, LLC, | § § § | |
|---|---|---|
| Plaintiffs, | § § | |
| v. | § § | CASE NO. 5:22-CV-00069-RWS |
| ONEPLUS TECHNOLOGY (SHENZHEN) CO., LTD., | § § § | |
| Defendant. | § § § | |

## <u>ORDER</u>

Before the Court is Defendant OnePlus Technology (Shenzhen) Co, Ltd.'s Rule 50(a) motion. Docket No. 422. The Court deferred its ruling on the Defendant's Rule 50(a) motion—because the Court did not grant this motion, the subject matter discussed therein was submitted to the jury for consideration and Defendant's Rule 50(a) motion (Docket No. 422) is **DENIED-AS-MOOT**.

Also before the Court are the parties' respective post-trial motions. Docket Nos. 464–66. The motions are fully briefed. Docket Nos. 472–74, 478–80, 484–86. The Court heard argument on these motions. Docket Nos. 492, 495. For the reasons set forth below,

- Defendant's Rule 50(b) Motion for Judgment as a Matter of Law (Docket No. 464) is **DENIED**;

- Plaintiffs' Corrected Motion for Entry of Judgment (Docket No. 466) is **GRANTED-IN-PART AS MODIFIED** and **DENIED-IN-PART**;

- Plaintiffs' Motion for Award of Attorneys' Fees and Enhancement (Docket No. 465) is **DENIED**; and

- The parties' respective motions that were subsequently corrected (Docket Nos. 421, 463) are **DENIED-AS-MOOT**.

## BACKGROUND

A jury trial was held in March 2024, wherein Plaintiffs Pantech Corporation and Pantech Wireless, LLC asserted that Defendant OnePlus Technology (Shenzhen) Co., Ltd. willfully infringed U.S. Patent Nos. 10,869,247 ("the '247 patent"), 11,012,954 ("the '954 patent), 9,548,839 ("the '839 patent"), 9,063,654 ("the '654 patent), and 8,893,052 ("the '052 patent"). *See* Docket No. 258. Defendant denied all allegations of infringement and presented various defenses. *See id.*; Docket No. 228 at 10. The jury returned a unanimous verdict, finding in Plaintiffs' favor on all counts. Docket No. 258. The jury also awarded $10.26 million in damages, an amount that was significantly higher than any theory presented by Plaintiffs. *See id.* at 6.

Both parties filed post-trial motions, including a request by OnePlus for a new trial under Rule 59. Docket Nos. 299, 300, 301, 302, 303, 308. Upon consideration of the parties' motions, the Court found that there was no infringement of the '052 patent as a matter of law and that a new trial on damages was warranted. Docket No. 360. The Court otherwise upheld the jury's verdict. *See id.*

A retrial on damages for the '247, '954, '839, and '654 patents was held in October 2024. *See, e.g.*, Docket Nos. 430–434. The jury returned a verdict awarding $739,708.43 for the '247, '954, and/or '839 patents (the "SEPs") and $260,291.57 for the '654 patent. Docket No. 441. The parties filed the post-trial motions presently before the Court.

# LEGAL STANDARDS

## I. Rule 50 Judgment as a Matter of Law

A renewed motion for judgment as a matter of law under Rule 50(b) may only raise arguments previously made in a motion for judgment as a matter of law under Rule 50(a). *OneBeacon Ins. Co. v. T. Wade Welch & Assocs.*, 841 F.3d 669, 676 (5th Cir. 2016). A court's review of a jury's verdict is "especially deferential." *Id.* at 675 (citation omitted). The jury's verdict may not be overturned "unless the jury's factual findings are not supported by substantial evidence, or if the legal conclusions implied from the jury's verdict cannot in law be supported by those findings." *See E.E.O.C. v. Boh Bros. Const. Co.*, 731 F.3d 444, 452 (5th Cir. 2013) (citations omitted). "Substantial evidence is defined as evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Nelson v. Sunbeam Prods, Inc.*, 579 F. Supp. 3d 857, 864 (E.D. Tex. 2022) (citation omitted).

## II. Attorneys' Fees

"The court in exceptional cases may award reasonable attorney fees to the prevailing party" if the fee-seeking party shows it is entitled to such fees by a "preponderance of the evidence." 35 U.S.C. § 285; *Bayer CropScience AG v. Dow AgroSciences LLC*, 851 F.3d 1302, 1305 (Fed. Cir. 2017). An exceptional case is "simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014). "District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Id.* at 545.

CONFIDENTIAL MATERIAL OMITTED

## III.    Enhanced Damages

It is within the Court's discretion "to determine whether the conduct is sufficiently egregious to warrant enhanced damages." *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 14 F.4th 1323, 1330 (Fed. Cir. 2021). "As with any exercise of discretion, courts should continue to take into account the particular circumstances of each case in deciding whether to award damages, and in what amount." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 106 (2016). While the Court may consider the non-exclusive *Read* factors to evaluate whether enhancement is appropriate, the Court's analysis ultimately focuses on "egregious infringement behavior" as the "touchstone for determining an award of enhanced damages." *Lone Star Tech. Innovations, LLC v. ASUSTek Computer Inc.*, No. 6:19-CV-00059-RWS, 2022 WL 4494312, at *6 (E.D. Tex. Aug. 18, 2022).

## ANALYSIS

## I.    Defendant's Motion for Judgment as a Matter of Law is DENIED

Defendant argues it is entitled to judgment as a matter of law as to damages. Docket Nos. 464, 489. With respect to the SEPs, Defendant focuses on Dr. Jonathan Putnam's allegedly flawed forward citation methodology, which Defendant asserts relies on flawed assumptions of which patents in Plaintiffs' portfolio are "actually" essential and improperly attributed value to other unasserted family members. *See, e.g.*, Docket No. 464 at 12–17. Defendant also reiterates arguments from summary judgment and the previous post-trial about the sufficiency of Dr. Putnam's apportionment methodology, whether Plaintiffs complied with their obligation to offer a fair, reasonable, and non-discriminatory ("FRAND") rate, the comparability of the ████ license, and Plaintiffs' failure to consider the ███████████ licenses. *Id.* at 17–20. In addition, Defendant argues that Plaintiffs failed to prove any damages for the '654 patent because Plaintiffs concede the '247 and '654 patents are not technically comparable and no expert conducted any

CONFIDENTIAL MATERIAL OMITTED

analysis comparing whether the '247 and '654 patents were economically comparable. *Id.* at 5–11.

Plaintiffs respond that most of Defendant's arguments are waived and the rest do not warrant judgment as a matter of law. Docket Nos. 473, 484. For example, Plaintiffs assert that Defendant waived its challenges to Plaintiffs' reliance on the ▮▮▮ license and Dr. Putnam's forward citation analysis, especially with respect to arguments that were not raised in Defendant's Rule 50(a) motion. *See, e.g.*, Docket No. 473 at 14–16, 25–28. Plaintiffs also characterize Defendant's criticism of Charles Mauro's testimony as a re-urged *Daubert* challenge that should be denied, especially because Mauro's testimony about the qualitative value of the '654 patent was uncontroverted. *Id.* at 11–13. In addition, Plaintiffs challenge Defendant's motion on its merits, citing substantial evidence in support of Dr. Putnam's analysis of the SEPs and the '654 patent. *Id.* at 7–14, 16–22. Plaintiffs explain that the damages for the SEPs were supported by substantial evidence, specifically Dr. Putnam's consideration of relevant licenses, including the ▮▮▮ ▮▮▮ licenses and his calculation of a reasonable royalty using the comparable licenses he identified as having built-in apportionment, and his further apportionment through his patent citation methodology. *See, e.g.*, *id.* at 16–31. With respect to the '654 patent, Plaintiffs rely on the testimony of several witnesses—including Mauro, Dr. Putnam, Dr. Yang-Won Jung, and Defendant's expert, Dr. Mario Lopez—to show that the jury was presented substantial evidence in support of damages and Dr. Putnam's analysis. *Id.* at 7–14. At the hearing, Plaintiffs further explained that the jury, like Dr. Putnam, could have relied on Mauro's qualitative analysis of the '654 patent and found it comparable to Dr. Todor Cooklev's testimony about the frequency of use and essentiality of the '247 patent. Docket No. 495 at 29:17–31:16.

OnePlus fails to persuasively show that judgment of no damages or damages at the rate opined by its expert is required as a matter of law. Plaintiffs are correct that some of Defendant's motions are untimely *Daubert* motions or exceed the scope of Defendant's Rule 50(a) motion. For example, Defendant's request that the damages be set at zero based on Dr. Putnam's allegedly faulty forward citation methodology is procedurally and substantively analogous to *Wirtgen Am., Inc. v. Caterpillar, Inc.*, No. 1:17-CV-00770-JDW, 2024 WL 4216057, at *12–14 (D. Del. Sept. 17, 2024). In *Wirtgen*, the defendant's request for judgment as a matter of law of no damages, based on a challenge to an allegedly faulty forward patent citation analysis, was determined to be an untimely *Daubert* motion. *Id.* The time to file a *Daubert* challenge "was well before the trial"— here, well before the *retrial*. *See id.* at *12. Moreover, Plaintiffs provided substantial evidence in support of Dr. Putnam's forward citation analysis, which they tied to the patents at issue and was subject to thorough cross-examination. The jury was free to credit or discredit Dr. Putnam's analysis. The fact that the jury disagreed with Defendant does not make the jury's verdict unreasonable.

Similarly, Defendant fails to show that the damages for the '654 patent should be set at zero. Plaintiffs provided sufficient evidence for a reasonable juror to award these damages as to the '654 patent. A reasonable jury could consider Dr. Putnam's testimony, Mauro's qualitative analysis, and Dr. Lopez's own methodology to determine that the awarded damages were no less than a reasonable royalty for the sales subject to this suit. This is not a case where there is *no* evidence of damages for the '654 patent—this is a case where there is evidence that Defendant simply disagrees with.

In summary, Defendant's judgment as a matter of law does not show that a reasonable jury could not have provided the ultimate reward, especially because the jury awarded damages within

the range presented by the parties. Accordingly, OnePlus's motion for judgment as a matter of law of no damages is **DENIED.**

## II.   Plaintiffs' Motion for Entry of Judgment, Interest, and Supplemental Damages is GRANTED-IN-PART, AS MODIFIED

Plaintiffs seek entry of judgment, pre-judgment interest, post-judgment interest, and supplemental damages. Docket No. 466. Defendant opposes Plaintiffs' motion. Docket No. 472.

### A.   Pre-Judgment Interest is GRANTED, as Modified

Plaintiffs request that the Court award pre-judgment interest at the prime rate compounded quarterly from January 21, 2021 for the $739,708.43 award for the infringement of the '247, '954, and '839 patents and June 3, 2022 for the $260,291.57 award for the '654 patent through the date the Court enters final judgment. *See, e.g.*, Docket Nos. 466 at 2–3, 479 at 3–4, 466-1 at 1.

Defendant argues pre-judgment interest is inappropriate here because it would result in a "windfall" to Plaintiffs and Plaintiffs failed to meet their burden. Docket No. 472 at 6–11. Defendant argues Plaintiffs fail to explain whether pre-judgment interest will be applied to the damages as a lump sum or a running royalty, why the prime rate should be applied rather than the treasury rate, why interest should be compounded quarterly rather than annually, and what prime rate should be selected. *Id.* at 7–11. Defendant also questions why the January 21, 2021 starting date should be the date for the interest to accrue for *all* the SEPs when the stipulated notice dates for the '247 patent was July 9, 2021 and for the '954 patent June 3, 2022. *Id.* at 8–9. Defendant contends awarding Plaintiffs' proposed pre-judgment interest period would improperly allow Plaintiffs to collect pre-judgment interest on sales that occurred before the notice date. *Id.* Defendant also believes pre-judgment interest would overcompensate Plaintiffs because the presentation of the multiplier inflated the final damages number. *Id.* at 6–7.

Plaintiffs respond that their request for pre-judgment interest—with a prime rate set at the date of final judgment and compounded quarterly—matches the "standard practice of [the] District," relies on publicly available information, and is being applied to a damages model that undisputably relied on a reasonable royalty, not a lump sum. Docket No. 479 at 2–3. Plaintiffs further assert that Defendant is the one who suggested the format of the verdict form so it cannot now object to the differing dates for the different SEPs. *Id.* at 4. Plaintiffs also contend that their presentation of a multiplier during closing did not affect damages because the jury's award of $1 million was less than the maximum damages presented by Dr. Putnam without any multipliers. *Id.* at 2.

First, there is no question here that the damages award was based on a reasonable royalty. The parties only heard expert testimony opining as to what a reasonable royalty would be and were instructed to award a reasonable royalty. *See* Docket No. 439 at 8–10. The jury was not instructed to award a lump sum. *Id.* Defendant's arguments to the contrary are without merit.

It is necessary, however, to address the appropriate period of the pre-judgment interest. Normally pre-judgment interest is awarded "from *the date of infringement* to the date of payment, since only such award will satisfy 'Congress' overriding purpose [in section 284] of affording patent owners complete compensation.' " *Bio-Rad Lab'ys, Inc. v. Nicolet Instrument Corp.*, 807 F.2d 964, 967 (Fed. Cir. 1986) (emphasis added) (citing *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655 (1983)); *see also Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co.*, No. 4:14-CV-00371, 2017 WL 1716589, at *3 (E.D. Tex. Apr. 27, 2017) (recognizing that the purpose of pre-judgment interest is "to compensate the patent owner for infringement"). Plaintiffs offer insufficient authority in support of its position that pre-judgment interest for the '247 and '954 patents should run before their respective infringement periods based on the format of the

verdict form. Plaintiffs' request would result in around six months of pre-infringement interest for the '247 patent and about 18 months of additional interest for the '954 patent.[1] Plaintiffs fail to convince the Court that there is no methodology available that would fairly allocate the award to each asserted patent and, indeed, they have never adequately addressed Defendant's concerns about this issue since the first trial. *See, e.g.*, Docket No. 309 at 9. Defendant persuasively show that Plaintiffs' proposed period of pre-judgment interest would result in an inappropriate excess. Weighing both parties' arguments and the delay caused by retrial, the pre-judgment interest period for the SEPs shall run from June 3, 2022 to the date of entry of judgment. Even though this adjusted period includes the delay caused by the retrial,[2] the removal of the months-long pre-infringement period mitigates the risk of overcompensation while balancing Plaintiffs' right to be fully compensated.

After resolving the pre-interest period issue, the only remaining dispute is whether the Court should follow the common practice of the Eastern District of Texas or apply Defendant's alternative proposal. The "[c]ommon practice in the Eastern District of Texas is to apply a prejudgment interest rate that compounds the prime rate quarterly." *Imperium*, 2017 WL 1716589, at *4. Having considered both parties' arguments, Defendant does not persuasively show that the Eastern District of Texas's common practice of compounding quarterly at the prime rate in effect at the entry of judgment is inappropriate here, especially because Defendant's concerns about overcompensation are sufficiently addressed by the Court's adjustment of the pre-judgment interest period. Accordingly, the Court finds it appropriate to otherwise follow the common

---

[1] In addition, the need for a retrial further delayed entry of judgment by at least seven months.

[2] Defendant did not ask for the pre-judgment interest period to be capped at the first trial date until it filed its surreply. *Compare* Docket No. 472 at 8–9 *with* Docket No. 486 at 5 n.1. Accordingly, Defendant's request for this additional relief is waived.

practice of this district. *See, e.g.*, *id.*; *see also Fractus, S.A. v. Samsung Elecs. Co.*, 876 F. Supp. 2d 802, 856 (E.D. Tex. 2012); *Georgetown Rail Equip. Co. v. Holland L.P.*, No. 6:13-CV-366, 2016 WL 3346084, at *10 (E.D. Tex. June 16, 2016), *aff'd*, 867 F.3d 1229 (Fed. Cir. 2017).

For these reasons, the pre-judgment interest on the jury award shall accrue from June 3, 2022 to the date of entry of judgment, compounded quarterly at the prime rate.[3]

### B.    Post-Judgment Interest is GRANTED

The parties do not dispute that post-judgment interest is available if there are damages. *See, e.g.*, Docket Nos. 472 at 11, 486 at 7 (opposing post-judgment interest only if OnePlus's Rule 50(b) motion is granted). Given that there are damages, the Court awards post-judgment interest at the statutory rate from the date of the Court's final judgment until the date of payment.

### C.    Plaintiffs' Request for Supplemental Damages is DENIED

Plaintiffs also ask the Court to assess whether they are owed supplemental damages. *See, e.g.*, Docket Nos. 466 at 3–4, 479 at 4–6. The jury's damages award was based on stipulated sales through the end of 2023, and Plaintiffs request seeks supplemental damages "for all infringing sales from Q1 of 2024 through the date of judgment." Docket No. 466 at 4. Plaintiffs argue the supplemental damages can be calculated by the Court at a future time, applying the methodology used in *Genband US LLC v. Metaswitch Networks Corp.*, 2018 WL 11357619, at *14 (E.D. Tex. Mar. 22, 2018). Docket No. 479 at 4–6.

Defendant responds that Plaintiffs' request for supplemental damages should be rejected in its entirety for failure of proof or, at the very least, for the period between the March trial and the October retrial. Docket No. 486 at 8. First, Defendant criticizes Plaintiffs' failure to provide a

---

[3] The Court recognizes that the parties may need to meet and confer further to implement Defendant's requested relief of a truncated pre-judgment interest period. If there any further disputes about this issue the parties **SHALL** meet and confer **in person** before seeking further relief from the Court.

"concrete proposal" for calculating supplemental damages. Docket No. 472 at 11–12. Defendant further argues that the methodology proposed in *Genband* is inapplicable because it arises from an unrelated case and was rejected by Plaintiffs' own expert. Docket No. 486 at 7–8.[4] Defendant also believes that supplemental damages are inappropriate because it would be impossible to determine how the jury calculated damages based on Plaintiffs' presentation of multipliers during closing. *See, e.g.*, *id.* at 5 n.2. Finally, Defendant notes that Plaintiffs acknowledge that whether to award supplemental damages is within the Court's discretion, which the Court should not exercise given that the Court previously ruled Pantech could not reopen the closed record with OnePlus's 2024 sales data *after* the first trial. *See* Docket No. 472 at 12–13.

It is within the Court's discretion whether to award supplemental damages. *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 38 (Fed. Cir. 2012) ("District courts have discretion to award damages for periods of infringement not considered by the jury."); *see also Genband*, 2018 WL 11357619, at *12 ("The Court's ability to award supplemental damages based on the jury's verdict is squarely within the province of the Court."). Plaintiffs fail to persuade the Court supplemental damages are appropriate here, given the posture of this case. Defendant convincingly shows that awarding supplemental damages now would be an end run around the Court's previous rulings and reward Plaintiffs for their behavior that lead to a retrial. There was no dispute over the sales period in the first trial—Plaintiffs did not move to compel additional sales data before discovery closed and did not move for supplemental damages after the first jury verdict. *See, e.g.*, Docket No. 302. Only after the Court ordered a retrial on damages did Plaintiffs seek relief for damages incurred in 2024, asking to reopen discovery to seek information that could have been

---

[4] Defendant further contends that Plaintiffs' attempt to propose the methodology from *Genband* is waived because it was raised for the first time in Plaintiffs' reply. *Id.*

CONFIDENTIAL MATERIAL OMITTED

obtained before the *first* trial. *See, e.g.*, Docket No. 369. The Court denied such relief given that it would not have been available absent the need for a retrial. *See* Docket Nos. 377, 386. There has been no change in fact or posture since Plaintiffs originally moved for such relief, and the Court sees no basis to award relief that would not be available absent Plaintiffs causing a retrial. Accordingly, Plaintiffs' motion for supplemental damages is **DENIED**.

## III.  Plaintiffs' Request for Attorneys' Fees and Enhancement is DENIED

Plaintiffs seek treble damages and attorneys' fees from August 28, 2023 through the initial post-trial hearing on June 27, 2024.[5] Docket Nos. 465, 478. Plaintiffs allege Defendant exploited the FRAND process by practicing holdout tactics, such as ████████████████████ ███████████████████████████████████, and refusing to make counter offers. *See, e.g.*, Docket No. 465 at 8–9. Plaintiffs characterize Defendant's litigation tactics as "unreasonable," criticizing, for example: Defendant's refusal to stipulate using representative products or produce certain licenses; the preparedness of Defendant's 30(b)(6) witnesses; the production of "inaccurate" sales data; the pursuit of discovery after its close; Defendant's behavior during trial; and Defendant's repeated attempts to raise untimely new defenses and theories— including the issue of constitutional standing. *See id.* at 11–35. Relying on all the *Read* factors, Plaintiffs also argue enhancement is appropriate based on Defendant's litigation behavior, in addition to Defendant's recklessness towards possibility of copying, its willful infringement, its financial size and strength, Plaintiffs' belief that this case was not close, Defendant's ongoing conduct and failure to remediate, and that Defendant's "holdout behavior" shows a motivation for harm and attempts to conceal its conduct. *See id.* at 39–52.

---

[5] Plaintiffs' request specifically excludes fees related to the retrial. *Id.*

Defendant responds that Plaintiffs complain about "run-of-the-mill" disputes in a hard-fought, close case. Docket Nos. 474, 485. For example, Defendant explains it had a good faith basis for not agreeing to the representative products, produced all relevant license agreements, prepared its 30(b)(6) witnesses, provided accurate sales data in the form it was maintained, reasonably participated in discovery, narrowed and focused its case, and resolved disputes and objections. *See, e.g.*, Docket Nos. 474 at 33–54, 485 at 10–12. Defendant also argues this was a close case, pointing to the length of the jury's deliberations in the first trial, the overturning of the jury's verdict as to the '052 patent and the original damages verdict, and the jury's award in the retrial. *See, e.g.*, Docket Nos. 474 at 10–13, 52–54, 485 at 10–13.

Defendant argues that enhancement is inappropriate and would overcompensate Plaintiffs when the jury award itself already overcompensates Plaintiffs. Docket No. 474 at 9–24. Defendant also relies on the *Read* factors to show this case does not warrant enhancement. *See id.* at 24–33. First, Defendant states there is no evidence of Defendant performing any copying, because any such copying would have been performed by Google or Qualcomm who provide the infringing code and components. *See id.* at 24–26. Second, Defendant argues it had a good faith belief in noninfringement and invalidity, emphasizing the closeness of the case. *See id.* at 10–14, 25–26. Third and fifth, Defendant reiterates that its litigation conduct was unremarkable and common place and that the case was close. *Id.* at 27–28. Fourth, Defendant argues that its "stable financial condition" should not weigh in favor enhancement. *Id.* at 28. Defendant also maintains the sixth *Read* factor weighs against enhancement because the infringement period was relatively short, the infringing components were off the shelf, and some of the features were subsequently removed. *Id.* at 29–31. Seventh, Defendant argues that it has taken remedial action by seeking mediation in December 2023. *Id.* at 31. Defendant argues that the "holdout" evidence does not show a

CONFIDENTIAL MATERIAL OMITTED

motivation to harm and is mainly evidence that Defendant was unwilling to agree to a non-FRAND offer. *Id.* at 31–32. Finally, Defendant argues there was no concealment because its phones are publicly available, it disclosed that its use of off-the-shelf components and software, and Defendant was within its rights to refuse to produce licenses within its possession that did not involve Defendant. *Id.* at 32–33.

This is not an exceptional case. The alleged litigation misconduct Plaintiffs complain of does not warrant fees. For example, at the hearing, Plaintiffs focused on Defendant's refusal to stipulate to representativeness. This argument is without merit. It is Plaintiffs' burden to prove representativeness and Defendant agreed to an alternative stipulation—that the accused products used stock Qualcomm chipsets and Android code. *See, e.g.*, Docket No. 485 at 10. Defendant's decision not to stipulate to representativeness was further supported by its evidence that later versions of the Android code removed some of the infringing functionalities. And while it is true that Defendant shifted its strategy and raised some theories and defenses out-of-time, so did Plaintiffs. *See, e.g.*, Docket No. 474 at 21–23. Moreover, as Defendant points out, there were many issues in this case the Court found to be close calls. *See, e.g.*, *id*. at 10–13. Plaintiffs fail to show by a preponderance of evidence that this case is exceptional.

Similarly, Plaintiffs fail to persuasively show that enhancement is appropriate here. Whether Defendant committed "egregious infringement behavior" is the "touchstone for determining an award of enhanced damages." *Lone Star Tech. Innovations*, No. 6:19-CV-00059-RWS, 2022 WL 4494312, at *6. Plaintiffs' best evidence is Defendant's relative ███████ ███████ and the first jury's willfulness finding. But given the closeness of this case, and the ultimate outcome, there is simply not enough to persuade the Court that Defendant's infringement behavior is egregious. Moreover, most of the *Read* factors are either neutral or do not weigh

towards enhancement. There is no evidence that Defendant itself performed any copying. Further, Plaintiffs fail to persuade the Court that there is sufficient evidence to show that Defendant was motivated to harm Plaintiffs or that Defendant attempted to conceal its conduct. As already discussed, many aspects of this case were close, and Defendant's litigation conduct was not exceptional. Further, Defendant's stable financial condition is a neutral factor that itself alone, does not warrant punishment. *See id.* at *7. Finally, while there was a willfulness finding by the jury, the infringement period was not long, and the accused products used on the off-the-shelf components and publicly available code, and Defendant's pre- and post-trial behavior as to the SEPs was tied closely to its reasonable belief that Plaintiffs' offer was not FRAND. In summary, Plaintiffs fail to convincingly show that the *Read* factors, when considered in the context of Defendant's overall infringement behavior, warrant enhancement.

For these reasons, Plaintiffs' motion for attorneys' fees and enhancement is **DENIED**.

## CONCLUSION

For these reasons, it is

**ORDERED** that Defendant's Rule 50(a) motion (Docket No. 422) is **DENIED-AS-MOOT**. It is further

**ORDERED** that Defendant's Rule 50(b) Motion for Judgment as a Matter of Law (Docket No. 464) is **DENIED**. It is further

**ORDERED** that Plaintiffs' Corrected Motion for Entry of Judgment (Docket No. 466) is **GRANTED-IN-PART AS MODIFIED** and **DENIED-IN-PART**. It is further

**ORDERED** that Plaintiffs' Motion for Award of Attorneys' Fees and Enhancement (Docket No. 465) is **DENIED.** It is further

· **ORDERED** that the parties' respective motions that were subsequently corrected (Docket Nos. 421, 463) are **DENIED-AS-MOOT**. It is further

**ORDERED** that, within **seven (7) days** of this Order's entry, the parties **SHALL** jointly move to file a redacted version of this Order. The parties' joint motion **SHALL** provide proposed redactions, describe the confidential information in those proposed redactions, and provide good cause for each redaction. Or, if no redactions are necessary, the parties **SHALL** jointly file an unsealed and unredacted version of the Order with a cover page stating no redactions are needed.

**So ORDERED and SIGNED this 23rd day of January, 2025.**

ROBERT W. SCHROEDER III
UNITED STATES DISTRICT JUDGE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TEXARKANA DIVISION

| | | |
|---|---|---|
| PANTECH CORPORATION and PANTECH WIRELESS, LLC, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | CASE NO. 5:22-CV-00069-RWS |
| ONEPLUS TECHNOLOGY (SHENZHEN) CO., LTD., | § § § § | |
| Defendant. | § § | |

## FINAL JUDGMENT

Pursuant to Rules 58 and 60(b) of the Federal Rules of Civil Procedure, consistent with the Court's Sealed Orders (Docket Nos. 360, 498), in consideration of the jury verdicts delivered on March 27, 2024 (Docket No. 258) and October 17, 2024 (Docket No. 441), and the entirety of the record available to this Court, the Court **ORDERS AND ENTERS FINAL JUDGMENT** as follows:

- Defendant OnePlus Technology (Shenzhen) Co., Ltd. is found to infringe claim 1 of U.S. Patent No. 10,869,247 ("the '247 Patent");

- Defendant OnePlus is found to infringe claims 6 and 9 of U.S. Patent No. 11,012,954 ("the '954 patent");

- Defendant OnePlus is found to infringe claims 9 and 11 of U.S. Patent No. 9,548,839 ("the '839 patent");

- Defendant OnePlus is found to infringe claims 1, 6, and 10 of U.S. Patent No. 9,063,654 ("the '654 patent);

- Defendant OnePlus is found to not infringe claims 10 and 17 of U.S. Patent No. 8,893,052 ("the '052 Patent");

- Defendant OnePlus is found to willfully infringe the asserted claims of the '247, '839, '954, and '654 patents;

- Claims 1, 6, and 10 of the '654 patent are not invalid;

- Claims 10 and 17 of the '052 patent are not invalid;

- The '839 and '954 patents are not exhausted;

- The Court awards a total of **$1,000,000** to Plaintiffs Pantech Corporation and Pantech Wireless, LLC: $739,708.43 for OnePlus's infringement of the asserted claims of the '247, '839, and/or '954 patents and $260,291.57 for OnePlus's infringement of the asserted claims of the '654 patent, consistent with the jury's verdict in the retrial (Docket No. 441 at 2);

- Pre-judgment interest on the jury award shall accrue from June 3, 2022 to the date of entry of judgment, compounded quarterly at the prime rate, and post-judgment interest is awarded at the statutory rate from the date of the Court's final judgment until the date of payment; and

- The Court finds this case is not exceptional.

All counterclaims or other claims and pending motions by any party not previously ruled or specifically granted herein are **DENIED-AS-MOOT.**[1]

The Clerk of Court is directed to **CLOSE** the case.

---

[1] This does not affect the parties' agreement to seek judgment for costs as provided for by 35 U.S.C. § 284 after judgment is entered.

**So ORDERED and SIGNED this 23rd day of January, 2025.**

ROBERT W. SCHROEDER III
UNITED STATES DISTRICT JUDGE

# EXHIBIT 1

US009548839B2

(12) **United States Patent**
Lee et al.

(10) Patent No.: **US 9,548,839 B2**
(45) Date of Patent: **Jan. 17, 2017**

(54) **METHOD FOR MAPPING PHYSICAL HYBRID AUTOMATIC REPEAT REQUEST INDICATOR CHANNEL**

(71) Applicant: **PANTECH CO., LTD.**, Seoul (KR)

(72) Inventors: **Jung Hoon Lee**, Gyeonggi-do (KR); **Joon Kui Ahn**, Gyeonggi-do (KR)

(73) Assignee: **PANTECH INC.**, Seoul (KR)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 32 days.

(21) Appl. No.: **14/726,014**

(22) Filed: **May 29, 2015**

(65) **Prior Publication Data**
US 2015/0263827 A1    Sep. 17, 2015

**Related U.S. Application Data**

(63) Continuation of application No. 14/184,345, filed on Feb. 19, 2014, now Pat. No. 9,048,991, which is a
(Continued)

(30) **Foreign Application Priority Data**

Dec. 8, 2008    (KR) ........................ 10-2008-0124084

(51) **Int. Cl.**
*H04L 1/18*        (2006.01)
*H04L 5/00*        (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC .......... *H04L 1/1861* (2013.01); *H04L 1/1854* (2013.01); *H04L 1/1864* (2013.01); *H04L 1/1896* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ...... H04L 5/0053; H04L 5/0055; H04L 5/0007; H04W 72/0406
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

7,894,330 B2 * 2/2011 Lee ...................... H04L 1/1854 370/208
8,631,297 B2 * 1/2014 Lee ...................... H04L 1/1854 370/208
(Continued)

OTHER PUBLICATIONS

R1-081063; 3GPP TSG RAN WG1 #52; "Text proposal for PHICH to RE mapping with cell ID"; LGE, Samsung, Nortel, Panasonic, Motorola, Ericsson, Nokia, NSN, Qualcomm, Feb. 11-15, 2008; Sorrento, Italy.*

(Continued)

*Primary Examiner* — Benjamin H Elliott, IV
(74) *Attorney, Agent, or Firm* — I P & T Group LLP

(57) **ABSTRACT**

A method for mapping a physical hybrid automatic repeat request indicator channel (PHICH) is described. The method for mapping a PHICH includes determining an index of a resource element group transmitting a repetitive pattern of the PHICH, according to a ratio of the number of available resource element groups in a symbol in which the PHICH is transmitted and the number of available resource element groups in a first or second OFDM symbol, and mapping the PHICH to the symbol according to the determined index. In transmitting the PHICH, since efficient mapping is performed considering available resource elements varying with OFDM symbols, repetition of the PHICH does not generate interference between neighbor cell IDs and performance is improved.

**12 Claims, 11 Drawing Sheets**



# US 9,548,839 B2
Page 2

### Related U.S. Application Data

continuation of application No. 13/012,702, filed on Jan. 24, 2011, now Pat. No. 8,681,599, which is a continuation of application No. 12/388,243, filed on Feb. 18, 2009, now Pat. No. 7,894,330.

(60) Provisional application No. 61/029,895, filed on Feb. 19, 2008.

(51) **Int. Cl.**
    *H04W 72/04* (2009.01)
    *H04L 1/06* (2006.01)

(52) **U.S. Cl.**
    CPC .......... *H04L 5/0007* (2013.01); *H04L 5/0053* (2013.01); *H04L 5/0055* (2013.01); *H04L 5/0073* (2013.01); *H04W 72/04* (2013.01); *H04W 72/0406* (2013.01); *H04L 1/0668* (2013.01); *H04L 1/1812* (2013.01); *H04L 5/0016* (2013.01)

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 8,631,298 | B2 * | 1/2014 | Lee | H04L 1/1854 370/208 |
| 8,681,599 | B2 * | 3/2014 | Lee | H04L 1/1854 370/208 |
| 9,048,991 | B2 * | 6/2015 | Lee | H04L 1/1854 |
| 2009/0175233 | A1 * | 7/2009 | Ojala | H04L 1/1854 370/329 |
| 2009/0274037 | A1 * | 11/2009 | Lee | H04L 1/1854 370/208 |
| 2010/0322324 | A1 * | 12/2010 | Lindh | H04L 1/1692 375/259 |
| 2011/0179331 | A1 * | 7/2011 | Lee | H04L 1/1854 714/749 |
| 2013/0114551 | A1 * | 5/2013 | Lee | H04L 1/1854 370/329 |
| 2013/0114552 | A1 * | 5/2013 | Lee | H04L 1/1854 370/329 |
| 2014/0169150 | A1 * | 6/2014 | Lee | H04L 1/1854 370/208 |
| 2015/0263827 | A1 * | 9/2015 | Lee | H04L 1/1854 370/329 |

### OTHER PUBLICATIONS

R1-080997; 3GPP TSG RAN WG1 #52; "Remaining issues on PHICH indexing and PHICH to RE mapping"; LG Eletronics; Feb. 11-15, 2008; Sorrento, Italy.*

* cited by examiner



FIG. 1



FIG. 2

U.S. Patent    Jan. 17, 2017    Sheet 3 of 11    US 9,548,839 B2



FIG. 3



FIG. 4



FIG. 5

FIG. 6



FIG. 7



FIG. 8



FIG. 9



FIG. 10

U.S. Patent      Jan. 17, 2017      Sheet 11 of 11      US 9,548,839 B2



FIG. 11

US 9,548,839 B2

1

## METHOD FOR MAPPING PHYSICAL HYBRID AUTOMATIC REPEAT REQUEST INDICATOR CHANNEL

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of co-pending U.S. application Ser. No. 14/184,345, filed on Feb. 19, 2014, which is a continuation of U.S. patent application Ser. No. 13/012,702, filed on Jan. 24, 2011, now issued as U.S. Pat. No. 8,681,599, which is a continuation of U.S. patent application Ser. No. 12/388,243, filed on Feb. 18, 2009, now issued as U.S. Pat. No. 7,894,330, all of which claim priority from and the benefit of U.S. Provisional Application Ser. No. 61/029,895, filed on Feb. 19, 2008, and Korean Patent Application No. 10-2008-0124084, filed on Dec. 8, 2008, which are all hereby incorporated by reference for all purposes as it fully set forth herein.

### BACKGROUND

#### Field

The present invention relates to a mapping method for frequency and orthogonal frequency division multiplexing (OFDM) symbol regions of a signal transmitted on downlink in a cellular OFDM wireless packet communication system.

#### Discussion of the Background

When transmitting/receiving a packet in a mobile communication system, a receiver should inform a transmitter as to whether or not the packet has been successfully received. If the reception of the packet is successful, the receiver transmits an acknowledgement (ACK) signal to cause the transmitter to transmit a new packet. If the reception of the packet fails, the receiver transmits a negative acknowledgement (NACK) signal to cause the transmitter to re-transmit the packet. Such a process is called automatic repeat request (ARQ). Meanwhile, hybrid ARQ (HARQ), which is a combination of the ARQ operation and a channel coding scheme, has been proposed. HARQ lowers an error rate by combining a re-transmitted packet with a previously received packet and improves overall system efficiency. In order to increase throughput of the system, HARQ demands a rapid ACKI-NACK response from the receiver compared with a conventional ARQ operation. Therefore, the ACKINACK response in HARQ is transmitted by a physical channel signaling method. The HARQ scheme may be broadly classified into chase combining (CC) and incremental redundancy (IR). The CC method serves to re-transmit a packet using the same modulation method and the same coding rate as those used when transmitting a previous packet. The IR method serves to re-transmit a packet using a different modulation method and a different coding rate from those used when transmitting a previous packet. In this case, the receiver can raise system performance through coding diversity.

In a multi-carrier cellular mobile communication system, mobile stations belonging to one or a plurality of cells transmit an uplink data packet to a base station. That is, since a plurality of mobile stations within one sub-frame can transmit an uplink data packet, the base station must be able to transmit ACKINACK signals to a plurality of mobile stations within one sub-frame. If the base station multiplexes a plurality of ACK/NACK signals transmitted to the mobile stations within one sub-frame using CDMA scheme within a partial time-frequency region of a downlink transmission band of the multi-carrier system, ACK/NACK signals with

2

respect to other mobile stations are discriminated by an orthogonal code or a quasi-orthogonal code multiplied through a time-frequency region. If quadrature phase shift keying (QRSK) transmission is performed, the ACK/NACK signals may be discriminated by different orthogonal phase components.

When transmitting the ACK/NACK signals using CDMA multiplexing scheme in order to transmit a plurality of ACK/NACK signals within one sub-frame, a downlink wireless channel response characteristic should not be greatly varied in a time-frequency region in which the ACK/NACK signals are transmitted. This is because if orthogonality is maintained between the multiplexed different ACK/NACK signals, a receiver can obtain satisfactory reception performance without applying a special receiving algorithm such as channel equalization. Accordingly, the CDMA multiplexing of the ACK/NACK signals should be performed within the time-frequency region in which a wireless channel response is not significantly varied. However, if the wireless channel quality of a specific mobile station is poor in the time-frequency region in which the ACK/NACK signals are transmitted, the ACK/NACK reception performance of the mobile station may also be greatly lowered.

Accordingly, the ACK/NACK signals transmitted to any mobile station within one sub-frame may be repeatedly transmitted over separate time-frequency regions in a plurality of time-frequency axes, and the ACK/NACK signals may be multiplexed with ACK/NACK signals transmitted to other mobile stations by CDMA in each time-frequency region. Therefore, the receiver can obtain a time-frequency diversity gain when receiving the ACK/NACK signals.

However, in a conventional physical hybrid ARQ indicator channel (PHICH) mapping method, there exists a defect that PHICH groups between neighbor cells have difficulty avoiding collision as illustrated in FIG. 1.

### SUMMARY

An object of the present invention devised to solve the problem lies in providing a method for mapping a PHICH so that repetition of the PHICH does not generate interference between neighbor cell IDs by considering available resource elements varying with OFDM symbols.

The object of the present invention can be achieved by providing a method for mapping a PHICH, including determining an index of an OFDM symbol in which a PHICH group is transmitted, determining an index of a resource element group transmitting a repetitive pattern of the PHICH group, according to a ratio of the number of available resource element groups in the determined OFDM symbol and the number of available resource element groups in a first or second OFDM symbol, and mapping the PHICH group according to the determined index.

The PHICH may be transmitted in units of a plurality of PHICH groups, and an index of an OFDM symbol in which an i-th repetitive pattern is transmitted may be defined by the following equation:

$$
l'_i = \begin{cases} 0 & \text{normal } \textit{PHICH} \text{ duration, all subframes} \\ i & \begin{array}{l}\text{extended } \textit{PHICH} \text{ duration,} \\ \text{non-}\textit{MBSFN} \text{ subframes}\end{array} \\ (\lfloor m'/2 \rfloor + i + 1) \bmod 2 & \begin{array}{l}\text{extended } \textit{PHICH} \text{ duration,} \\ \textit{MBSFN} \text{ subframes}\end{array} \end{cases}
$$

US 9,548,839 B2

**3**

where m' denotes an index of a PHICH group

The index of the resource element group may be determined according to a value obtained by multiplying the ratio by a cell ID.

The index of the resource element group may be determined by the following equation:

$$\bar{n}_i = \begin{cases} \left(\left\lfloor \left(N_{ID}^{cell} \cdot n_{l'}' / n_0' \right)\right\rfloor + m'\right) \bmod n_{l'}' & i = 0 \\ \left(\left\lfloor \left(N_{ID}^{cell} \cdot n_{l'}' / n_0' \right)\right\rfloor + m' + \left\lfloor n_{l'}'/3 \right\rfloor \right) \bmod n_{l'}' & i = 1 \\ \left(\left\lfloor \left(N_{ID}^{cell} \cdot n_{l'}' / n_0' \right)\right\rfloor + m' + \left\lfloor 2n_{l'}'/3 \right\rfloor \right) \bmod n_{l'}' & i = 2 \end{cases}$$

where $N_{ID}^{cell}$ denotes a cell ID, i denotes an index of a repetitive pattern, $n_{l'}'/n_0'$ denotes a ratio between the number of available resource element groups in an OFDM symbol $l_t'$ and the number of available resource element groups in a first OFDM symbol, and m' denotes an index, of a PHICH group.

In accordance with another aspect of the present invention, there is provided a method for mapping a PHICH, including determining an index of a resource element group transmitting a repetitive pattern of the PHICH, according to a ratio of the number of available resource element groups in a symbol in which the PHICH is transmitted and the number of available resource element groups in a second OFDM symbol, and mapping the PHICH to the symbol according to the determined index.

The PHICH may be transmitted in units of a plurality of PHICH groups each consisting of four resource elements.

The PHICH may be transmitted in units of a plurality of PHICH groups each consisting of two resource elements.

The index of the resource element group may be determined by the following equation:

$$\bar{n}_i = \begin{cases} \left(\left\lfloor \left(N_{ID}^{cell} \cdot n_{l'}' / n_1' \right)\right\rfloor + m'\right) \bmod n_{l'}' & i = 0 \\ \left(\left\lfloor \left(N_{ID}^{cell} \cdot n_{l'}' / n_1' \right)\right\rfloor + m' + \left\lfloor n_{l'}'/3 \right\rfloor \right) \bmod n_{l'}' & i = 1 \\ \left(\left\lfloor \left(N_{ID}^{cell} \cdot n_{l'}' / n_1' \right)\right\rfloor + m' + \left\lfloor 2n_{l'}'/3 \right\rfloor \right) \bmod n_{l'}' & i = 2 \end{cases}$$

where $N_{ID}^{cell}$ denotes a cell ID, i denotes an index of a repetitive pattern, $n_{l'}'/n_1'$ denotes a ratio between the number of available resource element groups in an OFDM symbol $l_t'$ and the number of available resource element groups in a second OFDM symbol, and m' denotes an index of a PHICH group.

According to the exemplary embodiment of the present invention, efficiency mapping is performed by considering available resource elements varying according to OFDM symbols during PHICH transmission, so that PHICH repetition does not generate interference between neighbor cell IDs and performance is improved.

BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, which are included to provide a further understanding of the invention, illustrate embodiments of the invention and together with the description serve to explain the principle of the invention.

In the drawings:

FIG. **1** illustrates an example of a conventional PHICH mapping method;

FIGS. **2** and **3** illustrate resource element groups to which a PHICH is mapped;

**4**

FIGS. **4** and **5** illustrate examples of mapping a PHICH when a spreading factor is 4;

FIGS. **6** and **7** illustrate examples of mapping a PHICH when a spreading factor is 2;

FIGS. **8** to **10** illustrate examples of repetitive mapping of a PHICH applied to the present invention; and

FIG. **11** illustrates an example of a PHICH mapping method according to an exemplary embodiment of the present invention.

DETAILED DESCRIPTION OF THE INVENTION

Reference will now be made in detail to the exemplary embodiments of the present invention, examples of which are illustrated in the accompanying drawings. The detailed description, which will be given below with reference to the accompanying drawings, is intended to explain exemplary embodiments of the present invention, rather than to show the only embodiments that can be implemented according to the invention.

When transmitting data through downlink of an OFDM wireless packet communication system, a channel transmitting ACK/NACK signals may be referred to as a physical hybrid ARQ indicator channel (PHICH).

In a 3rd generation partnership project (3GPP) long term evolution (LTE) system, the PHICH is repeatedly transmitted three times in order to obtain diversity gain. Through how many OFDM symbols the PHICH is transmitted, is determined depending on information transmitted through a primary broadcast channel (PBCH) and on whether or not a subframe is for multicast broadcast over single frequency network (MBSFN). If the PHICH is transmitted through one OFDM symbol, the PHICH repeating three times should be evenly distributed over a frequency bandwidth of one OFDM symbol. If the PHICH is transmitted through three OFDM symbols, each repetition is mapped to a corresponding OFDM symbol.

FIGS. **2** and **3** illustrate resource element groups (REGs) to which the PHICH is mapped.

Each REG is comprised of four resource elements. Since a first OFDM symbol includes reference signals RS**0** and RS**1**, locations except for the reference signal locations are available for the resource elements. In FIG. **3**, even a second OFDM symbol includes reference signals RS**2** and RS**3**.

FIGS. **4** and **5** illustrate examples of mapping a PHICH when a spreading factor (SF) is 4. When an SF is 4, one repetition of one PHICH group is mapped to one REG.

In FIGS. **4** and **5**, precoding for transmit diversity is applied. $A_{11}$, $A_{21}$, $A_{31}$, and $A_{41}$ denote resource elements of an REG constituting a specific PHICH. $C_1$, $C_2$, $C_3$, and $C_4$ denote resource elements of an REG for PHICH or a physical downlink control channel (PDCCH). FIGS. **4** and **5** correspond to the cases where the number of antennas is 1 and 2, respectively, when reference signals are not considered.

FIGS. **6** and **7** illustrate examples of mapping a PHICH when an SF is 2. When an SF is 2, one repetition of two PHICH groups is mapped to one REG.

Precoding for transmit diversity is applied to FIGS. **6** and **7**. FIGS. **6** and **7** correspond to the cases where the number of antennas is 1 and 2, respectively, when reference signals are not considered.

In actual implementation as illustrated in FIGS. **2** and **3**, it should be considered that the number of available REGs in an OFDM symbol including reference signals is not equal

US 9,548,839 B2

**5**

to the number of available REGs in an OFDM symbol which does not include reference signals.

Meanwhile, if a sequence for mapping the PHICH is denoted as $\overline{y}^{(p)}(0)$, K, $\overline{y}^{(p)}(M_{symb}-1)$, then $\overline{y}^{(p)}(n)$ satisfies $\overline{y}^{(p)}(n)=\Sigma y_i^{(p)}(n)$, which indicates the sum of PHICHs in one PHICH group, $y_i^{(p)}(n)$ denotes an i-th PHICH in a specific PHICH group. In this case, $z^{(p)}(t)=(y^{(p)}(4i),y^{(p)}(4i+1),y^{(p)}(4i+2),y^{(p)}(4i+3))$ (where i=0, 1, 2) donates a symbol quadruplet for an antenna port p.

An index of a PHICH group has m'=0 as an initial value. A symbol quadruplet $z^{(p)}(i)$ at m' is mapped to an REG of $(k',l')_i$ (where $l'_i$ is an index of an OFDM symbol in which i-th repetition of a PHICH group is transmitted, and $k'_i$ is an index of a frequency domain).

When a PHICH is transmitted through two OFDM symbols, the PHICH is repeated twice upon a first OFDM symbol and repeated once upon a second OFDM symbol according to a transmitted PHICH group. Conversely, the PHICH may be repeated once upon the first OFDM symbol and repeated twice upon the second OFDM symbol. This may be expressed by the following Equation 1.

[Equation 1]

$$l'_i = \begin{cases} 0 & \text{normal } PHICH \text{ duration, all subframes} \\ i & \begin{array}{l}\text{extended } PHICH \text{ duration,} \\ \text{non-} MBSFN \text{ subframes}\end{array} \\ (\lfloor m'/2 \rfloor + i + 1)\bmod 2 & \begin{array}{l}\text{extended } PHICH \text{ duration,} \\ MBSFN \text{ subframes}\end{array} \end{cases}$$

In Equation 1, $l'_i$ denotes an index of an OFDM symbol in which i-th repetition of a PHICH group is transmitted, m denotes an index of a PHICH group, and i denotes the number of repetitions of a PHICH. When the PHICH is repeated three times, i has values of 0, 1, and 2.

FIGS. 8 to 10 illustratively show Equation 1.

FIGS. 8 and 9 show the cases where $l'_i=0$ and $l'_i=(\lfloor m'/2 \rfloor +i+1)\bmod 2$, respectively. FIG. 10 shows the case where $l'_i=1$ and a PHICH group is repeated at a PHICH duration of 3.

A PHICH, which is an important channel for transmitting ACK/NACK signals indicating whether or not data has been received, should be transmitted as stably as possible. Further, since ACK/NACK signals should be transmitted to a user even in a cell edge, substantial power is used compared with other channels. If locations for transmitting the PHICHs in respective cells are the same, PHICH transmission performance may be deteriorated due to interference caused by transmission of the PHICH between neighbor cells. Accordingly, if transmission locations of the PHICH in respective cells differ, interference caused by transmission of the PHICH between neighbor cells is reduced. Consequently, PHICH transmission performance can be improved. Namely, if mapping locations of the PHICH are determined according, to cell IDs, the above-described problem can be solved. The PHICH is repeatedly transmitted three times to obtain diversity gain. To increase the diversity gain, each repetition should be evenly distributed over an entire frequency bandwidth.

To satisfy the above conditions, a PHICH group is transmitted in units of an REG consisting, of 4 resource elements. The location of a transmission start REG of the PHICH is designated according to a cell ID and each repetition of the PHICH is arranged at an interval of a value obtained, by dividing the number of REGs which can be transmitted by

**6**

3 based on the transmission start REG. However, when such a repetition of the PHICH is distributed over a plurality of OFDM symbols, the number of REGs which can be used for PHICH transmission in each OFDM symbol differs. That is because, in the first OFDM symbol, a physical control format indicator channel (PCFICH) for transmitting information including the number of OFDM symbols used for a control channel is transmitted, and because reference signals transmitted in the first and second OFDM symbols differ according to the number of transmit antennas. When the PHICH is transmitted through multiple OFDM symbols including different REGs, since the number of REGs in each OFDM symbol differs, repetitions of each PHICH are not evenly dispersed over an entire frequency bandwidth. The location of the first REG should be designated according to a cell ID and a repetitive pattern should be allocated at regular intervals based on an index of the first REG However, since resolution of a frequency location depending on the index differs according to the number of REGs in each OFDM symbol, there exists a defect that a reference location is changed.

Therefore, when the PHICH is transmitted through multiple OFDM symbols, if the start location according to the cell ID is determined in consideration of a ratio of REGs of the first start symbol to REGs of the other symbols, the above problem can be solved. When the PHICH is transmitted through one or three OFDM symbols, the location of the first start symbol is always the first OFDM symbol. However, when the PHICH is transmitted through two OFDM symbols, the first PHICH group is started from the second OFDM symbol. Accordingly, if the ratio of REGs is considered, a reference symbol should be changed.

The above description may be expressed by the following equation 2.

[Equation 2]

$$\overline{n}_i = \begin{cases} (\lfloor (N_{ID}^{cell} \cdot n'_{l'_i}/n'_0) \rfloor + m')\bmod n'_{l'_i} & i = 0 \\ (\lfloor (N_{ID}^{cell} \cdot n'_{l'_i}/n'_0) \rfloor + m' + \lfloor n'_{l'_i}/3 \rfloor)\bmod n'_{l'_i} & i = 1 \\ (\lfloor (N_{ID}^{cell} \cdot n'_{l'_i}/n'_0) \rfloor + m' + \lfloor 2n'_{l'_i}/3 \rfloor)\bmod n'_{l'_i} & i = 2 \end{cases}$$

In Equation 2, $\overline{n}_i$ denotes an index of an REG in which a repetitive pattern$_0$ of each PHICH is transmitted, $N_{ID}^{cell}$ denotes a cell ID, $n'_{l'_i}$ denotes the number of REGs which can be used for PHICH transmission in an OFDM symbol $l'_i$, $n'_{l'_i}/n'_0$ denotes a ratio between the number of available resource element groups in an OFDM symbol $l'_i$, and the number of available resource element groups in a first OFDM symbol and is a parameter for solving a problem caused by the different number of REGs between symbols, and m' denotes an index of a PHICH group as indicated in Equation 1, m' is desirably increased by 1.

FIG. 11 illustrates an example of a PHICH mapping method according to an exemplary embodiment of the present invention. As illustrated in FIG. 11, PHICH resource collision can be avoided based on cell planning.

If the PHICH is mapped from the second OFDM symbol, $n'_{l'_i}/n'_0$ is changed to $n'_{l'_i}/n'_1$. This may be expressed by the following Equation 3.

$$\overline{n}_i = \begin{cases} (\lfloor (N_{ID}^{cell} \cdot n'_{l'_i}/n'_1) \rfloor + m')\bmod n'_{l'_i} & i = 0 \\ (\lfloor (N_{ID}^{cell} \cdot n'_{l'_i}/n'_1) \rfloor + m' + \lfloor n'_{l'_i}/3 \rfloor)\bmod n'_{l'_i} & i = 1 \\ (\lfloor (N_{ID}^{cell} \cdot n'_{l'_i}/n'_1) \rfloor + m' + \lfloor 2n'_{l'_i}/3 \rfloor)\bmod n'_{l'_i} & i = 2 \end{cases}$$

7

In Equation 3, $N_{ID}^{cell}$ denotes a cell ID, i denotes an index of a repetitive pattern, $n'_{l'_1}/n'_1$ denotes a ratio between the number of available resource element groups in an OFDM symbol $l'_i$ and the number of available resource element groups in a second OFDM symbol, and m' denotes an index of a PHICH group. As in Equation 2, m' is desirably increased by 1.

Meanwhile, the location of the first PHICH group is allocated and then the other PHICH groups may be mapped successively after the first PHICH group.

It will be apparent to those skilled in the art that various modifications and variations can be made in the present invention without departing from the spirit or scope of the invention. Thus, it is intended that the present invention cover the modifications and variations of this invention provided they come within the scope of the appended claims and their equivalents.

The present invention provides a mapping method for frequency and OFDM symbol regions of a signal transmitted on downlink in a cellular OFDM wireless packet communication system and may be applied to a 3GPP LTE system, etc.

What is claimed is:

1. A method for mapping a physical hybrid automatic repeat request indicator channel (PHICH) to at least one orthogonal frequency division multiplexing (OFDM) symbol,
each OFDM symbol comprising a plurality of resource element groups,
each resource element group being comprised of four resource elements, the method comprising:
determining indexes of resource element groups in which the PHICH is transmitted; and
mapping the PHICH to at least one OFDM symbols according to the determined indexes,
wherein said indexes are determined according to ratio $n'_{l'_1}/n'_0$ or ratio $n'_{l'_1}/n'_1$ in OFDM symbol, having index $l'_i$,
$n'_{l'_i}$ is the number of available resource element groups in the OFDM symbol, having index $l'_i$, $n'_0$ is the number of available resource element groups in OFDM symbol, having index 0, of a sub-frame, $n'_1$ is the number of available resource element groups in OFDM symbol, having index 1, of the sub-frame,
available resource element groups in the OFDM symbol, having index $l'_i$, are resource element groups which can be used for PHICH transmission in the OFDM symbol, having index $l'_i$.

2. The method of claim 1, wherein the indexes are determined according to a value obtained by multiplying a cell identifier (ID) by the ratio $n'_{l'_1}/n'_0$ or the ratio $n'_{l'_1}/n'_1$.

3. The method of claim 1, wherein, if the PHICH is transmitted through one or three OFDM symbols, the indexes of the resource element groups in which the PHICH is repeatedly transmitted three times are determined using the following equation:

$$n_i = \begin{cases} \left(\lfloor (N_{ID}^{cell} \cdot n'_{l'_i} / n'_0)\rfloor + m'\right)\bmod n'_{l'_i} & i = 0 \\ \left(\lfloor (N_{ID}^{cell} \cdot n'_{l'_i} / n'_0)\rfloor + m' + \lfloor n'_{l'_i}/3\rfloor\right)\bmod n'_{l'_i} & i = 1 \\ \left(\lfloor (N_{ID}^{cell} \cdot n'_{l'_i} / n'_0)\rfloor + m' + \lfloor 2n'_{l'_i}/3\rfloor\right)\bmod n'_{l'_i} & i = 2 \end{cases}$$

where $N_{ID}^{cell}$ denotes a cell ID, i denotes an index of the repetition of the PHICH, $n'_{l'_i}/n'_0$ denotes the ratio between the number of available resource element

8

groups in the OFDM symbol $l'_i$ and the number of available resource element groups in the OFDM symbol, having index 0, of the sub-frame, and m' denotes an index of a PHICH group including the PHICH.

4. The method of claim 1, wherein, if the PHICH is transmitted through two OFDM symbols, the indexes of the resource element groups in which the PHICH is repeatedly transmitted three times are determined using the following equation:

$$n_i = \begin{cases} \left(\lfloor (N_{ID}^{cell} \cdot n'_{l'_i} / n'_1)\rfloor + m'\right)\bmod n'_{l'_i} & i = 0 \\ \left(\lfloor (N_{ID}^{cell} \cdot n'_{l'_i} / n'_1)\rfloor + m' + \lfloor n'_{l'_i}/3\rfloor\right)\bmod n'_{l'_i} & i = 1 \\ \left(\lfloor (N_{ID}^{cell} \cdot n'_{l'_i} / n'_1)\rfloor + m' + \lfloor 2n'_{l'_i}/3\rfloor\right)\bmod n'_{l'_i} & i = 2 \end{cases}$$

where $N_{ID}^{cell}$ denotes a cell ID, i denotes an index of the repetition of the PHICH, $n'_{l'_i}/n'_1$ denotes the ratio between the number of available resource element groups in the OFDM symbol $l'_i$ and the number of available resource element groups in the OFDM symbol, having index 1, of the sub-frame, and m' denotes an index of a PHICH group including the PHICH.

5. A base station for mapping a physical hybrid automatic repeat request indicator channel (PHICH) to at least one orthogonal frequency division multiplexing (OFDM) symbol,
each OFDM symbol comprising a plurality of resource element groups,
each resource element group being comprised of four resource elements, the base station comprising:
a processor configured to determine indexes of resource element groups in which the PHICH is transmitted, and map the PHICH to at least one OFDM symbols according to the determined indexes,
wherein said indexes are determined according to ratio $n'_{l'_1}/n'_0$ or ratio $n'_{l'_1}/n'_1$ in OFDM symbol, having index $l'_i$,
$n'_{l'_i}$ is the number of available resource element groups in the OFDM symbol, having index $l'_i$, $n'_0$ is the number of available resource element groups in OFDM symbol, having index 0, of a sub-frame, $n'_1$ is the number of available resource element groups in OFDM symbol, having index 1, of the sub-frame,
available resource element groups in the OFDM symbol, having index $l'_i$, are resource element groups which can be used for PHICH transmission in the OFDM symbol, having index $l'_i$.

6. The base station of claim 5, wherein the indexes are determined according to a value obtained by multiplying a cell identifier (ID) by the ratio $n'_{l'_1}/n'_0$ or the ratio $n'_{l'_1}/n'_1$.

7. The base station of claim 5, wherein, if the PHICH is transmitted through one or three OFDM symbols, the indexes of the resource element groups in which the PHICH is repeatedly transmitted three times are determined using the following equation:

$$n_i = \begin{cases} \left(\lfloor (N_{ID}^{cell} \cdot n'_{l'_i} / n'_0)\rfloor + m'\right)\bmod n'_{l'_i} & i = 0 \\ \left(\lfloor (N_{ID}^{cell} \cdot n'_{l'_i} / n'_0)\rfloor + m' + \lfloor n'_{l'_i}/3\rfloor\right)\bmod n'_{l'_i} & i = 1 \\ \left(\lfloor (N_{ID}^{cell} \cdot n'_{l'_i} / n'_0)\rfloor + m' + \lfloor 2n'_{l'_i}/3\rfloor\right)\bmod n'_{l'_i} & i = 2 \end{cases}$$

where $N_{ID}^{cell}$ denotes a cell ID, i denotes an index of the repetition of the PHICH, $n'_{l'_i}/n'_0$ denotes the ratio

US 9,548,839 B2

9

between the number of available resource element groups in the OFDM symbol l'$_t$ and the number of available resource element groups in the OFDM symbol, having index 0, of the sub-frame, and m' denotes an index of a PHICH group including the PHICH.

**8.** The base station of claim **5**, wherein, if the PHICH is transmitted through two OFDM symbols, the indexes of the resource element groups in which the PHICH is repeatedly transmitted three times are determined using the following equation:

$$\bar{n}_i = \begin{cases} (\lfloor \lfloor N_{ID}^{cell} \cdot n'_{l'_t} / n'_1 \rfloor \rfloor + m') \bmod n'_{l'_t} & i = 0 \\ (\lfloor \lfloor N_{ID}^{cell} \cdot n'_{l'_t} / n'_1 \rfloor \rfloor + m' + \lfloor n'_{l'_t} / 3 \rfloor) \bmod n'_{l'_t} & i = 1 \\ (\lfloor \lfloor N_{ID}^{cell} \cdot n'_{l'_t} / n'_1 \rfloor \rfloor + m' + \lfloor 2n'_{l'_t} / 3 \rfloor) \bmod n'_{l'_t} & i = 2 \end{cases}$$

where $N_{ID}^{cell}$ denotes a cell ID, i denotes an index of the repetition of the PHICH, $n'_{l'_t} / n'_1$ denotes the ratio between the number of available resource element groups in the OFDM symbol l'$_t$ and the number of available resource element groups in the OFDM symbol, having index 1, of the sub-frame, and m' denotes an index of a PHICH group including the PHICH.

**9.** A mobile station for decoding a physical hybrid automatic repeat request indicator channel (PHICH) mapped to at least one orthogonal frequency division multiplexing (OFDM) symbol,

each OFDM symbol comprising a plurality of resource element groups,

each resource element group being comprised of four resource elements, the mobile station comprising:

a processor configured to determine indexes of resource element groups in which the PHICH is transmitted, and decode the PHICH mapped to at least one OFDM symbols according to the determined indexes,

wherein said indexes are determined according to ratio $n'_{l'_t} / n'_0$ or ratio $n'_{l'_t} / n'_1$ in OFDM symbol, having index l'$_t$,

$n'_{l'_t}$ is the number of available resource element groups in the OFDM symbol, having index l'$_t$, n'$_0$ is the number of available resource element groups in OFDM symbol, having index 0, of a sub-frame, n'$_1$ is the number of available resource element groups in OFDM symbol, having index 1, of the sub-frame,

10

available resource element groups in the OFDM symbol, having index l'1, are resource element groups which can be used for PHICH transmission in the OFDM symbol, having index l'$_t$.

**10.** The mobile station of claim **9**, wherein the indexes are determined according to a value obtained by multiplying a cell identifier (ID) by the ratio $n'_{l'_t} / n'_0$ or the ratio $n'_{l'_t} / n'_1$.

**11.** The mobile station of claim **9**, wherein, if the PHICH is transmitted through one or three OFDM symbols, the indexes of the resource element groups in which the PHICH is repeatedly transmitted three times are determined using the following equation:

$$\bar{n}_i = \begin{cases} (\lfloor \lfloor N_{ID}^{cell} \cdot n'_{l'_t} / n'_0 \rfloor \rfloor + m') \bmod n'_{l'_t} & i = 0 \\ (\lfloor \lfloor N_{ID}^{cell} \cdot n'_{l'_t} / n'_0 \rfloor \rfloor + m' + \lfloor n'_{l'_t} / 3 \rfloor) \bmod n'_{l'_t} & i = 1 \\ (\lfloor \lfloor N_{ID}^{cell} \cdot n'_{l'_t} / n'_0 \rfloor \rfloor + m' + \lfloor 2n'_{l'_t} / 3 \rfloor) \bmod n'_{l'_t} & i = 2 \end{cases}$$

where $N_{ID}^{cell}$ denotes a cell ID, i denotes an index of the repetition of the PHICH, $n'_{l'_t} / n'_0$ denotes the ratio between the number of available resource element groups in the OFDM symbol l'$_t$ and the number of available resource element groups in the OFDM symbol, having index 0, of the sub-frame, and m' denotes an index of a PHICH group including the PHICH.

**12.** The mobile station of claim **9**, wherein, if the PHICH is transmitted through two OFDM symbols, the indexes of the resource element groups in which the PHICH is repeatedly transmitted three times are determined using the following equation:

$$\bar{n}_i = \begin{cases} (\lfloor \lfloor N_{ID}^{cell} \cdot n'_{l'_t} / n'_1 \rfloor \rfloor + m') \bmod n'_{l'_t} & i = 0 \\ (\lfloor \lfloor N_{ID}^{cell} \cdot n'_{l'_t} / n'_1 \rfloor \rfloor + m' + \lfloor n'_{l'_t} / 3 \rfloor) \bmod n'_{l'_t} & i = 1 \\ (\lfloor \lfloor N_{ID}^{cell} \cdot n'_{l'_t} / n'_1 \rfloor \rfloor + m' + \lfloor 2n'_{l'_t} / 3 \rfloor) \bmod n'_{l'_t} & i = 2 \end{cases}$$

where $N_{ID}^{cell}$ denotes a cell ID, i denotes an index of the repetition of the PHICH, $n'_{l'_t} / n'_1$ denotes the ratio between the number of available resource element groups in the OFDM symbol l'$_t$ and the number of available resource element groups in the OFDM symbol, having index 1, of the sub-frame, and m' denotes an index of a PHICH group including the PHICH.

* * * * *

# EXHIBIT 4

US011012954B2

(12) **United States Patent**　　　　　(10) Patent No.:　　**US 11,012,954 B2**
Kwon et al.　　　　　　　　　　　　　(45) Date of Patent:　　***May 18, 2021**

| | |
|---|---|
| (54) **APPARATUS AND METHOD FOR ESTABLISHING UPLINK SYNCHRONIZATION IN A WIRELESS COMMUNICATION SYSTEM** | (52) **U.S. Cl.**<br>CPC ......... *H04W 56/0005* (2013.01); *H04L 5/001* (2013.01); *H04W 56/0045* (2013.01);<br>(Continued) |
| (71) Applicant: **Pantech Corporation**, Seoul (KR) | (58) **Field of Classification Search**<br>CPC ............. H04W 56/0005; H04W 76/27; H04W 74/004; H04W 56/0045; H04W 88/08;<br>(Continued) |
| (72) Inventors: **Kibum Kwon**, Seoul (KR); **Myungcheul Jung**, Seoul (KR) | |
| (73) Assignee: **PANTECH CORPORATION**, Seoul (KR) | (56) **References Cited**<br>U.S. PATENT DOCUMENTS |
| ( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.<br><br>This patent is subject to a terminal disclaimer. | 8,606,336 B2　12/2013　Womack et al.<br>2009/0116434 A1　5/2009　Lohr<br>(Continued)<br><br>FOREIGN PATENT DOCUMENTS<br><br>JP　　2010-254386　　11/2010<br>JP　　2013-516917　　5/2013<br>(Continued) |
| (21) Appl. No.: **16/733,106** | |
| (22) Filed: **Jan. 2, 2020** | OTHER PUBLICATIONS |
| (65) **Prior Publication Data**<br>US 2020/0145949 A1　May 7, 2020 | ZTE, "Impact analysis of multiple TA", 3GPP TSG RAN WG2#68bis, R2-100308, Valencia, Spain, Jan. 18-22, 2010 (Year: 2010).*<br>(Continued) |
| **Related U.S. Application Data** | *Primary Examiner* — Lan-Huong Truong<br>(74) *Attorney, Agent, or Firm* — Capitol IP Law Group, PLLC |
| (63) Continuation of application No. 15/820,980, filed on Nov. 22, 2017, now abandoned, which is a<br>(Continued) | |
| | (57) **ABSTRACT** |
| (30) **Foreign Application Priority Data**<br><br>Feb. 10, 2010　(KR) ...................... 10-2010-0012564<br>Mar. 26, 2010　(KR) ...................... 10-2010-0027230<br>Jan. 28, 2011　(KR) ...................... 10-2011-0008683 | Uplink synchronization establishment in a base station which operates a plurality of component carriers according to one embodiment of the present description, is performed in that the base station is connected to a user equipment, sets component carrier aggregation information, generates an uplink timing groups in the set component carrier aggregation, and transmits information on the thus-generated uplink timing groups to the user equipment. |
| (51) **Int. Cl.**<br>*H04W 72/04*　　(2009.01)<br>*H04W 56/00*　　(2009.01)<br>(Continued) | **20 Claims, 11 Drawing Sheets** |



US 11,012,954 B2

Page 2

### Related U.S. Application Data

continuation of application No. 14/733,068, filed on Jun. 8, 2015, now Pat. No. 9,854,545, which is a continuation of application No. 13/578,531, filed as application No. PCT/KR2011/000909 on Feb. 10, 2011, now Pat. No. 9,054,835.

(51) **Int. Cl.**

| | |
|---|---|
| *H04W 76/27* | (2018.01) |
| *H04L 5/00* | (2006.01) |
| *H04W 74/00* | (2009.01) |
| *H04W 88/08* | (2009.01) |
| *H04W 92/10* | (2009.01) |
| *H04B 1/7087* | (2011.01) |

(52) **U.S. Cl.**
CPC ......... *H04W 74/004* (2013.01); *H04W 76/27* (2018.02); *H04B 1/7087* (2013.01); *H04L 5/0007* (2013.01); *H04W 88/08* (2013.01); *H04W 92/10* (2013.01)

(58) **Field of Classification Search**
CPC ............ H04W 92/10; H04W 56/0015; H04W 74/08; H04L 5/001; H04L 5/0007; H04B 1/7087

See application file for complete search history.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2009/0270094 | A1 | 10/2009 | Ito et al. |
| 2009/0274120 | A1 | 11/2009 | Chou |
| 2009/0279495 | A1* | 11/2009 | Yoo ...................... H04L 5/0078 |
| | | | 370/329 |
| 2009/0316642 | A1 | 12/2009 | Yamada et al. |
| 2009/0318175 | A1 | 12/2009 | Sandberg |
| 2010/0041399 | A1 | 2/2010 | Kim et al. |
| 2010/0086065 | A1 | 4/2010 | Higuchi et al. |
| 2010/0111005 | A1 | 5/2010 | Ahn et al. |
| 2010/0118720 | A1 | 5/2010 | Gauvreau et al. |
| 2010/0238857 | A1 | 9/2010 | Zhang et al. |
| 2010/0323744 | A1 | 12/2010 | Kim et al. |
| 2011/0170495 | A1 | 7/2011 | Earnshaw et al. |

| | | | |
|---|---|---|---|
| 2012/0008600 | A1* | 1/2012 | Marinier ........... H04W 74/0833 |
| | | | 370/336 |
| 2012/0099577 | A1* | 4/2012 | Baldemair ........ H04W 56/0065 |
| | | | 370/338 |
| 2012/0113939 | A1* | 5/2012 | Kim ................... H04W 74/006 |
| | | | 370/329 |

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| KR | 10-2008-0063023 | 7/2008 |
| KR | 10-2008-0079961 | 9/2008 |
| KR | 10-2009-0115913 | 11/2009 |
| WO | 2009/113815 | 9/2009 |

#### OTHER PUBLICATIONS

International Search Report of PCT/KR2011/000909 dated Dec. 7, 2011.
Non Final Office Action dated Jul. 16, 2014, in U.S. Appl. No. 13/578,531.
Notice of Allowance dated Feb. 4, 2015, in U.S. Appl. No. 13/578,531.
Qualcomm Incorporated, "Supporting multiple timing advance groups", 3GPP TSG-RAN WG2 meeting#68bis, Jan. 18-22, 2010, R2-100423, Valencia, Spain.
ITRI, "Time Alignment Timer for different TA", 3GPP TSG-RAN WG2 meeting#68bis, Jan. 18-22, 2010, R2-100560, Valencia, Spain.
NTT Docomo, Inc., "TA maintenance for CA", 3GPP TSG-RAN2#68bis, Jan. 18-22, 2010, R2-100472, Valencia, Spain.
Huawei, "Different Timing Advance Impact on Carrier Aggregation", 3GPP TSG RAN WG2 meeting#67bis, Oct. 12-16, 2009, R2-095815, Miyazaki, Japan.
CATT, "L3 Anchor Carrier", 3GPP TSG-RAN WG2 Meeting #67, R2-094322, Aug. 24-28, 2009, 2 pages, Shenzhen, China.
Nokia Corporation, Nokia Siemens Networks, "RACH and carrier aggregation", 3GPP TSG-RAN WG2 Meeting #67bis, Oct. 12-16, 2009, 3 pages, Miyazaki, Japan.
Office Action issued by JPO dated Jun. 13, 2017 for the corresponding JP Application No. 2015-154385.
Office Action issued by KIPO dated Dec. 21, 2016 for the corresponding KR Application No. 10-2011-0008683.
Nokia Corporation et al, 3GPP TSG-RAN WG2 Meeting #67bis, R2-095898, "RACH and carrier aggregation", Miyazaki, Japan dated Oct. 12-16, 2009.
Office Action issued by Chinese Patent Office dated Nov. 4, 2019 for the corresponding CN Application No. 201610908740.4.

\* cited by examiner



*FIG.1*

*FIG.2*



# FIG.3



# *FIG.4*



# FIG.5



# FIG.6



*FIG.7*





*FIG.8*

Case 5:22-cv-00625-RGJ Document 1-5 File 06/02/22 Page 02602 Filed 07/24/2025 Page ID #: 104

## FIG.9



*FIG.10*



*FIG.11*



US 11,012,954 B2

1

# APPARATUS AND METHOD FOR ESTABLISHING UPLINK SYNCHRONIZATION IN A WIRELESS COMMUNICATION SYSTEM

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 15/820,980, filed on Nov. 22, 2017, which is a continuation of U.S. patent application Ser. No. 14/733,068, filed on Jun. 8, 2015, which is a continuation of U.S. patent application Ser. No. 13/578,531, filed on Aug. 10, 2012, which is the National Stage Entry of International Application No. PCT/KR2011/000909, filed on Feb. 10, 2011, and claims priority from and the benefit of Korean Patent Application No. 10-2010-0012564, filed on Feb. 10, 2010, Korean Patent Application No. 10-2010-0027230, filed on Mar. 26, 2010, and Korean Patent Application No. 10-2011-0008683, filed on Jan. 28, 2011, all of which are hereby incorporated by reference for all purposes as if fully set forth herein.

## BACKGROUND

### Field

The present invention relates to a method and apparatus for establishing an uplink (UL) synchronization in a wireless communication system, and more particularly, to a method and apparatus for configuring a UL synchronization with respect to at least one Component Carrier (CC).

### Discussion of the Background

Synchronization between a user equipment (UE) and an evolved node B (eNB) is an important issue in a wireless communication system since transmission/reception of information between the UE and the eNB may not be performed without synchronization.

Current wireless communication system needs to satisfy a user demand through use of a plurality of CCs, unlike a conventional wireless communication system that supports a single component carrier (CC) or a single service band. However, a detailed scheme for synchronization with respect to the plurality of CCs has not been provided yet.

Accordingly, there is a desire for a scheme for effective synchronization in a wireless communication using a plurality of CCs since synchronization is a factor that has a great effect on an efficiency of a network.

## SUMMARY

Therefore, the present invention has been made in view of the above-mentioned problems, and an aspect of the present invention is to provide a method and apparatus for effectively operating a synchronization process by configuring an uplink (UL) synchronization in a wireless communication network supporting a plurality of CCs of Carrier Aggregation system for efficiency of a network, and secures stability of transmission/reception.

Another aspect of the present invention is to provide a method and apparatus for establishing synchronization in a wireless communication system.

Another aspect of the present invention is to provide a method and apparatus for transmitting/receiving synchroni-

2

zation information to be used for establishing synchronization in a wireless communication system.

Another aspect of the present invention is to provide a method and apparatus for configuring a synchronization group with respect to a plurality of CCs in a wireless communication system.

Another aspect of the present invention is to provide a method and apparatus for configuring a synchronization group with respect to a plurality of CCs based on a connection mode of a UE in a wireless communication system.

Another aspect of the present invention is to provide a method and apparatus for configuring a synchronization group based on characteristics of a plurality of CCs available in a wireless communication system.

Another aspect of the present invention is to provide a method and apparatus of a UE that may configure a UL timing synchronization group with respect to a plurality of CCs in a wireless communication system.

Another aspect of the present invention is to provide a method and apparatus of a UE that may obtain synchronization information associated with a plurality of CCs through a random access procedure in a wireless communication system, and may establish and update synchronization with an eNB.

In accordance with an aspect of the present invention, there is provided a method for an eNB to establish an uplink (UL) synchronization in a wireless communication system, the method including: receiving a synchronization request message from a user equipment (UE) through one or more delegate CCs in a UL timing group; and transmitting UL synchronization information corresponding to the UL timing group to the UE through the one or more CCs, so as to establish the UL synchronization, and the one or more delegate CCs are selected by the UE based on a state of the UL timing group and characteristics of a plurality of CCs forming the UL timing group, so as to establish the UL synchronization.

In accordance with another aspect of the present invention, there is provided a method for a UE to establish a UL synchronization in a wireless communication system, the method including: transmitting a synchronization request message to an eNB through one or more delegate CCs in a UL timing group; receiving UL synchronization information corresponding to the UL timing group for establishing the UL synchronization, from the eNB through the one or more delegate CCs; and establishing synchronization by applying, to the UL timing group, the UL synchronization information received through the one or more delegate CCs, and the one or more delegate CCs are selected by the UE based on a state of the UL timing group and characteristics of a plurality of CCs forming the UL timing group, so as to establish the UL synchronization.

In accordance with another aspect of the present invention, there is provided an eNB to establish a UL synchronization in a wireless communication system, the eNB including: a controller to generate UL synchronization information corresponding to a UL timing group, so as to establish the UL synchronization; and a transceiving unit to receive a synchronization request message from a user equipment (UE) through one or more delegate CCs in the UL timing group, and to transmit the UL synchronization information to the UE through the one or more delegate CCs, and the one or more delegate CCs are selected by the UE based on a state of the UL timing group and characteristics of a plurality of CCs forming the UL timing group, so as to establish the UL synchronization.

US 11,012,954 B2

3

In accordance with another aspect of the present invention, there is provided a UE to establish a UL synchronization in a wireless communication system, the UE including: a transceiving unit to transmit a synchronization request message to an eNB through one or more delegate CCs in a UL timing group, and to receive UL synchronization information corresponding to the UL timing group through the one or more delegate CCs; a controller to determine the UL synchronization information received by the transceiving unit; and a UL timing adjusting unit to establish a UL synchronization of the UL timing group, based on the UL synchronization information determined by the controller, and the one or more delegate CCs are selected by the UE based on a state of the UL timing group and characteristics of a plurality of CCs forming the UL timing group, so as to establish the UL synchronization.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a diagram illustrating an example of configuring a plurality of component carriers (CCs);

FIG. 2 is a diagram illustrating an example associated with a timing advance (TA) of a synchronization process;

FIG. 3 is a diagram illustrating a random access process performed between a user equipment (UE) and an evolved Node-B (eNB);

FIG. 4 is a diagram illustrating a process that obtains an uplink (UL) synchronization according to an embodiment of the present invention;

FIG. 5 is a diagram illustrating a process that obtains a Up Link (UL) synchronization according to another embodiment of the present invention;

FIG. 6 is a diagram illustrating a process that obtains a UL synchronization according to still another embodiment of the present invention;

FIG. 7 is a diagram illustrating a process in which an eNB enables the UE to obtain a UL synchronization in response to a request from the UE according to an embodiment of the present invention;

FIG. 8 is a diagram illustrating a process in which a UE obtains a UL synchronization through use of a UL timing group according to an embodiment of the present invention;

FIG. 9 is a diagram illustrating a process in which a UE obtains a UL synchronization through use of a UL timing group according to an embodiment of the present invention;

FIG. 10 is a block diagram of an eNB according to an embodiment of the present invention; and

FIG. 11 is a block diagram of a UE according to an embodiment of the present invention.

DETAILED DESCRIPTION OF THE ILLUSTRATED EMBODIMENTS

Hereinafter, exemplary embodiments of the present invention will be described with reference to the accompanying drawings. In the following description, the same elements will be designated by the same reference numerals although they are shown in different drawings. Further, in the following description of the present invention, a detailed description of known functions and configurations incorporated herein will be omitted when it may make the subject matter of the present invention rather unclear.

The specifications will describe a wireless communication system as an example, and operations performed in wireless communication may include all operations performed in a system that manages the wireless communication and a wireless communication device that transmits

4

data. The wireless communication system may provide various communication services such as voice data, packet data, and the like. According to an embodiment, the wireless communication system may include, for example, a user equipment (UE) and an evolved Node-B (eNB).

The UE may be an inclusive concept indicating a user terminal utilized in a wireless communication, including a UE in Wideband Code Division Multiple Access (WCDMA), Long Term Evolution (LTE), High Speed Packet Access (HSPA), and the like, and a mobile station (MS), a user terminal (UT), a subscriber station (SS), a wireless device and the like in Global System for Mobile Communications (GSM).

The eNB or a cell may refer to a fixed station where communication with the UE is performed, and may also be referred to as a Node-B, a base transceiver system (BTS), an access point, and the like.

The eNB or the cell may be construed as an inclusive concept indicating a portion of an area covered by a radio network controller (RNC) in WCDMA, and the like, and the concept may include various cell coverage areas, such as a megacell, macrocell, a microcell, a picocell, a femtocell, and the like.

In the specifications, the UE and the eNB are used as two inclusive transceiving subjects to embody the technology and technical concepts described in the specifications, and may not be limited to a predetermined term or word.

A multiple access scheme applied to the wireless communication system may not be limited. The wireless communication system may utilize varied multiple access schemes, such as Code Division Multiple Access (CDMA), Time Division Multiple Access (TDMA), Frequency Division Multiple Access (FDMA), Orthogonal Frequency Division Multiple Access (OFDMA), Orthogonal Frequency Division Multiple Frequency Division Multiple Access (OFDM-FDMA), Orthogonal Frequency Division Multiple Time Division Multiple Access (OFDM-TDMA), Orthogonal Frequency Division Multiple Code Division Multiple Access (OFDM-CDMA), and the like. Uplink (UL) transmission and downlink (DL) transmission may be performed based on a time division duplex (TDD) scheme that performs transmission based on different times, or based on a frequency division duplex (FDD) scheme that performs transmission based on different frequencies.

An embodiment of the present invention may be applicable to an asynchronous wireless communication scheme that is advanced through GSM, WCDMA, and HSPA, to be LTE and LTE-advanced, and may be applicable to a synchronous wireless communication scheme that is advanced through CDMA and CDMA-2000, to be UMB. Embodiments of the present invention may not be limited to a specific wireless communication scheme, and may be applicable to all technical fields to which a technical idea of the present invention is applicable.

FIG. 1 illustrates an example of a wireless communication system that uses a plurality of CCs according to an embodiment of the present invention.

Referring to FIG. 1, the wireless communication system may be a next generation communication system, including an LTE system and an LTE-A system.

The LTE/LTE-A system may extend a bandwidth to satisfy a high data transmission rate corresponding to a system requirement, and may use a plurality of component carriers (CCs) which are unit carriers. Here, a single CC may have a maximum bandwidth of 20 megahertz (MHz). Resource allocation may be performed within a bandwidth of 20 MHz depending on a service. However, it is merely an

US 11,012,954 B2

example during a process of embodying a system. Depending on a configuration of a system, a single CC may be configured to have a bandwidth smaller than or equal to 20 MHZ. Also, a plurality of CCs may be bound and used as a single system band, and may be referred to as a carrier aggregation (CA).

As illustrated in FIG. **1**, when five CCs having a maximum bandwidth of 20 MHz are used, a bandwidth may be expanded up to 100 MHz to support a quality of service. In this example, an allocable frequency band, which may be determined by each CC, may be contiguous or non-contiguous based on a scheduling of the CA.

Throughout the specifications, a component carrier may be denoted by a CC and may be distinguished by names, for example, CC**0**, CC**1**, and the like. However, a number included in a name of each CC may not always match an order of a corresponding CC or a location of a frequency band of the corresponding CC.

Referring to FIG. **1**, the CA may be configured to include a first CC (CC**1**) **110**, a second CC (CC**2**) **120**, a third CC (CC**3**) **130**, and an N$^{th}$ CC (CCN) **140**. A UL and a DL allocated to each CC may be different from each other, or may be the same as one another based on a scheduler.

In a wireless communication environment, an electric wave may experience a propagation delay while the electric wave is transferred from a transmitter to a receiver. Accordingly, although both the transmitter and the receiver are accurately aware of a time when the electric wave is transmitted from the transmitter, a time when the electric wave is received by the receiver may be affected by a distance between the transmitter and the receiver, an ambient propagation environment, and the like, and may vary over time when the receiver moves. When the receiver is not accurately aware of a point in time when a signal transmitted from the transmitter is to be received, the receiver may fail to receive the signal, or may receive a signal distorted due to the propagation delay and may fail to perform communication.

Accordingly, in the wireless communication system, synchronization between the eNB and the UE may be established first to receive a signal, irrespective of a UL and a DL. That is, a synchronization process is an essentially important process in a communication system, and maintaining the synchronization process may also significantly affect a stability of the system and a quality of communication.

There may be various types of synchronization, such as a frame synchronization, an information symbol synchronization, a sampling period synchronization, and the like. The sampling period synchronization may need to be obtained basically, so as to distinguish a physical signal.

In DL transmission corresponding to a communication link of transmission in a direction from the eNB to the UE, synchronization may be obtained in the UE based on a signal of the eNB. The eNB may transmit a predetermined signal that is mutually prearranged, so that the UE may readily obtain a DL synchronization, and the UE may need to accurately distinguish a time when the predetermined signal is transmitted from the eNB. In a case of a DL, a single eNB may simultaneously transmit the same synchronization signal to a plurality of UEs and thus, each UE may independently obtain synchronization based on the synchronization signal.

Conversely, in a case of a UL, the eNB may receive signals transmitted from the plurality of UEs and thus, the eNB may have difficulty in obtaining synchronization based on one of the UEs. Accordingly, a synchronization process that is different from the DL may be required.

When distances between the UEs and the eNB are different from each other, the UEs may have different transmission delay times. When each UE transmits UL information based on a corresponding DL synchronization, information transmitted from each UE may be received by the eNB at different times.

Although the uplink information transmitted from each UE is received at different times, the information may be received with a complexity being increased when a transmission scheme adopted by the wireless communication system, such as CDMA, is capable of separately receiving the information. However, in a wireless communication system that is based on OFDMA or FDMA, uplink transmission information of all the UEs may be simultaneously received by the eNB and may be demodulated and thus, a reception performance may increase as the uplink transmission information is received at an accurate time, and a reception performance may be rapidly deteriorated as a reception time difference of each UE signal received in the eNB is increased.

Accordingly, in a wireless communication system that utilizes OFDMA or SC-FDMA as a UL transmission scheme, such as LTE, a timing alignment value may be calculated for each UE based on a random access scheme and the like, to obtain a transmission delay time in a DL and a transmission delay time in a UL, and each UE may be informed of the calculated TA value, so that a UL synchronization is obtained.

FIG. **2** illustrates an example associated with a timing advance (TA) in a synchronization process according to an embodiment of the present invention.

In general, a UL radio frame i **220** may need to be transmitted at the same point in time as a point in time when a DL radio frame i **210** is transmitted, so as to perform communication between an eNB and a UE. However, a time difference may exist between the UE and the eNB due to propagation delay and the like.

Accordingly, a TA may be applied to enable the UE to transmit the UL radio frame i **220** a little earlier than the DL frame i **210** by taking the propagation delay into consideration, so that synchronization between the eNB and the UE may be obtained. An equation to calculate the TA may be expressed by Equation 1.

$$\text{TA} = (N_{TA} + N_{TA\ offset}) \cdot T_s \text{ seconds} \qquad \text{[Equation 1]}$$

Here, $N_{TA}$ denotes a value to be variable based on TA command information transmitted from the eNB, and $N_{TAoffset}$ denotes a value set based on a frame structure. $T_s$ denotes a sampling period. As shown in FIG. **2**, to obtain a UL synchronization, the UE may receive the TA command information provided by the eNB, and may proceed with a TA based on the received TA command information so that UE may obtain synchronization with the eNB for wireless communication.

FIG. **3** illustrates a random access process performed between a UE and an eNB according to an embodiment of the present invention.

To perform transmission and reception of data with an eNB **390**, a UE **380** may need to obtain a UL synchronization. To obtain the UL synchronization, the UE **380** may proceed with a process of receiving information required for synchronization, from the eNB **390**. FIG. **3** shows a random access procedure for receiving information required for synchronization. The random access procedure may be applicable when a UE is newly coupled to a network through a handover and the like. Also, upon completing the coupling, the UE may proceed with the random access procedure even

US 11,012,954 B2

7                                          8

under a circumstance such as synchronization, a state change, for example, from an RRC_IDLE to an RRC_CONNECTED, and the like.

The UE **380** may randomly select a preamble signature so as to generate a random access preamble (RAP). Subsequently, the UE **380** may transmit the selected preamble to the eNB **390** (step S**310**). The process of selecting the preamble signature may be contention-based selection or contention-free selection. In this example, the eNB may inform the UE of a previously reserved RAP, and the UE may transmit, to the eNB **390**, a preamble selected based on received information (step S**310**). Also, according to the contention-free selection, a procedure associated with a contention resolution (CR) message, which is required in the contention-based selection, may not need to be performed.

Here, the UE **380** may recognize random access-radio network temporary identifier (RA-RNTI) based on a transmission time and a frequency resource temporarily selected for selecting a preamble or for random access channel (RACH) transmission.

The eNB **390** may perform random access response (RAR) with respect to the preamble received from the UE **380**. In this example, the eNB **390** may transmit an RAR message through a physical downlink shared channel (PDSCH).

Information transmitted through the RAR message may include, for example, identification information of the UE preamble received by the eNB, an identifier (ID) of the eNB, a temporary cell radio network temporary identifier (C-RNTI), information associated with a time slot where the preamble is received, TA information, and the like. Timing information for a UL synchronization may be received through the RAR message and thus, the UE **380** may perform the UL synchronization with the eNB **390**. The UE **380** may perform a scheduled transmission that transmits data at a scheduled time determined based on the TA information received in step S**320** (step S**330**). In this example, the UE **380** may transmit synchronized data through a physical uplink shared channel (PUSCH), and may perform hybrid automatic repeat request (HARD).

Examples of a message transmitted in step S**330** may include a radio resource control (RRC) connection request, a tracking area update, a scheduling request, and the like. Also, one of the messages may include a temporary C-RNTI, a C-RNTI (if the UE already has one), UE identification information, and the like.

In steps S**310** through S**330**, collision may occur and thus, when the eNB **390** transmits a CR message (step S**340**), the UE **380** may i) determine whether a received message corresponds to the UE **380**, and may transmit an acknowledgement (ACK) when the received message corresponds to the UE **380** or ii) may not transmit response data when the received message corresponds to another UE. Also, the UE **380** may not transmit the response data when the UE **380** misses DL allocation or fails to decode the message. Also, the CR message may include a C-RNTI, UE identification information, and the like.

Unlike a process of obtaining a TA when a single carrier is utilized, in a wireless system that uses a plurality of CCs, TA values of the CCs may have a high probability of being different from each other when locations of center frequencies of the CCs are significantly distant from each other as shown in FIG. **1**, when the CCs are supported by different devices in a network, or the like.

Accordingly, when a synchronization obtaining scheme used for a single carrier is applied as is, the CCs may have difficulty in obtaining the UL synchronization for the CCs.

Accordingly, the UE may perform stable UL communication for a few CCs that obtain UL synchronization from among available CCs.

When the UE transmits, based on the same UL synchronization standard, information through CCs of which UL synchronization standards are different from each other, a probability of transmission error may be significantly high, and a time and resources for restoring the error may be wasted. In this example, it is difficult to satisfy a UL quality of service (QoS) for an application program required by a system.

When the wireless communication uses a plurality of CCs, a transmission delay time may be different in a DL based on a supporting scheme in a radio network and a characteristic of each CC with respect to a single UE. Accordingly, when CCs or CCs having the same TA value are configured as a set, a UL synchronization standard may be different for each CC set and thus, UL performance may be deteriorated.

Therefore, embodiments of the present invention for a wireless communication system supporting a plurality of CCs, are provided so that the UE obtains a UL synchronization of a corresponding CC or a group of CCs based on a type of each CC, a location of a center frequency, a network service type, and the like when CCs or groups including at least one CC have different UL synchronization standards.

Hereinafter, a user terminal may be referred to as a UE and a base station may be referred to as an eNB.

FIG. **4** illustrates a process that obtains a UL synchronization according to an embodiment of the present invention.

FIG. **4** shows a process in which a UE configures a group associated with a timing from among a plurality of CCs and performs RAP through a delegate CC when an eNB transmits information associated with the CCs to the UE.

Referring to FIG. **4**, when an RRC connection mode is an RRC_CONNECTED mode indicating that a UE **480** and an eNB **490** are connected, step S**410** may be performed. When the RRC connection mode is an IDLE mode or requires resetting, step S**405** may be performed first, and then step S**410** may be performed.

In step S**405**, RRC connection may be performed. When the RRC connection mode between the eNB **490** and the UE **480** is the IDLE mode or requires resetting, the eNB **490** may have difficulty in defining a CC set of the corresponding UE and transmitting CC set information in the IDLE mode UE. Therefore, the CC set information may be formed by selecting at least one CC to perform RRC connection so that the RRC connection is performed (step S**405**). At least one CC to perform the RRC connection may be selected based on one of the following methods.

i) select a CC that is most appropriate for attempting RRC connection based on information measured by the UE **480**

ii) attempt RRC connection based on information fixedly set in a system and stored in an internal memory of the UE **480**

iii) attempt RRC connection based on information transmitted to the UE **480** from the eNB **490** through system information

iv) attempt RRC connection through CCs corresponding to system information of the available CCs stored in an internal memory of the UE **480**

For example, a UE in an IDLE mode may select a single DL CC for the RRC connection based on the conditions, and may receive system information via a broadcasting channel that is transmitted through the selected CC. Based on the received system information, the selected DL CC and a UL CC having a linkage with the DL CC may be configured as

US 11,012,954 B2

9

a primary serving cell (PCell). The UE may transmit, to an eNB, an RRC connection request message through the PCell. In this example, the UE may transfer the RRC connection request message to the eNB through an RACH procedure.

Here, the DL CC corresponding to the PCell may be referred to as a DL primary CC (DL PCC), and the UL CC corresponding to the PCell may be referred to as a UL primary CC (UL PCC). Also, a CC corresponding to a secondary serving cell (SCell) 920 in a DL may be referred to as a DL secondary CC (DL SCC), and a CC corresponding to the SCell in a UL may be referred to as a UL secondary CC (UL SCC).

The PCell and the SCell have characteristics as follows. First, the PCell may be used for PUCCH transmission.

Second, the PCell is always activated, whereas the SCell 920 is activated or deactivated based on a predetermined condition.

Third, when the radio link failure (RLF) is detected via PCell, RRC reconnection PCell may be triggered. When the RLF is detected via SCell 920, RRC reconnection on SCell may not be triggered.

Fourth, the PCell may be changed by a change of a security key or by a handover procedure accompanying the RACH procedure. In a case of an MSG4 (contention resolution), only a PDCCH that indicates the MSG4 may be transmitted through the PCell, and MSG4 information may be transmitted through the PCell or the SCell.

Fifth, non-access stratum (NAS) information may be received through the PCell.

Sixth, the PCell may be configured as a pair of a DL PCC and a UL PCC.

Seventh, each UE sets a different CC as the PCell.

Eighth, a procedure such as, reconfiguration, adding, and removal of the SCell may be performed by an RRC layer. To add a new SCell, RRC signaling may be used to transmit system information associated with a dedicated SCell.

Technical concept of the PCell and the SCell in embodiments of the present invention may not be limited to the descriptions provided in the foregoing, and may include further examples.

When RRC connection setup is completed through one of the methods, and the RRC connection mode between the eNB 490 and the UE is the RRC_CONNECTED mode, step S410 may be performed.

The eNB 490 may allow the UE 480 to use a plurality of CCs based on a performance of hardware of the UE 480, available frequency resources of the eNB 490, and the like, and may define the plurality of CCs to be a CC set. The eNB 490 may transmit, to the UE 480, CC set information associated with the CC set that is allowed to the UE 480 (step S410).

As described in the foregoing, the UE 480 and the eNB 490 maintain the RRC_CONNECTED mode from step S405 or before. That is, a UL synchronization of a UL CC through which the RRC connection of the UE 480 is set up is maintained. The UE 480 may receive the CC set information determined based on the above condition, from the eNB 490.

According to a scheme of transmitting and receiving the CC set information, the eNB 490 may include the CC set information in an RRC reconfiguration message for transmission to the UE 480, or may use another message for transmission.

Also, the CC set information may be configured by adding/removing each CC. For example, when initial CC set information is transmitted, the CC set information config-

10

ured of DL CC1, DL CC2, and DL CCN may be configured as an added DL CC list and the list may include CC1, CC2, and CCN. In the same manner, UL CC set information may be configured as an added UL CC list.

As another example, when the CC set information is changed, that is, when the configured DL CC set is changed into CC1, CC3, and CCN, the DL CC set information may be transmitted by configuring CC2 as a removed DL CC list and CC3 as an added DL CC list.

The UE 480 may receive system information (SI) associated with CCs in the CC set, based on the received CC set information (step S420).

When a CC that is incapable of transmitting SI to a corresponding CC exists from among the CCs in the CC set, for example, an extension CC (ECC), or a CC that is incapable of receiving SI transmitted via a broadcasting channel (for example, a DL CC that belongs to an SCell) exists, the SI may be received by a CC that is capable of receiving the SI or may be received by a CC that is capable of receiving SI that is transformed in a form of control information.

The transformed SI may be transmitted to the UE together with the CC set information included in the RRC reconfiguration message transmitted by the eNB, or may be transmitted to the UE through the RRC reconfiguration message after the CC set information is received. Also, the current stage may be performed without receiving the SI associated with the corresponding CC.

The UE 480 may configure a UL timing group including CCs in the CC set as elements of the UL timing group, based on the received SI (step S432). When the UL timing group is configured, considerations may be as follows.

First, whether a plurality of CCs is assigned to different groups may be determined based on the following conditions. That is, a CC that satisfies at least one of the conditions may be configured to be a different group.

a-i) CCs of which a difference in center frequency values is greater than or equal to a threshold, are assigned to different groups. When a difference in the center frequency values is high, delay occurring in a wireless signal propagation process may be changed and thus, a difference in TA values may also increase.

a-ii) CCs to which different beamforming schemes are applied are assigned to different groups. TA values are highly likely to be different from each other when the beamforming schemes are different from each other.

a-iii) CCs that are set to be updated every time a UL synchronization update request exists are assigned to different groups. The setting may be included in SI set by the eNB 490 for transmission, or may be included in other messages for transmission.

a-iv) CCs that do not provide services in a macrocell or CCs that provide services in a space superposed on the macrocell by a femtocell, a picocell, a microcell, a relay, a repeater, and the like may have different characteristics from CCs that provide services by the macrocell and thus, the CCs are configured to be different groups.

a-v) a CC that has a UL synchronization update request from the eNB 490 may be a CC that has a changed synchronization and thus, the CC may be assigned to a different group.

As described in the foregoing, examples of a condition for setting CCs to be a UL timing group may be a-i) through a-v). In addition, CCs are configured to be a single group or to be different groups based on a wireless propagation characteristic, a predetermined measurement value, and the like.

US 11,012,954 B2

11

When one of the following conditions are satisfied, CCs may be configured to be a single group.

b-i) CCs of which a difference in center frequency values is within a threshold range may have similar propagation characteristic and thus, the CC may be configured to be a single group.

b-ii) CCs to which the same beamforming scheme is applied may be configured to be a single group

b-iii) CCs used in devices in the same radio network may be configured to be a single group

b-iv) CCs that do not satisfy conditions a-I through a-v for assigning CCs to different groups may be configured to be a single group

A method for the UE **480** to generate a group may include two schemes, that is, a scheme of generating groups by distinguishing CCs that belong to different groups and a scheme of generating a group by distinguishing CCs to be included in the same group. The two schemes may be used together or one of the two schemes may be used. Conditions to be used in a process of applying each scheme have been described in the foregoing.

When the UL timing group is generated, the UE **480** may select a delegate CC for each group (step **S434**). In this example, the delegate CC may be selected based on following conditions, from among CCs that are capable of obtaining a TA value to be used for obtaining a UL synchronization.

c-i) a CC having a lowest center frequency value

c-ii) a CC having a center frequency value that is closest to a mean value

c-iii) a CC having a highest center frequency value

c-iv) a CC having a broadest frequency band

c-v) a CC that is set to be used for monitoring DL quality

A CC satisfying one of the conditions may be selected as a delegate CC.

Here, a CC may be defined to include a DL CC or both the DL CC and a UL CC, and may be defined to be a cell or a serving cell. In other words, the cell may be defined by only DL frequency resources (for example, a CC) through which a wireless signal recognized by a UE reaches a predetermined area, and may be defined to be a pair of the DL frequency resources that is used by the UE to receive a signal from the eNB and UL frequency resources that is used by the UE to transmit a signal to the eNB.

Therefore, with respect to only a UE that is able to form a plurality of CCs, the eNB may be able to form a plurality of serving cells to perform transmission and reception of data with the UE

In this example, a PCell may indicate a single serving cell that provides a security input and NAS mobility information in an RRC establishment state or re-establishment state. Also, based on the capabilities of the UE, at least one cell may be configured to form a serving cell set with the PCell, and the at least one cell may be referred to as an SCell.

Accordingly, a serving cell set configured for a single UE may be configured of a single PCell or of a single PCell and at least one SCell. An adjacent cell in a frequency of the PCell and/or an adjacent cell in a frequency of the SCell may be in the same carrier frequency, and adjacent cells in frequencies of the PCell and the SCell may be in different carrier frequencies.

Here, a CC set for monitoring the DL quality may include an SCell to which a radio link monitoring (RLM) is defined. In particular, the RLM may include a process in which a UE monitors DL quality based on a cell-specific reference (CRS) signal so as to detect DL quality of a serving cell set between the UE and an eNB.

12

In this example, the UE may predict the DL quality based on predetermined parameters which are defined by a ratio of the measured CRS to energy of control channels.

The RLM may be set based on following conditions. To predict the DL quality through the RLM, a value that expresses a ratio of reception energy of an RE (single sub-carrier in a single OFDM symbol) through which a PDCCH/physical control format indicator channel (PC-FICH) is transmitted, to an average RE energy of the CRS based on a dB unit may be used as a criterion.

From among the parameters, a parameter $Q_{out}$ that is a criterion to determine an out-of-sync state may be configured based on a parameter set for transmitting a PDCCH/PCFICH and a value of which a block error rate (BER) of hypothetical PDCCH (based on a DCI format 1A) transmission based on an error of the PCFICH is greater than or equal to 10%. The value may be changed based on a number of antenna ports through which the CRS is transmitted.

For example, when the CRS is transmitted through a single antenna port, a ratio of energy between the PDCCH and the CRS to be determined as $Q_{out}$ may be based on 4 dB, and when the CRS is transmitted through two or more antenna ports, $Q_{out}$ may be based on 1 dB. From among the parameters, a parameter $Q_{in}$ that is a criterion to determine synchronization restoration or in-sync state may be determined based on a value having a sufficiently large reliability when compared to $Q_{out}$.

That is, a parameter set for transmitting the PDCCH/PCFICH and a value of which a BER of hypothetical PDCCH (based on a DCI format 1C) transmission based on an error of the PCFICH is greater than or equal to 2% may be used. The value may be changed based on a number of antenna ports through which the CRS is transmitted.

For example, when the CRS is transmitted through a single antenna port, a ratio of energy between the PDCCH and the CRS to be determined as $Q_{in}$ may be based on 0 dB, and when the CRS is transmitted through two or more antenna ports, $Q_{in}$ may be based on −3 dB.

A reason that an energy ratio used for determining $Q_{in}$ is lower than $Q_{out}$, is that the energy ratio is based on the parameter set for transmitting the PDCCH/PCFICH and the BER of the hypothetical PDCCH transmission. The parameters set for transmitting the PDCCH/PCFICH may include a DCI format of a PDCCH, a number of OFDM symbols through which control information of a subframe is transmitted, an aggregation level indicating a self-duplication rate of the PDCCH, and the like. The parameters may be affected by a bandwidth of a DL. $Q_{out}$ and $Q_{in}$ may be affected based on whether a UE performs discontinuous reception (DRX) with respect to a corresponding cell.

Therefore, the UE or the eNB may select a delegate CC in each group. In this example, the UE or the eNB may select the delegate CC by selecting an SCell including the delegate CC. In this example, the delegate CC or the SCell may be selected based on the conditions c-i) through c-v), from among CCs that are capable of obtaining a TA value to be used for obtaining a UL synchronization. That is, one of the c-i) through c-v) may be selected as a delegate CC.

In this example, according to a method of selecting a delegate CC for each UL timing group, the same criterion may be used for all groups or a different criterion may be used for each timing group. That is, the delegate CC may be selected based on a network state of each group, characteristics of CCs forming each group, and the like.

After completing steps **S432** and **S434** for setting a UL timing group and a corresponding delegate CC, to obtain a UL synchronization, the UE **480** may set an RAP through a

US 11,012,954 B2

13

delegate CC of each group, and may transmit the set preamble by selecting one of the resources defined in SI of each CC (step S440). The preamble may be included in a synchronization request message through which the UE requests synchronization. Transmission of the corresponding preamble may include a case in which the UE **480** sequentially, simultaneously, or randomly transmits a preamble through a selected CC in time/frequency resources set by the eNB **490**.

Cases that require obtaining a UL synchronization may be as follows. Although a condition does not satisfy one of the cases described below, when the UE **480** determines that it is required, the UE **480** may generate an RAP and may transmit the RAP to the eNB **490**.

d-i) a case in which the eNB **490** requires re-establishment of the entire DL synchronization

d-ii) a case that initializes and retries all UL data transmission

d-iii) a case in which a time alignment timer of the UE **480** expires

The UE **480** may transmit a preamble to be used for obtaining a UL synchronization with respect to total available CC groups.

Also, the UE **480** may need to obtain a UL synchronization with respect to a few available CC groups. Relevant cases will be described as follows.

e-i) a case in which a CC set is initially set and a TA value does not exist in a corresponding group

e-ii) a case in which a response is not obtained in response to UL transmission data transmitted through CCs in a group of the UE **480**

e-iii) a case in which an RRC connection between the eNB **490** and the UE **480** is reconfigured

e-iv) a case in which the UE **480** performs handover of a predetermined CC group to an eNB **490** that is physically different from the eNB **480**

e-v) a case in which the eNB **490** requests reconfiguration with respect to a predetermined CC group associated with a DL synchronization.

e-vi) a case in which a CC time alignment timer expires (the timer is set for each CC or for each group). When a condition satisfies one of the cases, a process for obtaining a UL synchronization with respect to a CC group including a corresponding CC may be performed.

For example, in steps S432 and S434, CC1, CC2, CC3, CC4, and CC5 exist, and CC1 and CC2 are configured to be group **1**, and CC3, CC4, and CC5 are configured to be group **2**. A delegate CC of group **1** is CC1, a delegate CC of group **2** is CC3. In this example, when a UL synchronization for the total available CC groups is required, the UE **480** may transmit an RAP through CC1 and CC3. When synchronization needs to be obtained for a few CC groups, that is, when synchronization needs to be obtained for group **2**, the UE **480** may transmit an RAP through CC3.

When a UL synchronization needs to be re-established while data is transmitted through a UL, the UE **480** may perform the following operation first, for example, initializing UL data transmission, and then may perform initializing HARQ buffers, releasing a physical uplink control channel (PUCCH)/releasing sounding reference signal (SRS), initializing semi-persistent scheduling allocation/allowance, and the like, as a procedure to obtain a UL synchronization.

The eNB **490** may calculate a TA value for each group with respect to each CC group (each delegate CC) based on the received RAP signal. The eNB **490** may transmit, to the UE **480**, UL grant information and a TA value of a UL timing

14

group (a delegate CC) through an RAR message (step S450). The TA value may be an example of UL synchronization information required when the UE adjusts a UL transmission time.

Subsequently, when the UE **480** determines that the TA value received in a CR procedure (step S460) is valid, the UE **480** may apply the TA value to another CC in the group for updating (step S470).

As described in the foregoing, when a procedure of obtaining a UL synchronization is performed with respect to all the groups, TA values associated with CC1 and CC3 may be applied to CCs each included in group **1** and group **2**. When a TA value of CC3 is received for group **2**, the TA value may be applied to CCs included in group **2**.

FIG. **5** illustrates a process that obtains a UL synchronization according to another embodiment of the present invention. Here, FIG. **5** shows that an eNB **590** configures a UL timing group.

Referring to FIG. **5**, the eNB **590** determines a mode (RRC_CONNECTED/RRC_IDLE) of a UE before transmitting UL timing information. When the eNB **590** is not connected to the UE, the eNB **590** may proceed with RRC connection (step S505), and may use a PCell for RRC connection, which will be performed in the same manner as step S405 of FIG. **4**.

A scheme of generating a group in the eNB **590** may be performed based the conditions a-i) through a-v) or b-i) through b-iv) of FIG. **4**.

Accordingly, the eNB **590** may transmit CC set information of the UE **580** and UL timing group information of the set UL timing group to the UE **580** (step S510). Here, the UL timing group information may be included in a CC set information message for transmission to the UE **580**, or a separate other message may be used for transmission. A case that uses a separate message will be described with reference to FIG. **6**. The CC set information provided for each UE may be an RRC (L3) message, an L1 signaling, or an L2 signaling.

The UE **580** may receive SI of CCs in a set, based on the received CC set information (step S520). In this example, the UE **580** may use the UL timing group generated by the eNB **590** in step S508 as it is, or may slightly change the UL timing group based on a current network state as shown in step S432 of FIG. **4**. This may indicate that the UE **580** may change the UL timing group when the UL timing group generated by the eNB **590** is inappropriate for an environment of the UE **580**.

That is, after receiving a UL timing group or after changing or newly generating a UL timing group, the UE **580** may select a delegate CC for each UL timing group (step S534). The conditions taken into consideration when a delegate CC is selected for each UL timing group have been described in step S434 of FIG. **4**.

After completing selection of a delegate CC for each UL timing group in step S534, when a UL synchronization needs to be obtained, the delegate CC in each group may set an RAP, and may transmit the selected preamble by selecting one of the resources defined in SI of each CC (step S540). The preamble may be included in a synchronization request message through which the UE requests synchronization.

Here, the UE **580** may transmit an RAP transmit message and the like for obtaining the UL timing information. Also, the corresponding preamble may be sequentially, simultaneously, or randomly selected and transmitted by the UE **580** in time/frequency resources set by the eNB **590**.

A case that requires the UE **580** to obtain a UL synchronization may be associated with conditions d-i) through

US 11,012,954 B2

15
16

d-iii). Also, the UE **580** may transmit a preamble to obtain a UL synchronization with respect to available total CC groups. The UE **580** may need to obtain a UL synchronization with respect to a few available CC groups.

The eNB **590** may calculate a TA value for each group with respect to each CC group (each delegate CC) based on the received RAP signal, and may include the corresponding TA value together with UL grant information in RAR information for transmission to UE **580** (step S**550**). The TA value may be an example of UL synchronization information required when the UE adjusts a UL transmission time.

For example, the eNB **590** may calculate a TA value based on the UL timing group set in step S**508**, and may transmit the calculated TA value. Also, the eNB **590** may transmit the RAR message through a predetermined CC, and may transmit the RAR message through all CCs in the corresponding UL timing group.

When the UE **580** determines that a TA value received in a CR procedure (step S**560**) is valid, the UE **580** may apply the TA value to remaining CCs in a group so as to update a TA value for each UL timing group (step S**570**).

FIG. **6** illustrates a process that obtains a UL synchronization according to still another embodiment of the present invention. Here, FIG. **6** shows that an eNB **690** configures a UL timing group and transmits group information through a separate message.

Referring to FIG. **6**, the eNB **690** determines a mode (RRC_CONNECTED/RRC_IDLE) of a UE **680**. When the eNB **690** is not connected to the UE **680**, the eNB **690** may proceed with an RRC connection setup (step S**605**), and may use a PCell for RRC connection, which will be performed in the same manner as step S**405** of FIG. **4** and step S**505** of FIG. **5**.

The eNB **690** may allow the UE **680** to use a plurality of CCs based on a performance of hardware of the UE **680**, available frequency resources of the eNB **690**, and the like, and may define the plurality of CCs to be a CC set. The eNB **690** may transmit CC set information of the UE **680** to the UE **680** (step S**610**). A CC set information message provided for each UE may be a message used for an RRC (L3) message and the like or may be an L1 signaling or an L2 signaling.

As described in the foregoing, the UE **680** and the eNB **690** maintain the RRC_CONNECTED mode from step S**605** or before. That is, a UL synchronization of a UL CC through which the RRC connection of the UE **680** is set up is maintained. The UE **680** may receive the CC set information determined based on the above condition, from the eNB **690**. As one of the schemes of receiving the CC set information, the eNB **690** may include the CC set information in an RRC reconfiguration message for transmission, and other messages may be used for transmission.

The UE **680** may receive SI of CCs in a set based on the received CC set information (step S**620**).

The eNB **690** may set a UL timing group with respect to CCs assigned to the UE **580** (step S**624**). In the process of configuring the UL timing group in the eNB **690**, CCs may be configured to be different groups of at least two or to be the same group. The conditions a-i) through a-v) or b-i) through b-iv) may use to set a UL timing group.

A method for the eNB **690** to generate a group may include two schemes, that is, a scheme of generating groups by distinguishing CCs that belong to different groups and a scheme of generating a group by distinguishing CCs to be included in the same group. The two schemes may be used

together or one of the two schemes may be used. Conditions to be used in a process of applying each scheme have been described in the foregoing.

The eNB **690** may transmit the UL timing group information to the UE **680** (step S**626**). The UL timing group information may not be included in the CC set information message and the like for transmission, and the UL timing group information may be transmitted independently with the CC set information through use of a separate message. The UL timing group information may be transmitted through a channel, such as a PDCCH channel, an RRC signaling, and a broadcasting channel, and may be transmitted through an L2 (MAC element control) message.

The UE **680** that receives the CC set information message may use the received UL timing group as it is, or may slightly change the UL timing group based on a current network state. This may include a case in which the UE **680** changes the UL timing group when the UL timing group generated by the eNB **690** is inappropriate for an environment of the UE **680**. After receiving the UL timing group or after changing or newly generating the UL timing group, the UE **680** may select a delegate CC for each UL timing group (step S**634**). The conditions taken into consideration when a delegate CC is selected for each UL timing group have been described in step S**434** of FIG. **4**, and step S**534** of FIG. **5**.

After completing selection of a delegate CC for each UL timing group in step S**634**, when a UL synchronization needs to be obtained, the delegate CC in each group may set an RAP, and may transmit the selected preamble by selecting one of the resources that are allocated for random access and defined in SI of each CC (step S**640**). The preamble may be sequentially, simultaneously, or randomly selected and transmitted by the UE **680** in time/frequency resources set by the eNB **690**. The preamble may be included in a synchronization request message through which the UE requests synchronization.

The eNB **690** may calculate a TA value for each CC group (each delegate CC) based on the received RAP signal, and may include the corresponding TA value together with UL grant information in RAR information for transmission to UE **680** (step S**650**). For example, the eNB **690** may calculate a TA value based on the UL timing group set in step S**624**, and may transmit the calculated TA value in advance. Also, the eNB **690** may transmit the RAR message through a predetermined CC, and may transmit the RAR message through all CCs in the corresponding UL timing group. The TA value may be an example of UL synchronization information required when the UE adjusts a UL transmission time.

When the UE **680** determines that a TA value received in a CR procedure (step S**660**) is valid, the UE **680** may apply the TA value to remaining CCs in a group so as to update a TA value for each UL timing group (step S**670**).

As described in FIG. **6**, the UE **680** may receive a set UL timing group from the eNB **690**, and may perform a random access procedure based on a representative value of a corresponding group. Subsequently, the UE **680** may receive a TA value of the timing group based on a preamble associated with the random access procedure, and may adjust a UL timing for obtaining synchronization.

FIG. **7** illustrates a process in which an eNB supports the UE to obtain a UL synchronization in response to a request from the UE according to an embodiment of the present invention.

Referring to FIG. **7**, the eNB determines an RRC mode of the UE (step S**702**). When the RRC mode between the eNB

US 11,012,954 B2

17

and the UE is an RRC_CONNECTED mode (step S704), the eNB may proceed with step S710.

When the RRC mode is different from the RRC_CON-NECTED mode, the eNB may proceed with step S705. The eNB may determine whether an RRC connection request from the UE exists in step S705. The eNB may receive the RRC connection request from the UE (step S705), and may complete RRC connection (step S706). In this example, the eNB may receive an RRC connection request message from the UE, may transmit an RRC connection setup message, and may receive an RRC connection setup complete message from the UE so as to complete RRC connection. As described in steps S405, S505, and S605, a PCell may be used for RRC connection.

The eNB may set a CC set including at least one available CC with respect to an RRC_CONNECTED UE, and may transmit CC set information associated with the CC set to the UE (step S710).

The eNB may transmit SI associated with at least one predetermined CC in the CC set, based on the CC set information of the UE (step S720). Here, the CC set information may be transmitted through an RRC message. Also, the SI of the CC set may be transmitted through a broad-casting channel.

The eNB may determine whether a subject of generating a UL timing group is the eNB (step S722). When the UL timing group is generated by the eNB, the eNB may generate a UL timing group based on the CC set information of the UE, and may transmit information associated with the generated UL timing group to the UE (step S726). Here, the UL timing group information may be generated at the same point in time when the CC set information is generated and transmitted in step S710, or may be transmitted together with the CC set information.

The eNB may receive an RAP from the UE (step S740). The preamble may be included in a synchronization request message through which the UE requests synchronization. Step S740 may include a case in which the subject of generating the UL timing group is the UE. That is, the UE may generate a UL timing group based on available CC set information of step S710 and SI of a corresponding CC of step S720, may set a delegate CC for each timing group, and may transmit an RAP through a corresponding delegate CC. Therefore, the eNB may receive the preamble transmitted from the UE. Here, the eNB may receive a synchronization request message, for example, the preamble, simultaneously through a plurality of delegate CCs, or at separated time, that is, sequentially through a delegate CC for each UL timing group.

Subsequently, the eNB may transmit an RAR message with respect to the received preamble. In this example, the eNB may transmit UL grant information for the UE and TA information for each UL timing group along with the RAR message (step S750).

The TA value may be an example of UL synchronization information required when the UE adjusts a UL transmission time. Also, the TA information for each UL timing group may be transmitted through a plurality of delegate CCs, simultaneously or at separated time. Here, the TA informa-tion for each UL timing group may be transmitted in a form of a table including a TA value corresponding to a group index. Also, the TA information for each UL timing group may be transmitted in a form including a unit error for each timing group based on a reference TA value. In this example, the error for each group may be expressed by an integer-multiple of a predetermined unit value, or may be specified in detail. The TA information for each UL timing group may

18

be transmitted in a form of an indicator indicating a TA based on a predetermined rule.

The eNB may transmit a CR message to the UE (step S760). This may include an operation that enables the UE to determine the validity of the received TA value and to update a TA value of a corresponding group.

FIG. 8 illustrates a process in which a UE obtains a UL synchronization through use of a UL timing group according to an embodiment of the present invention.

Referring to FIG. 8, the UE may determine an RRC mode (step S802). When the RRC mode is different from an RRC_CONNECTED mode, that is, when the RRC mode is an IDLE mode, the UE may perform RRC connection setup.

Accordingly, the UE may select a predetermined CC through which RRC connection is performed (step S806), may transmit an RRC connection request message to the selected predetermined CC, may receive an RRC connection setup message from the eNB through the selected predeter-mined CC, and may transmit an RRC connection setup complete message to the eNB so as to complete RRC connection setup (step S808).

When the UE corresponds to the RRC_CONNECTED mode (step S804), whether a UL is continuously maintained may be determined (step S810).

When the UL is not maintained, step S812 may be performed. In step S812, the UE may determine whether an RRC connection setup reconfiguration message is received from the eNB (step S812).

Here, when the RRC mode of the UE is the IDLE mode, or when the RRC connection setup reconfiguration is per-formed, the eNB may have difficulty in defining a CC set and transmitting CC set information. Accordingly, the UE may f-i) select a CC that is most appropriate for attempting RRC connection based on information measured by the UE, or may select at least one CC to perform RRC connection through use of one of f-ii) information fixedly set in a system and stored in an internal memory of the UE, f-iii) informa-tion transmitted to the UE from the eNB through SI, or f-iv) SI of available CCs stored in an internal memory of the UE and thus, may form the CC set information. When the mode of the UE is changed to the RRC_CONNECTED mode after completing RRC connection setup, step S830 may be per-formed.

When the UE performs handover, the UE may determine the received RRC connection setup reconfiguration message (step S814), and determine mobility control information (MCI) (step S816). The UE may determine information to be used for obtaining synchronization of a corresponding CC from a target eNB (T-eNB), based on the MCI information. That is, the UE may obtain a UL synchronization from the T-eNB. When the UE does not perform handover, the UE may merely determine the received RRC connection setup reconfiguration message (step S814), and may not proceed with steps S816 and S818.

In other words, when the UE does not perform handover in the process of obtaining a UL synchronization, the UE may proceed with a procedure for obtaining a UL synchro-nization between a source eNB (S-eNB) and a correspond-ing CC so as to obtain the UL synchronization. As another example, when the UE performs handover, the UE may proceed with a procedure for obtaining a UL synchroniza-tion of a corresponding CC based on SI of a CC of a T-eNB received from an S-eNB, so as to obtain the UL synchroni-zation. Desirably, a random access procedure may be used, and other procedures may also be applicable.

Subsequently, to obtain synchronization with the S-eNB or the T-eNB, the UE may select a preamble and may

US 11,012,954 B2

19

20

transmit the preamble to the S-eNB or the T-eNB (step S820). The preamble may be included in a synchronization request message through which the UE requests synchronization. The UE may receive an RAR message from the S-eNB or the T-eNB in response to transmission of the preamble. In the RAR message, UL grant information for the UE and TA information for each group including at least one CC to be used for obtaining a UL synchronization may be included (step S822).

The UE may verify whether the TA received through a CR procedure is valid (step S824), and the UE may update a UL timing group including at least one CC based on the received TA value (step S826) when the UE determines that the TA is valid.

When the RRC connection setup reconfiguration message is not received, step S820 may be performed.

When a UL is maintained or when the UE obtains a UL synchronization, the UE may receive CC set information from the eNB (step S830). Also, the UE may receive SI of the received CC set (step S832).

Subsequently, the UE may determine whether UL timing group information is received (step S840). In this example, when the UL timing group information is generated by the eNB, the UE may receive the UL timing group through the CC set information receiving process or through a separate message. The UL timing group information may include delegate CC information for each group. When the delegate CC information for each group is included in the UL timing group, step S852 may not be performed. When the delegate CC information for each group is not included in the UL timing group, the UE may determine the received UL timing group, and may set a delegate CC for the corresponding UL timing group (step S852). The delegate CC may be set based on the conditions c-i) through c-v) of FIG. 4. Also, the delegate CC used for adjusting a TA value of each UL timing group may be set by applying the same criterion to all groups, or by applying a different criterion based on a characteristic of each UL timing group.

When the UL timing group information is not received or when the received timing group is inappropriate for a radio network state where the UE is located or inappropriate for the UE, the UE may set UL timing group information based on the received CC set information (step S850). Also, the UE may set a predetermined CC in the set UL timing group, as a delegate CC for the timing group (step S852).

The UE may select a preamble and may transmit the preamble through the delegate CC (step S854). This may also be applicable when a TA needs to be updated after the delegate CC is set.

The UE may receive an RAR message from the eNB. In this example, the UE may receive UL grant information for the UE and the TA information for each UL group (step S856). Here, the UE may determine a TA value in a form of a table corresponding to a group index of each UL timing group. Also, the UE may determine a TA difference value in a form including a unit error for each timing group based on a predetermined reference TA value. Also, the UE may determine an error for each UL timing group that has a size of an integer-multiple of a predetermined unit value, and may also determine an error for each UL timing group that is specified in detail. Also, the UE may determine a TA indicator determined to be an indicator based on a predetermined rule.

Subsequently, the UE may verify the validity of a TA through a CR procedure (step S860).

When the UE determines that the TA is valid, the UE may update a TA value for each UL timing group (step S870).

Here, the UE may transmit the updated TA value for each UL timing group to the eNB through a delegate CC. That is, a procedure of determining the TA value may be additionally performed to obtain accurate synchronization with the eNB.

FIG. 9 illustrates operations of a UE according to an embodiment of the present invention. Here, FIG. 9 shows the operations of the UE when setting of an initial UL timing group is performed in an eNB.

Referring to FIG. 9, the UE may receive CC set information from the eNB (step S972). The CC set information may be received via a PCC or a Pcell. The PCC may correspond to the PCell as described in the foregoing. A UE in an IDLE mode may select a single DL CC based on the condition described in the foregoing, for RRC connection, and may receive SI through a broadcasting channel transmitted through the selected CC. The CC set information may be transmitted through an RRC message.

The UE may receive SI associated with CCs in the CC set, based on the received CC set information (step S974). The SI may be transmitted to a plurality of UEs in common through a broadcasting channel or may be transmitted through an RRC message in a form of a dedicated channel. The SI may be transmitted through the PCC. Accordingly, the UE may configure UL CCs in the CC set based on the SI.

In step S974, the UE may receive an RAP of each CC or information associated with time/frequency resources to be used by the UE, from the eNB. The UE may configure an initial UL timing group based on the received RAP of each CC or the information associated with the time/frequency resources. The RAP or the information associated with the time/frequency resources may be included in the SI for transmission through the PCC, or may be transmitted in a form of an RRC message.

The UE may determine whether simultaneous transmission of the RAP through all UL CCs configured for obtaining a UL synchronization is possible, based on CC parameters and RACH information included in the received SI (step S976).

Here, the UE may determine a UE-specific RACH parameter from among RACH parameters of the UL CCs configured by the eNB.

In this example, when RAP information is set in the UE-specific RACH parameter, the UE may determine the RAP information of the UE and may set an RAP to be transmitted through each of the configured UL CCs. Here, the RAP information may be preamble information set to be different for each UE for distinguishing the UEs.

When time/frequency resource information is set in the UE-specific RACH parameter, the UE may determine the time/frequency resource information of the UE, and may set an RAP to be transmitted to the configured UL CCs. Here, the time/frequency resource information may be set by the eNB to be different for each UE.

When simultaneous transmission of the RAP through all the configured UL CCs is possible in step S976, the UE may simultaneously transmit the RAP (step S978).

Conversely, when it is determined that the UE is incapable of simultaneously transmitting the RAP through all the UL CCs in step S976, the UE may proceed with step S990.

With respect to the simultaneous transmission of the RAP, the UE may determine RACH parameters included in SI of each of a plurality of UL CCs, and determine a plurality of time/frequency resources defined in the RACH parameters, and may select a RAP transmission time (rach_t) for transmitting the RACH at the same time. The RAP transmission

US 11,012,954 B2

21

time (rach_t) may correspond to a time when the RAPs are simultaneously transmitted by the UE through all the UL CCs.

When the UE is incapable of setting the RAP transmission time (rach_t), that is, when the UE is incapable of transmitting the RAP through all the configured UL CC at the same time, the UE may transmit an RAP resource information request message to the eNB (step S990).

For example, it is assumed that a time for determining the RACH parameters of all the UL CCs and transmitting RAP is limited to t0 and t1. When the UE determines that transmitting RAP through CC1, CC3, and CCN is allowed at t0, and is not allowed at t1, and the UE determines that transmitting RAP through CC2 is allowed at t1, and is not allowed at t0, the UE may transmit an RAP resource information request message to the eNB.

Subsequently, in response to the RAP resource information request, the UE may receive an RAP resource information response message from the eNB (step S992). Here, the eNB that receives the RAP resource information request message may determine that the UE is incapable of simultaneously transmitting the RAP through all the CCs. Therefore, the eNB may include transmission time/frequency resource to be used for RAP transmission of the UE and a type of a preamble in the RAP resource information response message for transmission to the UE.

Accordingly, the UE may transmit the RAP through all UL CCs configured based on information included in the RAP resource information response message (step S994). When the RAP resource information does not exist in the RAP resource information response message received from the eNB, a time that is closest to the time when the RAP needs to be transmitted may be selected so that the RAP may be simultaneously transmitted through all the UL CCs. In this example, the same RAP may be selected from all the CCs and may be simultaneously transmitted.

Subsequently, the UL timing group information may be received from the eNB through a PCC. That is, the eNB may determine RAPs transmitted from the UE, may determine that the UE requests configuration of a UL timing group, may calculate a TA value based on the preambles received through the RAPs, and may generate the UL timing group of the UE based on the calculated TA. The UL timing group information of the generated UL timing group may be transmitted to the UE.

The UL timing group information may be received through the PCC (PCell) in a form of a PDCCH or control information of a MAC message, or may be received through an RRC message.

The UE may simultaneously receive RAR from the eNB through a few or all of DL CCs having linkages with all the configured UL CCs (step S982). The linkage may be set fixedly in a wireless communication system, or may be set for each eNB based on SI, or may be set for each UE or for each UE group based on an RRC message.

The RAR message may include, for example, identification information of the UE preamble received by the eNB, an identifier (ID) of the eNB, a temporary C-RNTI, information associated with a time slot where the UE preamble is received, UL grant information, TA information for obtaining a UL synchronization, and the like.

Accordingly, the UE may transmit data through a PUSCH through use of time/frequency resource information included in the UL grant information at a scheduled time determined based on the received TA information, and may perform HARQ.

22

The UE may simultaneously verify the validity of the TA with respect to CCs through which the RAR is received (step S984). In this example, when RAP information is set in the UE-specific RACH parameter, the UE may omit verifying the validity of the TA.

As described in the foregoing, the UE may determine whether C-RNTI, T_C-RNTI, or UE identity included in an ACK message received from the eNB is identical to C-RNTI, T_C-RNTI, or UE identity assigned to the UE, so as to simultaneously verify the validity of the TA. Here, the UE may transmit an L2/L3 message including the C-RNTI, the T_C-RNTI, or the UE identity to the eNB, and may receive an L1/L2 message from the eNB since the ACK message is based on the HARQ operation.

The UE may recognize that the eNB sets UL CCs having linkages with the received DL CC through which the RAR is received as delegate CCs in a group, and may set the UL CCs as the delegate CCs in the group (step S986).

The UE may apply a TA value of the delegate CC received in step S972 to remaining CCs in each group for updating (step S988).

FIG. 10 illustrates a configuration of a transmitting apparatus according to an embodiment of the present invention.

Referring to FIG. 10, a transmitting apparatus 1000 may include a connection mode determining unit 1005 to determine an RRC mode of a UE, a CC set determining unit 1020 to determine a CC set including at least one CC available to the UE, a UL timing group generating unit 1030 to generate a UL timing group, a transceiving unit 1050, and a controller 1010 to control the above component elements.

The controller 1010 may generate UL synchronization information corresponding to the UL timing group, so as to establish a UL synchronization. The transceiving unit 1050 may receive a synchronization request message from the UE through at least one delegate CC in the UL timing group, and may transmit the UL synchronization information to the UE through the at least one delegate CC. The at least one delegate CC may be selected by the UE based on a state of the UL timing group and characteristics of a plurality of CCs forming the UL timing group, so as to obtain the UL synchronization. In particular, the at least one delegate CC may correspond to at least one of c-i) through c-v). The CC may be included in the serving cell as described in the foregoing.

In particular, the RRC mode determining unit 1005 may determine a connection mode between the UE and the eNB, and when the UE and the eNB are not connected, that is, when the connection mode is an RRC_IDLE mode or UL synchronization is not established, the RRC mode determining unit 1005 may change the connection mode of the UE to an RRC_CONNECTED mode or may enable the UL synchronization to be established. In this example, RRC connection setup may be performed through use of the UE and a PCC as described in the foregoing.

For example, the RRC mode determining unit 1005 may operate the transceiving unit 1050 to receive an RRC connection request transmitted from the UE, and to transmit an RRC connection setup message to the UE. Also, the RRC mode determining unit 1005 may receive an RRC connection setup complete message from the UE, may complete the RRC connection setup, and may determine an UE RRC_CONNECTED mode.

The CC set determining unit 1020 may determine at least one CC available to the UE, and may set a CC set of the UE. In this example, the CC set for the UE may be set based on a difference in UL synchronization times of the available (configurable) CCs, type information of each CC, a center

US 11,012,954 B2

23

frequency location of each CC, a service type of each CC, a network service for each CC, and the like.

The controller 1010 may set the CC set determined by the CC set determining unit 1020 as a CC set to be used by the UE, and the transceiving unit 1050 may transmit information associated with the set CC set to the UE through a PCell or a primary CC, before receiving the synchronization request message.

The UL timing group generating unit 1030 may generate the UL timing group of the UE based on the CC set determined by the CC set determining unit 1020. Here, the UL timing group may be generated to satisfy at least one of the conditions a-i) through a-v) or b-i) through b-iv), and may be determined by comparing a difference in center frequency values of CCs with a threshold, determining whether the CCs have the same beamforming scheme or different beamforming schemes, determining whether the CCs are updated in response to a UL synchronization update request, or determining whether the CCs correspond to CCs that are incapable of providing services in a macrocell but are capable of providing services in a space superposed by a cell smaller than the macrocell, such as a femtocell, a picocell, a micorcell, a relay, a repeater, and the like.

The transceiving unit 1050 may transmit the CC set information and UL timing group information to the UE. In this example, the transceiving unit 1050 may transmit the UL timing group information together with the CC set information as shown in FIG. 5, or may transmit the UL timing group information and the CC set information separately as shown in FIG. 6. Also, the transceiving unit 1050 may additionally transmit SI after transmitting the CC set information. Therefore, the UE may be able to configure the UL timing group based on the CC set information and the SI.

The transceiving unit 1050 may receive, from the UE, the synchronization request message requesting synchronization, for example, a message including an RAP. That is, the RAP transmitted through the delegate CC determined by the UE for the UL timing group may be determined, and a TA value for each UL timing group may be transmitted. The synchronization request message may be received through at least one delegate CC, simultaneously or sequentially at separated time.

The transceiving unit 1050 may change a portion or all of the UL timing group determined by the UL timing group generating unit 1030, based on the RAP message transmitted from the UE.

The controller 1010 may control the transceiving unit 1050 to generate information associated with synchronization based on the received RAP, for example, a message including UL grant information, TA information associated with the synchronization, and the like, and to transmit the generated information to the UE. In this example, the message including the TA information may include an RAR message. The information associated with the synchronization may include TA information required to move up a UL transmission time. Therefore, the controller 1010 may control the transceiving unit 1050 to generate and transmit synchronization information with respect to the UL timing group.

Here, the controller 1010 may generate TA information for each UL timing group in a form of a table including a TA value corresponding to a group index, in a form of a TA value including a unit error for each timing group. The error for each timing group may have a size of an integer-multiple of a predetermined unit value, or may be specified in detail. Also, the controller 1010 may control the transceiving unit 1050 to transmit the TA information for each UL timing

24

group as an indicator indicating a TA based on a predetermined rule. The TA value may be an example of the UL synchronization information required when the UE adjusts a UL transmission time, and the synchronization information for the UL timing group may be transmitted through one or more delegate CCs, simultaneously or at separated time.

The UL synchronization information, as described in the foregoing, may be calculated by comparing, with a predetermined threshold, a difference in center frequency values of a plurality of CCs in the CC set configured for the UE, or may be calculated to enable the CCs to have different transmission times by determining whether the CCs correspond to CCs having the same beamforming scheme, correspond to CCs updated in response to a synchronization update request, or correspond to CCs that do not provide services in a macrocell but provide services in a space superposed by a coverage cell smaller than the macrocell.

Also, the controller 1010 may control all component elements, and a few component elements may independently operate. The component elements of FIG. 10 may be configured as a single module or two or more modules, or may be configured to perform a single function in two or more modules.

FIG. 11 illustrates a configuration of a receiving apparatus according to an embodiment of the present invention.

Referring to FIG. 11, a receiving apparatus 1110 may include a connection mode determining unit 1105, a CC set determining unit 1107, a controller 1110, a UL timing adjusting unit 1120, a UL timing group generating unit 1130, and a transceiving unit 1150.

The transceiving unit 1150 may transmit a synchronization request message to an eNB through one or more CCs in a UL timing group, and may receive UL synchronization information through the one or more CCs. The controller 1110 may control the transceiving unit. The controller 1110 may determine the UL synchronization information received through the transceiving unit. The UL timing adjusting unit 1120 may establish a UL synchronization of the UL timing group based on the UL synchronization information determined by the controller. That is, the UL timing adjusting unit 1120 may establish the UL synchronization of the UL timing group based on the UL synchronization information received through the transceiving unit. Here, the controller 1110 may determine UL grant information and a TA value calculated to adjust a UL transmission time for each group corresponding to the UL timing group, through an RAR message received in response to the synchronization request message transmitted through the transceiving unit. The UL timing adjusting unit 1120 may establish a UL synchronization based on the UL synchronization information determined by the controller. In this example, the UL timing adjusting unit 1120 may establish the UL synchronization based on a TA value distinguished based on the UL timing group, based on a unit error distinguished based on the UL timing group, or based on an error distinguished based on the UL timing group and having a size of an integer-multiple of a determined unit value, or using an indicator associated with a rule determined based on the UL timing group. The UL synchronization information may be distinguished based on a group index of the UL timing group.

Here, the one or more delegate CCs may be selected by the UE based on a state of the UL timing group and characteristics of a plurality of CCs forming the UL timing group, so as to obtain the UL synchronization. In particular, the one or more delegate CCs may correspond to at least one of c-i) through c-v). The CCs may be included in a serving cell as described in the foregoing.

US 11,012,954 B2

25

In particular, the connection mode determining unit **1105** may determine a connection mode with the eNB. That is, when the connection mode is an UE RRC_IDLE mode or UL synchronization with the eNB is not established, the connection mode determining unit **1105** may enable the UE to change the connection mode to an RRC_CONNECTED mode or enable the UL synchronization to be established. In this example, RRC connection setup may be performed through use of the UE and a PCC as described in the foregoing.

For example, the connection mode determining unit **1005** may transmit an RRC connection request message to the eNB through use of the transceiving unit **1050**, may receive an RRC connection setup message from the eNB, and may complete RRC connection setup through use of an RRC connection setup complete message.

The transceiving unit **1150** may perform transmission and reception of information with the eNB. For example, the transceiving unit **1150** may receive CC set information and information associated with synchronization from the eNB. In particular, the transceiving unit **1150** may receive the CC set information from the eNB through a PCell or a primary CC, before transmitting the synchronization request message. After receiving the CC set information, the transceiving unit **1150** may receive SI associated with the CCs in the CC set, from the eNB. The SI may include frequency band information of a CC, information associated with an available frequency magnitude, and the like.

The CC set determining unit **1107** may determine at least one CC available to the UE, from the CC set information. The CC set may be determined based on a difference in UL synchronization times of the CCs available to the UE, type information of each CC, a center frequency location of each CC, a service type of each CC, a network service for each CC, and the like.

The UL timing group generating unit **1130** may generate a UL timing group of the UE based on the CC set determined by the CC set determining unit **920**. Here, the UL timing group may be configured by the UE based on the conditions described in FIG. **10** (at least one of conditions a-i) through a-v) or b-I through b-iv)). Also, the UL timing group generating unit **1130** may select a delegate CC of the UL timing group.

For example, when the UL timing group generating unit **1130** receives, from the eNB, UL timing group information of CCs together with the CC set information, the UL timing group generating unit **1130** may select a delegate CC from the received UL timing group. Also, the UL timing group generating unit **1130** may receive, through the transceiving unit **1150**, the UL timing group information separately from the CC set information, through a separate signaling.

Therefore, when the transceiving unit **1150** does not receive the UL timing group information of CCs or the UL timing group information generated by the eNB is inappropriate for a network state of the UE, the UL timing group generating unit **1130** may configure a new UL timing group.

Also, the controller **1110** may control the transceiving unit **1150** to transmit a synchronization request message requesting synchronization to the eNB through the delegate CC, and to receive information associated with synchronization from the eNB through the delegate CC.

For example, the controller **1110** may control the transceiving unit **1150** to transmit a message including a RAP selected by the UE, and to receive an RAR message transmitted from the eNB. Also, the controller **1110** may control the transceiving unit **1150** to perform, with the eNB, transmission and reception of a message for RRC reconfiguration

26

and synchronization. The synchronization request message may be transmitted through one or more delegate CCs simultaneously or at separated time.

Also, the controller **1110** may control the UL timing group generating unit **930** to change a portion or all of the determined UL timing group, based on the RAR message.

In particular, the controller **1110** may perform controlling so as to determine a TA value associated with each UL timing group based on the set UL timing group included in the RAR message. Also, the controller **1110** may perform controlling so as to determine frequency resource information assigned for UL transmission of the UE.

The UL timing adjusting unit **1120** may determine the TA value determined by the controller **1110**, and may apply the TA value to all CCs of the corresponding UL timing group where the delegate CC is included. That is, the TA value may be applied to the corresponding UL timing group for synchronization with the eNB. Here, TA information for each UL timing group may be in a form of a table including a TA value corresponding to a group index, in a form of a TA value including a unit error for each timing group, in a form of an error having a size of an integer-multiple of a predetermined unit value, for each timing group, in a form of an error specified in detail for each timing group, or in a form of an indicator indicating a TA based on a predetermined rule. Therefore, the UL timing adjusting unit **1120** may obtain synchronization by applying a determined TA to each UL timing group. The TA value may be an example of UL synchronization information required when the UE adjusts a UL transmission time, and the synchronization information for the UL timing group may be received through one or more delegate CCs simultaneously or at separated time.

For example, when the TA information is included in the synchronization information, the TA information may be set equally to all CCs in the UL timing group.

As described in the foregoing, the controller **1110** may control all component elements, and a few component elements may independently operate. The component elements of FIG. **11** may be configured as a single module or two or more modules, and may be configured to perform a single function in two or more modules.

Based on the descriptions of FIG. **9**, the transceiving unit **1150** may receive SI of CCs in the CC set based on the CC set information, and the controller **1110** may control the transceiving unit **1105** to simultaneously transmit the synchronization request message to the eNB through all CCs in the CC set, based on the received SI.

Subsequently, the transceiving unit **1105** may receive UL timing group information from the eNB, and simultaneously receive UL synchronization information through a few or all of DL CCs associated with the received UL timing group, and the controller **1110** may set a UL CC associated with a CC through which the UL synchronization information is received as a delegate CC of the received UL timing group.

Therefore, according to an embodiment of the present invention, when a plurality of CCs is used, a different UL synchronization may be obtained for each CC or for each CC group and thus, when the UE transmits information in a UL through a plurality of CCs, data transmission error due to an error in obtaining synchronization and delay in receiving information in the eNB may be effectively reduced.

Also, when a UL synchronization standard is different for each of the plurality of CCs, the UE may obtain a UL synchronization based on a type of each CC, a center frequency location, and a service type.

US 11,012,954 B2

27

The invention claimed is:

**1**. A communication method for a user equipment(UE) comprising:

receiving, at the UE, a Radio Resource Control (RRC) message through a primary Component Carrier (CC), wherein the primary CC belongs to a first uplink (UL) timing group, the RRC message comprises information related to a second UL timing group, which has been set by an evolved Node B (eNB), the second UL timing group includes a secondary CC;

receiving, at the UE, information indicating a random access preamble;

transmitting, at the UE, the random access preamble according to a non-contention selection, through one or more CCs, each of the one or more CCs transmitting the random access preamble being set as a delegate CC for a respective second UL timing group;

receiving, at the UE, a random access response through the primary CC, the random access response includes a Timing Advanced (TA) value for the secondary CC for the respective second UL timing group,

wherein each TA value is transmitted from the eNB for the respective second UL timing group based on the transmitted random access preamble associated with the delegate CC of the respective second UL timing group; and

applying each TA value to the secondary CC for the respective second UL timing group.

**2**. The method of claim **1**, wherein the one or more delegate CCs correspond to at least one of i) a CC having a lowest center frequency value, ii) a CC having a center frequency value that is closest to a mean value, iii) a CC having a highest center frequency value, iv) a CC having a broadest frequency band, and v) a CC that is set to be used for monitoring downlink (DL) quality, from among a plurality of CCs forming the second UL timing group; and the CC is included in one or more serving cells.

**3**. The method of claim **1**, wherein the second UL timing group is configured of i) at least one CC having a difference in a center frequency value within a threshold range, ii) at least one CC to which a same beamforming scheme is applied, iii) at least one CC used in devices in a same radio network, or iv) at least one CC that does not belong to another second UL timing group, from among a plurality of CCs; and the second UL timing group is generated by the UE or the eNB.

**4**. The method of claim **1**, further comprising:

receiving the TA value that is calculated to adjust a UL transmission time for the second UL timing group in response to the transmitted random access preamble, together with UL grant information through the random access response from the eNB.

**5**. The method of claim **1**, wherein the random access response is configured to include the TA value distinguished based on the second UL timing group, to include a unit error distinguished based on the second UL timing group, or to include an error distinguished based on the second UL timing group and having a size of an integer-multiple of a predetermined unit value, or is configured as an indicator associated with a rule determined based on the second UL timing group, and the random access response is distinguished based on a group index of the second UL timing group.

**6**. A communication apparatus for a user equipment (UE) comprising:

a memory; and

a processor operably coupled to the memory;

wherein the processor, when executing program instructions stored in the memory, is configured to:

28

cause the apparatus to receive a Radio Resource Control (RRC) message through a primary Component Carrier (CC), wherein the primary CC belongs to a first uplink (UL) timing group, the RRC message comprises information related to a second UL timing group, which has been set by an evolved Node B(eNB), the second UL timing group includes a secondary CC;

cause the apparatus to receive information indicating a random access preamble;

cause the apparatus to transmit the random access preamble according to a non-contention selection, through CC one or more UL CCs, each of the one or more UL CCs transmitting the random access preamble being set as a delegate CC for a respective second UL timing group;

cause the apparatus to receive a random access response through the primary CC, the random access response includes a Timing Advanced(TA) value for the secondary CC for the respective second UL timing group,

wherein each TA value is transmitted from the eNB for the respective second UL timing group based on the transmitted random access preamble associated with the delegate CC of the respective second UL timing group; and

cause the apparatus to apply each TA value to the secondary CC for the respective second UL timing group.

**7**. The UE of claim **6**, wherein the one or more delegate CCs correspond to at least one of i) a CC having a lowest center frequency value, ii) a CC having a center frequency value that is closest to a mean value, iii) a CC having a highest center frequency value, iv) a CC having a broadest frequency band, and v) a CC that is set to be used for monitoring downlink (DL) quality, from among a plurality of CCs forming the second UL timing group; and the CC is included in one or more serving cells.

**8**. The UE of claim **6**, wherein the second UL timing group is configured of i) at least one CC having a difference in a center frequency value within a threshold range, ii) at least one CC to which a same beamforming scheme is applied, iii) at least one CC used in devices in a same radio network, or iv) at least one CC that does not belong to another second UL timing group, from among a plurality of CCs; and the second UL timing group is generated by the UE or the eNB.

**9**. The UE of claim **6**, further comprising:

the processor is configured to cause the apparatus to receive the TA value that is calculated to adjust a UL transmission time for the second UL timing group in response to the transmitted random access preamble, together with the UL grant information through the random access response from the eNB.

**10**. The UE of claim **6**, wherein the random access response is configured to include the TA value distinguished based on the second UL timing group, to include a unit error distinguished based on the second UL timing group, or to include an error distinguished based on the second UL timing group and having a size of an integer-multiple of a predetermined unit value, or is configured as an indicator associated with a rule determined based on the second UL timing group, and the random access response is distinguished based on a group index of the second UL timing group.

**11**. A communication method for an evolved Node-B (eNB) comprising:

US 11,012,954 B2

29                                    30

transmitting, to a user equipment (UE), a Radio Resource Control (RRC) message through a primary Component Carrier (CC), wherein the primary CC belongs to a first uplink (UL) timing group, the RRC message comprises information related to a second UL timing group, the second UL timing group includes a secondary CC;

transmitting, to the UE, information indicating a random access preamble;

receiving, from the UE, the random access preamble according to a non-contention selection, through one or more UL CCs, each of the one or more UL CCs transmitting the random access preamble being set as a delegate CC for a respective second UL timing group; and

transmitting, to the UE, a random access response through the primary CC, the random access response includes a Timing Advanced (TA) value for a secondary CC for the respective second UL timing group,

wherein each TA value is calculated by eNB for the respective second UL timing group based on the received random access preamble associated with the delegate CC of the respective second UL timing group, and

wherein the TA value is configured to be applied to the secondary CC for respective second UL timing group.

**12**. The method of claim **11**, wherein the one or more delegate CCs correspond to at least one of i) a CC having a lowest center frequency value, ii) a CC having a center frequency value that is closest to a mean value, iii) a CC having a highest center frequency value, iv) a CC having a broadest frequency band, and v) a CC that is set to be used for monitoring downlink (DL) quality, from among a plurality of CCs forming the second UL timing group; and the CC is included in one or more serving cells.

**13**. The method of claim **11**, wherein the second UL timing group is configured of i) at least one CC having a difference in a center frequency value within a threshold range, ii) at least one CC to which a same beamforming scheme is applied, iii) at least one CC used in devices in a same radio network, or iv) at least one CC that does not belong to another second UL timing group, from among a plurality of CCs; and the second UL timing group is generated by the UE or the eNB.

**14**. The method of claim **11**, further comprising:

calculating the TA value that is calculated to adjust a UL transmission time for the second UL timing group in response to the received the random access preamble; and transmitting, to the UE, the calculated TA value together with UL grant information for the UE through the random access response.

**15**. The method of claim **11**, wherein the random access response is configured to include the TA value distinguished based on the second UL timing group, to include a unit error distinguished based on the second UL timing group, or to include an error distinguished based on the second UL timing group and having a size of an integer-multiple of a predetermined unit value, or is configured as an indicator associated with a rule determined based on the second UL timing group; and the random access response is distinguished based on a group index of the second UL timing group.

**16**. A communication apparatus for an evolved Node-B (eNB) comprising:

a memory; and

a processor operably coupled to the memory;

wherein the processor, when executing program instructions stored in the memory, is configured to:

cause the apparatus to transmit, to a user equipment(UE), a Radio Resource Control (RRC) message through a primary Component Carrier (CC), wherein the primary CC belongs to a first uplink(UL) timing group, the RRC message comprises information related to a second UL timing group, the second UL timing group includes a secondary CC;

cause the apparatus to transmit, to the UE, information indicating a random access preamble;

cause the apparatus to receive, from the UE, the random access preamble according to a non-contention selection, through one or more UL CCs, each of the one or more UL CCs transmitting the random access preamble being set as a delegate CC for a respective second UL timing group; and

cause the apparatus to transmit, to the UE, a random access response through the primary CC, the random access response includes a Timing Advanced (TA) value for the secondary CC for the respective second UL timing group,

wherein each TA value is calculated by eNB for the respective second UL timing group based on the received random access preamble associated with the delegate CC of the respective second UL timing group, and

wherein the TA value is configured to be applied to the secondary CC for respective second UL timing group.

**17**. The eNB of claim **16**, wherein the one or more delegate CCs correspond to at least one of i) a CC having a lowest center frequency value, ii) a CC having a center frequency value that is closest to a mean value, iii) a CC having a highest center frequency value, iv) a CC having a broadest frequency band, and v) a CC that is set to be used for monitoring downlink (DL) quality, from among the plurality of CCs forming the second UL timing group; and the CC is included in one or more serving cells.

**18**. The eNB of claim **16**, wherein the second UL timing group is configured of i) at least one CC having a difference in a center frequency value within a threshold range, ii) at least one CC to which a same beamforming scheme is applied, iii) at least one CC used in devices in a same radio network, or iv) at least one CC that does not belong to another UL timing group, from among the plurality of CCs; and the second UL timing group is generated by the UE or the eNB.

**19**. The eNB of claim **16**, further comprising:

the process is configured to cause the apparatus to calculate the TA value to adjust a UL transmission time for the second UL timing group in response to the received the random access preamble; and cause to the apparatus to transmit, to the UE, the calculated TA value together with UL grant information for the UE through the random access response.

**20**. The eNB of claim **16**, wherein the random access response is configured to include the TA value distinguished based on the second UL timing group, to include a unit error distinguished based on the second UL timing group, or to include an error distinguished based on the second UL timing group and having a size of an integer-multiple of a predetermined unit value, or is configured as an indicator associated with a rule determined based on the second UL timing group; and the random access response is distinguished based on a group index of the second UL timing group.

* * * * *

Case 5:25-1628   Document 78   Filed: 07/24/2025   Page: 07/24/2025

# EXHIBIT 6

US010869247B1

(12) **United States Patent**
Zhang et al.

(10) Patent No.: **US 10,869,247 B1**
(45) Date of Patent: **Dec. 15, 2020**

(54) **SUPPORTING UPLINK TRANSMISSIONS**

(71) Applicant: **Signal Trust for Wireless Innovation**, Wilmington, DE (US)

(72) Inventors: **Guodong Zhang**, Syosset, NY (US); **Sung-Hyuk Shin**, Northvale, NJ (US); **Stephen E. Terry**, Northport, NY (US); **James M. Miller**, Verona, NY (US); **Stephen G. Dick**, Nesconset, NY (US)

(73) Assignee: **Signal Trust for Wireless Innovation**, Wilmington, DE (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **17/008,439**

(22) Filed: **Aug. 31, 2020**

**Related U.S. Application Data**

(63) Continuation of application No. 16/545,398, filed on Aug. 20, 2019, now Pat. No. 10,791,491, which is a
(Continued)

(51) **Int. Cl.**
 *H04W 36/18* (2009.01)
 *H04L 1/18* (2006.01)
 (Continued)

(52) **U.S. Cl.**
 CPC ........... *H04W 36/18* (2013.01); *H04L 1/1812* (2013.01); *H04L 1/1887* (2013.01);
 (Continued)

(58) **Field of Classification Search**
 None
 See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 5,628,631 A | 5/1997 | Aneha |
| 5,794,149 A | 8/1998 | Hoo |
| (Continued) | | |

FOREIGN PATENT DOCUMENTS

| DE | 10225428 | 12/2003 |
| EP | 0 977 393 | 2/2000 |
| (Continued) | | |

OTHER PUBLICATIONS

"Hybrid ARQ text proposal for Section 7 of TR25.896" TSG-RAN WG1 #31, R1-030208, Tokyo, Japan, Feb. 18-21, 2002, 4 pages.
(Continued)

*Primary Examiner* — Brian S Roberts
(74) *Attorney, Agent, or Firm* — Volpe Koenig

(57) **ABSTRACT**

A method and a wireless transmit/receive unit (WTRU) supporting uplink transmissions. The method being used in a WTRU and comprising transmitting a data block to a base station using a hybrid automatic repeat request (H-ARQ) process, receiving uplink scheduling information from the base station, wherein the uplink scheduling information includes a H-ARQ process identification for the H-ARQ process, and determining whether to retransmit the data block based on the received uplink scheduling information and not based on whether the WTRU has received a negative acknowledgement (NACK) from the base station. The uplink scheduling information includes physical channel resources. The uplink scheduling information is received from a primary cell and the WTRU transmits to the primary cell and at least one secondary cell. The scheduling information indicates a modulation and coding scheme.

**20 Claims, 4 Drawing Sheets**



500

START

505 — RNC INITIATES HARD HANDOVER FOR A WTRU CONNECTED TO A SOURCE NODE-B.

510 — THE RNC INFORMS THE SOURCE NODE-B WHEN THE WTRU WILL STOP TRANSMISSION AND RECEPTION IN SOURCE CELL.

515 — THE RNC SENDS AN ACTIVATION TIMER TO THE SOURCE NODE-B TO SET THE TIME FOR HANDOVER.

520 — AS MANY DATA PACKETS AS POSSIBLE THAT WERE PREVIOUSLY NACKED ARE RETRANSMITTED BEFORE THE ACTIVATION TIMER EXPIRES.

525 — THE SOURCE NODE-B ADJUSTS THE PRIORITY OF RETRANSMISSIONS.

530 — THE SOURCE NODE-B ADJUSTS THE MODULATION AND CODING SCHEME OF THE RETRANSMISSIONS.

535 — HANDOVER IS COMPLETED AT THE EXPIRATION OF THE ACTIVATION TIMER.

END

## US 10,869,247 B1

Page 2

**Related U.S. Application Data**

continuation of application No. 16/283,407, filed on Feb. 22, 2019, now Pat. No. 10,791,490, which is a continuation of application No. 15/699,418, filed on Sep. 8, 2017, now Pat. No. 10,219,194, which is a continuation of application No. 14/869,313, filed on Sep. 29, 2015, now Pat. No. 9,763,156, which is a continuation of application No. 13/908,242, filed on Jun. 3, 2013, now Pat. No. 9,215,636, which is a continuation of application No. 13/308,950, filed on Dec. 1, 2011, now Pat. No. 8,457,072, which is a continuation of application No. 11/434,330, filed on May 15, 2006, now Pat. No. 8,130,720, which is a continuation of application No. 10/962,720, filed on Oct. 12, 2004, now Pat. No. 7,046,648.

(60) Provisional application No. 60/578,674, filed on Jun. 10, 2004, provisional application No. 60/520,692, filed on Nov. 17, 2003, provisional application No. 60/519,990, filed on Nov. 14, 2003, provisional application No. 60/517,656, filed on Nov. 5, 2003.

(51) **Int. Cl.**
| | | |
|---|---|---|
| *H04W 74/04* | (2009.01) | |
| *H04W 74/00* | (2009.01) | |
| *H04W 88/08* | (2009.01) | |
| *H04B 7/022* | (2017.01) | |
| *H04W 36/30* | (2009.01) | |

(52) **U.S. Cl.**
CPC ......... *H04L 1/1893* (2013.01); *H04W 74/004* (2013.01); *H04W 74/12* (2013.01); *H04B 7/022* (2013.01); *H04W 36/30* (2013.01); *H04W 88/08* (2013.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,933,787 | A | 8/1999 | Gilhousen et al. |
| 5,946,320 | A | 8/1999 | Decker et al. |
| 6,434,396 | B1 | 8/2002 | Rune |
| 6,507,567 | B1 | 1/2003 | Willars |
| 6,628,631 | B1 | 9/2003 | Mazawa et al. |
| 6,643,813 | B1 | 11/2003 | Johansson et al. |
| 6,650,905 | B1 | 11/2003 | Toskala et al. |
| 6,678,249 | B2 | 1/2004 | Toskala et al. |
| 6,678,523 | B1 | 1/2004 | Ghosh et al. |
| 6,690,939 | B1 | 2/2004 | Jonsson et al. |
| 6,754,496 | B2 | 6/2004 | Mohebbi et al. |
| 6,778,830 | B1 | 8/2004 | Oizumi et al. |
| 6,829,482 | B2 | 12/2004 | Rune et al. |
| 6,850,771 | B2 | 2/2005 | Malladi et al. |
| 6,892,071 | B2 | 5/2005 | Park et al. |
| 6,907,245 | B2 | 6/2005 | Ohlsson et al. |
| 6,915,465 | B2 | 7/2005 | Fujiwara et al. |
| 6,977,888 | B1 | 12/2005 | Frenger et al. |
| 7,013,143 | B2 | 3/2006 | Love et al. |
| 7,026,911 | B2 | 4/2006 | Aono et al. |
| 7,046,648 | B2 | 5/2006 | Zhang et al. |
| 7,054,633 | B2 | 5/2006 | Seo et al. |
| 7,065,359 | B2 | 6/2006 | Chuah et al. |
| 7,103,729 | B2 | 9/2006 | Altahan et al. |
| 7,124,350 | B2 | 10/2006 | Chao et al. |
| 7,158,504 | B2 | 1/2007 | Kadaba et al. |
| 7,185,256 | B2 | 2/2007 | Miki et al. |
| 7,206,598 | B2 | 4/2007 | Attar et al. |
| 7,266,384 | B2 | 9/2007 | Kim et al. |
| 7,269,420 | B2 | 9/2007 | Heo et al. |
| 7,277,407 | B2 | 10/2007 | Kim et al. |
| 7,283,508 | B2 | 10/2007 | Choi et al. |
| 7,283,509 | B2 | 10/2007 | Moon et al. |
| 7,283,782 | B2 | 10/2007 | Sinnarajah et al. |

| | | | |
|---|---|---|---|
| 7,315,741 | B2 | 1/2008 | Chun |
| 7,317,700 | B2 | 1/2008 | Hwang |
| 7,346,035 | B2 | 3/2008 | Lee et al. |
| 7,366,538 | B2 | 4/2008 | Seki et al. |
| 7,372,898 | B2 | 5/2008 | Shin et al. |
| 7,403,513 | B2 | 7/2008 | Lee et al. |
| 7,414,989 | B2 | 8/2008 | Kuchibhotla et al. |
| 7,428,424 | B2 | 9/2008 | Hwang et al. |
| 7,433,337 | B2 | 10/2008 | Chao et al. |
| 7,519,016 | B2 | 4/2009 | Lee et al. |
| 7,558,230 | B2 | 7/2009 | Lee et al. |
| 7,606,205 | B2 | 10/2009 | Ranta-Aho et al. |
| 7,848,290 | B2 | 12/2010 | Cheng et al. |
| 7,903,610 | B2 | 3/2011 | Cheng et al. |
| 7,974,630 | B1 | 7/2011 | Haumont et al. |
| 8,023,463 | B2 | 9/2011 | Dick et al. |
| 8,682,325 | B1 | 3/2014 | Cooper |
| 9,438,381 | B2 | 9/2016 | Dick et al. |
| 10,390,279 | B2 | 8/2019 | Dick et al. |
| 2001/0020285 | A1 | 9/2001 | Fujiwara et al. |
| 2002/0080719 | A1* | 6/2002 | Parkvall ................ H04L 1/1825 |
| | | | 370/235 |
| 2002/0093937 | A1 | 7/2002 | Kim et al. |
| 2002/0095635 | A1 | 7/2002 | Wager et al. |
| 2002/0115460 | A1 | 8/2002 | Kim et al. |
| 2002/0115467 | A1 | 8/2002 | Hamabe |
| 2002/0172208 | A1 | 11/2002 | Malkamaki |
| 2002/0191544 | A1 | 12/2002 | Cheng et al. |
| 2002/0198025 | A1 | 12/2002 | Brownlee et al. |
| 2003/0002470 | A1 | 1/2003 | Park et al. |
| 2003/0007480 | A1 | 1/2003 | Kim et al. |
| 2003/0031119 | A1 | 2/2003 | Kim et al. |
| 2003/0043786 | A1 | 3/2003 | Kali et al. |
| 2003/0054824 | A1 | 3/2003 | Choi et al. |
| 2003/0081692 | A1 | 5/2003 | Kwan et al. |
| 2003/0123403 | A1 | 7/2003 | Jiang |
| 2003/0123470 | A1 | 7/2003 | Kim et al. |
| 2003/0131124 | A1 | 7/2003 | Yi et al. |
| 2003/0147370 | A1 | 8/2003 | Wu |
| 2003/0161284 | A1 | 8/2003 | Chen |
| 2003/0171118 | A1 | 9/2003 | Miya |
| 2003/0176195 | A1 | 9/2003 | Dick et al. |
| 2003/0202500 | A1 | 10/2003 | Ha et al. |
| 2003/0210668 | A1 | 11/2003 | Malladi et al. |
| 2004/0004954 | A1 | 1/2004 | Terry et al. |
| 2004/0072567 | A1 | 4/2004 | Cao et al. |
| 2004/0085934 | A1 | 5/2004 | Balachandran et al. |
| 2004/0109433 | A1* | 6/2004 | Khan ................ H04L 1/1671 |
| | | | 370/345 |
| 2004/0120306 | A1 | 6/2004 | Wigard et al. |
| 2004/0160925 | A1 | 8/2004 | Heo et al. |
| 2004/0202129 | A1 | 10/2004 | Kolding et al. |
| 2004/0203991 | A1 | 10/2004 | Chen et al. |
| 2004/0219917 | A1 | 11/2004 | Love et al. |
| 2004/0219919 | A1 | 11/2004 | Whinnett et al. |
| 2004/0219920 | A1 | 11/2004 | Love et al. |
| 2004/0228313 | A1 | 11/2004 | Cheng et al. |
| 2005/0041694 | A1 | 2/2005 | Liu |
| 2005/0047354 | A1 | 3/2005 | Zeira et al. |
| 2005/0048920 | A1 | 3/2005 | Liu |
| 2005/0088388 | A1 | 4/2005 | Smee et al. |
| 2005/0207374 | A1 | 9/2005 | Petrovic et al. |
| 2006/0045010 | A1 | 3/2006 | Baker et al. |
| 2006/0105796 | A1 | 5/2006 | Malladi et al. |
| 2006/0274712 | A1 | 12/2006 | Malladi et al. |
| 2007/0047501 | A1 | 3/2007 | Usuda et al. |
| 2007/0079207 | A1 | 4/2007 | Seidel et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 1 217 777 | 6/2002 |
| GB | 2 353 439 | 2/2001 |
| JP | 04-157821 | 5/1992 |
| JP | 2000-217139 | 8/2000 |
| JP | 2001-8251 | 1/2001 |
| JP | 2001-128209 | 5/2001 |
| JP | 2002-009741 | 1/2002 |
| JP | 2003-134180 | 5/2003 |
| JP | 2003-163960 | 6/2003 |

## US 10,869,247 B1

Page 3

(56)　　　　　References Cited

FOREIGN PATENT DOCUMENTS

| JP | 2007-511135 | 4/2007 |
| KR | 20020095231 | 12/2002 |
| KR | 20030003943 | 1/2003 |
| KR | 20030040972 | 5/2003 |
| RU | 2003112283 | 4/2005 |
| RU | 2005110767 | 10/2006 |
| TW | 536896 | 6/2003 |
| TW | 200303689 | 9/2003 |
| WO | 99/027740 | 6/1999 |
| WO | 00/35226 | 6/2000 |
| WO | 00/074263 | 12/2000 |
| WO | 02/01893 | 1/2002 |
| WO | 02/37572 | 5/2002 |
| WO | 02/037872 | 5/2002 |
| WO | 02/047317 | 6/2002 |
| WO | 02/082108 | 10/2002 |
| WO | 02/101966 | 12/2002 |
| WO | 02/102109 | 12/2002 |
| WO | 03/003643 | 1/2003 |
| WO | 03/026231 | 3/2003 |
| WO | 03/037027 | 5/2003 |
| WO | 03/047155 | 6/2003 |
| WO | 03/053087 | 6/2003 |
| WO | 03/067953 | 8/2003 |
| WO | 03/088545 | 10/2003 |
| WO | 2005/048503 | 5/2005 |

OTHER PUBLICATIONS

3GPP TSG RAN WG1 #31, Tdoc R1-03-0273, Qualcomm, "Channel Structure for Consideration in Enhanced Uplink", Tokyo, Japan, Feb. 18-21, 2003.

3GPP, "3rd Generation Partnership Project; Technical Specification Group Radio Access Network; Feasibility Study for Enhanced Uplink for UTRA FDD; (Release 6)," 3GPP TR 25.896 V1.0.2 (Oct. 2003).

3GPP, "3rd Generation Partnership Project; Technical Specification Group Radio Access Network; Feasibility Study for Enhanced Uplink for UTRA FDD (Release 6)," 3GPP TR 25.896 V6.0.0 (Mar. 2004).

3GPP, "3rd Generation Partnership Project; Technical Specification Group Radio Access Network; Multiplexing and channel coding (FDD) (Release 1999)," 3GPP TS 25.212 V3.11.0 (Sep. 2002).

3GPP, "3rd Generation Partnership Project; Technical Specification Group Radio Access Network; Medium Access Control (MAC) protocol specification (Release 1999)." 3GPP TS 25.321 V3.16.0 (Sep. 2003).

3GPP, "3rd Generation Partnership Project; Technical Specification Group Radio Access Network; Multiplexing and channel coding (FDD) (Release 4)," 3GPP TS 25.212 V4.6.0 (Sep. 2002).

3GPP, "3rd Generation Partnership Project; Technical Specification Group Radio Access Network; Multiplexing and channel coding (FDD) (Release 5)," 3GPP TS 25.212 V5.6.0 (Sep. 2003).

3GPP, "3rd Generation Partnership Project; Technical Specification Group Radio Access Network; Multiplexing and channel coding (FDD) (Release 5)," 3GPP TS 25.212 V5.9.0 (Jun. 2004).

3GPP, "3rd Generation Partnership Project; Technical Specification Group Radio Access Network; Multiplexing and channel coding (FDD) (Release 6)," 3GPP TS 25.212 V6.2.0 (Jun. 2004).

3GPP, "3rd Generation Partnership Project; Technical Specification Group Radio Access Network; Medium Access Control (MAC) protocol specification (Release 1999)." 3GPP TS 25.321 V3.17.0 (Jun. 2004).

3GPP, "3rd Generation Partnership Project; Technical Specification Group Radio Access Network; Medium Access Control (MAC) protocol specification (Release 6)." 3GPP TS 25.321 V6.2.0 (Jun. 2004).

3GPP, "3rd Generation Partnership Project; Technical Specification Group Radio Access Network; Medium Access Control (MAC) protocol specification (Release 4)." 3GPP TS 25.321 V4.9.0 (Sep. 2003).

3GPP, "3rd Generation Partnership Project; Technical Specification Group Radio Access Network; Medium Access Control (MAC) protocol specification (Release 5)." 3GPP TS 25.321 V5.9.0 (Jun. 2004).

3GPP, "3rd Generation Partnership Project; Technical Specification Group Radio Access Network; Medium Access Control (MAC) protocol specification (Release 4)." 3GPP TS 25.321 V4.10.0 (Jun. 2004).

3GPP, "3rd Generation Partnership Project; Technical Specification Group Radio Access Network; Medium Access Control (MAC) protocol specification (Release 5)." 3GPP TS 25.321 V5.6.0 (Sep. 2003).

3GPP, "3rd Generation Partnership Project; Technical Specification Group Radio Access Network; Feasibility Study for Enhanced Uplink for UTRA FDD; (Release 6)," 3GPP TR 25.896 V1.0.1 (Oct. 2003).

3GPP, "3rd Generation Partnership Project; Technical Specification Group Radio Access Network; Radio Resource Control (RRC) protocol specification (Release 1999)," 3GPP TS 25.331 V3.16.0 (Sep. 2003).

3GPP, "3rd Generation Partnership Project; Technical Specification Group Radio Access Network; Radio Resource Control (RRC) protocol specification (Release 1999)," 3GPP TS 25.331 V3.20.0 (Sep. 2004).

3GPP, "3rd Generation Partnership Project; Technical Specification Group Radio Access Network; Radio Resource Control (RRC) protocol specification (Release 4)," 3GPP TS 25.331 V4.11.0 (Sep. 2003).

3GPP, "3rd Generation Partnership Project; Technical Specification Group Radio Access Network; Radio Resource Control (RRC) protocol specification (Release 4)," 3GPP TS 25.331 V4.15.0 (Jun. 2004).

3GPP, "3rd Generation Partnership Project; Technical Specification Group Radio Access Network; Radio Resource Control (RRC); Protocol Specification (Release 5)," 3GPP TS 25.331 V5.6.0 (Sep. 2003).

3GPP, "3rd Generation Partnership Project; Technical Specification Group Radio Access Network; Radio Resource Control (RRC); Protocol Specification (Release 5)," 3GPP TS 25.331 V5.10.0 (Sep. 2004).

3GPP, "3rd Generation Partnership Project; Technical Specification Group Radio Access Network; Radio Resource Control (RRC); Protocol Specification (Release 6)," 3GPP TS 25.331 V6.3.0 (Sep. 2004).

3GPP, "3rd Generation Partnership Project; Technical Specification Group Radio Access Network; UTRAN Iub interface NBAP signaling (Release 1999)," 3GPP TS 25.433 V3.14.2 (Sep. 2004).

3GPP, "3rd Generation Partnership Project; Technical Specification Group Radio Access Network; UTRAN Iub interface NBAP signaling (Release 1999)," 3GPP TS 25.433 V3.14.0 (Sep. 2003).

3GPP, "3rd Generation Partnership Project; Technical Specification Group Radio Access Network; UTRAN Iub interface NBAP signaling (Release 4)," 3GPP TS 25.433 V4.10.0 (Sep. 2003).

3GPP, "3rd Generation Partnership Project; Technical Specification Group Radio Access Network; UTRAN Iub interface NBAP signaling (Release 4)," 3GPP TS 25.433 V4.13.0 (Sep. 2004).

3GPP, "3rd Generation Partnership Project; Technical Specification Group Radio Access Network; UTRAN Iub interface NBAP signaling (Release 5)," 3GPP TS 25.433 V5.6.0 (Sep. 2003).

3GPP, "3rd Generation Partnership Project; Technical Specification Group Radio Access Network; UTRAN Iub interface NBAP signaling (Release 5)," 3GPP TS 25.433 V5.10.0 (Sep. 2004).

3GPP, "3rd Generation Partnership Project; Technical Specification Group Radio Access Network; UTRAN Iub interface NBAP signaling (Release 6)," 3GPP TS 25.433 V6.3.0 (Sep. 2004).

3GPP, "Third Generation Partnership Project; Technical Specification Group Radio Access Network; FDD Enhanced Uplink; Overall Description; Stage 2 (Release 6)," 3GPP TS 25.309 V6.0.0 (Sep. 2004).

3GPP2 C.20003-C, "Medium Access Control (MAC) Standard for cdma2000 Spread Spectrum Systems", 3rd Generation Partnership Project 2 "3GPP2", Version 2.0, Release C, Aug. 2004.

## US 10,869,247 B1

Page 4

(56)                    **References Cited**

OTHER PUBLICATIONS

3GPP2 C.S0004-C, "Signaling Link Access Control (LAC) Standard for cdma2000 Spread Spectrum Systems", 3rd Generation Partnership Project 2 "3GPP2", Version 2.0, Release C, Jul. 23, 2004.

3GPP2 C.S0005-C, "Upper Layer (Layer 3) Signaling Standard for cdma2000 Spread Spectrum Systems", 3rd Generation Partnership Project 2 "3GPP2", Version 2.0, Release c, Jul. 23, 2004.

ETSI, UMTS XX. 15 V0.3.0 Jan. 1999, UTRA Handover, 21pp.

GPP2 C.S0002-C, "Physical Layer Standard for cdma2000 Spread Spectrum Systems", 3rd Generation Partnership Project 2 "3GPP2", Version 2.0, Release C, Jul. 23, 2004.

Heck et al., "Diversity Effects on the Soft Handover Gain in UMTS Networks," Proceedings of the IEEE Vehicular Technology Conference, vol. 2, pp. 1269-1273 (Sep. 2002).

Interdigital, "Performance Analysis of HARQ in Soft Handover," 3GPP TSG-RAN WG1 #34 meeting, R1-030979 (Oct. 6-10, 2003).

Nokia, "HARQ overhead issues", TSG-RAN1 #33, R1-030733 (Aug. 25-29, 2003).

Panasonic, "HARQ operation during Soft Handover," 3GPP TSG-RAN WG1 Meeting #33, R1-030802, New York, USA (Aug. 25-29, 2003).

Panasonic, HARQ Operation During Soft Handover, 3GPP TSG-RAN WG1 Meeting #33 R1-030802, Aug. 25-29, 2003.

Qualcomm, "Impact of Downlink Support Channels," 3GPP TSG RAN WG1 #32, Tdoc R1-03-0433, Paris, France (May 19-23, 2003).

R1-030803, "HARQ operation during Soft Handover", Panasonic, TSG RAN1 #33.

Samsung, "HARQ performance in soft handover", TSG RAN1 #33, R1-030765 (Aug. 25-29, 2003).

Samsung, "HARQ Structure", 3GPP TSG-RAN WG1 #31, R1-030247, Tokyo, Japan, 3 pages (Feb. 18-21, 2003).

Samsung, "Transport channel multiplexing options considering SHO", 3GPP TSG RAN WG1 #33, R1-030767, New York, USA, 5 pages (Aug. 25-29, 2003).

Third Generation Partnership Project, Feasibility Study for Enhanced Uplink for UTRA FDD; (Release 6, " 3GPP TR 25.896 V0.4.2 (R1-030952) (Sep. 2003).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Requirements for support of radio resource management (FDD) (Release 1999)," 3GPP TS 25.133 V3.19.0 (Sep. 2004).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Requirements for support of radio resource management (FDD) (Release 4)," 3GPP TS 25.133 V4.10.0 (Sep. 2003).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Requirements for support of radio resource management (FDD) (Release 4)," 3GPP TS 25.133 V4.13.0 (Sep. 2004).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Requirements for support of radio resource management (FDD) (Release 5)," 3GPP TS 25.133 V5.12.0 (Sep. 2004).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Requirements for support of radio resource management (FDD) (Release 6)," 3GPP TS 25.133 V6.7.0 (Sep. 2004).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Requirements for support of radio resource management (FDD) (Release 1999)," 3GPP TS 25.133 V3.15.0 (Sep. 2003).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Requirements for support of radio resource management (FDD) (Release 5)," 3GPP TS 25.133 V5.8.0 (Sep. 2003).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Requirements for support of radio resource management (FDD) (Release 6)," 3GPP TS 25.133 V6.3.0 (Sep. 2003).

Third Generation Partnership Project, Technical Specification Group Radio Access Network; Feasibility Study for Enhanced Uplink for UTRA FDD (Release 6), 3GPP TR 25.896 V0.2.1 (R1-030372) pp. 14-17 (Feb. 2003).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Physical layer procedures (FDD) (Release 1999)," 3GPP TS 25.214 V3.12.0 (Mar. 2003).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Physical layer procedures (FDD) (Release 4)," 3GPP TS 25.214 V4.6.0 (Mar. 2003).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Physical layer procedures (FDD) (Release 5)," 3GPP TS 25.214 V5.6.0 (Sep. 2003).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Physical layer procedures (FDD) (Release 5)," 3GPP TS 25.214 V5.9.0 (Jun. 2004).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Physical channels and mapping of transport channels onto physical channels (FDD) (Release 1999)," 3GPP TS 25.211 V3.12.0 (Sep. 2002).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Physical channels and mapping of transport channels onto physical channels (FDD) (Release 4)," 3GPP TS 25.211 V4.6.0 (Sep. 2002).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Physical channels and mapping of transport channels onto physical channels (FDD) (Release 5)," 3GPP TS 25.211 V5.5.0 (Sep. 2003).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Physical channels and mapping of transport channels onto physical channels (FDD) (Release 5)," 3GPP TS 25.211 V5.6.0 (Sep. 2004).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Physical channels and mapping of transport channels onto physical channels (FDD) (Release 6)," 3GPP TS 25.211 V6.2.0 (Sep. 2004).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Physical layer procedures (FDD) (Release 6)," 3GPP TS 25.214 V6.3.0 (Sep. 2004).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; High Speed Downlink Packet Access (HSDPA); Overall description; Stage 2 (Release 6)," 3GPP TS 25.308 V6.2.0 (Sep. 2004).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; High Speed Downlink Packet Access (HSDPA); Overall description; Stage 2 (Release 5)," 3GPP TS 25.308 V5.6.0 (Sep. 2004).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; High Speed Downlink Packet Access (HSDPA); Overall description; Stage 2 (Release 5)," 3GPP TS 25.308 V5.4.0 (Mar. 2003).

TSGR1#3(99)187, "Improvements to Site Selection Delivery Transmission (SSDT)", TSG-RAN Working Group 1 meeting #3, Source: Motorola, Stockholm, Sweden, 5 pages (Mar. 22-26, 1999). ftp://www.3gpp.org/tsg_ran/WG1_RL1_03/Docs/pdfs/R1-99187.PDF.

Ericsson, "E-DCH multiplexing and transport channel structure," TSG-RAN Working Group 2 meeting #42, Tdoc R2-040917, Montreal, Canada, (May 2004).

Holma et al., "WCDMA for UMTS—Radio Access for Third Generation Mobile Communications," First Edition, (2000).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network, FDD Enhanced Uplink, Overall description, Stage 2 (Release 6)," 3GPP TS 25.309 V0.2.0 (Jun. 2004).

3GPP, "3rd Generation Partnership Project; Technical Specification Group Radio Access Network; UTRAN Iub Interface User Plane Protocols for Common Transport Channel data streams (Release 5)," 3GPP TS 25.435 V5.5.0 (Jun. 2003).

**US 10,869,247 B1**

Page 5

(56)  **References Cited**

OTHER PUBLICATIONS

3GPP, "3rd Generation Partnership Project; Technical Specification Group Radio Access Network; UTRAN Iub Interface User Plane Protocols for Common Transport Channel data streams (Release 6)," 3GPP TS 25.435 V6.1.0 (Mar. 2004).

3GPP, "3rd Generation Partnership Project; Technical Specification Group Radio Access Network; Radio resource management strategies (Release 5)," 3GPP TR 25.922 V5.0.0 (Mar. 2002).

Universal Mobile Telecommunications System (UMTS); "Radio resource management strategies (3GPP Tr 25.922 version 5.1.0 Release 5)," ETSI TR 125 922 V5.1.0 (Sep. 2003).

Universal Mobile Telecommunications System (UMTS); "Radio resource management strategies (3GPP TR 25.922 version 6.0.1 Release 6)," ETSI TR 125 922 V6.0.1 (Apr. 2004).

* cited by examiner



FIG. 1
PRIOR ART



FIG. 2



*FIG. 3*



FIG. 4

FIG. 5

US 10,869,247 B1

**1**

## SUPPORTING UPLINK TRANSMISSIONS

### CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 16/545,398, filed Aug. 20, 2019, which is a continuation of U.S. patent application Ser. No. 16/283,407, filed Feb. 22, 2019, which is a continuation of U.S. patent application Ser. No. 15/699,418 filed on Sep. 8, 2017, now U.S. Pat. No. 10,219,196 issued on Feb. 26, 2019, which is a continuation of U.S. patent application Ser. No. 14/869,313, filed on Sep. 29, 2015, now U.S. Pat. No. 9,763,156 issued on Sep. 12, 2017, which is a continuation of U.S. patent application Ser. No. 13/908,242 filed on Jun. 3, 2013, now U.S. Pat. No. 9,215,636 issued on Dec. 15, 2015, which is a continuation of U.S. patent application Ser. No. 13/308, 950 filed on Dec. 1, 2011, now U.S. Pat. No. 8,457,072 issued on Jun. 4, 2013, which is a continuation of U.S. patent application Ser. No. 11/434,330 filed on May 15, 2006, now U.S. Pat. No. 8,130,720 issued on Mar. 6, 2012, which is a continuation of U.S. patent application Ser. No. 10/962,720 filed Oct. 12, 2004, now U.S. Pat. No. 7,046,648 issued on May 16, 2006, which claims the benefit of U.S. Provisional Application Ser. No. 60/578,674 filed Jun. 10, 2004; 60/520, 692 filed Nov. 17, 2003; 60/519,990 filed Nov. 14, 2003; and 60/517,656 filed Nov. 5, 2003, all of which are incorporated by reference as if fully set forth. This application is also related to a co-pending patent application, entitled "Supporting Uplink Transmissions", Ser. No. 17/008,468, filed on Aug. 31, 2020.

### FIELD OF INVENTION

The present invention is related to a wireless communication system. More particularly, the present invention is related to a method and apparatus for coordinating Node-Bs and supporting enhanced uplink (EU) transmissions during handover.

### BACKGROUND

Many schemes have been proposed to improve coverage, throughput, and transmission latency for EU transmissions in third generation partnership project (3GPP). One of the developments is to move the functions for scheduling and assigning uplink (UL) physical channel resources from a radio network controller (RNC) to a Node-B. A Node-B can make more efficient decisions and manage UL radio resources on a short-term basis better than the RNC, even if the RNC retains overall control over Node-Bs. A similar approach has already been adopted in downlink for high speed data packet access (HSDPA) in both universal mobile telecommunication system (UMTS) frequency division duplex (FDD) and time division duplex (TDD) modes.

It has also been recognized that performance is greatly enhanced with the use of medium access control (MAC) level automatic repeat request (ARQ) and hybrid ARQ (H-ARQ). Application of these techniques during soft handover provides additional significant benefits.

FIG. 1 shows a conventional wireless multi-cell communication system **100** including a wireless transmit/receive unit (WTRU) **105**, a Node-B **110**, an RNC **115**, and at least two cells **120**A, **120**B. Each of the cells **120**A, **120**B, is served by the Node-B **110**. Node-B **110** is controlled by the

**2**

RNC **115**. When a change in the cell offering the best radio conditions is determined between cells **120**A and **120**B, a handover process is initiated.

An "intra-Node-B handover" occurs when a WTRU changes from one cell to another cell controlled by the same Node-B, as shown in FIG. 1. An "inter-Node-B handover" occurs when a WTRU changes from one cell to another cell controlled by a different Node-B. In the latter case, the Node-B that controls the cell before the handover is called a source Node-B, and the Node-B that controls the cell after the handover is called a target Node-B.

During soft handover, a WTRU establishes a plurality of connections with a plurality of Node-Bs in an active set. In this situation, a problem may arise for scheduling and H-ARQ operation. A WTRU may receive conflicting EU transmission scheduling from more than one Node-B. It is also difficult for the WTRU to receive, decode and process H-ARQ positive and negative acknowledgements (ACKs/NACKs) generated by a plurality of Node-Bs. The soft buffer of an H-ARQ process in Node-Bs may be corrupted during soft handover.

One method to support H-ARQ across multiple Node-Bs, when the WTRU is in soft handover, is to place the ACK/NACK generation function in the RNC, which derives a single ACK/NACK based on the results from the multiple Node-Bs. However, this approach presents a significant delay to the ACK/NACK process, which is highly undesirable for performance reasons.

When a WTRU undergoes an inter-Node-B hard handover, there is a possibility that a source Node-B, which is a Node-B for hard handover is completed, may not successfully receive EU transmissions for data packets that have been NACKed prior to hard handover activation time. Other WTRUs competing for UL resources may not be provided with enough physical resources in the source cell. If data blocks that have been NACKed prior to the handover are retransmitted to the source Node-B before the handover activation timer expires, those data blocks can be combined with the previous data blocks for H-ARQ decoding. In this way, the decoding takes the advantage of previous, although failed, transmissions of those data blocks in the source cell. If data blocks that have been NACKed prior to the handover are not retransmitted to the source Node-B before the handover activation timer is expired, they have to be transmitted again in the target cell as new data blocks. In this case, the previous transmissions of those data blocks in the source cell are not utilized.

### SUMMARY

An enhanced uplink user equipment is in soft handover. A radio network controller selects a primary Node-B out of a plurality of Node-Bs supporting the soft handover. The radio network controller receiving successfully received enhanced uplink data packets from the plurality of Node-Bs. The radio network controller reordered the successfully received enhanced uplink data packets for in-sequence deliver. The primary Node-B sends specified scheduling information to the user equipment that the other Node-Bs does not transmit. At least the primary Node-B transmits acknowledgements and negative acknowledgements to the user equipment.

### BRIEF DESCRIPTION OF THE DRAWINGS

A more detailed understanding of the invention may be had from the following description, given by way of

US 10,869,247 B1

3

example and to be understood in conjunction with the accompanying drawings wherein:

FIG. 1 shows a conventional wireless communication system;

FIG. 2 shows a system which uses a UL scheduler located in a primary Node-B during soft handover for EU in accordance with the present invention;

FIG. 3 shows a system which uses an ACK/NACK generation function located in a primary Node-B during soft handover for EU in accordance with the present invention;

FIG. 4 is a flowchart of a process including method steps for coordinating Node-Bs during soft handover for EU in accordance with one embodiment of the present invention; and

FIG. 5 is a flowchart of a process including method steps for prioritizing the transmission of NACKed data in a source Node-B before hard handover is completed in accordance with a separate embodiment of the present invention.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The present invention will be described with reference to the drawing figures wherein like numerals represent like elements throughout.

Hereafter, the terminology "WTRU" includes but is not limited to a user equipment (UE), a mobile station, a fixed or mobile subscriber unit, a pager, or any other type of device capable of operating in a wireless environment.

When referred to hereafter, the terminology "Node-B" includes but is not limited to a base station, a site controller, an access point or any other type of interfacing device in a wireless environment.

The present invention may be implemented in any type of wireless communication systems, such as UMTS-FDD, TDD, time division synchronous code division multiple access (TDSCDMA), code division multiple access 2000 (CDMA2000) (EV-DO and EV-DV) or any other type of wireless communication system.

The features of the present invention may be incorporated into an IC or be configured in a circuit comprising a multitude of interconnecting components.

FIG. 2 shows a wireless multi-cell communication system 200 which uses a UL scheduler located in a primary Node-B in accordance with the present invention. The wireless multi-cell communication system 200 includes a WTRU 205, a plurality of Node-Bs 210 (i.e., 210A, 210B), an RNC 215 and a plurality of cells 260 (i.e., 260A, 260B, 260C). Cells 260A and 260C are served by the Node-B 210A. Cells 260B are served by the Node-Bs 210B. All of the Node-Bs 210 are controlled by the RNC 215.

During soft handover, the WTRU 205 establishes multiple connections with the Node-Bs 210 included in an active set. Each transmission from the WTRU 205 is processed independently at each of the Node-Bs 210. One of the Node-Bs 210 in the active set is designated as a primary Node-B 210A, and the other Node-Bs are designated as non-primary Node-Bs 210B.

As shown in FIG. 2, the primary Node-B 210A includes a MAC entity 250A including a UL scheduler 255. Each of the non-primary Node-Bs 210B also includes a MAC entity 250B. Each of the MAC entities 250A, 250B, handles EU transmissions. The UL scheduler 255 in the MAC entity 250A is responsible for scheduling the EU transmissions.

In accordance with one embodiment of the present invention, the UL scheduler 255 is implemented only at the primary Node-B 210A during soft handover. The WTRU 205 receives a UL transmission schedule only from the

4

primary Node-B 210A in a primary cell 260A. However, the primary Node-B 210A cannot send the scheduling information to the non-primary Node-Bs 210B in every transmission time interval (TTI). In order to allow the primary Node-B 210A to allocate resources for the WTRU 205 to transmit in cells controlled by the non-primary Node-Bs 210B, those resources scheduled by the primary Node-B 250A in a plurality of cells 260B controlled by the non-primary Node-Bs 210B cannot be assigned by the non-primary Node-Bs 210B. Therefore, some physical resources common to all of the cells in the active EU subset should be assigned and reserved by a particular Node-B for the WTRU 205 during the soft handover, so that those resources can be used only by the primary Node-B 210A.

The UL scheduler 255 located in the primary Node-B 210A considers the interference level caused by the EU transmission at any cell 260A, 260B, 260C, in the EU active subset to be below a predetermined maximum allowed interference level. Thus, the primary Node-B 250A limits the transmit power level of the WTRU 205 such that the interference levels are also within the maximum allowed interference levels at other cells 260B, 260C. To achieve this, the RNC 215 needs to relay necessary information, such as transmission power level and interference level, of the cells 260B controlled by the non-primary Node-Bs 210B to the primary Node-B 210A, which then uses the information to schedule the UL transmissions.

The EU scheduling information is transmitted to the WTRU 205 only by the primary Node-B 210A through the primary cell 260A. During soft handover, the WTRU 205 receives EU scheduling information only in the primary cell 260A, although the EU scheduling information is valid in all other cells 260B, 260C.

In one embodiment, the primary Node-B 250A is selected by either the RNC 215 or the WTRU 205. The RNC 215 may choose a Node-B that has the highest percentage of correctly received data blocks during a predefined time window as a primary Node-B.

In another embodiment, the RNC 215 generates statistics for each Node-B, such as a bit error rate (BER) or a frame error rate (FER), or the like, over a predetermined time period. Then, the RNC 215 may select a Node-B having the best performance to be the primary Node-B 210A. The RNC 215 then notifies the WTRU 205 and all other Node-Bs about the primary Node-B 210A via radio resource control (RRC) and Iub signaling, respectively.

In another embodiment, the WTRU 102 may choose a Node-B 210 that has the best downlink pilot power, (i.e., best downlink path loss or highest code power), as a primary Node-B 210A. The WTRU 205 measures the power of pilot signals received from all Node-Bs 210 and selects the Node-B 210 having the highest pilot power to be the primary Node-B 210A. The WTRU 205 then notifies all other Node-Bs about the primary Node-B 210A via fast physical layer signaling.

The WTRU 205 may report the downlink pilot power of all cells 260 to the RNC 215. The RNC 215 then chooses one Node-B 210 to be the primary Node-B 210a based on the combined uplink and downlink quality. The uplink quality of a cell 260 based on the percentage of correctly received data blocks, (or BER, FER, or the like), during a predefined time window, and the downlink quality of a cell 260 is based on the WTRU received downlink pilot power. Then, the RNC 215 notifies the WTRU 205 and all of the Node-Bs 210 about the primary Node-B 210A via RRC and Iub signaling, respectively.

US 10,869,247 B1

5

The present invention is advantageous over prior art systems. Using the present invention, a WTRU does not receive conflicting scheduling of EU transmissions from Node-Bs during soft handover. In addition, EU transmission is scheduled in consideration of an interference level and radio resources in cells controlled by non-primary Node-Bs. Signaling delay from the primary Node-B **210**A to the WTRU **205** is much lower as compared to signaling delay from the RNC **215** to the WTRU **205**.

In a separate embodiment, FIG. **3** shows a wireless multi-cell communication system **300**, similar to the system **200** shown in FIG. **2**. As shown in FIG. **3**, the primary Node-B **210**A includes a MAC entity **250**A including an ACK/NACK generator **305**. Only the primary Node-B **210**A has the ACK/NACK generator **305**. The primary Node-B **210**A may perform H-ARQ with incremental redundancy, or only ARQ without implementing incremental redundancy.

Still referring to FIG. **3**, the primary Node-B **210**A receives at least one data packet from the WTRU **205** through the primary cell **260**A and performs an error check on the data packet. Any error checking method, such as a cyclic redundancy check (CRC), may be utilized. If the primary Node-B **210**A correctly decodes the data packet, such as passing the CRC, the primary Node-B **210**A transmits an ACK to the WTRU **205** and also transmits the correctly decoded data packet to the RNC **215**. If the primary Node-B **210**A fails to correctly decode the data packet, the primary Node-B **210**A transmits a NACK to the WTRU **205**.

The non-primary Node-Bs **210**B also perform an error check on the data packet. However, the non-primary Node-Bs **210**B do not send ACKs or NACKs to the WTRU **205**. Instead, the non-primary Node-Bs send successfully decoded data packets to the RNC **215**. During soft handover, only the primary Node-B **210**A generates H-ARQ (or ARQ), ACKs and NACKs, and controls retransmissions.

The MAC layer WTRU identities received by the non-primary Node-Bs **210**B may be used for routing of successfully received transmissions in a universal terrestrial radio access network (UTRAN). Since the non-primary Node-Bs **210**B are not aware of which WTRUs have been scheduled for EU transmission by the primary Node-B **210**A, the non-primary Node-Bs **210**B may rely on in-band MAC layer signaling of the WTRU ID to route correctly received transmissions to the correct RNC radio link. Even though the primary Node-B **210**A may be aware of which WTRU is scheduled, the same method may be implemented by the primary Node-B **210**A.

Preferably, the primary Node-B **210**A may use soft combining to process transmissions, while the non-primary Node-Bs **210**B may process each transmission without soft combining. If the primary Node-B sends a NACK to the WTRU **205**, the NACKed data packet is stored in a buffer of the primary Node-B **210**A, and the NACKed data packet is combined with a retransmitted data packet. In contrast, the non-primary Node-Bs **210**B do not store the NACKed data packets. This eliminates the problem of soft buffer corruption between the Node-Bs **210**, and the complexities of multiple independent ACKs and/or NACKs.

When an incremental combining process is implemented, measures should be taken to avoid soft buffer corruption. Sequence information or a new data indicator is required to enable a Node-B **210** to detect that the WTRU **205** is no longer repeating data for a particular WTRU H-ARQ process, but instead is sending new data. This is specifically required because the Node-B **210** has no other way to learn that a new transmission has started. Alternatively, the non-

6

primary Node-Bs **210**B may simply perform an ARQ, without using an incremental combining process. This eliminates the soft buffer corruption problem.

In the case where non-primary Node-Bs **210**B perform simple ARQ without incremental combining, the WTRU **205** must transmit self-decodable data packets to ensure that all of the Node-Bs **210** may decode transmissions, regardless of the result of earlier transmissions. Preferably, the H-ARQ functionality is terminated at the Node-Bs **210**. Each of the Node-Bs **210** sends to the RNC **215** successfully decoded data packets with explicit identification of transmission, such as a transmission sequence number (TSN). The RNC **215** may optionally use data packets delivered from the non-primary Node-Bs **210**B. A MAC entity **310**, located in the RNC **215**, is used to implement an in-sequence delivery process for delivering data to higher layers over all of the packets received from the Node-Bs **210**. After the RNC MAC entity **310** has completed its re-ordering process, it sends the data to a radio link control (RLC) (not shown). Missed packets are identified at the RNC **215** and the WTRU **205** is informed through RLC messaging.

Alternatively, EU transmissions may identify WTRU ID, H-ARQ process, transmission sequence and/or new data indication (NDI) to allow for soft combining in the non-primary Node-B's **210**B. If this method is used to allow soft combining in the non-primary Node-Bs **210**B, the primary Node-B **210**A may not have to rely on scheduling and H-ARQ ACK/NACK decisions to determine when combining should be performed.

There are two options for the transmission of ACK/NACK messages. The first option is a synchronous transmission. The ACK/NACK messages are transmitted after a unique time delay with respect to the corresponding uplink transmission or the EU channel allocation message. The second option is an asynchronous transmission. There is no unique delay between the transmission of ACK/NACK messages and the corresponding uplink transmission or the EU channel allocation message. Explicit information in the ACK/NACK message identifies the corresponding uplink transmission to enable the WTRU **205** to make the correct association between the ACK/NACK message and the transmission. This association is made by either identifying the H-ARQ process number and/or a unique sequence number, such as a TSN with each ACK/NACK feedback message to the WTRU **205**.

In a separate embodiment, preferably implemented for the asynchronous ACK/NACK feedback case, the non-primary Node-Bs **210**B may provide H-ARQ ACK/NACK results to the primary Node-B **210**A in order to avoid unnecessary retransmissions for transmissions that are not correctly received by the primary Node-B **210**A, but are correctly received by the non-primary Node-Bs **210**B. A non-primary Node-B **210**B does not directly send an ACK or NACK message to the WTRU **205**. The non-primary Node-Bs **210**B sends ACK/NACK or CRC results to the RNC **215**. Then, the RNC **215** sends ACK or CRC results to the primary Node-B **210**A.

In order to speed up H-ARQ processing, the first ACK message from any non-primary Node-B **210**B received by the RNC is preferably immediately forwarded to the primary Node-B **210**A. The primary Node-B **210**A also immediately generates an ACK message if the transmission is received correctly in the primary Node-B **210**A without waiting for feedback from the non-primary Node-Bs **210**B. The primary Node-B **210**A also generates an ACK message immediately upon reception of a forwarded ACK message from the RNC, even if other ACK messages may be forwarded. Since an

US 10,869,247 B1

7

ACK is generated if any of the paths are successful, an ACK can be generated as soon as the first successful transmission is found.

Alternatively, in order to simplify the design of the ACK/NACK generator 205, only a subset of the generating nodes may be used. For example, ACKs may be generated only at the RNC, or at the RNC and the primary Node-B 210A.

When the WTRU 205 sends an uplink transmission, for each H-ARQ process the WTRU 205 waits at least the time required for the primary Node-B 210A to send ACK/NACK feedback. For each H-ARQ process, if an ACK is received by the WTRU 205, the WTRU 205 may send new data in the next available or assigned opportunity.

A NACK message can only originate in the RNC 215 since it is the only node that has all of the information necessary in the soft handover to determine that there have been no successful receptions at any Node-B 210. The RNC 215 generates a NACK command if the RNC 215 receives no ACK from the Node-Bs 210 within a predetermined time interval. The RNC 215 forwards the NACK message to the WTRU 205 via the primary Node-B 210A.

It is also possible that this procedure can be implemented without an explicit NACK command. In this case, the lack of ACK reception within a particular period of time is considered the same as an explicit NACK command at either the primary Node-B 210A and/or the WTRU 205.

FIG. 4 is a flowchart of a process 400 including method steps for coordinating Node-Bs during soft handover in accordance with one embodiment of the present invention. In step 405, the RNC 215 makes a decision to initiate an inter-Node-B soft handover. In step 410, the WTRU 205 establishes connections with at least two Node-Bs 210 in an active set. In step 415, one of the Node-Bs 210 in the active set is designated as a primary Node-B 210A and the one or more Node-B(s) 210 remaining in the active set are designated as a non-primary Node-Bs 210B. In step 420, the primary Node-B 210A controls UL transmissions during soft handover by performing EU scheduling and H-ARQ operations.

FIG. 5 is a flowchart of a process 500 including method steps for prioritizing the transmission of NACKed data in a source Node-B before hard handover is completed in accordance with a separate embodiment of the present invention. In step 505, the RNC 215 makes a decision to initiate a hard handover for a WTRU 205 connected to a source Node-B 210. In step 510, the RNC 215 informs the source Node-B 210 when the WTRU 205 will stop transmission and reception in the source cell 260. In step 515, the RNC 215 sends an activation timer to the source Node-B 210 to set the time for handover.

Still referring to FIG. 5, if the source Node-B 210 determines that there are data packets that were previously NACKed, as many previously NACKed data packets as possible should be retransmitted before the handover activation timer expires. Otherwise, the system may lose the benefit of incrementally combining the previous transmission with the retransmission. Therefore, the source Node-B scheduler 255 takes the handover activation time into account when it schedules the data packets that have been NACKed. If there is not enough radio resource for the source Node-B 210 to schedule transmission of all the NACKed data packets in time, the source Node-B 210 should manage to schedule transmission of as many NACKed data packets as possible.

Still referring to FIG. 5, in order to transmit as many NACKed data packets as possible before the activation timer

8

expires, the source Node-B 210 adjusts the priority of transmissions (step 525) and, in step 530, the source node-B 210 adjusts the MCS of the transmissions (step 530). Higher priority of scheduling is given to the data packets that have been NACKed. If the radio resources are sufficient, a more robust MCS may be used to increase the probability of successful transmissions from the WTRU 205 to the source Node-B 210. In step 535, the handover is completed at the expiration of the activation timer.

In order for the WTRU 205 to understand that the scheduled uplink transmission is intended for data blocks with previous transmission failures, the source Node-B 210 uplink scheduler 255 may specify that the scheduled UL transmission is intended for the data blocks that were previously NACKed. This may be implemented by including H-ARQ process identification in the UL scheduling information that is sent from the source Node-B 210 to the WTRU 205. By receiving the scheduling information from the source Node-B 210, the WTRU 205 knows that the scheduled transmission is for specific data associated with HARQ process identification sent together with the scheduling information.

While this invention has been particularly shown and described with reference to preferred embodiments, it will be understood by those skilled in the art that various changes in forms and details may be made therein without departing from the scope of the invention as described above.

What is claimed is:

1. A wireless transmit/receive unit (WTRU) comprising:
at least one transceiver; and
a processor;
wherein the at least one transceiver and the processor are configured to cause the WTRU to:
transmit, using a hybrid automatic repeat request (H-ARQ) process, a data block to a base station;
receive uplink scheduling information from the base station, wherein the uplink scheduling information includes a H-ARQ process identification for the H-ARQ process; and
determine whether to retransmit the data block based on the received uplink scheduling information and not based on whether the WTRU has received a negative acknowledgement (NACK) from the base station.

2. The WTRU of claim 1, wherein the at least one transceiver and the processor are further configured to cause the WTRU to, in response to a determination to retransmit the data block, retransmit the data block.

3. The WTRU of claim 2, wherein the data block is retransmitted using physical channel resources included in the uplink scheduling information.

4. The WTRU of claim 1, wherein the reception of the uplink scheduling information initiates retransmission of a negatively acknowledged (NACK'ed) data block.

5. The WTRU of claim 1, wherein the uplink scheduling information includes physical channel resources.

6. The WTRU of claim 1, wherein the uplink scheduling information is received from a primary cell and the WTRU transmits to the primary cell and at least one secondary cell.

7. The WTRU of claim 1, wherein the at least one transceiver and the processor are further configured to cause the WTRU to receive an ACK/NACK signal from the base station.

8. The WTRU of claim 1, wherein the scheduling information indicates a modulation and coding scheme.

9. The WTRU of claim 1, wherein the transmitted data block has a first modulation and coding scheme (MCS) and

US 10,869,247 B1

9

the scheduling information indicates a second MCS, wherein the first MCS and the second MCS are different.

10. The WTRU of claim 9, wherein the at least one transceiver and the processor are further configured to cause the WTRU to, in response to a determination to retransmit the data block, retransmit the data block using the second MCS.

11. A method comprising:

transmitting, by a wireless transmit/receive unit (WTRU), a data block to a base station using a hybrid automatic repeat request (H-ARQ) process;

receiving, by the WTRU, uplink scheduling information from the base station, wherein the uplink scheduling information includes a H-ARQ process identification for the H-ARQ process; and

determining, by the WTRU, whether to retransmit the data block based on the received uplink scheduling information and not based on whether the WTRU has received a negative acknowledgement (NACK) from the base station.

12. The method of claim 11 further comprising, in response to a determination to retransmit the data block, retransmitting, by the WTRU, the data block.

10

13. The method of claim 12, wherein the data block is retransmitted using physical channel resources included in the uplink scheduling information.

14. The method of claim 11, wherein the reception of the uplink scheduling information initiates retransmission of a negatively acknowledged (NACK'ed) data block.

15. The method of claim 11, wherein the uplink scheduling information includes physical channel resources.

16. The method of claim 11, wherein the uplink scheduling information is received from a primary cell and the WTRU transmits to the primary cell and at least one secondary cell.

17. The method of claim 11 further comprising receiving, by the WTRU, an ACK/NACK signal from the base station.

18. The method of claim 11, wherein the scheduling information indicates a modulation and coding scheme.

19. The method of claim 11, wherein the transmitted data block has a first modulation and coding scheme (MCS) and the scheduling information indicates a second MCS, wherein the first MCS and the second MCS are different.

20. The method of claim 19 further comprising, in response to a determination to retransmit the data block, retransmitting the data block using the second MCS.

* * * * *

# EXHIBIT 7

US009063654B2

(12) **United States Patent**

Shin

(10) **Patent No.:** **US 9,063,654 B2**

(45) **Date of Patent:** **Jun. 23, 2015**

(54) **TERMINAL APPARATUS AND METHOD FOR SUPPORTING SMART TOUCH OPERATION**

(75) Inventor: **Dong Chan Shin**, Seoul (KR)

(73) Assignee: **Pantech Co., Ltd.**, Seoul (KR)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 352 days.

(21) Appl. No.: **13/603,376**

(22) Filed: **Sep. 4, 2012**

(65) **Prior Publication Data**

US 2013/0063378 A1     Mar. 14, 2013

(30) **Foreign Application Priority Data**

Sep. 9, 2011     (KR) ........................ 10-2011-0091901

(51) **Int. Cl.**
*G06F 3/041* (2006.01)
*G06F 3/0488* (2013.01)

(52) **U.S. Cl.**
CPC ........ *G06F 3/04886* (2013.01); *G06F 3/04883* (2013.01)

(58) **Field of Classification Search**
CPC ....... G06F 3/016; G06F 3/041; G06F 3/0488; G06F 3/04883; G06F 3/04886; H04M 1/72522; H04M 1/72552
USPC ............. 345/156, 173, 179; 178/18.01, 19.01
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 8,860,680 | B2 * | 10/2014 | Miyazaki | 345/173 |
| 2008/0122796 | A1 * | 5/2008 | Jobs et al. | 345/173 |
| 2008/0218535 | A1 * | 9/2008 | Forstall et al. | 345/690 |
| 2008/0297482 | A1 * | 12/2008 | Weiss | 345/173 |
| 2009/0122022 | A1 * | 5/2009 | Park et al. | 345/173 |
| 2009/0193361 | A1 * | 7/2009 | Lee et al. | 715/810 |
| 2010/0079797 | A1 * | 4/2010 | Yang et al. | 345/173 |
| 2010/0251161 | A1 * | 9/2010 | Fong et al. | 715/773 |
| 2010/0251176 | A1 * | 9/2010 | Fong et al. | 715/821 |
| 2011/0221684 | A1 * | 9/2011 | Rydenhag | 345/173 |
| 2012/0044149 | A1 * | 2/2012 | Son et al. | 345/169 |
| 2012/0092288 | A1 * | 4/2012 | Wadia | 345/174 |
| 2012/0113008 | A1 * | 5/2012 | Makinen et al. | 345/168 |
| 2012/0240044 | A1 * | 9/2012 | Johnson et al. | 715/716 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| KR | 1020080034110 | 4/2008 |
| KR | 1020080097114 | 11/2008 |
| KR | 1020090087177 | 8/2009 |
| KR | 10-2010-0062077 | 6/2010 |
| KR | 1020110026359 | 3/2011 |

* cited by examiner

*Primary Examiner* — Joe H Cheng

(74) *Attorney, Agent, or Firm* — H.C. Park & Associates, PLC

(57) **ABSTRACT**

A terminal apparatus includes an interface to detect a touch input, to detect a touch region corresponding to the touch input, and to identify an object that is overlapped by the touch input by at least a reference percentage in the touch region as a first object; a processing unit to generate a second object based on the first object, and to display the second object in an untouched region; and a control unit to execute an operation corresponding to the second object. A method for executing an operation according to a touch input includes detecting a touch input and a corresponding touch region; identifying an object overlapped by at least a reference percentage in the touch region as a first object; generating a second object based on the first object; displaying the second object in an untouched region; and executing an operation corresponding to the second object.

**19 Claims, 7 Drawing Sheets**



Case 5:22-Case029-F62S DDocument1-18 FileRage6/292 Filed 97/24/2925eID #: 162

FIG. 1



Case 5:22-Case025-F5/25 DDocument1-38 FilePage06/2962 Filed 07/242025eID #: 163

**FIG. 2**



Case 5:22-cv-00029-FB2S DDocumeent1-88 FilePag06/0297/22 Filed 07/245/2025 elD #: 164

**FIG. 3**



Case 5:22-cv-00029-RGS    Document 1-8 Filed 06/29/22    Page 67 of 29 PageID #: 165

**FIG. 4**



Case 5:22-CV-00029-FB28   Document 1-8   Filed 06/02922   Page 07/24 52925eID #: 166

**FIG. 5**





Case 5:22-cv-00029-RGS   Document 1-88   Filed 06/30/22   Page 87 of 92 PageID #: 167

**FIG. 6**



Case 5:22-cv-00289-FB2S   Document 1-88   Filed 06/30/22   Page 97 of 245 PageID #:  168

**FIG. 7**



US 9,063,654 B2

**1**

## TERMINAL APPARATUS AND METHOD FOR SUPPORTING SMART TOUCH OPERATION

### CROSS-REFERENCE TO RELATED APPLICATION

This application claims priority from and the benefit under 35 U.S.C. §119(a) of Korean Patent Application No. 10-2011-0091901, filed on Sep. 9, 2011, which is incorporated by reference for all purposes as if fully set forth herein.

### BACKGROUND

1. Field

The following description relates to a smart touch technology, and more specifically to a smart touch technology to support a display of an overlapped object.

2. Discussion of the Background

A display module that supports or receives a touch input may be applied to an electronic device (e.g., a smart phone, personal digital assistant, a mobile computing device, and the like), a user interface (UI), such as a digital keyboard or touch screen, may be used to receive a touch input.

In order to execute or select a target object among a plurality of objects in a display region, the target object may be selected by a touch input on the UI of the electronic device. If a gap between the target object and surrounding objects is narrow, inaccurate selection of the target object or selection of multiple objects may occur, which may lead to execution of the wrong object, contrary to an intention of a user.

Accordingly, a technology to enable the user to more easily select and/or execute a target object may be beneficial.

### SUMMARY

Exemplary embodiments of the present invention provide a terminal apparatus to support a smart touch operation and method for supporting a smart touch operation.

Additional features of the invention will be set forth in the description which follows, and in part will be apparent from the description, or may be learned by practice of the invention.

Exemplary embodiments of the present invention provide a terminal apparatus including an interface to detect a touch input, to detect a touch region corresponding to the touch input, and to identify an object that is overlapped by the touch input at least a reference percentage in the touch region as a first object; a processing unit to generate a second object based on the first object, and to display the second object in an untouched region; and a control unit to execute an operation corresponding to the second object.

Exemplary embodiments of the present invention provide a method for executing an operation according to a touch input including detecting a touch input and a corresponding touch region on a display of a terminal; identifying an object overlapped by at least a reference percentage in the touch region as a first object; generating a second object based on the first object; displaying the second object in an untouched region; and executing an operation corresponding to the second object.

Exemplary embodiments of the present invention provide a method for executing an operation according to a touch input including detecting a touch input and a corresponding touch region on a display of a terminal; identifying an object overlapped by at least a reference percentage in the touch region as a first object; determining a direction of the touch input; generating a second object based on the first object; display-

**2**

ing the second object in an untouched region based on the direction of the touch input; and executing an operation corresponding to the second object if the second object is selected for execution, in which the second object comprises information associated with the first object.

It is to be understood that both the foregoing general description and the following detailed description are exemplary and explanatory and are intended to provide further explanation of the invention as claimed. Other features and aspects will be apparent from the following detailed description, the drawings, and the claims.

### BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, which are included to provide a further understanding of the invention and are incorporated in and constitute a part of this specification, illustrate embodiments of the invention, and together with the description serve to explain the principles of the invention.

FIG. **1** is a block diagram illustrating a terminal apparatus to support a smart touch operation according to an exemplary embodiment of the present invention.

FIG. **2** is a diagram illustrating a smart touch operation according to an exemplary embodiment of the present invention.

FIG. **3** is a diagram illustrating a smart touch operation according to an exemplary embodiment of the present invention.

FIG. **4** is a diagram illustrating a smart touch operation according to an exemplary embodiment of the present invention.

FIG. **5** is a diagram illustrating a smart touch operation according to an exemplary embodiment of the present invention.

FIG. **6** is a diagram illustrating a smart touch operation according to an exemplary embodiment of the present invention.

FIG. **7** is a flowchart illustrating a method for supporting a smart touch operation according to an exemplary embodiment of the present invention.

### DETAILED DESCRIPTION OF THE ILLUSTRATED EMBODIMENTS

The invention is described more fully hereinafter with reference to the accompanying drawings, in which embodiments of the invention are shown. This invention may, however, be embodied in many different forms and should not be construed as limited to the embodiments set forth herein. Rather, these embodiments are provided so that this disclosure is thorough, and will fully convey the scope of the invention to those skilled in the art. It will be understood that for the purposes of this disclosure, "at least one of X, Y, and Z" can be construed as X only, Y only, Z only, or any combination of two or more items X, Y, and Z (e.g., XYZ, XZ, XYY, YZ, ZZ). Throughout the drawings and the detailed description, unless otherwise described, the same drawing reference numerals are understood to refer to the same elements, features, and structures. The relative size and depiction of these elements may be exaggerated for clarity.

It will be understood that when an element is referred to as being "connected to" another element, it can be directly connected to the other element, or intervening elements may be present.

FIG. **1** is a block diagram illustrating a terminal apparatus to support a smart touch operation according to an exemplary embodiment of the present invention.

US 9,063,654 B2

3

Referring to FIG. **1**, the terminal apparatus **100** may include an interface **101**, a processing unit **103**, and a control unit **105**.

The interface **101** may detect or recognize a region touched by a user on a screen, and may determine whether one or more selectable objects may be included in the touched region. More particularly, the interface **101** may recognize the region touched by the user or a different source, and may identify first set of objects or first objects (hereinafter, "first objects" may refer to a first set of objects or one or more objects **10** included in the first set of objects). The first object may refer to objects that are at least partially overlapped in the touched region by a touch input (e.g., a finger or input apparatus touching the touched region may overlaps one or more keys on a digital keyboard). The interface **101** may identify, among **15** a plurality of objects displayed on the screen, N number of objects having a reference percentage or higher (e.g., 15% and above) of their displayed image included in the touched region as the first objects. Here, N may be a natural number.

Although an overlap of an object is described as being **20** overlapped by a touch input, it is not limited thereto. An object may be overlapped, without limitation, by a covering, a shadow, a light signal, an object on the display screen, a stylus, or other devices that may provide a signal indicating an overlap of the object. **25**

For example, a total of 4 objects may be identified as being at least partially overlapped by a touch input in the recognized touched region, but not all 4 objects may be s considered as a first object. More specifically, if an object\_**190 1**, an object\_**190 2**, an object\_**190 3**, and an object\_**190 4**, among **30** the plurality of objects displayed on the screen, are overlapped by a touch input in percentages of 55%, 21%, 9%, and 15%, respectively, and the reference percentage is determined to be 15%, the interface **101** may identify the object\_**190 1**, the object\_**190 2**, and the object\_**190 4** having met or **35** exceeded the reference percentages of overlap as the first objects.

Here the first object is described as an object overlapped by a reference percentage or higher, however, the description of the first object is not limited thereto. The first object may be an **40** object overlapped by a percentage higher than but not equal to the reference percentage, or less than the reference percentage.

The interface **101** may determine an input direction of the touch using at least one of a form or shape of the recognized **45** touched region and a touch pressure related to the touch or touch input with respect to time. In an example, the form or shape of the recognized touched region may be determined based on continuous touch movement (e.g., a user dragging his or her finger from a lower right hand corner to a upper left **50** hand corner may provide a diagonal region or shape). For example, the interface **101** may recognize an elliptical or diagonally shaped formed region, which may begin from a lower right end point and extends to an upper left end point, as the form of the touched region. If a touch pressure is detected **55** in an upper portion of the elliptical shape at the time of detection, that is, the upper left end, the interface **101** may determine a direction from the lower right end to the upper left end to be the input direction of the touch.

The processing unit **103** may generate one or more objects **60** based on the first objects as second objects, and display the second objects (hereinafter, "second objects" may refer to a second set of objects or one or more objects included in the second set of objects). The second objects may be displayed in an untouched region of the screen. More particularly, the **65** processing unit **103** may display the second objects, which may correspond to one or more objects of the first set of

4

objects, in the untouched region of the screen. In an example, the processing unit **103** may display one or more objects in the second set of objects in a pop-up form in an untouched region so that the respective second objects may not be obscured by the touch.

The processing unit **103** may display the second objects in a portion of the untouched region that is selected according to the input direction of the touch so that the second objects may be positioned in different locations according to the recognized touch or touch direction. Accordingly, the second objects may not be obscured by a touch input, which may be provided by a finger or a stylus input pen.

For example, if the input direction of the touch is determined as a direction going from the lower right region to the upper left region, the processing unit **103** may display the second objects in other directions except for a southeast direction, which may correspond to the direction from the upper left region to the lower right region of the touched region. Accordingly, the second objects, which may be selected for execution, may be displayed with reduced risk of obstruction by the touch.

If the touched region is recognized as being in close proximity to a boundary of the screen and the input direction faces the boundary, the processing unit **103** may display the second objects in a direction that is rotated by a reference angle based on the input direction. For example, in a case where the screen is in a rectangular form, the touched region may be s recognized as being in close proximity to an upper-left portion of the screen, such as an upper-left corner portion. If the input direction faces the corner portion, the processing unit **103** may display the second objects in a direction that is rotated by a reference range of angles (e.g., 5° to 45°) based on the input direction so that the second set of objects may not be obscured by a touch input or an input apparatus touching the screen. Accordingly, the second objects may be positioned within the screen.

The processing unit **103** may display the second objects, which may be adjusted in size based on respective percentages of overlap of the first objects in the touched region. For example, if a percentage of overlap by a touch input of an object in the touched region corresponds to 50%, the processing unit **103** may determine that the object in the touched region is a first object. The processing unit **103** may further expand the size of the first object by a factor of 2 and may display the expanded first object as a second object. If the percentage of overlap of an object by a touch input in the touched region corresponds to 30%, the processing unit **103** may determine that the object is a first object, and expand the first object by a factor of 1.3 to provide a second object. In an example, the sizes of the first objects in the two described scenarios may be identical or similar. Also, if the percentage of overlap of an object by a touch input in the touched region corresponds to 50%, the processing unit **103** may generate and display a second object with a dimension of 10 millimeter (mm)×10 mm. If the percentage of overlap of an object by a touch input in the touched region corresponds to 30%, the processing unit **103** may generate and display a second object with a dimensions of 7 mm×7 mm. Further, while the second objects are described as being expanded in proportion to the percentage of overlap, the second objects are not limited thereto. The second objects may be adjusted in size to s be larger or smaller than the first object and in varying proportions.

If a first object has at least a reference percentage of overlap in the touched region, the processing unit **103** may adjust a size of the first object to be greater than its normal size as a

US 9,063,654 B2

5

second object so that the second object may be displayed to be recognized more easily or displayed with reduced risk of obstruction, if any.

The processing unit **103** may display second objects, which may include expanded textual information included in the first objects, or may display second objects as processed information associated with the first objects.

For example, the processing unit **103** may display a second object as textual information, which may be expanded from the information included in the first object. The second object may expand a part of article information included in the first object, which may be an article object (e.g., letters "ion" in the word "communication") that is overlapped in a touched region by a touch input. Article objects may be displayed on a screen providing a webpage, documents, images, and the like. The processing unit **103** may parse letter information found on a webpage positioned in the touched region recognized by the interface **101**. Further, if the article object is associated with a hyperlink to a webpage or another source, the processing unit **103** may identify the letter information as an article object.

The processing unit **103** may display a first object as small dots indicating a subway station, and a corresponding second object including station information on a subway route map. The second object may also include a menu to set or view departure station or arrival station information with respect to a corresponding station. More specifically, the second object may include processed information associated with a station object that may be overlapped by a touch input in a touched region.

The control unit **105** may execute an operation corresponding to the second object if the second object is selected. The operation of the second object may include, without limitation, inputting of information corresponding to the second object (e.g., key letters, numbers, symbols, images, and the like), activating a hyperlink, activating an application associated with the second object, downloading a corresponding file, and the like. For example, in a case where the second object corresponds to a keypad letter object, the control unit **105** may input a keypad letter into an input window if the second object corresponding to the keypad letter is selected. In a case where the second object corresponds to an article information object, the control unit **105** may provide the selected article information via a new webpage if the corresponding second object is selected.

The control unit **105** may control the interface **101** to restrict a selection of a first object while a second object is being displayed.

Also, if a second object is not selected within a reference time period after the second object is displayed, the control unit **105** may remove the display of the second object and may return to an idle state for a selection or touch of a first object.

FIG. **2** is a diagram illustrating a smart touch operation according to an exemplary embodiment of the present invention.

Referring to FIG. **2**, the terminal apparatus may recognize a touched region if a screen is touched, and may determine an input direction of the touch using at least one of a form or shape of the recognized touched region and a touch pressure associated with the touch.

In an example, the terminal apparatus may recognize an elliptical touched region **201**. Although not illustrated, the elliptical touch region **201** may be oriented from a lower right region to an upper left region with respect to time, and may determine an input direction **205** based on this movement. Further, the input direction **205** may be determined to be in a direction from the lower right region to the upper left

6

region if a touch pressure **203** is detected in an upper portion of the ellipse, that is, the upper left region. In this instance, the terminal apparatus may recognize the direction of the touch based on strength or intensity of the touch pressure **203** with respect to time.

For example, if touch pressure is higher at bottom right hand corner of the touch region initially, and the touch pressure is dragged to the upper left hand corner with respect to time, it may be determined that the input direction **205** is in the direction corresponding to the dragged touch motion. Accordingly, since touch pressure may be higher at the subsequent touch point in comparison to the previously touched point, an input direction of the touch may be detected based on change in touch pressure with respect to time or continuous touch movement to determine the input direction of the touch.

If the direction from the lower right region to the upper left region is determined to be the input direction **205** of the touch, the terminal apparatus may display second objects **207-1**, **207-2**, and **207-3** in directions except for a southeast direction, which may coincide with the touched region. Accordingly, the respective second objects may not be displayed in the direction from the lower right region to the upper left region based on the touched region **201** so that the second objects **207-1**, **207-2**, and **207-3** may not be obscured by a touch input or an input apparatus **209**. The input apparatus **209** may be positioned in the southeast direction and may be touching the screen. In an example, the input apparatus may include, without limitation, a finger, s a stylus, a touch input pen, or other similar apparatus to provide input.

Referring again to FIG. **2**, the terminal apparatus may recognize an elliptical touched region **211**. Although not illustrated, the elliptical touch region **211** may be oriented from a lower left region to an upper right region with respect to time, and may determine an input direction **215** based on this movement. Further, the terminal apparatus may determine an input direction **215** to be from the lower left region to the upper right region if a touch pressure **213** is detected in an upper portion of the ellipse, that is, the upper right region.

If the direction from the lower left region to the upper right region is determined to be the input direction **215** of the touch, the terminal apparatus may display second objects **217-1**, **217-2**, and **217-3** in directions except for a southwest direction, which may coincide with the touched region. Accordingly, the respective second objects may not be displayed in the direction from the lower left region to the upper right region so that the second objects **217-1**, **217-2**, and **217-3** may not be obscured by a touch input or an input apparatus **219**. The input apparatus **219** may be positioned in the southwest direction and may be touching the screen. In an example, the input apparatus may include, without limitation, a finger, a stylus, a touch input pen, or other similar apparatus to provide input.

FIG. **3** is a diagram illustrating a smart touch operation according to an exemplary embodiment of the present invention.

Referring to FIG. **3**, if a touched region is recognized as being in close proximity to a boundary of a screen and an input direction of a touch faces the boundary or moves towards the boundary, the terminal apparatus may display second objects in a direction that may be rotated by a reference angle from the input direction.

Referring to FIG. **3**, a touched region may be recognized as being in close proximity to an upper-left portion of the screen, such as a corner portion **301**, which is a boundary of the screen. If an input direction **303** faces the corner portion **301**, the terminal apparatus may display second objects **305-1** and **305-2** in a direction that is rotated by a reference range of

US 9,063,654 B2

7 8

angles (e.g., 10° or 20°) based on the input direction **303** so that the second objects **305-1** and **305-2** may not be obscured by a touched path, which is illustrated in an elliptical shape enclosing the input direction **303**. Accordingly, the second objects may be positioned within the screen.

FIG. **4** is a diagram illustrating a smart touch operation according to an exemplary embodiment of the present invention.

Referring to FIG. **4**, the terminal apparatus may recognize a touched region if a screen is touched, and may identify one or more objects that are at least partially overlapped by a touch input in the recognized touched region as first objects. The terminal apparatus may display second objects corresponding to the first objects in an untouched region of the screen.

Referring to FIG. **4**, the terminal apparatus may recognize a touched region **401** if a screen providing a digital keypad is touched, and may identify objects that are at least partially overlapped by a touch input in the recognized touched region **401**. As shown in FIG. **4**, a 'g' object **403**, an 'h' object **405**, a 'v' object **407**, and a 'b' object **409** may be identified as being overlapped by the touch input. The terminal apparatus may determine, which among the objects that are overlapped in the touched region **401** are determined to be first objects based on a percentage of overlap.

The 'g' object **403**, the 'h' object **405**, the 'v' object **407**, and the 'b' object **409** are a shown to have overlap percentages of 55%, 21%, 9%, and 15%, respectively. If the reference percentage is 10%, the 'g' object **403**, the 'h' object **405**, and the object 'b' **409** having higher percentages of overlap than the reference overlap in the touched region **401**, may be determined to be first objects. The terminal apparatus may display second objects corresponding to the first objects, that is, the 'g' object **403**, the 'h' object **405**, and the object 'b' **409** in an untouched region of the screen.

The terminal apparatus may reduce an error in selecting the second objects by displaying the second objects by adjusting, for example, sizes of the second objects based on the percentages of overlap of the objects in the touched region **401**. For example, the terminal apparatus may adjust the size of a second object corresponding to the 'g' object **403** and the 'h' object **405** based on the percentages of overlap, which may be 55% and 21%, respectively.

Since the overlap of the 'g' object **403** is greater than the overlap of the 'h' object **405**, the size of the second object corresponding to the 'g' object **403** may be enlarged in greater proportion than the second object corresponding to the 'h' object **405**.

FIG. **5** is a diagram illustrating a smart touch operation according to an exemplary embodiment of the present invention.

Referring to FIG. **5**, the terminal apparatus may recognize a touched region if a screen is touched, and may identify objects that are overlapped by the touch input by at least a reference percentage as the recognized touched region. The terminal apparatus may display second objects corresponding to the first objects in an untouched region of the screen. The terminal apparatus may display the second objects as processed information associated with the first objects.

Referring to FIG. **5**, the terminal apparatus may recognize a touched region **501** if a screen providing a subway route map is touched, and may identify objects that are overlapped by the touch input by at least a reference percentage as first objects. In the recognized touched region **501**, an object **503**, an object **505**, and an object **507** may be determined to be first objects. The first object **503** may correspond to a second object 'Naebang' **509**, the first object **505** may correspond to

a second object 'Bangbae' **511**, and the first object **507** may correspond to a second object 'Seocho' **513**.

The terminal apparatus may display second objects 'Naebang' **509**, 'Bangbae' **511**, and 'Seocho' **513**, which may include station information and control setting menu to set a departure station with respect to the second objects. A control setting service, such as a service for setting a corresponding station or object as a departure station, or an informational service for providing information about the corresponding station or object, may be provided.

FIG. **6** is a diagram illustrating a smart touch operation according to an exemplary embodiment of the present invention.

Referring to FIG. **6**, the terminal apparatus may recognize a touched region if a screen is touched, and may identify objects that are overlapped by the touch input by at least a reference percentage as first objects in the recognized touched region. The terminal apparatus may display second objects corresponding to the first objects in an untouched region of the screen. The terminal apparatus may display information related to the first objects, such as textual information, as second objects.

Referring to FIG. **6**, the terminal apparatus may recognize a touched region **601** if a screen providing a webpage or a document is touched. The terminal apparatus may identify objects that are overlapped by at least a reference percentage in the recognized touched region **601** as first objects. Here, an object **603** and an object **605** may be determined to be first objects. Second object **607** and second object **609** may correspond to the first object **603** and the first object **605**, respectively.

The terminal apparatus may display the second object **607** and the second object **609** by expanding a part of first object information to include information related to the first object. As shown in FIG. **6**, the first object **603** may include characters "cers" and the corresponding second object **607** may expand on the first object **603** to include the entire word and related words to include "Senior officers". Similarly, the first object **609** may include characters "tion" and the corresponding second object **609** may expand on the second object **605** to include the entire word of "Communication". Accordingly, the second object **607** may include related information of the first object **603** and the second object **609** may include related information of the second object **605** so that the second objects may be viewed and selected more easily.

FIG. **7** is a flowchart illustrating a method for supporting a smart touch operation according to an exemplary embodiment of the present invention.

The method of FIG. **7** below is described as if the method is performed by a terminal apparatus, but is not limited as such.

Referring to FIG. **7**, in operation **701**, the terminal apparatus may recognize a region touched by a user on a screen, and may identify an object in the touched region. More particularly, the terminal apparatus may recognize the region touched by the user, and may identify one or more objects that may be overlapped by the touch input by at least a reference percentage in the recognized touched region. The terminal may identify, among a plurality of objects constituting the screen, N number of objects that may have at least a reference percentage of overlap in the touched region as first objects. Here, N may be a natural number.

In operation **703**, the terminal apparatus may determine whether the number of first objects is plural.

In operation **705**, the terminal apparatus may display first objects as individual objects in an untouched region of the screen as second objects if the number of first objects is

**9**

determined to be plural. That is, if the number of first objects is determined to be plural, the terminal apparatus may generate and display second objects corresponding to the first objects in the untouched region of the screen.

Further, the terminal apparatus may determine an input direction of the touch using at least one of a form or shape of the touched region and a touch pressure associated with the touch. The terminal apparatus may then display the second objects in view or vicinity of the determined input direction so that the second objects may not be obscured by a touch input or an input apparatus touching the screen. In an example, the input apparatus may include, without limitation, a finger, a stylus, a touch input pen, or other similar apparatus to provide input.

If a direction starting from a lower right region to an upper left region is determined to be the input direction of the touch, the terminal apparatus may display the second objects in various directions except for a southeast direction corresponding to the input direction. Accordingly, the second objects may be more easily recognized.

If the touched region is recognized as being in close proximity to a boundary of the screen and the input direction faces the boundary, the terminal apparatus may display the second objects in a direction that is rotated by a reference angle based on the input direction. For example, in a case where the screen is in a rectangular form, the touched region may be recognized as being in close proximity to an upper-left portion of the screen or an upper-left corner portion, and the input direction faces the corner portion, the terminal apparatus may display the second objects in a direction that is rotated by a reference range of angles (e.g., 5° to 45°) based on the input direction so that the second objects may not be obscured by the touch input or input apparatus touching the screen. Accordingly, the second objects may be positioned within the screen.

The terminal apparatus may display the second objects, which may be adjusted in size based on respective percentages of overlap of the first objects in the touched region. If a first object has a reference percentage of overlap (e.g., 50%) in the touched region, the terminal apparatus may adjust a size of the first object to be in a corresponding manner (e.g., 150% increase in size), and may display the first object of which the size is adjusted as a second object. Accordingly, the second object may be displayed with limited obstruction.

The terminal apparatus may display second objects, which may expand textual information included in the first objects, or may display second objects as processed information associated with the first objects.

For example, the terminal apparatus may display a second object as textual information, which may be expanded from the information included in the first object. The second object may expand a part of article information included in the first object, which may be an article object (e.g., letters "ion" in the word "communication") that is overlapped in a touched region by a touch point. Article objects may be displayed on a screen providing a web page, documents, images, and the like. The terminal apparatus may parse letter information found on a webpage positioned in the touched region. Further, if the article object is associated with a hyperlink to a webpage or another source, the terminal apparatus may identify the letter information as an article object.

Also, the terminal apparatus may display a first object as small dots indicating a subway station, and a corresponding second object including station information on a subway route map. Further, the second object may be displayed as a menu, which may set or view departure station or arrival station information with respect to a corresponding station.

**10**

More specifically, the second object may include processed information associated with a station object that may be overlapped by a touch input in a touched region.

In operation **707**, the terminal apparatus may execute a second object if the second object is selected. That is, the terminal apparatus may support an operation of the selected second object. The operation of the second object may include, without limitation, inputting of information corresponding to the second object (e.g., key letters, numbers, symbols, images, and the like), activating a hyperlink, activating an application associated with the second object, downloading a corresponding file, and the like. For example, in a case where the second object corresponds to keypad letter object, the terminal apparatus may input a keypad letter into an input window if the second object corresponding to the keypad letter is selected. In a case where the second objects correspond to article information objects, the terminal apparatus may provide selected article information via a new webpage if the corresponding second object is selected. Further, although not shown, if a second object is not selected, the terminal apparatus may execute a second object having a greatest percentage of overlap with the touch input, or may s execute a second object that most closely corresponds to other user inputs. For example, if a user is typing a message and types a "q" and then applies a touch input where a "u", and "w", and an "a" are listed as second objects, the terminal apparatus may execute the second object corresponding to the letter "u" even if the "u" as a second object is not selected.

In operation **709**, if the number of first objects is determined not to be plural, that is, singular in number, the terminal apparatus may execute the single first object without displaying a second object and without waiting for a second object to be selected. An operation corresponding to the selected first object may be executed. The operation of the first object may include, without limitation, inputting of information corresponding to the first object (e.g., key letters, numbers, symbols, images, and the like), activating a hyperlink, activating an application associated with the second object, downloading a corresponding file, and the like.

According to exemplary embodiments of the invention, an object to be executed may be selected by identifying first objects that are overlapped by a touch input by at least a reference percentage in a touched region. In addition, second objects corresponding to the first objects may be displayed on an untouched region of the screen for selection.

According to exemplary embodiments of the invention, second objects corresponding to first objects may be displayed in view of an input direction of a touch input so that the second objects may not be obscured by the touch.

The exemplary embodiments of the invention may be recorded on computer-readable medium including program instructions to implement various operations embodied by a computer. The computer-readable medium may also include, alone or in combination of program instructions, data files, data structures, and the like. The computer-readable medium may be those specially designed and constructed for the purposes of the invention, or they may be of the kind well-known and available to those having skill in the computer software arts. Examples of computer-readable media include magnetic media such as hard disks, floppy disks, and magnetic tape; optical media, such as compact disc (CD) read-only memories (ROM) discs and digital versatile disc (DVD); magneto-optical media, such as floptical discs; and hardware devices that are specially configured to store and perform program instructions, such as ROM, random access memory (RAM), flash memory, and the like. Examples of program instructions include both machine codes, such as produced by a compiler,

US 9,063,654 B2

**11**

and files containing higher level code that may be executed by the computer using an interpreter. The described hardware devices may be configured to act as one or more software modules in order to perform the operations of the above-described embodiments of the present invention.

It will be apparent to those skilled in the art that various modifications and variation can be made in the present invention without departing from the spirit or scope of the invention. Thus, it is intended that the present invention cover the modifications and variations of this invention provided they come within the scope of the appended claims and their equivalents.

What is claimed is:

**1**. A terminal apparatus, comprising:

an interface to detect a touch input, to detect a touch region corresponding to the touch input, and to identify an object that is overlapped by the touch input in the touch region as a first object;

a processing unit to generate a second object based on the first object, and to display the second object in an untouched region; and

a control unit to execute an operation corresponding to the second object if the second object is selected,

wherein the control unit removes the display of the second object if the second object is not selected within a reference period of time.

**2**. The terminal apparatus of claim **1**, wherein the interface further determines a direction of the touch input.

**3**. The terminal apparatus of claim **2**, wherein the interface determines the direction of the touch input using at least one of a form of the touched region and a pressure of the touch input with respect to time.

**4**. The terminal apparatus of claim **3**, wherein the form of the touched region is determined based on a dragging movement of the touch input.

**5**. The terminal apparatus of claim **2**, wherein the processing unit displays the second object in a direction rotated by a reference angle relative to the direction of the touch input, the reference angle being based on at least one of the direction of the touch input and a location of the touch region.

**6**. The terminal apparatus of claim **1**, wherein the second object is displayed in a pop-up form.

**7**. The terminal apparatus of claim **1**, wherein the second object is adjusted in size relative to the first object based on a percentage of overlap of the first object by the touch input.

**8**. The terminal apparatus of claim **1**, wherein the second object comprises information associated with the first object.

**9**. The terminal apparatus of claim **1**, wherein the operation of the second object comprises at least one of inputting of information corresponding to the second object, activating a hyperlink, activating an application associated with the second object, and downloading a corresponding file.

**10**. The terminal apparatus of claim **1**, wherein the control unit controls the interface to restrict a selection of the first object while the second object is selected.

**12**

**11**. The terminal apparatus of claim **1**, wherein the interface identifies an object that is overlapped by the touch input by at least a reference percentage of the touch region as the first object.

**12**. A method for executing an operation according to a touch input, comprising:

detecting a touch input and a corresponding touch region on a display of a terminal;

identifying an object overlapped in the touch region as a first object;

generating a second object based on the first object;

displaying the second object in an untouched region;

executing an operation corresponding to the second object if the second object is selected; and

removing the display of the second object if the second object is not selected within a reference period of time.

**13**. The method of claim **12**, further comprising determining a direction of the touch input.

**14**. The method of claim **13**, wherein the direction of the touch input is determined using at least one of a form of the touched region and a pressure of the touch input with respect to time.

**15**. The method of claim **14**, wherein the form of the touched region is determined based on a dragging movement of the touch input.

**16**. The method of claim **13**, wherein the second object is displayed in a direction rotated by a reference angle relative to the direct of the touch input, the reference angle being based on at least one of the direction of the touch input and a location of the touch region.

**17**. The method of claim **12**, wherein the second object is adjusted in size relative to the first object based on a percentage of overlap of the first object by the touch input.

**18**. The method of claim **12**, wherein the second object comprises information associated with the first object.

**19**. A method for executing an operation according to a touch input, comprising:

detecting a touch input and a corresponding touch region on a display of a terminal;

identifying an object overlapped in the touch region as a first object;

determining a direction of the touch input;

generating a second object based on the first object;

displaying the second object in an untouched region based on the direction of the touch input;

executing an operation corresponding to the second object if the second object is selected for execution; and

removing the display of the second object if the second object is not selected within a reference period of time,

wherein the second object comprises information associated with the first object.

\* \* \* \* \*